**E-FILED**
Tuesday, 02 November, 2004  08:59:24 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
DANVILLE/URBANA DIVISION

UNITED STATES OF AMERICA,

v.                                                      Case No.   CR 04-20031

DENNY R. PATRIDGE

**MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS COUNTS ONE THROUGH
SEVEN FOR PERJURY AND PROSECUTORIAL MISCONDUCT
BEFORE GRAND JURY**

Denny Patridge by and through his attorney, Jerold W. Barringer, files this

Memorandum in Support of his Motion to Dismiss Counts One through Seven of

the September 1, 2004 Grand Jury "Superceding" Indictment on the basis that it

was obtained by prosecutorial misconduct in the proceedings before the Grand

Jury of deliberate and intentional presentation of perjured testimony, false

testimony, and misleading testimony, resulted in an indictment in violation of

Defendant's Fifth Amendment Right to be indicted by a Grand Jury as to each

element of the alleged crime (finding probable cause) and in violation of the due

process safe- guards the Fifth Amendment mandates.

1

Alternatively, Defendant requests this Court to exercise its supervisory power and dismiss the Grand Jury Superceding Indictment on grounds of prosecutorial misconduct regarding deliberate presentation of perjured testimony, false testimony, and misleading testimony.

I.     QUESTIONS PRESENTED

    A.     DID AGENT COLEMAN INTENTIONALLY COMMIT PERJURY WHILE TESTIFYING TO THE GRAND JURY REGARDING THE REASON WHY THE IRS ISSUED THE NOTICES' OF DEFICIENCY TO BOTH THE DEFENDANT AND TO PATRIDGE ASSET MANAGEMENT TRUST?

    B.     DID AGENT COLEMAN PARTICIPATE IN Hilary FROOMAN'S PROSECUTORIAL MISCONDUCT?

    C.     DID FORMER IRS AGENT LARRY PHILLIPS, THEN EMPLOYED BY JK HARRIS, CO., INTENTIONALLY COMMIT PERJURY WHILE TESTIFYING TO THE GRAND JURY REGARDING HIS RELATIONSHIP WITH THE DEFENDANT AND THE DEFENDANT'S COOPERATION WITH PROVIDING THE NECESSARY DOCUMENTS TO JUSTIFY NUMBERS FOR TAX PREPARATION PURPOSES?

    D.     DID FORMER AGENT LARRY PHILLIPS PARTICIPATE IN HILARY FROOMAN'S PROSECUTORIAL MISCONDUCT?

    E.     WAS AGENT COLEMAN AWARE THAT THE DEFENDANT HAD EXERCISED HIS RIGHT TO A COLLECTION DUE PROCESS HEARING UNDER SECTION 6330 AND THAT THIS EXERCISE WAS PROVIDED BY A SPECIFIC PROVISION OF THE INTERNAL REVENUE CODE?

     F.     DID AGENT COLEMAN TESTIFY THAT HE BELIEVED THE JANUARY 27, 2000 NOTICE OF DEFICIENCIES WERE NOT ACCURATE ACCORDING TO THE INTERNAL REVENUE CODE?

     G.     DID HILARY FROOMAN, BY SYNCHRONIZING AND INSTIGATING THE FALSE TESTIMONY OF BOTH LARRY PHILLIPS AND AGENT COLEMAN, COMMIT THE ACT OF "INTENTIONAL PROSECUTORIAL MISCONDUCT?"

     F.     SHOULD THE INDICTMENT BE DISMISSED BECAUSE IT IS IN LARGE PART BASED UPON THE INTENTIONAL FALSE TESTIMONY OF BOTH LARRY PHILLIPS AND AGENT COLEMAN?

## II.    BACKGROUND

The defendant has been connected to the insurance and securities field for years.   Because "annuities" are a mixed issue between insurance and securities, defendant was licensed to sell and broker both products through the State of Illinois.

Sometime prior to January 1, 1996, the defendant became involved as a consumer in a business relationship with Aegis, a Trust Company out of Chicago, Illinois.  Sometime prior to March 1, 2000, the IRS began a criminal investigation regarding all customers of Aegis.

Sometime thereafter, the criminal division of the IRS in either the Northern and/or Central District of Illinois became aware that Denny R. Patridge was a

person of interest with regard to his relationship with Aegis as a customer.

On or about April 15, 1997, 1998 and 1999, Denny R. Patridge ("defendant") timely filed through professional tax preparers, several different information request forms with the IRS according to the laws governing the entities therein mentioned for the years in question. These forms included 1040 forms, 1120 forms and 1041 forms all regarding income and the tax imposed on those entities regarding said income.

On or about January 27, 2000, two Notices of Deficiencies were issued pursuant purportedly to 26 U.S.C. § 6213 which took issue with the above mentioned tax returns and directed that both Patridge Asset Management Trust and Denny and Judy Patridge personally had "proposed" deficiencies in income based upon "changes" made by a person by the name of "V. Boyd" otherwise "VB." This document purported to claim that the defendant had 90 days from January 27, 2000 or until May 11, 2000 ("105 days") to file any disagreements he had with the proposal to and in the United States Tax Court.

On or about April 20, 2000, the defendant hired a firm out of South Carolina named the JK Harris Company to act as a representative between the Defendant and the person named "V.Boyd" from the IRS relating to the January 27, 2000 Notices of Deficiencies. On July 17, 2000, defendant's representative, former

4

IRS Agent Larry Phillips, an employee of JK Harris Company wrote the defendant a letter regarding the agreement between "Craig, manager at the IRS, Champaign Office" to allow an "audit reconsideration for years 1996, 1997, forms 1040 and 1041 for" the defendant and Patridge Asset Management Trust.

On July 31, 2000 and August 7, 2000, the IRS filed "assessments" against both the defendant and Patridge Asset Management Trust regarding the "amounts" purported in the January 27, 2000 Notices of Deficiencies naming both the defendant and Patridge Asset Management Trust.

On August 22, 2000, the defendant, through his representative from JK Harris, former IRS agent Larry Phillips ("defendant's representative"), contacted the "Taxpayer's Advocate Office" providing "data necessary to follow up on the request for audit reconsideration."

On or about August 22, 2000  defendant's representative contacted the "group manager at the Champaign office of the IRS" where that IRS employee informed the defendant's representative that by the end of "this week" an "answer" would be given as to whether the IRS would authorize an "audit reconsideration." The defendant's representative also on this same date stated that he wondered "if he will act timely.   The Taxpayer's Advocate will get some results..."

On September 4, 2000, the IRS alleges someone  sent a notice of "intent to

levy" to Patridge Asset Management Trust.

On September 8, 2000, the defendant's representative stated that "we feel the corrected tax returns for the years 1996 and 1997 could be prepared at our corporate office....than doing them by hand in Illinois."  Defendant's representative also stated on this date that "since we have already assembled all the numbers for those years..." and "I will make copies of the contents and return the originals to you."   Defendant's representative likewise stated that "the sooner we proceed in this direction, the sooner we will get collection out of the loop." And "once we file the 'changed returns' they will be processed and the changed assessments will be due.  Finally, the defendant's representative stated to the defendant that "a payment plan coupled with an offer and compromise can be entertained......all this will allow additional time for you to get your finances in order."

On October 4, 2000, the IRS alleges the Defendant placed a lien on his home for purpose of preventing the IRS from "enforced collection" of the January 27, 2000  Notice of Deficiency amounts.  On October 16, 2000, the IRS alleges someone sent a "notice of intent to levy" to the Defendant called a "CP 504."

On October 19, 2000, IRS Agent Michael T. Helfer, out of the "Champaign" "Compliance Area 7" wrote a letter to the defendant regarding "examination of the

1998 return for Patridge Insurance Services, Inc."   This letter also acknowledges that "Larry Phillips" is "power of attorney."

On October 19, 2000, IRS Agent Michael T. Helfer, out of the "Champaign" "Compliance Area 7" in the same letter referenced above, writes the defendant regarding "examination of your 1998 Individual Income Tax Return" and the "1999 return" and directs the defendant that his "1999 return" was due on October 16, 2000, and would now be delinquent." This letter also directs that the IRS is well aware in the "Champaign" office that Larry Phillips is the authorized Power of Attorney for the defendant.

On October 31, 2000, Attorney Eduardo M. Rivera, sent a letter to the IRS in response to the October 16, 2000 "CP 504."   On November 23, 2000, the IRS sent a "Final Notice - Notice of Intent to Levy and Notice of Your Right to a Hearing Please Respond Immediately" to the defendant.  This "notice" also contained the statements "we may file a Notice of Federal Tax Lien at any time to protect the government's interest."  It also states that "if you do not pay this amount,....or request Appeals consideration within 30 days from the date of this letter, we may take your property..."  And "please send us full payment today for the amount you owe on the back of this letter."

On November 28, 2000, the defendant exercised his rights under 26 U.S.C.

7

§ 6330 and asked for a collection due process hearing prior to being required to "pay this amount."

On December 6, 2000, the IRS exercised its right to file a "Notice of Federal Tax Lien" to secure the "government's interest" pending the outcome of the Collection Due Process Hearing.

On December 28, 2000, IRS Accounts Management Branch Supervisor "Robert A. Banks" wrote a response letter to the defendant's October 31, 2000 letter addressing the CP 504 dated October 16, 2000.   In this letter, Mr. Banks states to the defendant that "we have not resolved this matter" and "you do not need to do anything further now on this matter" and identifying the matter as "tax periods" Dec. 31, 1996 and December 31, 1997.

On February 28, 2001, an IRS employee with the ID number of 09-15809 wrote a letter to the defendant stating that he would be contacted in "60 days" by the "Appeals Analyst" regarding his "Collection Due Process Hearing.  On May 4, 2001, the defendant received a letter from the "IRS Appeals Officer" informing the defendant of the officer's assignment.

On April 18, 2002, IRS-CID Agent Bernie Coleman interfered with the rights of the defendant for a "Collection Due Process Hearing" and directed that David P. Schermann ("CDP officer") "suspend" the section 6330 hearing

defendant had request back on November 28, 2000.  Agent Coleman told the

CDP officer that this request was originating from the "U.S. Attorney."

On January 6, 2004, the CDP officer demanded an immediate "hearing" on

the November 28, 2000 CDP request by defendant.   CDP officer gave defendant's

counsel "10 days."

On February 10, 2004, the CDP officer issued a letter to counsel for the

defendant, Brent Winters, directing that "I discussed your reasons for continuing

to postpone the CDP hearing with IRS Special Agent Bernie Coleman...It was

concluded that in the best interest of all parties, the CDP hearing will remain 'on

hold' pending the resolution of the criminal case."

## III.    ARGUMENT

### A.    Agent Coleman intentionally lied to the Grand Jury regarding the reason why the IRS issued the Notice of Deficiencies to both the defendant and Patridge Asset Management Trust.

The elements of tax evasion are "willfulness, a substantial tax deficiency,

and one affirmative act constituting evasion."

On June 2, 2004, Hilary Frooman, Assistant U.S. Attorney for the Central

District of Illinois conducted an interrogation of Criminal Investigator Bernie

Coleman regarding the tax liabilities and other matters involving the defendant

and Patridge Asset Management Trust for tax years 1996 and 1997 before the

Grand Jury.

Agent Coleman lied about when the IRS became aware of the defendant's usage of the Aegis Financial Plan.

First, Agent Coleman ("IRS") in answering a question from Assistant U.S. Attorney Hilary Frooman ("government") about "at some point the IRS catches on or else he catches the attention of the IRS. I don't know which is the better way to explain it...." and the IRS answers "yes." The IRS knew full well what caught the attention of the IRS and it had nothing to do with any "audit" on 1996 and 1997. *Page 15,   line 26, Page 16 through line 4, June 2, 04 Trans* It was the investigation of Aegis which was eventually marked by the Affidavit for Search Warrant by Bernie Coleman in March of 2000.

Agent Coleman lied to the Grand Jury about why Agent Boyd issued the Notice of Deficiency because Agent Coleman never spoke to Agent Boyd.

IRS testifies to the Grand Jury saying "So the revenue agent disallows the expenses and picks up the income and writes a report for the assessment of the taxes because he would not cooperate and provide any documentation during the audit." *Page 16, line 19, June 2,04 Trans*

Agent Coleman never spoke to Agent Boyd and Agent Coleman and Hilary Frooman knew this at the time these lies were injected into the minds of the Grand

Jury.

    Agent Coleman told the Grand Jury that Larry Phillips told the defendant "these trusts did not work" which was a statement Larry Phillips never made to Agent Coleman and former Agent Larry Phillips never said these words.

    IRS testifies in answering a question about Larry Phillips' opinion regarding what he told the defendant about the type of trusts the defendant was using and the Agent said before the Grand Jury that Larry Phillips told the defendant that "these trusts did not work." *Page 18, line 3-4, June 2,04 Trnas.*

    Agent Coleman lied to the Grand Jury when he told them Larry Phillips said the documents which were to redetermine the tax liability for 1996 and 1997 did "not come freely."

    When asked did Larry Phillips have "difficulty obtaining all the documents he really needed to see to understand the Patridge's finances" the IRS answered "Yes he did, he told us that the documents did not come freely..." *Page 18, lin 12-18, June 2,04 Trans*

    Agent Coleman lied to the Grand Jury when he knew that the list of accounts that were closed as listed in Counts Two and Four were held in the name of Patridge Asset Management Trust and not the defendant personally.

    Agent Coleman testified to the Grand Jury that Mr. Patridge "liquidates a stock account he has with Raymond James..." *Page 21, line 5 -16, June 2, 04 Trans*

11

Agent Coleman lied to the Grand Jury and told them that around July 13, 2000, was when the defendant was given his final notice of intent to levy and right to collection due process hearing when it was actually dated November 23, 2000.

The Government asks the IRS "And this is just about the time he is receiving the final – the notices from the Internal Revenue Service very late July and First week in August" to which Agent Coleman answered "Yes, it is."

Hilary Frooman knew that the Defendant was a target in an on going criminal investigation prior to January 27, 2000.   She also knew those "notices" were not "final."

Agent Coleman ,who testified against the Defendant on June 2, 2004, the day of the indictment, as a summary witness, also was the CID agent who swore out an affidavit for the search warrant of the affiliated Aegis Company targets back in March 2000.

Hilary Frooman knew the Notice of Deficiencies dated January 27, 2000 were defective in many ways and could not be relied upon to establish the tax liability of the Defendant.

She knew they did not explain the reason for the issuance of the Statutory Notices under 26 U.S.C. § 6213(a).

12

She knew they contained no explanation for the 20% penalty.

She knew they did not contain the "last day for filing" as the amendments to section 6213 mandate.

She knew the Defendant hired JK Harris, and Larry Phillips to address the January 27, 2000 deficient Notice of Deficiencies.

She knew that Larry Phillips was still working on years 1996 and 1997 well into October of 2000.

She knew the Defendant did not owe$ 200k plus which was the amount and relevance of the wires at issue in Counts Two, Four, Five, Six and Seven,

She knew the Notice of Deficiencies were over inflated by some $ 200k.

She knew the Defendant had enough cash reserves to pay any amount of money he actually could have owed, setting aside the previous strategies the Defendant acquired through the Aegis Company, and treating the Defendant as if he and not the corporation or trust earned any income.

She knew the notice sent to the Defendant on September 4, 2000, referred to as a CP-504 is not a "final notice" as she states before the Grand Jury on June 4, 2003 and again on June 2, 2004, and to which is reiterated in the indictment at Count Two, paragraph 9. She knew the Defendant had a right to a "final notice" and right to notification of right to collection due process hearing.

13

She knew that notice was not given to the Defendant until November 23, 2000.  She knew by the time of the "final notice" the IRS had decided not to allow "audit reconsideration" to the Defendant for years 1996 and 1997.

She knew that this November 23, 2000 "final notice" still afforded the Defendant the right to challenge the underlying claim of liability, when all else failed,  prior to the Defendant having to "pay" or "owe" the January 27, 2000 amounts which she now admits the Defendant did not owe.

She knew the Defendant was making every effort to have his representative from JK Harris figure out what ever the IRS wanted.

She knew on June 2, 2003 when she issued the subpoena to Larry Phillips that she did not wish for Mr. Phillips to turn over those subpoenaed records until after she had a chance to look at them.

She knew that having a fact witness turn over records to her was improper since she was the Government attorney prosecuting the case yet her June 2, 2003 subpoena to Larry Phillips offers this option.

She knew by September 1, 2004, the Grand Jury to whom issued a superceding indictment against the Defendant, was not aware of the "more than $ 30,000.00" they added in the "special finding" section in the back of the superceding indictment.

14

She knew no testimony was presented to support these numbers.

She knew that no person testified that the reason for the Defendant exercising his right to a CDP hearing was so that he could "delay and prevent enforced collection action, to gain time to spend the money....and to delay and prevent the IRS from discovery that the mortgage filed on October 4, 2000,...., was in fact controlled by him...."

Hilary Frooman even had Agent Coleman falsely claim that the Paris Bank Defendant used was further away from his home than the Bank in Clay City, using significantly further away to describe motive, while knowing full well that the Paris Bank was a few miles closer to the Defendant than the Bank in Clay City.

Each of these false and misleading acts directly affect the rights of the Defendant regarding his right to have any possible Grand Jury indictment contain a finding of probable cause as to each element of the alleged crime.   There is no question that the Tax Evasion charge in Count Two clearly relies heavily on the Defendant's willful acts, that he owed a substantial tax deficiency that was *due*, and that he committed at least one affirmative act constituting evasion.

B.    DID AGENT COLEMAN PARTICIPATE IN Hilary FROOMAN'S PROSECUTORIAL MISCONDUCT?

How else could the numerous factual errors have been presented?   They

15

simply could not have been done without the assistance of Agent Coleman.

      C.     DID FORMER IRS AGENT LARRY PHILLIPS, THEN
EMPLOYED BY JK HARRIS, CO., INTENTIONALLY COMMIT
PERJURY WHILE TESTIFYING TO THE GRAND JURY
REGARDING HIS RELATIONSHIP WITH THE DEFENDANT
AND THE DEFENDANT'S COOPERATION WITH PROVIDING
THE NECESSARY DOCUMENTS TO JUSTIFY NUMBERS FOR
TAX PREPARATION PURPOSES?

Larry Phillips was the professional JK Harris appointed to the Defendant's
case when Defendant hired the JK Harris Company to handle and satisfy the IRS
involving the matters of the Defendant.

Larry Phillips was well aware that long after July 20, 2000, he remained the
representative Power of Attorney for the Defendant and that long after July 30,
2000, the IRS was still considering the tax liability of the Defendant.

Larry Phillips continued to write letters to the Defendant informing him of
the current state of his "audit" well into September, 2000.

Larry Phillips knew that he had participated in a taped conversation with the
Defendant and Defendant's then attorney Brent Winters.  He was made aware of
the transcript prior to his testifying before the Federal Grand Jury.

During the time Phillips testified before the Grand Jury he was asked to read
certain parts and comment on what the transcript said regarding what he had told

or directed the Defendant to do with certain documents which purported to establish the existence of certain entities.  At no time is it alleged that any records of transactions the entity participated in were ever sent or directed to be sent to any place whatsoever.

What Mr. Phillips read and what he omitted clearly was an attempt by him and Hilary Frooman to mislead the Grand Jury into believing "records" of transactions and not "documents" establishing the existence of the entities was what was "shipped" to a foreign country.

Hilary Frooman and Larry Phillips intentionally misled and lied to the Grand Jury about this fact in effort to make the Grand Jury believe that the Defendant sent "records" of transactions out of this country regarding the entity in an effort to keep the IRS from discovering those records.

First, the Government alleges that the amount the Defendant owed was conclusive as of May 11, 2000, when the Defendant did not exercise his option of going to Tax Court.   Shipping records, though this never happened, in conjunction with any tax liability for years 1996 and 1997 and those amounts already claimed "owed,"  would not be any issue whatsoever.

Second, the list of entities in paragraph 23 of Count Two are not any listed entity regarding Count Two other than paragraph 23 itself.   Though the title of

17

this section is "Transfer of Records" the body only mentions "documents associated with ..."

Third, the Government's position is that the policy of the IRS is to disregard the form and turn to "substance" to calculate any liability.    Though the Government has no federal law that puts forth this claim, if the forms are disregarded then what relevance to what happened to those forms would there be to a tax evasion charge as to Count Two.

The only relevance is alleging the transfer of the entity creation documents was an "affirmative act" to the tax evasion theory alleged in Count Two. Specifically lying to the Grand Jury in effort to confuse them and distort what actually happened and furthering this objective by having Larry Phillips read only a part of the transcript of the conversation he had with the Defendant and his attorney in 2003, when the remaining part clearly says the opposite of what Larry Phillips said to the Grand Jury, is prosecutorial misconduct and this Court should find as much.

Larry Phillips was allowed to lie to the Grand Jury several times regarding the Defendant giving him "records" so he could calculate what the IRS sought which was tax returns according to the way the IRS wished them to appear. Again, disregarding form and looking at substance only.  He made references to

the Defendant's cooperation at one point as only giving one copy of an entertainment expense, then he stated he gave few expenses, then he said there was no paper trail per se, then he said the Defendant did not supply additional records to him, then he spoke about the "various" documents, all in an effort to confuse the Grand Jury and mislead them on what the Defendant had actually done.

If the Defendant had chosen not to give any evidence of any "expenses" that Larry Phillips asked for, under no uncertain terms could this have prevented Larry Phillips from doing his Job.   At best, this type of conduct would only make what was owed more to the Government under their theory.   Though this is not the case, the Grand Jury was misled into believing this former IRS Agent who the Defendant hired was telling the truth.

Next, at the direction of Hilary Frooman, Mr. Phillips told the Grand Jury that all the 1099's showing the income of the Defendant were reported to the IRS in the name of Trusts.    This was not true.  In fact, almost all the 1099's at issue reported to the IRS in the name of Denny Patridge and Patridge Insurance Services, Inc.   Certainly, any 1099 issued to an entity Trust  was the exception and not the rule.  Yet , Mr. Phillips led the Grand Jury into believing that all the income was reported to the IRS as being received by entities.   This was an

intentional false statement before the Grand Jury made in effort to mislead the Grand Jury into thinking the IRS could not find the "income" Denny Patridge earned.

In fact, it appears the Government wishes the Defendant ignore that he filed information forms with the IRS through professional services. But that can hardly be the case. The Defendant attached all 1099's to each document. Larry Phillips had them. The IRS had them. Hilary Frooman had them. The Grand Jury records keeper had them. Yet, Mr. Phillips and Mrs. Frooman attempted, with success, to mislead the Grand Jury into indicting the Defendant by claiming crafty or tricky moves by the Defendant by somehow keeping the IRS from learning of the Defendant's income.

In this case, the facts go from all income was reported to the IRS through 1099s, 1040s, 1120s and 1041, and goes to the complete opposite side that the Defendant had some reason why he would not give all his 1099s to Mr. Phillips and that the reason was because they were all made out to Trusts to which the Defendant sought to hide. That is simply false.

The Government claims through Larry Phillips that the Defendant would not give his own representative, Larry Phillips, bank statements regarding 1996 and 1997. Then how did Larry Phillips' handwriting get on the bank statements?

Why did he meet with the Defendant at a truck stop?    How does he say in a letter in September that he had all the numbers figured and ready for audit reconsideration if he did not have any bank accounts, expenses copies, income statements, nor any cooperation from the Defendant?   He is simply lying

Furthermore, the Government sought and obtained these records by Grand Jury Subpoena which was later "discharged" and "terminated" because the Government had received all the "records" they sought through the Grand Jury Subpoenas.

Hilary Frooman knew there was more to the document she had Larry Phillips read regarding the transcript of the phone conversation between Larry Phillips and the Defendant and that what she directed Mr. Phillips to read and then comment on clearly contradicts the remaining paragraphs of the transcript she omitted from having Larry Phillips read to the Grand Jury.    Why would she need Larry Phillips to read from a transcript that Larry Phillips was unaware of?   What about that transcript was she attempting to argue against?   It is clear she was attempting to give testimony in opposition to the transcript while at the same time not allowing consideration as to why she was giving the opposition in the first place.    Not one time did Mr. Phillips testify as to whether the transcript of the conversation was in fact what he said.  If he was invited to lie, then no one would

want to comment on the veracity of the transcript of the tape.

Hilary Frooman knew that she had Mr. Phillips give false testimony about what he had told the Defendant in the taped telephone conversation and she knew why she had to present the false testimony.    Otherwise, there would have been no merit to any "affirmative act" regarding whether "documents" were sent out of the Country in July of 2000  regarding entities not at issue with the 1996 and 1997 tax liability.  Clearly, Mr. Phillips told the Defendant to send back to where they came from those entity-creation documents because the IRS was disregarding form and considering substance only for the purpose of any future years outside of 1996 and 1997.   The transcript of the conversation said Mr. Phillips directed the Defendant return the originating documents to the originator and Hilary Frooman mislead the Grand Jury into believing that Mr. Phillips never directed the Defendant to send "records" of transactions for 1996 and 1997 out of the Country.

She knew that any records for 1996 and 1997 were of no issue yet she continued to advance her erroneous theory.   The only logical theory that this Court could construe the need in July of 2000 for originating documents of entities not at issue for tax years 1996 and 1997 is because there was an ongoing "criminal investigation" going on without the IRS ever informing the Defendant.

D.    DID FORMER AGENT LARRY PHILLIPS PARTICIPATE IN
        Hilary FROOMAN'S PROSECUTORIAL MISCONDUCT?

Once an IRS Agent it appears always an IRS Agent.  Former Agent Phillips

carefully and craftily navigated around the evidence which opposed what he

wanted the Grand Jury to hear.    There is no other way to construe the multiple

errors other than Larry Phillips knew what Hilary Frooman wished for and that he

participated with her in that delivery.

E.    WAS AGENT COLEMAN AWARE THAT THE DEFENDANT
        HAD EXERCISED HIS RIGHT TO A COLLECTION DUE
        PROCESS HEARING UNDER SECTION 6330 AND THAT THIS
        EXERCISE WAS PROVIDED BY A SPECIFIC PROVISION OF
        THE INTERNAL REVENUE CODE?

Count Two contains a startling "affirmative act" allegation because the

Defendant exercised "his option" to ask for a Collection Due Process Hearing.

We know what section 6330 says.   We know that the "statute of limitations" is

suspended while any case is pending in the appeals procedure outlined in section

6330.   We know a person can challenge the liability therein prior to "owing"

what the government claims they are intending to levy.   We also know that the

Government carefully omitted from the Grand Jury the time period of when Mr.

Phillips was helping the Defendant get into "audit reconsideration."   We know the

23

Government claims the "final" notice of intent to levy was sometime in September/October by the testimony of Agent Coleman and there is no mention to the Grand Jury of the November 23, 2000 actual "Final Notice of Intend to Levy and Right to Collection Due Process Hearing" Notice. We know that Agent Coleman claims it is a mystery when the actual criminal investigation began. We know that Hilary Frooman was fully aware of the CDP process between the IRS and the Defendant when she issued the Grand Jury Subpoena to which rendered anything the Defendant was doing before the CDP Officer suspicious. All that is needed is to read the "notes" of the CDP Officer.

Hilary Frooman utilized Agent Coleman to thwart any forthcoming decision on the challenge to the liability the Defendant was raising before the CDP. She says in her "response" to the Defendant's Motions to Dismiss that it was the Defendant who stalled the CDP hearing knowing that was not true. She says the same notes from the CDP Officer claims that everything the CDP Officer looked at so far was frivolous. At the same time she admits the liability was "overinflated" by $200,000.00.

Section 6330 says that the Defendant was to be given an unbiased Appeals Officer. How could the CDP Officer, Agent Coleman, Agent Boyd, Hilary Frooman and all others involved in the tax endeavors of the Defendant, say for so

long that the Defendant owed $236,000.00 and now we all know and no one

disputes the Notice of Deficiencies taxed dollars twice, the "assessments"

contained different numbers with no explanation as to how they changed and

decreased based upon the January 27, 2000 Notices of Deficiency?   The Levy

amounts the IRS gave the Defendant notice of were over $200,000.00.    Audit

reconsideration was denied.  The right to a CDP request is carefully overlooked by

the Government.   Also, the moment the Government finally has to admit the

numbers they were trying to collect do not measure up even in the most liberal

interpretation of the tax code, the Government claims asking for these numbers to

be reviewed by CDP was nothing more than another act in a series of "affirmative"

acts supporting a tax evasion motive.

How much of the $236,000.00 was the Defendant allegedly attempting to

"evade" by asking for the place of last resort to verify what the IRS has done?

Now alleged to be $30,000.00.   This means the Defendant was not attempting to

evade over $200,000.00 by asking for the CDP hearing.  Oh, by the way, how

much was the amount of money sent out of the Country?   $200,000.00!   Then,

the Government admits that the Defendant had enough money to pay $30,000.00 if

that was determined to be due and owed.   Yet, nothing in the law forces the IRS

to "collect" money here in the United States.  Instead, the Government argues they

had a right for the $30,000.00 to come from the $200,000.00 which left the

Country.   The Defendant had a right to ask for the Collection Due Process

Hearing and telling the Grand Jury that was an act to affirm tax evasion of some

$236,000 is simply outrageous conduct which only sanctions can correct.

Attorney Frooman advanced a theory before the Grand Jury that mislead,

concealed, distorted and outright lied to the Grand Jury.  For this, the Court should

find Prosecutorial Misconduct and dismiss this action.

F.    DID AGENT COLEMAN TESTIFY THAT HE BELIEVED THE
JANUARY 27, 2000 NOTICE OF DEFICIENCIES WERE NOT
ACCURATE ACCORDING TO THE INTERNAL REVENUE
CODE?

The answer to this question is absolutely not.

G.    DID HILARY FROOMAN BY SYNCHRONIZING AND
INSTIGATING THE FALSE TESTIMONY OF BOTH LARRY
PHILLIPS AND AGENT COLEMAN COMMIT THE ACT OF
"INTENTIONAL PROSECUTORIAL MISCONDUCT?"

It is abundantly clear that Assistant United States Attorney Hilary Frooman

coordinated the testimony between Agent Phillips and Agent Coleman to

mislead, conceal, distort and outright allow perjury before the Grand Jury.

H.    SHOULD THE INDICTMENT BE DISMISSED BECAUSE IT IS IN
LARGE PART BASED UPON THE INTENTIONAL FALSE
TESTIMONY OF BOTH LARRY PHILLIPS AND AGENT
COLEMAN?

26

There is no other option because there is no way of saying that the Grand Jury would have ever indicted the Defendant if they were given the entire truth without fabrication.

## IV.  AUTHORITY

There can be no doubt that "the knowing use of perjured testimony involves prosecutorial misconduct " *U.S. v. Bagley*  473 U.S. 667, 680 (1985)  Whenever a Grand Jury returns an indictment, the defendant can move to dismiss based on prosecutorial misconduct before the Grand Jury. Many courts have dismissed indictments procured through deliberate presentation of perjured testimony, intentional failure to present exculpatory evidence, and a variety of other types of prosecutorial misconduct.  *Gray v. Bell*, 712 F.2d 490 (D.C. Cir. 1983)

First, a court may dismiss an indictment if it perceives constitutional error that interferes with the grand jury's independence and the integrity of the grand jury proceeding. "Constitutional error is found where the `structural protections of the grand jury have been so compromised  as to render the proceedings fundamentally unfair, allowing the presumption of prejudice' to the defendant." *United States v. Larrazolo*, 869 F.2d 1354, 1357-58 (9th Cir. 1989). Constitutional error may also be found "if [the] defendant can show a history of prosecutorial misconduct that is so systematic and pervasive that it affects the fundamental

27

fairness of the proceeding or if the independence of the grand jury is substantially infringed." Id. at 1358.  See U.S. v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992)

This general rule encompasses claims of prosecutorial misconduct during the grand jury proceedings. See *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254-255,263 (1988) Prejudice occurs if a "violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence" of the violation. Id. @ 256 (quotation and citation omitted).  The prejudicial inquiry must focus on whether any violations had an effect on the grand jury's decision to indict. If violations did substantially influence this decision, or if there is grave doubt that the decision to indict was free from such substantial influence, the violations cannot be deemed harmless.  Id. @ 263

Few restraints protect targets appearing before grand juries. "One protection to which a target remains entitled is the conscientious and dutiful conduct by the prosecutor, who 'is an administrator of justice, an advocate, and an officer of the court.'" Id. (quoting *American Bar Ass'n Standards Relating to the Admin. of Crim. J.*). We emphasize that "[t]he duty of the prosecutor is to seek justice, not merely to convict." Id. (quoting same).  *U.S. v. Gillespie*, 974 F.2d 796 (7th Cir. 1992)

And, as did the First Circuit in *Pacheco-Ortiz*, the Seventh Circuit gave notice that alternative avenues to secure enforcement of the Department's internal practice may be pursued in the future. Therefore, in appropriate circumstances, the Court is to consider referring internal policy violations to the Department's Office of Professional Responsibility for a report concerning the steps the Department proposes to take to police its internal policy guidelines and to discipline those of its employees who choose not to follow them. "This comports with Nova Scotia, which directs that the focus be placed upon the responsible individual - i.e., the prosecutor who failed to adhere to internal policy-and that the responsibility be placed upon the accountable agency - i.e., the Department of Justice. See 487 U.S. at 263, 108 S.Ct. at 2378. The prospect of such enforcement, we trust, will prove an adequate deterrent to violations of policies designed to ensure a fair judicial process." *Gillespie,* supra

V.   CONCLUSION

Based upon the foregoing, Defendant Denny Patridge respectfully requests this Honorable Court dismiss the Superseding Indictment, and all counts included therein, for having been obtained through intentional prosecutorial misconduct.

Denny Patridge, Defendant,


By:     /s/ Jerold W. Barringer
        Jerold W. Barringer
        Attorney at Law
        102 S. Pine St.
        P.O. Box 213
        Nokomis, IL 62075
        (217) 563-2646

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this Memorandum in Support of Motion to Dismiss Counts 1 through 7 for finding of Prosecutorial Misconduct was electronically delivered through the Clerk's ECF system on November 2, 2004 to:


Hilary W. Frooman
201 S. Vine, Suite 226
Urbana, Illinois 61802
hilary.frooman@usdoj.gov


                                        /s/ Jerold W. Barringer
                                        Server