E-FILED

Monday, 06 December, 2004 11:25:22 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

**FILED**

DEC 0 6 2004

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
v. ) Cause No. 04-20031
)
DENNY PATRIDGE, )
)
Defendant. )

**RECEIVED**

DEC 0 3 2004

JOHM M. WATERS, Clerk
CENTRAL DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

**SEALED**
RESPONSE TO DEFENDANT'S MOTION TO DISMISS FOR
PERJURY AND PROSECUTORIAL MISCONDUCT

Comes now, the United States of America, through Jan Paul Miller, United States

Attorney for the Central District of Illinois, by and through Hilary W. Frooman,

Assistant United States Attorney, and in response to the defendant's Motion to Dismiss

Counts One Through Seven for Perjury and Prosecutorial Misconduct, states:

1.    On November 2, 2004, defendant Patridge filed a Motion to Dismiss

Counts One Through Seven For Perjury And Prosecutorial Misconduct Before The

Grand Jury. (R.33) He filed a memorandum in support of that motion on the same date.

(R.34) The defendant accuses the government of gross abuse in the grand jury

proceedings, including the presentation of perjured testimony, false testimony, and

misleading testimony. (R.33, 34) He moves for a dismissal of the indictment as a result

of these abuses. (R.34, p.2, 29)

THE INDICTMENT ADHERES TO THE REQUIREMENTS OF FED.R.CRIM.P.7(c).

2.    Rule 7(c) of the Federal Rules of Criminal Procedure requires that an

indictment "be a plain, concise and definite written statement of the essential facts

constituting the offense charged." Compliance with Rule 7(c) ensures the satisfaction of

three constitutional rights. First, it satisfies the Sixth Amendment guarantee that in a

criminal prosecution the accused shall be informed of the nature and cause of the

1

accusation. Second, it protects the right of an accused to be free from double jeopardy, as guaranteed by the Fifth Amendment. Finally, it guarantees that the accused has been indicted by a grand jury, as required by the Fifth Amendment, for offenses on which he is to be tried. United States v. Sugar, 606 F.Supp.1134, 1141-42 (S.D.N.Y. 1985). The third function is met by the requirement that an indictment contain some factual particularity, thus preventing the prosecution from filling in elements of its case with facts not presented or, or considered, by the grand jury. United States v. Abrams, 539 F.Supp. 378, 384 (S.D.N.Y. 1982).

3.      The grand jury performs the dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions. United States v. Udziela, 671 F.2d 995, 998 (7th Cir.1982). The grand jury "does not sit to determine the truth of the charges brought against a defendant, but only to determine whether there is probable cause to believe them true, so as to require him to stand trial." Bracy v. United States, 98 S.Ct. 1171, 1172 (1978).

4.      An indictment is sufficient if it contains the elements of the offense, fairly informs the defendant of the charge against which he must defend, and enables him to plead an acquittal or conviction in bar of future prosecutions. Hamling v. United States, 418 U.S. 87, 117-18 (1974). The validity of an indictment is to be determined upon practical rather than technical grounds. United States v. Guthartz, 573 F.2d 225, 227 (5th Cir. 1978).

5.      A facially valid indictment is enough to call for trial of the charge on the merits. Costello v. United States, 350 U.S. 359, 363-64 (1956). Review of grand jury proceedings is very limited. United States v. Abrams, 359 F.Supp. 378, 384 (S.D.N.Y. 1982).

2

6.     An indictment can be based solely on hearsay evidence. Costello
v. United States, 350 U.S. 359 (1956); United States v. Taylor, 154 F.3d 675, 681 (7th Cir.
1998). A defendant does not have the right to call for a kind of preliminary trial to
determine the competency and adequacy of the evidence before the grand jury. Id. at
363. A defendant is not entitled to a disclosure of grand jury proceedings without some
demonstration of "particularized need". United States v. Edelson, 581 F.2d 1290, 1291
(7th Cir.1978). A defendant's unsupported speculation about improper conduct before
the grand jury does not demonstrate "particularized need" and does not entitle the
defendant to disclosure of the grand jury proceedings. United States v. Edelson, 581
F.2d 1290, 1291 (7th Cir.1978).

7.     This indictment is properly charged. As this Court found in its Order of
November 10, 2004, Counts Two through Seven sufficiently set forth the elements of the
charged offenses and are sufficient to inform Defendant of the offenses with which he is
charged. (R.36, pp.8, 9,12,14)

EVEN IF ERRORS OCCURRED, DISMISSAL IS NOT APPROPRIATE.

8.     Generally, a district court may not dismiss an indictment for errors in grand
jury proceedings unless such errors prejudiced the defendants. Bank of Nova Scotia v.
United States, 108 S.Ct. 2369, 2373 (1988). This general rule encompasses claims of
prosecutorial misconduct during the grand jury proceedings. Id. at 2373-74, 2378.
Prejudice occurs if a "violation substantially influenced the grand jury's decision to
indict, or if there is grave doubt that the decision to indict was free from the substantial
influence" of the violation. Id. at 2374. See also United States v. Anderson, 61 F.3d 1290,
1296 (7th Cir. 1995).

9.     An indictment, regular on its face and returned by a legally constituted
grand jury, is presumed to be founded on competent evidence, and the law is well
established that the submission to a grand jury of some incompetent proof is not a

3

ground for dismissing the indictment. United States v.Dunham Concrete Products, Inc.

475 F.2d 1241, 1248-49 (5th Cir. 1973).

10. In United States v. Udziela, 671 F.2d 995 (7th Cir.1982), it was

discovered that perjured testimony had been given to the grand jury by a cooperating

witness. The Seventh Circuit upheld the district court's denial of the motion to dismiss

the indictment and stated:

> If other, sufficient evidence is present so that the grand jury may
> have indicted without giving any weight to the perjured testimony,
> the indictment cannot be challenged on the basis of the perjury.
> (citations omitted) Our rationale for these rules is simple enough:
> errors before the grand jury, such as perjured testimony, normally
> can be corrected at trial, where evidentiary and procedural rules
> safeguard the accused's constitutional rights. (citations omitted) Put
> differently, grand jury proceedings need not be perfect.

Udziela at 1001.

11. The validity of an indictment is not affected by the form of the evidence

considered, and an otherwise valid indictment cannot be challenged on the ground that

the grand jury based it on inadequate or incompetent evidence. United States v. Taylor,

154 F.3d 675, 681 (7th Cir. 1998). An indictment is beyond challenge unless the grand

jury heard no evidence competent to sustain the indictment. United States v. Roth, 777

F.2d 1200, 1203 (7th Cir. 1985); citing United States v. Claiborne, 765 F.2d 784, 791-92 (9th

Cir.1985); United States v. Adamo, 742 F.2d 927, 939-42 (6th Cir.1984); United States v.

Johnson, 767 F.2d 1269, 1275 (8th Cir.1985).

12. The indictment against Patridge is presumptively valid. Grand jury

proceedings need not be perfect, and dismissal of the indictment, as prayed for by the

defendant, should be denied.

COUNT TWO IS SUFFICIENT AND IS PROPERLY CHARGED.

13. Defendant complains that "Count Two contains a startling 'affirmative act'

allegation because the Defendant exercised 'his option' to ask for a Collection Due

4

Process Hearing." (R.34, p.23)

14. The charge in Count Two of the indictment, upon which the defendant focuses his criticism, is tax evasion under 26 U.S.C. §7201. The elements of tax evasion are (1) willfulness, (2) a tax deficiency, and (3) an affirmative act of evasion or attempted evasion of the tax. Sansone v. United States, 380 U.S. 343, 351 (1965).

15. The "affirmative act" of evasion can be "any conduct, the likely effect of which would be to mislead or conceal." Spies v. United States, 317 U.S. 492, 499 (1943). The "...real character of the offense lies...in the attempt to defraud the government by evading the tax." Emmich v. United States, 298 F.5, 9 (6th Cir. 1924). The prosecution need not prove each affirmative act alleged. United States v. Mackey, 571 F.2d 376, 387 (7th Cir.1978). If there is sufficient evidence to prove some affirmative act of evasion, the charge can be sustained. Id. (citing a mail fraud case, United States v. Reicin, 497 F.2d 563, (7th Cir. 1974)).

16. In a tax case in which the government proved some affirmative acts alleged in the indictment, but failed to prove all of the affirmative acts alleged in the indictment, the Seventh Circuit concluded that it was not necessary for the Government to prove each of the fraudulent acts constituting the scheme to defraud. United States v. Reicin, 497 F.2d 563, 570 (7th Cir. 1974). In a conspiracy case, there is no requirement that the grand jury consider evidence on each overt act of a conspiracy. See United States v. Armone, 363 F.2d 385 (2d Cir. 1966). The government's proof is likewise not limited only to the overt acts charged in the indictment. Id. at 400. See also United States v. Negro, 164 F.2d 168 (2d Cir. 1947); Worthington v. U.S. 1 F.2d 154, 155 (7th Cir. 1924).

17. Therefore, the focus should be on whether the grand jury heard sufficient evidence to indict the defendant on Count Two, not whether the specific term "Collection Due Process Hearing" was discussed with the grand jury, as the defendant vociferously argues. (R.34, pp.23-26). As this Court noted in its November 10, 2004

5

Order, "[a]ccording to the allegations in the superseding indictment, Defendant took actions to evade payment of his taxes before he requested a collection due process hearing." (R.36, p.5) Tax evasion, as alleged in Count Two of the indictment, is sufficiently charged.

18.    The defendant is perturbed about the reason Count Two includes an allegation about the transfer of records. (R.34,pp.17-18) He appears to think that if the IRS disregards form and turns to substance, then the documents transferred out of the country are irrelevant. What the defendant fails to recognize is that the government disregards form when that form is merely a means to disguise the substance of a transaction. It does not mean that forms and documents are therefore irrelevant to a case.

### THE DEFENDANT'S ALLEGATIONS THAT THE GOVERNMENT ENGAGED IN ABUSES OF THE GRAND JURY PROCEEDINGS ARE INCORRECT AND HAVE NO BASIS IN FACT.[1]

19.    The defendant accuses the government of knowingly presenting perjured testimony to the grand jury and the defendant accuses IRS Agent Bernard Coleman of depriving the defendant of his rights by preventing the defendant from receiving his collection due process hearing. (R.34, pp.8, 24-25) The defendant misstates numerous facts which he claims to have found in the grand jury transcripts. The defendant first alleges that Agent Coleman intentionally lied to the grand jury about the reason the IRS issued notices of deficiency to the defendant and to Patridge Asset Management Trust. (R.34, pp.9-15)

20.    The defendant alleges that Agent Coleman lied about when the IRS became aware of the defendant's usage of the Aegis Financial Plan. (R.34, p.10) The defendant is

---

[1] The government provided grand jury transcripts of witnesses who would definitely testify on behalf of the government in a jury trial. The defendant would have been entitled to these transcripts at some point under 18 U.S.C. §3500. These transcripts are the subject of many of the defendant's accusations. The transcripts in question: Larry Phillips, 6/4/03; Agt. Bernard Coleman, 6/4/03, 6/2/04.

6

of the opinion that the defendant came to the attention of the IRS as the result of a search
warrant. (R.34, p.10) This point is irrelevant to the charges in the indictment, but the
question put to Agent Coleman before the grand jury was:

> Q. Why don't you explain to us why you were investigating Denny R.
> Patridge.
> A. Okay. Denny Patridge is an individual who was affiliated with a
> company called Aegis out of Palos Hills, Illinois.

(Coleman, GJ 6/2/04, 4)

21.    Obviously, the question put to Agent Coleman did not call for a precise
statement of the date on which the IRS became aware of the defendant. Although the
defendant pursues his discussion regarding the date on which the IRS began its criminal
investigation of the defendant, the date is irrelevant to the charges in the indictment.

(R.34, pp.12,22,24)

22.    Agent Coleman is further accused of deliberately misleading the grand
jury by explaining the audit process for the audit of the defendant's 1996 and 1997 taxes
with the statement:

> So the revenue agent disallows the expenses and picks up the
> income and writes a report for the assessment of the taxes
> because he would not cooperate and provide any
> documentation during the audit.

(Coleman, GJ 6/2/04, 16) (R.34, p.10)

The point the agent made before the grand jury was for explanation and understanding
of the audit process and, whether accurate or inaccurate, the indictment is nevertheless
supported by substantial evidence. Nevertheless, the government is of the opinion that
the statement is entirely accurate as a summary of the process with respect to the
defendant. Furthermore, the statement is not related in any way to an IRS employee
named "Boyd." (R.34, p.10) Because the summary is unrelated to specific allegations in
the indictment, there is no need for the Court to hear testimony on the point prior to any
trial.

7

23.    The defendant accuses S/A Coleman of deliberately misstating what Larry Phillips told the defendant on several points. (R.34, p.11)  Larry Phillips testified before the grand jury in person and the transcript of his testimony was available to the grand jury (Coleman, GJ 6/2/04, p.4).  The grand jurors were free to review Phillip's testimony on their own, so the government certainly was not attempting to mislead the grand jury. The defendant accuses Agent Coleman of falsely summarizing Phillip's grand jury testimony as follows: "these trusts did not work." (R.34, p.11) (GJ 6/2/04, 18)  S/A Coleman's statement is entirely accurate.  Phillips had testified:

> We got involved with his comments regarding the trust, what I thought about the trust, and what I knew about the trust that he was involved with.  I told him then, I said Denny, you're not going to get free from paying income tax when you have income earned in the United States.  I don't really care what form you want to put your activities under, business activities that is, you're going to have to pay income tax if you have net income earned in the United States.

(Phillips, GJ 6/2/04, 7-8)

* * *

> Denny was a firm believer that these trusts were a valid tax document that he could use and not pay taxes.  And I was taking the opposite position.  I could find nothing in the tax law that would allow anyone or any business to use the guise of a trust instrument so as to not pay any income tax.

(Phillips, GJ 6/2/04, 25-26)

24.    The defendant accuses Agent Coleman of falsely stating to the grand jury that Phillips indicated that financial documents from the defendant "did not come freely." (R.34, p.11) (Coleman,GJ 6/2/04, 18).  Agent Coleman made the comment as alleged, but it was not false.  It was a characterization of what Phillips stated and it was accurate:

> Q.  Well, here you are, you are there to assist a taxpayer who apparently wants assistance with the IRS, but you in all the time you were actually working for him as your client never actually saw all the bank records that were involved in the argument with the IRS?
>
> A.  That's correct.

> Q. Going back to the 1998 tax year, did he comply with the
> IRS request to provide the records to the Internal Revenue
> Service?
>
> A. He complied very minimally, that is fi – I don't remember
> the number of records that was asked for or the number of
> expense accounts that needed verification or documentation.
> I can only think of one invoice that I saw that dealt with
> entertainment expense. Out of probably eight or ten different
> expense accounts, I only saw that one invoice. He didn't
> want to give me very many documents or records, and of
> course I don't know why, but he didn't.

(Phillips, GJ 6/2/04, 12-13)

25.     The defendant accuses Agent Coleman of misleading the grand jury by

informing the grand jury that the defendant was given his final notice of intent to levy

on July 13, 2000 when in fact, this occurred November 23, 2000. (R.34, p.12) The

defendant is completely incorrect. The government attorney began to ask a question of

Agent Coleman and then corrected herself. The question as stated was:

> And this is just about the time he is receiving the final – the
> notices from the Internal Revenue Service very late July and
> first week in August, of the exact amount that the tax
> assessment is, right?

(Coleman, GJ 6/2/04, 21)

26.     The defendant argues that the January 27, 2000 Notice of Deficiency was

"defective." (R.34, p.12) The indictment in Count Two terms the amount of tax owed in

this notice "proposed." A "proposed" amount is hardly "defective;" it is a figure to

which the taxpayer may take exception and against which the taxpayer may choose to

argue in tax court. This defendant did not choose to argue "proposed" amount in tax

court.

27.     Against the prosecutor, the defendant makes accusations all based on her

failure to present facts the defendant sees as "accurate." The defendant accepts his view

of the facts as totally accurate and any other view of the facts as false and deliberately

misleading.

9

Notices Issued by the IRS

28.     The defendant accuses the prosecutor of knowing that the January 27, 2000 notices were defective and could not be relied upon to establish tax liability of the defendant. (R.34,p.12).  Furthermore, he accuses her of knowing that the notices could not be relied upon to explain the reason for the issuance of the Statutory Notices under 26 U.S.C. §6213(a). (R.34, p.12)  The government does not see the point behind the defendant's allegations, as the indictment does not allege any such connection exists and under Title 26 such a connection is not required. [2]

29.     The indictment asserts that the defendant's receipt of notices from the IRS over a period of time are the catalyst toward his ultimate transfer of funds out of the United States.  Even if the notices were inaccurate, they could still act as the catalyst for the defendant's further criminal activity.  The charges as written make the reason for the issuance of the Statutory Notices under 26 U.S.C. §6213(a), as the defendant terms it, irrelevant.

30.     The defendant is convinced that the notice sent to the defendant on September 4, 2000 was not "final" and by referring to it as such, the prosecutor deliberately presented false testimony to the grand jury. (R.34, p.13)  The prosecutor referred to "final" notices on but one occasion during the presentation of the indictment to the grand jury and on that occasion it was a misstatement quickly corrected:

> Q.  And this is just about the time he is receiving the final
> –the notices from the Internal Revenue Service, very late July
> and first week in August, of the exact amount that the tax
> assessment is, right?

---

[2] 26 U.S.C. §6213(a) provides: "(a) Time for filing petition and restriction on assessment.–Within 90 days...after the notice of deficiency authorized in section 6212 is mailed...the taxpayer may file a petition with the Tax Court for a redetermination of the deficiency....The Tax Court shall have no jurisdiction to enjoin any action or proceeding or order any refund under this subsection unless a timely petition for a redetermination of the deficiency has been filed and then only in respect of the deficiency that is the subject of such petition.

(Coleman, GJ 6/2/04, 21)

31.     Following a perusal of the grand jury transcripts, the government can find

no other occasion in which the word "final" was used in reference to a notice as the

defendant accuses:

> Q. Okay. So then September 4th, 2000, Patridge was
> informed that Patridge – on behalf of Patridge Asset
> Management Trust that the IRS could levy on his property,
> correct?
> A. Yes, he received a notice to that effect.
> Q. And it indicated: "To prevent collection action, please pay
> the current balance now." Correct?
> A. Yes, it did.

(Coleman, GJ 6/2/04, 30)

32.     Although the defendant accuses the government of wrongly referring to

"final" notices in the grand jury session of June 4, 2003, the government has not found

such a reference. Rather, the government has found that the term "formal" rather

"final" was used:

> Q. And the IRS had notified Denny Patridge that it was
> going to be – well, they had already issued a notice of tax
> deficiency in early 2000, hadn't they?
> A. Yes, the first one that was sent out to him was in early
> 2000, yes.
> Q. And in July of 2000 he was notified that they had what's
> called an intent to levy?
> A. I don't believe the July of 2000 notices that he got had the
> intent to levy wording on them, but he received notices of
> deficiency for both Patridge Asset Management Trust and for
> himself, and those were July, I believe July 31st of 2000.
> Q. Okay. So and those were then what we call formal
> notices?
> A. Yes.

(Coleman, GJ, 6/4/03, 16-17)

Failure to Present Accurate Facts through Larry Phillips

33.     The defendant asserts that the prosecutor committed some misconduct

because she actually knew that the defendant hired JK Harris and Larry Phillips to

handle the "deficient notices." (R.34, p.14,16) The prosecutor knew nothing of the kind

11

and Larry Phillips did not inform the grand jury that he was hired to handle the

"deficient notices." Phillips may have been hired to assist the defendant with his 1996

and 1997 taxes, but Phillips never in any way indicated that he believed the notices were

"deficient." Larry Phillips informed the grand jury:

> Then he proceeded to say that the '96 and '97 he would like
> to have reopened, the audit was closed and it was closed
> because he did not respond to the IRS letter saying I'd like to
> meet with you, you produce your records and we will then
> verify all the expenses, verify all the income tax that are on
> these tax returns and see if they're accurate.

Phillips, GJ, 6/4/03,7)

34.    Whether Phillips was still working on the defendant's 1996 and 1997 tax

years into October of 2000 is completely irrelevant to the charges in the indictment.

Phillips informed the grand jury that he first met the defendant on June 30, 2000.

(Phillips, GJ, 6/4/03, 5). Phillips explained he was in Illinois approximately two months

when he informed the defendant:

> And if you don't give me the records and I have asked
> several times, then I really don't know what I can do.
> And I told Denny that and I told him that I had to get back to
> the corporate office....I have a job to do in South Carolina
> also.

(Phillips, GJ, 6/4/03, 17)

Irrelevance of $200,000 Referred to in Counts Two, Four, Five Six, and Seven

35.    The defendant accuses the prosecutor of knowing that the defendant did

not owe $200,000 in taxes which, the defendant asserts, "was the amount and relevance

of the wires at issue in Counts Two, Four, Five, Six and Seven." (R.34,p.13) The

defendant was informed on several occasions through several different types of formal

notices, that he owed back taxes. The various notices recorded balances owed that were

different than the government seeks from the defendant in the criminal case. That is not

the point. The notices were a civil method of informing a taxpayer of the amount he

owed in taxes. The IRS seeks interest and penalties in a civil case against a taxpayer.

Civil notices may include interest and penalties. In a criminal case, interest and civil and penalties are not included. The indictment does not assert that the IRS civil notices establish taxes owed in a criminal case. The notices were the catalyst which caused the defendant to take action to hide his money from the IRS. The indictment traces the various communications from the IRS to the defendant and the actions the defendant took as a result of those communications.

36.     The defendant's further accusations that the prosecutor knew he had cash reserves to pay his taxes are irrelevant. A large percentage of white collar criminals no doubt have sufficient money to make fraud unnecessary. Greed or refusal to pay are probably as frequently behind fraud as is need. The amount of taxes owed is irrelevant to a prosecution for tax fraud. United States v. Minneman, 143 F.3d 274, 279(7th Cir. 1998). Whether or not the money was available to pay the taxes is irrelevant. Ferguson v. United States, 317 F.Supp.2d 945, 961 (S.D.Iowa 2004). Any person who is "responsible" within the meaning of Title 26, Section 6672 throughout the period in which withheld taxes are not remitted to the Government acts willfully if, when or after he or she gains actual knowledge that the taxes are delinquent, liquid funds are available from which the taxes can be paid and he or she, having the ability to pay the taxes, fails to do so. Peterson v. United States, 758 F.Supp.1209, 1216 (N.D.Ill. 1990).

The defendant accuses the prosecutor of misusing subpoenas to Larry Phillips

37.     The defendant accuses the prosecutor of somehow misusing the grand jury's power with respect to Larry Phillips. (R.34,pp.16-23) The defendant believes that somehow the government was hiding something from the grand jury because certain records from Larry Phillips were provided to the government before Phillips appeared to testify before the grand jury. Delivery of subpoenaed documents to investigatory agents is proper. United States v. Nathan, 816 F.2d 230, 234 (6th Cir. 1987). Documents were so delivered in this case. (Phillips, GJ, 6/2/03, 31) Mr. Phillips appeared in

13

person and explained the documents. Nothing improper occurred.

Lack of testimony to support figures in "special findings"

38.     The defendant asserts that the indictment lacks probable cause because no testimony was presented to support the figures in the "special finding" section of the indictment. (R.34, pp.14-15) True, no such testimony was presented, but the grand jury indicts based on probable cause to believe that a crime has been committed, not on issues relevant for sentencing in a fraud case.

Failure to present evidence of the reason the defendant sought a CDP hearing.

39.     True, as the defendant indicates, no testimony directly related to the reason for the defendant's request for a CDP hearing was presented to the grand jury. (R.34, p.15) Nevertheless, sufficient evidence to establish the charge under 26 U.S.C. §7201 was presented. The defendant could be convicted without any proof of the allegation to which the defendant refers, which is paragraph twenty-two of Count Two. The indictment could also have stood without inclusion of the allegation and the defendant would then have had to rely on a Bill of Particulars and on discovery to learn that the government might present such evidence. The defendant now knows that the government will present such evidence.

40.     The defendant alleges that the prosecutor knowingly produced false evidence before the grand jury. The defendant complains that Agent Coleman testified that Clay City Bank is further from the defendant's home than is Edgar County Bank. (R.34,p.15) While it is true that Agent Coleman inadvertently made the misstatement noted, there is no reason to believe the statement was deliberately false. Further, the statement is immaterial to the charges in the indictment.

The Defendant accuses Witness Larry Phillips of intentionally committing perjury before the grand jury and the defendant accuses the government of knowingly using

14

Phillips' perjured testimony.

41.    The defendant asserts that Larry Phillips and the prosecutor knowingly

misled the grand jury to believe that the defendant transferred records to a foreign

country. (R.34,p.17)  The defendant presents the facts in a misleading light for the

defendant did indeed transfer records to a foreign country.  The defendant, in a Rule to

Show Cause[3] hearing held January 16, 2002, testified that Larry Phillips directed him to

send certain records offshore:

> To show good faith; that I was no longer going to use the system.
> He told me to dump the system or to quit using it.  He advised me
> to take what records I had from the offshore, gather them up, send
> them back to the offshore representative, make a copy of the
> receipt or the Fed-Ex and to quit using the system and that's what
> I did.  And that was July of 2000.

(RTSC, 1/16/02, 44)

42.    Larry Phillips was specifically asked if he told the defendant to send

documents back to Belize.

> A.  No I never told Denny that.
> Q.  Would you ever tell that to a client?
> A.  No.
> Q.  Why not?
> A.  You can't do an audit if you don't have the records....You need
> records, all the records that you use to prepare these tax returns,
> anything that you have available so that I may review them as a revenue
> agent or if I'm going to assist you in this audit, I need all those
> documents.  It would be absurd to think that I would tell anybody, well,
> no, you send those back, we don't need those, that's crazy.

(Phillips, GJ, 6/4/03, 39-40)

43.    The defendant also argues that the government prosecutor deliberately

caused Phillips to inform the grand jury that the defendant failed to report income

from his 1099's. (R.34, p.20)  The defendant misstates the facts.  First, it was not the

prosecutor, but a grand juror who questioned Phillips on this point, and the defendant

---

[3]The defense was present with counsel for all RTSC hearings referenced; to assist the Court,
under MISC.02-GJ-49, were hearings on 1/16/03 and 2/13/03; under MISC. 03-GJ-49 were hearings
6/25/03, 8/11/03,10/10/03, all of which have been SEALED.

misstates Phillips' answer:

> Q. GRAND JUROR: On the transactions amongst the trusts,
> was there a paper trail then from the time that it left where
> he had the income coming in and sending it to different
> trusts? Was that ever given to you as something that you
> could look at and say that I've gained X amount of money
> and transferred it to this trust, that trust to get it overseas?
> A. I never saw a paper trail per se. It was done through if
> you wish journal entries, notes written on a book
> transferred, you know, 35,000 dollars to Trust A or from
> Trust A to Trust B, that sort of thing.
>  He did have the trust' names on the 1044s. [sic]. That
> would indicate that whomever he is working for selling
> their insurance, he told that company don't send it to me,
> Denny Patridge, but send it to me Denny Patridge trust.
>  That was done, so the money then on the 1099 was made
> payable or the check, I didn't see the checks, but the 1099
> indicated it was sent to the trust which was of course Denny
> Patridge.

(Phillips, GJ, 6/4/03, 45-46)

44.    Whether 1099's were made out to trusts or to the defendant personally is

irrelevant to whether taxes were paid on the funds. As the indictment alleges, funds

were "distributed." (Count 1, ¶5) The defendant used the distribution method as his

means to avoid inclusion of such funds in his taxable income. Therefore, a tax return

might show 1099 earnings, yet following the final distribution to an overseas "trust,"

no taxes were paid on the money.

45.    The defendant furiously asserts that the government misrepresented the

contents of a telephone call made by Brent Winters, former attorney for the defendant,

to Phillips. (R.34, p.21) The defendant complains that Phillips presented only a portion

of the transcript of the call. (R.34, p.21) In truth, it was the prosecutor who read the

transcript, not Phillips. The defendant alleges that the very fact that Phillips was

questioned about the contents of the transcript demonstrates the prosecution's

improper motives, for the defendant's position is that Phillips was unaware of this

transcript.

46.    The defendant's position is illogical. The transcript was of a telephone

16

call in which Phillips was one of two participants. Phillips knew of the call. Phillips did not know the call was being taped. (Phillips, GJ, 6/2/04, 37). The reason for presenting the transcript rather than the tape was that the tape of the call was difficult to hear. (Phillips, GJ, 6/2/04, 37). The reason the prosecutor asked Phillips about the tape was to determine "...were you attempting to state yes, you agree, that you had told Denny Patridge to send the documents back to Belize?" Phillips' answer to this question was "no." (Phillips GJ , 6/2/04, 39) The call had no other direct relevance to the discussion before the grand jury, as the Court can determine on its own, should it wish to. (Exh. 1)

47.    Finally, the defendant alleges that the government is making an issue out of the defendant's failure to turn records over to Phillips when the defendant turned those records over to the grand jury and the subpoenas which called for those records were discharged. (R.34, p.20-21) The defendant forgets that there were five Rule to Show Cause Hearings in which the government sought records subpoenaed from the defendant and the Court heard testimony from one or both parties. These were: January 16, 2003, February 13, 2003, August 11, 2003, September 16, 2003, and October 10, 2003. The purpose of all of these hearings was to obtain records from the defendant. The hearings on January 16, 2003 and February 13, 2003 focused primarily on records which had been returned to Belize by the defendant or were maintained in Antigua. Those records were associated with the trusts which are the focus of counts One, Two and Three of the indictment. The defendant's position is that because the subpoenas were ultimately discharged, that means the defendant promptly provided records to the IRS and to the grand jury, and thus, never committed tax fraud. On the contrary, the defendant did not promptly turn records over to the grand jury as soon as the grand jury requested them, or even after the court, on December 9, 2002, determined that the defendant's asserted Fifth Amendment privilege would not

17

protect the records. The defendant's view of the facts has no basis in reality.

CONCLUSION

48.  The government engaged in no misconduct, nor did the government encourage grand jury witnesses to commit perjury. IRS Agent Coleman did not commit perjury or deliberately misstate facts. Witness Larry Phillips did not commit perjury or misrepresent facts. The government and none of its witnesses engaged in any acts that would prevent the grand jury from obtaining complete relevant and material information.

49.  The defendant presents no credible facts to support his allegations that the government engaged in the misconduct he alleges. In fact, the defendant fails to provide references to support his allegations and he himself misquotes from grand jury transcripts. The defense has used the government's liberal discovery policy to hysterically hurtle accusations for which there is no factual basis.

50.  Numerous attorneys file motions; some motions point to government errors, and some motions are filed solely to preserve a client's rights. This motion simply multiplied the proceedings in this case in an unreasonable and vexatious manner, actions for which relief can be sought pursuant to 29 U.S.C. §1927.

51.  The allegations in this defense motion are reckless, frivolous and nothing less than insulting. Defense attorney Jerold Barringer's motion is an ad hominem attack that is entirely malicious. It has wasted the government's time and the Court's time. The Court should consider sanctions to deter further such activity in the future.

18

The defense motion should be denied.

Respectfully submitted,

JAN PAUL MILLER
United States Attorney

HILARY W. FROOMAN
Assistant United States Attorney
United States Attorney
201 S. Vine, Suite 226
Urbana, Illinois 61802
217/373-5875
FAX: 217/373-5891
hilary.frooman@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2004, I mailed by the United States Postal Service, the foregoing Sealed Response to Defendant's Motion To Dismiss for Perjury and Prosecutorial Misconduct to the following: Carol Dison, Attorney at Law, 508 S. Broadway, Urbana, Illinois 61801; Jerold Barringer , Attorney at Law, 102 S. Pine, P.O. Box 213, Nokomis, IL 62075; Michael L. Minns, Michael Louis Minns PLC, Suite One, 9119 S. Gressner, Houston, TX 77074 and Enid Williams, Michael Louis Minns PLC, Suite One, 9119 S. Gressner, Houston, TX 77074.

<span style="margin-left:3em;">_Hilary W. Frooman_</span>

HILARY W. FROOMAN
Assistant United States Attorney
United States Attorney
201 S. Vine, Suite 226
Urbana, Illinois 61802
217/373-5875
FAX: 217/373-5891
hilary.frooman@usdoj.gov

**TRANSCRIPT FROM PHONE CONVERSATION BETWEEN**
**LARRY PHILLIPS, BRENT WINTERS AND DENNY PATRIDGE**
**Tuesday January 28, 2003 at 2:45** p.m.

**Brent Winters**: Larry, can you hear me now?

**Larry Phillips**: I can hear you.

**Denny Patridge**: Hello Larry.

**Larry Phillips**: Hi.  How ya' doing?:

**Denny Patridge**: Fair

**Brent Winters**:  Larry....Denny is...uh, speaks positively about you but, he uh went through a negative experience and you accompanied him through that negative experience.

**Larry Phillips**: Ok.

**Brent Winters**: Well, the experience has escalated and I, we believe now, looking back that it all started back uh, when you were before a fellow named Helfer, IRS agent who has since retired, uh shortly after that, I think he did.  And Denny now faces incarceration uh, at the order of federal judge because the U.S. Attorney is trying to convince a federal judge that Denny is not providing documents that has since been shipped back to Belize uh, over two years ago.  Long before he had any idea that he was investigated.  Now, Denny shipped those documents back because you, at that time, said "well the best thing to do is to collapse all this, get rid of it and just do what they want to do."  Which, was good advise, I agree.  And uh, you, apparently, he followed your advise.  Collapsed everything, shipped all the documents back to Belize and uh, now, they're coming back over two years later saying "we want them."  Of course, he

Exhibit #1                                           1

**TRANSCRIPT FROM PHONE CONVERSATION BETWEEN
LARRY PHILLIPS, BRENT WINTERS AND DENNY PATRIDGE
Tuesday January 28, 2003 at 2:45 p.m.**

has no idea. And he's having trouble getting them. We're working hard to try
and do that. But he, of course uh, telephone calls and they seem to be friendly
people there but they don't, their laws may not permit them to do what we want
them to do. At any rate, I've even talked to their attorney about this. But uh,
would you be willing to help us in this matter if, and uh, help substantiate...that?
Uh, you indeed told Denny that this wouldn't work. That the IRS wasn't going to
go for it. And that he should collapse it, cut all the ties to all these people, give
them all their material back and quit. Would you be willing to help us
substantiate that?

-short pause-

**Larry Phillips**: Uh, I don't have any problem with that uh, but my situation is this.
I, currently I'm living down in Florida. Uh, that's not a major crisis either. I'm
outside of Tampa about 30 miles. Uh, but I don't know, right off hand, I don't
know what, what work papers I have that would, would be true construed as
predictable court documents and that is, is uh something that the IRS may want
now. And if I did have, I have to find out where those folders are at the moment.
I don't think I have them here....my office in Florida. I think they should be at the
main office in Charleston but I can make phone calls and uh, retrieve those files.
I say I can, it's very rare that I haven't been successful in, you know, collecting
that data.

**Brent Winters**: Are you with uh, a J K Harris?

**Larry Phillips**: I'm sorry?

2

**TRANSCRIPT FROM PHONE CONVERSATION BETWEEN
LARRY PHILLIPS, BRENT WINTERS AND DENNY PATRIDGE
Tuesday January 28, 2003 at 2:45 p.m.**

1   **Brent Winters**: Oh, well, that would be helpful if there were documentation like

2   that. What we would request would be a couple of things. Would you be willing

3   to fax him an affidavit stating that you told Denny to bail out and to uh, return, cut

4   all ties and return all documents?

5   **Larry Phillips**: Um, yeah, basically what I told Denny. I, I recommend it anyway.

6   I mean like, I don't like to use the word "told" because I, I'm not uh, I'm not king

7   here. I don't mean it that way at all. But I thought it 'd be the best....uh, way to

8   go would be to uh, _____about the trust and and track everything out and put all

9   the numbers on the form that'd be uh, would have been put at the time,

10   -unintelligible- -unintelligible- particular trusts involved and uh, events which I

11   tried to do with, you know get these numbers together, that's a little bit of help. I

12

13

14