E-FILED
Thursday, 21 April, 2005 03:58:43 PM
Clerk, U.S. District Court, ILCD

**FILED**

APR 2 1 2005

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. ) Case No. CR 04-20031
)
DENNY PATRIDGE, ) **UNDER SEAL**
)
Defendant. )

### THE UNITED STATES OF AMERICA'S EX PARTE DISCLOSURE OF
### ALLEGATIONS CONCERNING A WITNESS FOR IN CAMERA REVIEW

NOW COMES the United States of America, by Jan Paul Miller, United States

Attorney for the Central District of Illinois, and Hilary W. Frooman, Assistant United

States Attorney, and hereby discloses certain portions of a former IRS employee's

personnel file and moves for *in camera* review by the Court and moves *ex parte* for a

ruling that this information need not be disclosed to the defendant:

#### Background

1.     Denny R. Patridge was indicted on June 1, 2005 for, among other charges,

filing a false tax return for the 1998 calendar year (26 U.S.C. § 7206; Count 1) and tax

evasion for the 1999 calendar year (26 U.S.C. § 7201; Count 3). For both 1998 and 1999,

the IRS revenue agent who performed the civil audit was Michael T. Helfer. It has come

to the government's attention that in 1997, the IRS Inspector General investigated

certain allegations against Revenue Agent Helfer. The government now provides the

complete employee file to the Court for review, together with the following explanation:[1]

## **General Law Regarding Disclosure**

2. The United States is required to provide to the defense any evidence favorable to the accused and material to the accused's guilt or punishment. *Brady v. Maryland,* 373 U.S. 83 (1963). The principle of *Brady* has been extended to require the United States to disclose evidence that affects its witnesses' credibility. *Giglio v. United States,* 405 U.S. 150 (1972).

3. Only certain information is imputed to the United States, however. The United States is not required to disclose information not known to the prosecution team, such as information known to other federal agents or agencies that are not involved in the case at issue. *United States v. Morris,* 80 F.3d 1151, 1169-70 (7th Cir. 1996) (information possessed by federal agencies not part of investigative or prosecutorial team not imputed to prosecutors who were unaware of information); *see also United States v. Locascio,* 6 F.3d 924, 949 (2d Cir. 1993) (prosecutor's knowledge not inferred where the only agents that were aware of the information were not assigned to the investigation and prosecution). Thus, no violation of *Brady* or *Giglio* can occur if the information is not known to the United States at the time of the witness's testimony. *See United States v. Dimas,* 3 F.3d 1015, 1019 n.3 (7th Cir. 1993); *United States v. Lockhart,* 956

---

[1]References to Report of Investigation, IRS Inspector General's Office, are "Ex.1___"; references to Negotiated Alternative Disciplinary Agreement are to "Ex.2" .

2

F.2d 1418, 1425 (7th Cir. 1992); *cf. United States v. Moore*, 25 F.3d 563, 569 (7th Cir. 1994) (United States not required to seek out impeachment information of which it was not aware and which was not in their possession), *cert. denied*, 513 U.S. 939 (1994). Although *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) does impose a general duty on the United States to learn of any favorable evidence possessed by the agents involved in the case, *Kyles* cannot be "read as imposing a duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue." *Morris*, 80 F.3d at 1169.

4.     As noted above, if the United States is aware of it, impeachment evidence must be disclosed to a defendant. Allegations of bad acts, however, are not always admissible into evidence for impeachment. In fact, extrinsic evidence of specific instances of conduct of a witness, such as extrinsic evidence of the allegations against a witness, may not be used to impeach a witness's credibility. Fed.R.Evid. 608(b); *see also United States v. Saunders*, 166 F.3d 907, 920 (7th Cir. 1999). Instead, a proponent of such evidence is limited to inquiring into allegations on cross-examination, and then only if (1) the allegations concern the witness's character for truthfulness or untruthfulness, and (2) if the court so allows in its discretion. Fed.R.Evid. 608(b).

5.     Rule 608(b) does not, however, preclude extrinsic evidence from being introduced to show bias, as opposed to untruthfulness. *United States v. Abel*, 469 U.S. 45, 55-56 (1984). The Seventh Circuit only allows an examiner to question a witness as to bias based on an ongoing investigation into acts for which the witness has not been

3

convicted if the examiner can show (1) the bad act actually occurred; (2) the government
has knowledge of the bad act; (3) the lack of prosecution for the bad act; and (4) the
existence of promises not to prosecute. *United States v. West*, 670 F.2d 675, 683 (7th Cir.
1982), overruled on other grounds by *United States v. Green*, 258 F.3d 683, 690 (7th Cir.
2001); *see also United States v. Sasson*, 62 F.3d 874, 884 (7th Cir. 1995) ("general fear [of
prosecution] is not enough to allow the admission of prior bad acts in an attempt to
demonstrate bias"); *United States v. DeLeon*, 498 F.2d 1327, 1332-33 (7th Cir. 1974) ("if a
witness' general fear that he might be caught and prosecuted were sufficient to show
bias, then the rule that past criminal conduct not resulting in conviction is inadmissible
would never apply to government witnesses"). Furthermore, no argument can be made
that a witness is biased by fear of investigation or self-interest where the witness is
unaware of the pending investigation at the time the witness testified. *United States v.
Veras*, 860 F. Supp. 471, 478 (N.D. Ill. 1994), *aff'd*, 51 F.3d 1365 (7th Cir. 1995).

      6.     Even if evidence is known to the government and could have been used
for impeachment, it still only need to have been disclosed if it was "material," *i.e.*, that
there was a reasonable probability that, had the evidence been disclosed to the defense,
the result of the proceeding would have been different. *Strickler v. Greene*, 527 U.S. 263,
280 (1999), citing *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). Reasonable probability is a
probability sufficient to undermine confidence in the outcome. *Strickler*, 567 U.S. at
289-90. After all, the government "is not obligated to disclose 'every possible shred of
evidence that could conceivably benefit the defendant'." *United Stats v. Bhutani*, 175 F.3d

4

572, 577 (7th Cir. 1999) (quoting *United States v. Hamilton,* 107 F.3d 499, 509 (7th Cir. 1997)).

7.     For example, evidence that could not have been admitted at a proceeding could not be material to the outcome of the proceeding. *See Wood v. Bartholomew,* 516 U.S. 1, 6-8 (1995); *accord United States v. Silva,* 71 F.3d 667, 670 (7th Cir. 1995); *Dimas,* 3 F.3d at 1019. Applying this proposition, the Seventh Circuit held that an undisclosed perjury allegation made against a police officer was immaterial because it would have been admissible under Rule 608(b) only to the extent that the officer could be confronted with the allegation and defense counsel would be bound by his denial. *United States v. Veras,* 51 F.3d 1365, 1375 (7th Cir. 1995).[2]

8.     Likewise, evidence of conduct that is of remote significance or is irrelevant, is immaterial to a witness's credibility. *United States v. Duran,* 957 F.2d 499, 505-06 (7th Cir. 1992). In *Duran,* the Court affirmed the trial court's decision to preclude cross-examination of a police officer regarding charges that he forced a woman to have sex because those allegations were of remote significance and did not bear on the officer's credibility. *Id.*

9.     Finally, evidence that is preliminary, not reliable, speculative, or unsubstantiated is immaterial to a witness's credibility under *Giglio* and need not be disclosed. *Giles v. Maryland,* 386 U.S. 66, 98 (1967) (no duty to disclose "preliminary,

---

[2]Similarly, undisclosed evidence is not material to a decision to plead guilty where the evidence was not admissible. *See United States v. Persico,* 164 F.3d 796, 805 (2d Cir. 1999).

5

challenged or speculative information"); *Bhutani*, 175 F.3d at 577 ("government cannot be held responsible for failing to disclose merely speculative evidence"); *United States v. Locascio*, 6 F.3d 924, 948-49 (2d Cir. 1993) (no *Giglio* violation for failing to disclose "untrustworthy and unsubstantiated" allegation); *see also United States v. Agurs*, 427 U.S. 97, 109 n.16 (1976); *Tate v. Wood*, 963 F.2d 20, 25 (2d Cir. 1992).

## Discovery

10.     The government has a duty as required by *Giglio* to turn over to the defense in discovery all material information casting a shadow on a government witness's credibility.  Impeachment evidence, and all evidence material to the defendant's guilt is subject to a standard materiality test. *United States v. Dawes*, 1990 WL 171074 (D.Kan. 1990). (Evidence that a government witness is the subject of a pending IRS audit or investigation tends to show the possible bias or prejudice of that witness; such evidence is impeaching, exculpatory and material; *Benn v. Lambert*, 283 F.3d 1040,1055 (9th Cir. 2002).

## In Camera Review

11.     The Seventh Circuit has approved *in camera* review of disputed evidence in various cases. *See, e.g., United States v. Hach*, 162 F.3d 937, 947 (7th Cir. 1998) (*in camera* review of witness's psychiatric records); *United States v. Tucker*, 773 F.2d 136, 141-42 (7th Cir. 1985) (approving *in camera* submission by government); *United States v. Navarro*, 737 F.2d 625, 630-31 (7th Cir. 1984) (noting that *in camera* review by trial court may have solved appellate issue).  Furthermore, the Seventh Circuit has permitted a

6

district court to review such allegations *ex parte*. *United States v. Rodriguez-Andrade*, 62

F.3d 948, 954 (7th Cir. 1995).

12.    An overriding theme of the case law is that, out of an abundance of

caution, disputed evidence should be disclosed to the Court:

> [Our ruling] means, naturally, that a prosecutor anxious
> about tacking too close to the wind will disclose a favorable
> piece of evidence. This is as it should be. Such disclosure
> will serve to justify trust in the prosecutor as "the
> representative . . . of a sovereignty . . . whose interest . . . in a
> criminal prosecution is not that it shall win a case, but that
> justice shall be done."

*Kyles v. Whitley*, 514 U.S. 419, 439 (1995) (citations omitted).

## Presentation of facts

13.    The original allegation against Revenue Agent Helfer was that he

purchased a vehicle from Poling Chevrolet, Inc. while he was conducting an Internal

Revenue Service audit of Poling Chevrolet, Inc., in violation of Office of Government

Ethics, Section 2635.502, "personal and business relationships". (Ex. 1, Cover page)

Such an association would be considered a conflict of interest by the IRS. (Ex.1, 008)

The results of the investigation were:

> There was no evidence secured to indicate that a criminal
> violation occurred. No referral was made to the United
> States Attorney for consideration of criminal prosecution.
> MICHAEL T. HELFER admitted to purchasing a vehicle
> from the company on which he had conducted an Internal
> Revenue Service tax examination.

(R.1, Cover Page)

7

14.    Investigation revealed that Helfer had approached the president of Poling Chevrolet and inquired about the purchase of a vehicle. (Ex. 1, 045) When the president of Poling Chevrolet inquired whether it was proper for them to engage in a sale during the audit, Helfer indicated it would be no problem. (Ex. 1, 045) Helfer applied no undue pressure and, in fact, got a "worse than average" deal on the vehicle. (Ex. 1, 045) A question later arose about whether Helfer approached the president of Poling Chevrolet while Helfer was conducting the audit or after he had been removed from the audit. (Ex. 1, 051)

15.    The ensuing investigation revealed that Revenue Agent Helfer approached his group manager and advised him that he intended to purchase a vehicle from Poling Chevrolet and he requested that the Poling Chevrolet audit be reassigned. (Ex.1, 051) Helfer's group manager was aware that Helfer was assigned to the Poling Chevrolet audit, but did not forbid him to purchase the vehicle and did not advise him that the purchase would be a violation of IRS regulations. (Ex.1, 051) Helfer's group manager did not review the file and determine the number of days Helfer had spent on the audit and what, if any adjustments to the taxpayer's taxes had been made. (Ex.1, 051) Helfer's group manager asked Helfer if he truly wanted to make this purchase and "attempted to persuade Helfer that purchasing the car would not be such a good idea." (Ex.1, 051) Helfer indicated he wished to purchase the vehicle and the audit was reassigned to another revenue agent. (Ex.1,051)

8

16.     Helfer's group manager later recognized that Helfer had made adjustments
to some of the Poling Chevrolet employment tax returns and this had occurred before
Helfer purchased a vehicle from Poling Chevrolet. (Ex.1, 052)  When interviewed,
Helfer admitted he was assigned to the audit of Poling Chevrolet, that he became
interested in a vehicle and that he had contacted his supervisor and requested to be
removed from the audit.  He indicated that he had not made any adjustments to the
Poling Chevrolet tax returns prior to purchasing the vehicle. (Ex. 1, 048)[3]  Helfer
indicated that he purchased the vehicle after being removed from the audit.  He
indicated he would not have made the purchase if his supervisor had advised him not
to do so. (Ex.1, 049)

17.     Included in the investigation report is a complete discussion of the work
Helfer performed on the returns on which he worked at Poling Chevrolet.  (Ex.1, 007-
037)  It is obvious that this review was done to determine whether Helfer had made
adjustments which favored Poling Chevrolet and benefitted Helfer in the purchase of
the vehicle.  No such conclusion was reached. (Ex. 1, 033-036)  Poling Chevrolet
reviewed the sales figures for trade-ins and vehicles such as the one Helfer purchased
and concluded Helfer had not received a "special deal."  In fact, Helfer paid somewhat
more for the vehicle than many purchasers. (Ex.1, 045-046)  While a group manager

---

[3]Helfer was incorrect, he had made an adjustment to an employment tax return prior to
purchasing the vehicle. (R.51-52) The audit occurred in July, 1996 and the interview took place
in February, 1997.  Helfer had access to his workpapers during the interview, but there is no
indication that Helfer had access to the tax returns during the interview.

criticized Helfer's work on the audit, Helfer explained his methods for performing an audit and Helfer was not disciplined for any failures with respect to audit performance. (Ex.1, 007-009;048-050; Ex. 2)

## Discussion

18.     In this case, the United States has discovered, through due diligence, that the IRS Inspector General's Office investigated Revenue Agent Helfer in 1997 when he was employed by the IRS. He has since retired. Helfer is a significant witness in the government case. There have been no promises not to prosecute, so under Rule 608(b), the incident is not admissible.

19.     The government has reviewed the complete internal IRS file reference the Helfer investigation and provides it to the Court to review *in camera*. The government concludes that nothing in the file could be used to impeach Agent Helfer's character for truthfulness. The incident, if anything, demonstrates the IRS's extremely strict code of conduct and what might be termed "poor judgment" on behalf of an employee. There was nothing criminal in Helfer's conduct and nothing that could be admitted against him at any trial at which he should testify. Helfer readily admitted his action in the Poling Chevrolet incident and had even gone to his supervisor prior to making the purchase. While the government has a duty, as required by *Giglio*, to turn over to the defense all material information casting a shadow on a government witness's credibility, this information cannot be considered information which could cast a shadow on a witness's credibility. Further, the IRS investigation file includes so much

10

more than the simple allegation of possible conflict of interest, that the facts can become
confusing.

20.    The investigation file includes a group manager's critique of Helfer's audit
methodology and Helfer explained how he would have handled the audit had he
remained on the audit. (Ex.1, 007-008, 048-049)  Helfer was allowed to speak in very
general terms; clearly, audit methodology was not truly the focus of the investigation.
(Ex.1, 048-049)  Helfer's ability to perform an audit was not in question.  What was in
question was whether Helfer's audit had somehow granted special favors to Poling
Chevrolet.  The investigators did not reach such a conclusion.

21.    The investigation report also reviewed Helfer's request for medical leave,
but it seems more because the investigators were very thorough than for any other
reason. (Ex.1, 037-044)  The true focus of the investigation was, of course, whether
Helfer had committed a criminal act.  The conclusion was absolutely not. (Ex.1, Cover
page)  What Helfer did violate was an internal rule concerning conflict of interest.  (See:
Negotiated Alternative Disciplinary Agreement, Ex. 2)  In the settlement, the IRS did
not seek formal disciplinary action.  The IRS settled for five days without leave rather
than a five day suspension. (Ex. 2)  The particular violation may reveal poor judgment
on one occasion, but Revenue Agent Helfer did not deny his actions and did not benefit
from his actions.  If anything, he obtained a worse than average deal on the vehicle in
question.  Helfer certainly did not pressure Poling Chevrolet to obtain a good deal on
the vehicle and he did not use his position with IRS to obtain a favorable deal. (Ex. 1,
045-046)

11

22.    If Helfer's supervisor had suggested that they must review the file and determine if the rules allowed Helfer to purchase a vehicle at that time, or if Helfer's supervisor had simply told him he could not purchase a vehicle from Poling Chevrolet after an audit had begun, there would have been no regulatory violation. Helfer did, after all, inform his supervisor of his intentions and was honest in his stated reason for requesting that the audit be reassigned.

23.    It appears that the current review could focus as much on Helfer's supervisor for responsibility as it does on Helfer. However, Helfer's supervisor is not a government witness. In any case, the incident in question does not provide discoverable information regarding Revenue Agent Helfer's character for truthfulness. The incident in question concerns the strict rules under which IRS revenue agents must work.

24.    The IRS regulation on conflict of interest is, no doubt, to prevent agents from accusations of misconduct and to prevent the taxpayer from actual acts of misconduct. While Helfer did not misuse his position to obtain the vehicle he wanted, his actions made it appear that he might have misused his position in such a way. When confronted, Helfer did not try to hide his actions in any way and freely admitted to them. Further, as revealed in the Negotiated Alternative Disciplinary Agreement, (Ex. 2) the parties reached an agreement, and Helfer was not suspended. The fact that the IRS was prepared to negotiate a settlement reveals that the IRS did not consider Helfer's violation of the most serious nature.

12

## Conclusion

25. The Court and the government bear a heavy burden when considering whether to release a witness' personnel file. Personnel files are private and protected for good reason. Once revealed, the information can never be completely private again.

26. The United States of America respectfully requests that this Court issue an order as to the United States's duty to disclose a portion of Revenue Agent Helfer's personnel file and the investigation by the inspector general's office to defense counsel. Based on the foregoing reasons, the United States does not believe that it should be required to disclose any portion of the investigation from Helfer's personnel file. The particular incident is not material to Revenue Agent Helfer's credibility.

27. Should the Court determine that this information must be provided to the defense, the government requests that this Court order as follows:

> 1. The Court has reviewed the complete investigation, provided to the Court so the Court could determine whether the report contained matters discoverable under *Giglio*. The Court has determined that the Negotiated Alternative Disciplinary Agreement (Ex. 2) contains sufficient information for the defense. It is the sole document to be provided to defense.

13

2. Before the defendant can use information provided pursuant to *Giglio* with reference to Revenue Agent Helfer, the defense must establish the materiality of such information and reveal how the information will be used.

Respectfully submitted,

JAN PAUL MILLER
UNITED STATES ATTORNEY

s/Hilary W. Frooman
HILARY W. FROOMAN
Assistant United States Attorney
United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
217/373-5875
FAX: 217-373-5891

# REPORT OF INVESTIGATION

### (Chief Inspector - Washington, D. C. 20224)

| Office of Origin | | Date of Report |
|---|---|---|
| Regional Inspector - Midstates Region | | April 9, 1997 |

| Title (Name and Address) | Type of Investigation | Type of Report |
|---|---|---|
| MICHAEL T. HELFER<br>401 Arbours Drive<br>Savoy, Illinois  61874 | Conduct | ☐ Preliminary<br>☒ Final<br>☐ Supplemental |

| Social Security Number | Position and Grade |
|---|---|
| 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 | ☒ Employee    ☐ Applicant    ☐ Non-Employee |

| Date of Birth | Place of Birth | Position and Grade |
|---|---|---|
| December 8, 1944 | Champaign, Illinois | Internal Revenue Agent  GS-12 |

| Headquarters (City) | Date Entered on Duty |
|---|---|
| Chicago, Illinois | October 14, 1973 |

| Post of Duty | Period of Investigation |
|---|---|
| Champaign, Illinois | October 8, 1996 thru March 7, 1997 |

### BASIS FOR INVESTIGATION

On August 19, 1996, Internal Revenue Service (IRS) Examination Division officials reported that Internal Revenue Agent MICHAEL T. HELFER may have engaged in a conflict of interest by purchasing a vehicle from the automobile dealership (POLING CHEVROLET), which he was in the process of auditing.

### ALLEGATION

Internal Revenue Agent MICHAEL T. HELFER purchased a vehicle from POLING CHEVROLET, INC., a company of which HELFER was conducting an Internal Revenue Service audit in violation of:

Office of Government Ethics, Section 2635.502 personal and business relationships.

### RESULTS OF INVESTIGATION

There was no evidence secured to indicate that a criminal violation occurred.  No referral was made to the United States Attorney for consideration of criminal prosecution.  MICHAEL T. HELFER admitted to purchasing a vehicle from the company on which he had conducted an Internal Revenue Service tax examination.

| Distribution | No. | Case Number | Signature of Investigator Making Report |
|---|---|---|---|
| Chief Inspector | 2 | | *Kim W. Clift (for)* |
| Regional Inspector | 1 | 6-9610-0026 | Gary D. Bacon |
| Inspector General | | Signature of Person Examining and Forwarding Report | |
| Asst. U. S. Attorney | | Kevin Cliff  *Kim W. Clift* | |
| Other (Specify) | | Title<br>Supervisor-in-Charge, Internal Security | Office (City)<br>Chicago, Illinois |

## Exhibit 1

Form **2028**                                           Department of the Treasury - Internal Revenue Service

### Details of Investigation                                                  Page

On August 19, 1996 Internal Revenue Service(IRS) Examination Division Group Manager ROGER    1 - 3
FISHER reported that Internal Revenue Agent (R/A) MICHAEL HELFER requested that FISHER
reassign the audit, which HELFER was working on (POLING CHEVROLET, INC.). HELFER
reported that he had purchased a vehicle from POLING CHEVROLET..

On October 3, 1996 IRS Examination Division Branch Chief DEE FEATHERSTONE reported that a    2
review of the audit file relating to POLING CHEVROLET by her and Group Manager ROGER        27
FISHER indicated that HELFER had made tax adjustments to the taxpayer's employment tax returns
and secured a signed agreement from the taxpayer.

Review of the IRS Official Personnel File relating to MICHAEL HELFER disclosed that HELFER    5
was promoted to Group Manager on two occasions during his career with the IRS. However, records
indicate that HELFER voluntarily accepted downgrades to return to the field.

IRS Employment Tax Group Manager BUTCH PETERSON reviewed the corporate and employment    7 - 26
tax audit file regarding the audit of taxpayer POLING CHEVROLET. PETERSON found several
areas in the examination that raised some concern. HELFER secured an agreement on employment
taxes prior to completing the corporate audit. HELFER did not properly determine the value of the
demonstration automobiles owned by POLING CHEVROLET. This resulted in a discrepancy of
nearly $80,000.00 in the value determination. It does not appear that HELFER followed proper
procedures for conducting a corporate/employment tax audit of POLING CHEVROLET prior to
requesting reassignment of the audit. PETERSON added that when he initially reviewed the audit,
his opinion was that the audit was conducted by an inexperienced agent, the agent did not conduct a
professional audit, or that the agent had a business relationship with the taxpayer.

On July 26, 1996, POLING CHEVROLET President MARC POLING signed an agreement to    2 - 3
additional tax assessments made by HELFER.                                          27

On August 13, 1996, HELFER notified his Group Manager that he wished to be removed from the    2
audit of POLING CHEVROLET. On August 16, 1996, HELFER purchased a 1997 Chevrolet    29
Cavalier from the taxpayer, POLING CHEVROLET. Review of Illinois State Records and POLING    30-32
CHEVROLET records indicated that the price HELFER paid for the subject vehicle was no better
than the price the average buyer would pay and HELFER may have paid a higher than average price
for the vehicle.

Review of available industry reference information disclosed that HELFER received the average    33 - 36
amount for the trade-in of his old vehicle and paid an above average price for the subject vehicle.

On January 7, 1996 IRS Examination Branch Chief DEE FEATHERSTONE reported that HELFER    37 - 44
requested Leave Without Pay (LWOP), but HELFER had not provided the necessary documentation    47
from his physician and was therefore put in Absent Without Leave (AWOL) status.  HELFER did    48 - 50
not provide the necessary documentation until on or about February 5, 1997.

MARC POLING, President of POLING CHEVROLET stated that he was approached by HELFER    45 , 46
during the audit and HELFER inquired into the purchase of the vehicle which was on the showroom
floor of the business. POLING asked HELFER if it was proper for him to sell a vehicle to him and
HELFER advised him that there would be no problem. POLING stated that since he had never been
through an IRS audit before he had to depend on what HELFER told him. POLING then referred
HELFER to one of his salesman who discussed the vehicle purchase with HELFER approximately
one week prior to the actual purchase. He added that HELFER applied no undue pressure on him
regarding the purchase of the vehicle or the audit. POLING reviewed the records relating to the sale
of the vehicle to HELFER and added that in his opinion, HELFER received a "worse" than average
deal on the 1997 vehicle.

Internal Revenue Agent MICHAEL HELFER stated that he was assigned an audit of POLING    48-50
CHEVROLET in June 1996. Shortly after beginning the audit he noticed that the business was
delinquent in employment taxes and he secured delinquent returns to stop the penalties and interest.
He does not recall making any adjustments or securing a signed agreement from the taxpayer.
HELFER added that normally he would conduct the corporate audit first, but that in this case he dealt
with the employment tax issue first. HELFER then would have gone back to correct the employment
tax figures if necessary after completing the corporate audit. HELFER stated that he is not aware of a
Motor Vehicle ISP regarding demonstration automobiles and in this audit did not use an Information
Document Request (IDR).   HELFER stated that he was familiar with the conflict of interest
provisions of the U.S. Treasury Department and Internal Revenue Service. HELFER admitted that he
became interested in purchasing a vehicle from the taxpayer while conducting the audit and initiated a
discussion with the taxpayer in relation to that purchase.   HELFER added that he would have
properly dealt with the demonstration automobile issue had he continued to conduct the corporate
audit. HELFER explained that if his supervisor, ROGER FISHER, had advised him not to purchase
the vehicle, he would not have done so. HELFER stated that he has been having emotional problems
and that the delay in providing the proper documentation was due to miscommunications with his
doctors.

Internal Revenue Service Examination Group Manager ROGER FISHER advised that an    51 - 54
employment tax issue regarding POLING CHEVROLET was brought to his attention prior to
assignment of the audit on POLING CHEVROLET, INC. The audit was assigned to MICHAEL
HELFER and HELFER was advised of the employment tax issue prior to the audit.   HELFER
initiated the audit of POLING CHEVROLET on or about June 26, 1997. On August 13, 1996,
HELFER requested that the audit be reassigned to another agent because he intended to purchase a
vehicle from the taxpayer, POLING CHEVROLET. FISHER added that although he did not advise
HELFER not to purchase the vehicle, he attempted to have HELFER reexamine his decision to do so.
FISHER stated that he was not aware that HELFER had previously secured an employment tax
agreement from the taxpayer. FISHER reassigned the audit to another agent. FISHER explained that
adjustments to employment tax returns are not usually made until completion of the corporate tax
audit. FISHER also reported that HELFER accused him of being a "whistleblower" and he explained
to HELFER that he had no choice but to report the matter to Inspection.

6-9610-0026                              3
HELFER, Michael T.

## Exhibit List Sheet

| Exhibit | Page |
|---|---|
| Memorandum Of Interview - Interview of Examination Division Group Manager ROGER FISHER, dated August 19, 1996. | 1 |
| Memorandum of Interview - Interview of Examination Division Branch Chief DEE FEATHERSTONE, dated October 3, 1996. | 2 , 3 |
| Illinois Secretary of State vehicle registration record relating to 1997 Chevrolet owned by MICHAEL T. and SHERRY F. HELFER , | 4 |
| Memorandum of Activity - Review of Official Personnel Records relating to Internal Revenue Agent (R/A) MICHAEL T. HELFER, dated October 3, 1996. | 5 |
| Photocopy of Internal Revenue Service (IRS) appointment letter relating to POLING CHEVROLET, dated June 26, 1996 prepared and signed by MICHAEL T. HELFER. | 6 |
| Memorandum of Interview - Interview of IRS Employment Tax Group Manager BUTCH PETERSON dated October 17, 1996. | 7 , 8 |
| Original notes relating to the audit review of POLING CHEVROLET audit prepared by Group Manager BUTCH PETERSON, dated October 28, 1996. | 9 - 11 |
| Photocopy of IRS Motor Vehicle ISP re: Demonstrator Automobiles. | 12 - 22 |
| Photocopy of audit exhibit D-9 relating to audit of POLING CHEVROLET regarding value of demonstrator automobiles. | 23 |
| Photocopy of trial balance sheets reflecting value of demonstrator automobiles owned by POLING CHEVROLET for years 1994 and 1995. | 24 - 26 |
| Photocopy of Form 2504, Agreement to Assessment and Collection of Additional Tax and Acceptance of Overassessment signed by POLING CHEVROLET President MARC POLING, dated July 26, 1996. | 27 |
| Certified Photocopy of Illinois Secretary of State Certificate of Origin and Title relating to a 1997 Chevrolet sold by POLING CHEVROLET to MICHAEL T. and SHERRY F. HELFER on August 16, 1996. | 28 - 31 |
| Photocopy of Illinois Department of Revenue Form ST-556, Sales Tax Transaction Return relating to the sale of a 1997 Chevrolet Cavalier by POLING CHEVROLET to MICHAEL T. and SHERRY F. HELFER signed and dated August 16, 1996. | 32 |

6-9610-0026                                    5
HELFER, Michael T.

| | |
|---|---|
| Photocopy of 1997 Edition of American Car Price Guide relating the value of a 1997 Chevrolet Cavalier Z-24 Coupe. | 33 , 34 |
| Photocopy of NADA Official Used Car Guide, dated August 1996 relating to the value of a 1993 Pontiac Grand Prix. | 35 , 36 |
| Memorandum of Interview - Interview of IRS Examination Division Branch Chief DEE FEATHERSTONE, dated January 7, 1997. | 37 |
| Photocopy of Form 1725, Routing Slip to Manager, Exam Group 1711 prepared and signed by MICHAEL T. HELFER, dated December 17, 1996. | 38 |
| Photocopy of Request for Advanced Annual/Sick Leave/LWOP prepared and signed by MICHAEL T. HELFER, dated December 16, 1996. | 39 , 40 |
| Photocopy of Optional Form 41, Routing and Transmittal Slip to Chief, Examination Branch prepared and signed by ROGER FISHER dated December 17, 1996. | 41 |
| Photocopy of electronic mail message prepared by DELORIS FEATHERSTONE, dated December 19, 1996. | 42 |
| Photocopy of Christie Clinic letter to ROGER FISHER relating to MICHAEL HELFER prepared and signed by JAMES R. SMITH, Ph.D., dated December 24, 1996. | 43 |
| Memorandum of Interview - Interview of IRS Examination Division Branch Chief DEE FEATHERSTONE, dated February 4, 1997. | 44 |
| Memorandum of Interview - Interview of MARC POLING, President of POLING CHEVROLET, dated February 12, 1997. | 45 , 46 |
| Photocopy of Christie Clinic letter addressed to ROGER FISHER relating to MICHAEL HELFER prepared and signed by JOHN A. GERGEN, dated February 3, 1997. | 47 |
| Memorandum of Interview - Interview of Internal Revenue Service Agent MICHAEL T. HELFER, dated February 26, 1997. | 48 - 50 |
| Memorandum of Interview - Interview of IRS Examination Division Group Manager ROGER FISHER, dated March 7, 1997. | 51 , 52 |

6-9610-0026                                    3
HELFER, Michael T.

Photocopy of notes relating to the IRS audit of POLING CHEVROLET submitted by IRS     53
Examination Division Group Manager ROGER FISHER, dated June 11, 1996.

IRS Form 1725, Routing Slip sent to ROGER FISHER prepared and signed by R/A MICHAEL     54
HELFER, dated February 28, 1997.

6-9610-0026                            4
HELFER, Michael T.

| Type of Activity:<br>☐ Personal Interview<br>☒ Telephone Interview<br>☐ Records Review<br>☐ Other | Inspection Service<br>**Memorandum of Interview<br>or Activity** | Date and Time<br><br>August 19, 1996 |
|---|---|---|
| Activity or Interview of: *(Include all necessary data)*<br><br>ROGER FISHER<br>Examination Group Manager<br>Champaign Post-of-Duty<br>Illinois District | Conducted by: Inspector R. SEMMENS |  |
|  | Location Of Interview/Activity<br><br>via telephone |  |

**Subject Matter/Remarks**

FISHER reported that Revenue Agent MICHAEL HELFER approached him Tuesday, August 13, 1996, regarding an examination of POLING CHEVROLET in Monticello, Illinois. HELFER explained that he was going to buy a car from POLING CHEVROLET and asked if FISHER wished to reassign Revenue Agents because of a perceived conflict of interest. FISHER switched the case agent to NANCY ALLEN and took HELFER off the examination. FISHER is not aware of any benefit received by HELFER and FISHER doubts the examination could be compromised in any way. FISHER was advised to report if any further information he receives relating to this examination indicates any impropriety, otherwise the matter will be filed as Miscellaneous Information Item.

| Name:<br>HELFER, MICHAEL | Case Number:<br>6-9610-0026 |
|---|---|

Form 8052 IS  (Rev. 8-96)          Department of the Treasury - Internal Revenue Service

| Type of Activity: | Inspection Service | Date and Time |
|---|---|---|
| ☒ Personal Interview<br>☐ Telephone Interview<br>☐ Records Review<br>☐ Other | **Memorandum of Interview**<br>**or Activity** | October 3, 1996<br>9:00AM |

| Activity or Interview of: *(Include all necessary data)* | Conducted by:  S/I Gary Bacon |
|---|---|
| DEE FEATHERSTONE<br>Examination Manager<br>DDIR - Illinois District | Location Of Interview/Activity<br><br>320 West Washington Street, Rm. 610<br>Springfield, Illinois |

**Subject Matter/Remarks**

Examination Manager FEATHERSTONE reported the following:

On or about August 19, 1996 Examination Group Manager ROGER FISHER reported that Internal Revenue Agent (R/A) MICHAEL HELFER declined to perform a corporate audit of POLING CHEVROLET, due to the fact that HELFER had purchased a vehicle from that dealership. On the surface, it appeared that R/A HELFER conducted himself properly by removing himself from the audit. However, since that date it has been brought to her attention that R/A HELFER has, in fact, performed an employment tax audit of POLING CHEVROLET which was initiated in July 1996 and an agreement was signed by the taxpayer, POLING CHEVROLET on July 26, 1996. The examination resulted in additional tax assessments of over $1,200.00.

During this employment tax audit, HELFER took R/A ANDY SCHMIDT with him. SCHMIDT examined the 1994 Form 1040 tax return of the General Manager of POLING CHEVROLET regarding a fringe benefit issue. Later review of this audit revealed that R/A SCHMIDT did not use the proper method in this examination. The audit of the 1120 U.S. Corporation Income Tax Return was also not conducted at that time. Also, there was no adjustment made for "demo" automobiles used by the owner of POLING CHEVROLET or the owner's wife.

The 1120 Income Tax audit was initiated by HELFER on June 26, 1996. HELFER charged time to this audit on June 26, July 11, July15, July 16, August 12, August 13, and August15, 1996. HELFER removed himself from the audit on August 13, 1996 after he decided to purchase a vehicle from POLING CHEVROLET. At this point, however, HELFER had previously conducted the employment tax audit and worked on the corporate tax audit. HELFER took delivery of the vehicle purchased from POLING CHEVROLET on August 16, 1996. The employment tax audit is still open pending appeal by the corporate accountant for abatement of penalties.

002

| Name:<br>HELFER, MICHAEL | Case Number:<br>6-9610-0026 |
|---|---|
| Form 8052 IS  (Rev. 8-96) | Department of the Treasury - Internal Revenue Service |

On September 24, 1996, BUTCH PETERSON, Group Manager - Employment Tax Group located in Downers Grove, Illinois came to Springfield to give a presentation to employees. While he was present, FEATHERSTONE asked him to review the Poling Chevrolet employment tax audit. She did not advise PETERSON of the situation regarding HELFER. PETERSON advised her that he had some concerns regarding certain missing workpapers relating to the audit and questioned the lack of addressing the "demo" issue. PETERSON also indicated that it was highly unusual that the employment tax audit was closed without first conducting the corporate tax audit. When asked why a R/A would handle the audit that way, PETERSON replied that either the R/A was inexperienced or the R/A had a business relationship with the taxpayer.

FEATHERSTONE advised that the coporate audit was reassigned to R/A NANCY ALLEN as of August 15, 1996.

003

| Name: | Case Number: |
|---|---|
| HELFER, MICHAEL | 6-9610-0026 |
| Form 8052 IS  (Rev. 8-96) | Department of the Treasury -  Internal Revenue Service |

```
RTO1 OO          *R1

MICHAEL T HELFER                    EXP- JUN 97    MYKHEL4
SHERRY F HELFER                     EXP- JUN 96    MYKHEL4
401 ARBOURS DR
SAVOY              61874            VIN 1G1JF12T5V7104863
CHAMPAIGN                           97 CHEVROLET                    COUPE
H416-5584-4349    H416-7864-6937    4 CYL 25.6 HP
MULTI OWNER-2

                                              TITLE T6260399036
                                  RENL MAIL O                      PROC 16


YR  TA     DESCRIPTION      VAL-DATE MA SERL     FEE    CLSS ACT-DATE MFILM-NUM
97  68   PLT TRANSFER       09/05/96 RS 1251    25.00 4215 09/19/96 T6260399036
96  68   PLT TRANSFER       08/10/95 TG 8420    25.00 4215 08/30/95 G9396540
```

004

| Type of Activity:<br>☐ Personal Interview<br>☐ Telephone Interview<br>☒ Records Review<br>☐ Other | **Inspection Service**<br>**Memorandum of Interview**<br>**or Activity** | Date and Time<br><br>October 3, 1996 |
|---|---|---|
| Activity or Interview of: *(Include all necessary data)* | Conducted by: SI Gary Bacon | |
| Review of Official Personnel Records relating<br>to Internal Revenue Agent MICHAEL T. HELFER | Location Of Interview/Activity<br><br>Internal Revenue Service Center<br>Kansas City, Missouri | |

**Subject Matter/Remarks**

On October 3, 1996, Internal Revenue Service General Investigator HERSHEL COLE conducted a review of the Official Personnel File (OPF) of Internal Revenue Agent (R/A) MICHAEL HELFER. The OPF review disclosed the following:

R/A HELFER was promoted to a GS-13 Supervisory Internal Revenue Agent on July 1, 1979 in Charleston, South Carolina. On July 27, 1979 R/A HELFER requested and received a downgrade to an Internal Revenue Agent GS-12. On July 30, 1979 R/A HELFER transferred to the Springfield, Illinois District office. On May 15, 1983 he was again promoted to a GS-13 Supervisory R/A in Sarasota, Florida. On June 26, 1983 he requested and received a downgrade to a GS-11 R/A again being assigned to the Springfield District. He was promoted to a GS-12 R/A on March 15, 1987.

005

| Name:<br>HELFER, MICHAEL | Case Number:<br>6-9610-0026 |
|---|---|
| Form 8052 IS (Rev. 8-96) | Department of the Treasury - Internal Revenue Service |

310 W. Church Street
Champaign, Il.    61820

Date:  June 26, 1996            Form Number:  1120

                                Tax Year(s) Ended:  Dec. 31, 1994

                                Person to Contact:  Michael T. Helfer

Poling Chevrolet
c/o Mr. Marc Poling             Telephone Number :  (217) 398-5407
P.O. Box 192, Bridge St. Rd.
Monticello, Il.   61856
                                Date/Time/Place of Appointment:
                                   Monday, July 15, 1996 @ 8:30 a.m.,
                                   @ Poling Chevrolet, Monticello.

—

Dear Mr. Poling,

     The Corporate Federal Income tax return for the above year(s) has been
assigned to me for examination.  Because I need access to information to
verify items reported on the return, I have scheduled an appointment for the
date, time, and place shown above.

     To help make the examination as brief as possible, please have the
following information available (as applicable) for the year(s) being
examined:

     y  Corporate Minute Book.
     y  Stock Certificate Book.
     N  Certified Audit Report
     N  Prior Examination (I.R.S.) Report.
     y  Chart of Accounts.
     y  Detailed Depreciation Schedule.
     y  Employment Tax Forms 940 and 941.
     y  Forms W-2 and W-3.
     y  Forms 1099 and 1096.
     y  Form 5500.
     N  Form 720 and 2290.
     y  Form 1120 for Prior and Subsequent Year.
     y  Form 1040 for Shareholder(s) Owning 50% or More of Corporate Stock.
     y  Bank Statements and Cancelled Checks.
     y  Year End Trial Balance and Adjusting Journal Entries.
     y  Year End Inventory Records.
        Books of Original Entry; i.e., Journals and Ledgers.

     If it is necessary to reschedule the appointment because of either the
date, time, or location, please contact me at the number shown above.

                            Sincerely,

                            Michael T. Helfer
                            Michael T. Helfer,
                            Internal Revenue Agent

                    006

                                                        A-1 (a)

| Type of Activity: ☒ Personal Interview ☐ Telephone Interview ☐ Records Review ☐ Other | Inspection Service **Memorandum of Interview or Activity** | Date and Time October 17, 1996 1:35 PM |
|---|---|---|
| Activity or Interview of: *(Include all necessary data)* BUTCH PETERSON Employment Tax Group Manager DDIR - Illinois District | Conducted by: SI Gary Bacon Location Of Interview/Activity Office of the Regional Inspector 320 West Washington Street Room 610 Springfield, Illinois | |

**Subject Matter/Remarks**

Group Manager PETERSON conducted an independent review of the employment tax and corporate tax audit relating to POLING CHEVROLET conducted by Revenue Agent (R/A) HELFER. PETERSON provided the following:

On the employment tax audit it appears that R/A HELFER arbitrarily determined a value for the demonstration model vehicles (demos) which the dealership listed being assigned to the General Manager and to one of the salesman. It appears HELFER used a figure of $12,000 to $24,000 for the vehicle/vehicles. It is not clear whether there is one demo used by both individuals or whether each individual was driving a separate vehicle. HELFER applied a 40% valuation to be included in income. It appears that HELFER had no method of determining these values and percentages. The dealership should have records relating to the value of these demos, however, it does not appear that HELFER requested these documents.

It also appears that R/A HELFER did not inquire as to who in the company was actually driving demos. It seems odd that the owners of the company would not be driving demos but R/A HELFER indicated that the owner and his wife only drive used cars. Determination of who had demos assigned should have resulted in additional FICA/FUTA taxes being assessed. There was also Form 1099 issues included in the audit. R/A HELFER should have questioned whether or not the persons being issued Form 1099 should have been considered as employees rather than contract labor. HELFER did not pursue this.

PETERSON also looked at the Form 1120 U. S. Corporation Income Tax Return which was initially examined by R/A HELFER. On exhibit A1A HELFER issued a letter to the taxpayer requesting certain documents. It does not appear that HELFER followed the Internal Standard Procedures (ISP) used by Examination Division to request the value of any demos that the dealership may have had in inventory. HELFER should have issued an Information Document Request (IDR) requesting this information per the ISP. This request is not reflected anywhere in HELFER's audit workpapers. Again, the owners of the business made day to day business decisions and signed company checks but found it unusual that the owners would not be driving demos according to exhibit B1A of HELFER's workpapers. Exhibit B1C of the workpapers also indicates that HELFER should have expanded certain issues, however, it appears that HELFER initial interview of the taxpayer was vague and incomplete. This information was not in the file.

007

| Name: HELFER, MICHAEL | Case Number: 6-9610-0026 |
|---|---|

Form 8052 IS  (Rev. 8-96)   Department of the Treasury - Internal Revenue Service

PETERSON added that according to exhibits B2A and B2B of the workpapers, it appears that the father of the current owner was the previous owner of the business and transferred 100% of the shares of stock to his son. It appears that HELFER never questioned whether or not the Father was ever assigned a demo to drive. Included in the workpapers is coversheet Form 4318 which indicates that R/A HELFER conducted a comparative analysis. However, this analysis cannot be located anywhere in the file.

Per workpaper exhibit C2 it appears that the owners return was not examined. This is unusual as it should be examined to determine if the issue of the demos applied here. Also it appears that the shareholders' returns were not examined. It seems odd that HELFER's first appointment was with the taxpayer on July 15, 1996. On that same date, HELFER determined not to examine the shareholder's returns. This is unusual because normally an agent would conduct the examination prior to making that determination. However, HELFER may have made that decision based on his initial interview of the taxpayer. Regarding exhibit C3 of the workpapers it appears that HELFER did not question the employment status of the individual who was issued a Form 1099. This would be routine procedure. Also, it appears that HELFER did not consider the value of the insurance or maintenance of the demos.

PETERSON also reviewed the work done by R/A NANCY ALLEN after HELFER transferred the audit to her. It appears that Issue V listed on the Form 4318 conflicts with HELFER's in that ALLEN has computed an adjustment of $11,000.00 which is not reflected in HELFER's workpapers. Also exhibits E4B, E24, E37, and E52 reflects no demo listed in the inventory in HELFER's workpapers. However, exhibit H of ALLEN's workpapers reflect demo values which would reflect 6 to 8 demo vehicles in the business inventory valued at $92,00.00. This information should have and would have been available to HELFER had he followed the ISP and issued an IDR to request this information. Also on workpaper V of HELFER' s workpapers the owners claim to drive used vehicles reporting that they drive 5,000 to 10,000 miles of business mileage per year. However, it appears that HELFER has never questioned the year, make, or model of these used vehicles and what the business mileage was for.

Examination records reflect that the Form 1040 Individual Income Tax Return audits on one of the salesman by the name of HENDON and the General Manager by the name of WINCHESTER was assigned to R/A SCHMIDT by R/A HELFER. It appears that SCHMIDT just transfers the figures provided by HELFER to the individual audits. There is no basis for these figures as reflected in HELFER's employment tax audit. There appears to be a "self-serving" statement included in the file which ties these figures to the employment tax and income tax audits of the business but there is no real basis for these figures found anywhere in the workpapers. There is another document which appears to "self-serving" on exhibit D-9 of the WINCHESTER audit.

PETERSON concluded that saying that when he initially reviewed this audit several weeks ago he believed that the audit indicated that the R/A was either inexperienced or that the R/A had entered into a business relationship with the taxpayer. He added that if the R/A entered into a business relationship with the taxpayer, it would be improper to do so and my reflect a conflict of interest by the Revenue Agent.

| Name: | Case Number: |
|---|---|
| HELFER, MICHAEL | 6-9610-0026 |

Form 8052 IS (Rev. 8-96) | Department of the Treasury - Internal Revenue Service

The following notes are based on a a review of Poling Chevrolet
(37-0867554) 9412 & 9512 conducted on October 17, 1996.

**941 File**
1. No indication of how Auto FMV arrived at.

2. Appears that F. Winchester (Sales GM Manager may not meet
   definition of full time auto sales person per Reg.
   1.132-5(0).

3. No indication that M. Hendon qualifies as full time sales
   person under Reg.

4. No indication of how amounts arrived at for purpose of FICA
   Tax & FUTA Tax computations appear to be based on percentage
   of business vs. personal.

5. Does dealership owner have demo (?), wife (?), any children
   (?), other employees (?), retired board member (father) (?),
   possibly should be considered in 941 & 940 (?) wages/for
   purpose of FICA & FUTA.   Why no backup withholding for
   9512?

**4318 File       Agent: M. Helfer**
1. A-1(a) Initial letter shows no request for list of employees
   using demo vehicles.  Review of file does not indicate that
   it ever was requested.  Chart of Accounts, Detailed
   Depreciation Schedule and Trial Balance received, but not in
   file.

2. B-1(a) TPH and TPW sign all checks.  Do they have demo
   vehicles?  No indication in file that they do or was it ever
   determined to ascertain if so.  Ric (G.M.) signs checks
   determined that he had demo and subject to tax.

3. B-1(c) Initial interview on corporate autos barely touched
   surface.  Responses require further development.  No
   indication that this was done.

4. B-2(a) Father (prior owner) transferred stock to son.  Did
   he have any usage of company auto?  Doesn't appear to have
   been considered.

5. Marc Poling (TPH) and Carole Dawn Poling (TPW), do they have
   demo?

6. No comparatives in file.

10-28-96
HELF

7. C-2 agent indicates that S/H return  not be examined at this time.

8. C-3 1099's issued to ind.  No indication that conversion of workers considered.  Possible back-up withholding applicable.

9. No indication as to whether insurance and maintenance included in annual lease value.


Brown Binder '        R.A. Nancy Allen
Audit Plan - Issue check indicates that there is a taxable benefit to S/H.  No one else though appears to be considered.

1. E-4(b) No demo value in LIFO inventory.

2. E-24 No demo value in LIFO inventory.

3. E-37 No demo value in LIFO inventory.

4. E-52 No demo value in LIFO inventory.

5. H   Adj. trial bal.- Acct. 23000 - Inventory - Demonstrator
       Prior Period          Unadj. Bal       Adj. Bal
       92,307.02             44,465.68        44,465.68
       for period ended 12/31/95

6. H   Adj. trial bal. - Acct. 23000 - Inventory - Demonstrator
       Prior Period          Unadj. Bal       Adj. Bal
       -                     92,307.02        92,307.02
       for period ended 12/31/94
       Also contained in Federal income tax grouping for 9412
       9512.

7. V - Check of agent's computation of personal use of auto for S/H appear that S/H state they drive used vehicles only.
       (TPH) Claims 62.5% business
       (TPW) Claims 33.4% business
       Use average value of autos of 12,000 & 10,000 each.

File for M. Hendon
1. Workpaper states that TP used a used auto.  Used various autos TP claims personal use of 40%.  What percentage is business and how determined (see notes on employment tax file)?  How did Courtesy Ford determine reportable amount?

2. How was FMV determined?

010

10-26-76
HBP

**F. Winchester**
1. See notes above.

2. TP claims as G.M. he was required to drive 250 miles per
   month for business out of 550 miles.  What business purpose
   is the 250 miles for?  TP has used car as stated in w/p.
   See w/p D-9.

HEP 10/17/96

Harold E. Peter
Group Manager
Employment Tax Group (1824)
10-28-96

011

MOTOR VEHICLE ISP
DEMONSTRATOR AUTOMOBILES
ERNEST A. FREEDMAN
708-918-4831

I. DISCUSSION OF REG. 1.132-5(o)

II. DISCUSSION OF COMMUTING VALUATION RULE
   A. REG. 1.61-21(f)(1)
   B. REG. 1.274-6T(a)(3)

III. DISCUSSION OF DEMO AUDIT PLAN

IV. PHILOSOPHY OF CHICAGO DISTRICT

012

| Name of Taxpayer | Year/Period |
| DEMO ISSUE – VALUATION OF PERSONAL USE – REG.1.132-5(o) | xxxx |

INTRODUCTION ·

Reg. 1.132-(5)(o) allows a select group of individuals who drive demonstrators to report no income on their W-2's for personal use. However, the total exclusion of income is not a right but a privilege to be earned. Many dealerships assume the only qualification for this privilege is for an individual to be classified as a "full-time salesman." This is only the first step. There are two more steps to climb. The additional steps are (a) there must be substantial restrictions placed on the use of the demo and (b) proper substantiation must be maintained by the employee and employer. Any stumble on the three steps will prevent total exclusion of income. If an individual stumbles on the first step (full-time salesman), the working condition fringe benefit rules of Reg. 1.132-(5)(o) do not apply to that individual.

## A. DEFINITION OF FULL-TIME AUTOMOBILE SALESMAN

Regulation 1.132-5(o)(1) states the following: "In general. The value of qualified automobile demonstration use is excludable from gross income as a working condition fringe." This exclusion is available only to an individual who is a "full-time automobile salesman." The individual must be in a position of selling cars. A parts manager, service manager, office manager, and a F&I manager are examples of individuals who would not qualify for the exclusion. Reg. 1.132-5(o)(2) states the following: "Full-time automobile salesman--(i) Defined. The term "full-time automobile salesman" means any individual who----
    (A) Is employed by an automobile dealer;
    (B) Customarily spends at least half of a normal business day performing the functions of a floor salesperson or sales manager;
    (C) Directly engages in substantial promotion and negotiation of sales to customers;
    (D) Customarily works a number of hours considered full-time in the industry (but at a rate not less than 1,000 hours per year); and
    (E) Derives at least 25 percent of his or her gross income from the automobile dealership directly as a result of the activities described in paragraphs (o)(2)(i)(B) and (C) of this section."
(A) and (D) appear to be self-explanatory. (B), (C), and (E) are somewhat vague especially when it comes to classifying an individual other than a floor salesperson. A sales manager is an example of an individual who is sometimes difficult to define as a "full-time salesperson." It is not the title that is defining but what does the individual actually do? The test of defining a "full-time salesperson" can be broken down into two parts: (a) Activities Test and (b) Income Test. It is conceivable an individual could satisfy the activities part but not the income part. If the activities part does not result in a sale, no income is derived directly as a result of the individuals' efforts. Also, the 25 percent rule in (E) above does not mean the salesperson must earn a commission or other flat amount based on the number of vehicles sold. So long as the income is derived from the

| Name of Taxpayer | Year/Period |
|---|---|
| DEMO ISSUE – VALUATION OF PERSONAL USE – REG.1.132-5(o) | xxxx |

activities, it satisfies the requirement. A straight salary that compensates
an individual for selling automobiles to customers qualifies under the
regulation.

## B. RESTRICTIONS

The next hurdle to overcome for the gross income exclusion to apply is found
in Reg. 1.132-5(o)(1)... "Qualified automobile demonstration use" is any use
of a demonstration automobile ... in the sales area in which the automobile
dealer's sales office is located if----
      (i) Such use is provided primarily to facilitate the salesman's perform-
ance of services for the employer; and
      (ii) There are substantial restrictions on the personal use of the
automobile by the salesman." The Regulation does not expand on (i) but it
does define what "substantial restrictions" are. Reg. 1.132-5(o)(4) states
the following: "Substantial restrictions on personal use. Substantial
restrictions on the personal use of a demonstration automobile exist when all
of the following conditions are satisfied:
      (i) Use by individuals other than the full-time automobile salesman
(e.g., the salesman's family) is prohibited;
      (ii) Use for personal vacation trips is prohibited;
      (iii) The storage of personal possessions in the automobile is
prohibited; and
      (iv) The total use by mileage of the automobile by the salesman outside
the salesman's normal working hours is limited." The first three restrictions
are obvious. The fourth is not so obvious. Commuting is allowed. The
mileage restriction applies to personal use of the automobile, other than
commuting use, outside of working hours. The regulations do not provide a
specific number of miles. The amount of miles permissible under the
regulations may vary depending on each salesperson's facts and circumstances.
Clearly, however, the employer should have some "meaningful policy" in place
to restrict personal mileage use.

## C. SUBSTANTIATION REQUIREMENTS

The third hurdle to overcome is the substantiation requirements. Reg. 1.132-
5(o)(6) states the following: "Applicability of substantiation requirements
of sections 162 and 274 (d). Notwithstanding anything in this section to the
contrary, the value of the use of a demonstration automobile may not be
excluded from gross income as a working condition fringe, by either the
employer or the employee, unless, with respect to the restrictions of
paragraph (o)(4) of this section, the substantiation requirements of section
274(d) and the regulations thereunder are satisfied. See 1.132-5(c) for
general and safe harbor rules relating to the applicability of the
substantiation requirements of section 274(d)."

Section 1.132-5(c)(1) of the regulations provides that the value of property

| Name of Taxpayer | Year/Period |
| DEMO ISSUE — VALUATION OF PERSONAL USE — REG.1.132-5(o) | XXXX |

or services provided to an employee may not be excluded from the employee's gross income as a working condition fringe unless the applicable substantiation requirements of either section 274(d) or section 162 (whichever is applicable) and the regulations thereunder are satisfied.

Section 1.274-5T(e) of the regulations provides that an employee may not exclude from gross income as a working condition fringe any amount of the value of the availability of "listed property" provided by an employer to the employee, unless the employee substantiates for the period of availability the amount of the exclusion in accordance with the requirements of section 274(d) and either section 1.274-5T or 1.274-6T. The term "listed property" includes any passenger automobile. Section 280F(d)(4)(A)(i).

Section 274(d) of the Code provides that, with respect to listed property, no deduction is allowable unless the taxpayer substantiates by adequate records or sufficient evidence corroborating the taxpayer's own statement the amount, time and place, business purpose, and business relationship of the expense or other item.

Section 1.274-5T(b)(6) of the regulations provides, in pertinent part, that the elements to be proved with respect to an automobile are (1) the amount of business use based on mileage, (2) the total use based on mileage, (3) date of use, and (4) the business purpose for the use of the automobile.

Detailed rules on substantiation are provided in section 1.274-5T(c) of the regulations. These regulations strongly encourage taxpayers to maintain contemporaneous written records and other documentary evidence but do not require them. The following passage is illustrative:

> A contemporaneous log is not required, but a record of the elements of an expenditure or of a business use of listed property made at or near the time of the expenditure or use, supported by sufficient documentary evidence, has a high degree of credibility not present with respect to a statement prepared subsequent thereto when generally there is a lack of accurate recall. Thus, the corroborative evidence required to support a statement not made at or near the time of the expenditure or use must have a high degree of probative value to elevate such statement and evidence to the level of credibility reflected by a record made at or near the time of the expenditure or use supported by sufficient documentary evidence.

Section 1.274-6T of the regulations provides two types of written policy statements ("short cut substantiation") that an employer may use to implement a policy of either (i) no personal use or (ii) no personal use other than commuting. If policy statements meeting the requirements of the regulations are implemented, the employee need not keep a separate set of records for purposes of the employer's substantiation requirements under section 274(d) with respect to use of a vehicle satisfying these written policy statement rules.

015

| Name of Taxpayer | Year/Period |
|---|---|
| DEMO ISSUE - VALUATION OF PERSONAL USE - REG.1.132-5(o) | XXXX |

Paragraphs (i)·(B) and (ii)(B) of section 1.274-6T(a)(3) of the regulations state that the employer must, for bona fide noncompensatory business reasons, require the employee to commute to and/or from work in the vehicle.

Can the "short cut substantiation" method be used in the ordinary automobile demonstration use context? Assuming all the other requirements are satisfied under 1.132-5(o) it would appear that a "full-time automobile salesperson" can use this method. The existence of the working condition fringe exclusion for qualified automobile demonstration use is evidence of Congress' recognition of the business connection inherent in this type of automobile use. The automobile dealers clearly have an interest in having their salesmen know the automobiles they sell. If; however, under the facts and circumstances, it appears that the real purpose in providing the automobile is to compensate the employee, the substantiation method provided in section 1.274-6T is unavailable.

Section 1.274-6T(a)(3) of the regulations sets forth six requirements for "short cut substantiation" that must be followed for vehicles not used for personal purposes other than commuting. The regulation also states that there must be evidence that would enable the Commissioner to determine whether the use of the vehicle met those six conditions. What kind of evidence is adequate? The purpose of "short cut substantiation" is to establish substantiation requirements that are less stringent than those in section 1.274-5T. Section 1.274-5T does not require (although it strongly suggests) the use of a contemporaneously kept log by each employee using an automobile. Section 1.274-6T(a)(1) of the regulations provides that an employee need not keep a separate set of records for purposes of the employer's substantiation requirements. Evidence that may suffice for these purposes includes records maintained by an employer demonstrating that mileage does not fluctuate significantly. Significant mileage fluctuation may be evidence of more than de mimimis personal use, because the employee's commuting and limited personal use mileage should be relatively constant.

Section 1.274-6T of the regulations provides no exceptions to its general rule that each of the six enumerated requirements in paragraphs (a)(3)(i) and (ii) be satisfied. Therefore, it is necessary to include the $1.50 one-way commute in income to obtain the advantage of "short cut substantiation." The employer has a choice between requiring full substantiation under 1.274-5T with the resulting potential for no income inclusion or establishing a written policy statement under section 1.274-6T and including $1.50 per one-way commute in the employee's income.

CONCLUSION

The following conclusions or comments can be made relative to the previous discussion:
1. Analyze what individuals are classified as "full-time salesmen." Make sure the activities test and income test are satisfied.
2. Analyze what substantial restrictions are placed on the use of the demos.

| Name of Taxpayer | Year/Period |
|---|---|
| DEMO ISSUE – VALUATION OF PERSONAL USE – REG.1.132-5(o) | XXXX |

Without substantial restrictions, total exclusion of personal use as a working condition fringe is not available.

3. What happens when the employer and employee do not have adequate records required under Reg. 1.274-5T?  The following observations can be made:
- (a) Can the employer default to Reg. 1.274-6T?  If so, it is necessary to include the $1.50 one-way commute in income.
- (b) If the employer can not default to the commuting valuation rule requirements then it will be necessary to arrive at a reasonable personal percentage.  One can only assume without adequate records there must be some personal use in excess of commuting.

4. Please keep in mind that personal use of a demonstration automobile by an individual other than a full-time automobile salesman is not treated as a working condition fringe.  Therefore, any personal use, including commuting use, of a demonstration automobile by an individual who is not a full-time automobile salesman is not "qualified automobile demonstration use" and thus not excludable from gross income.  This is the case whether or not the personal use is within the sales area.

017

DEMONSTRATOR AUDIT PLAN

## A. ADMINISTRATIVE

1. Identify TP.
2. Request controls on last quarter of year under audit. Use TP's 941 copy or request a BRTVUE. Use Source Code 62 and Project Code 450.
3. Contact TP. Ask for office manager, business manager, or controller. Be flexible.
4. Schedule appointment and send out IDR.
5. Request controls as audit is expanded to previous and subsequent years.

## B. INITIAL INTERVIEW

1. Use IDR as reference point. Go down list.
2. Demo Use
   --------
   a. Ask for list of employees who have access to demos. Note each employee's position and title. This will be important to determine who is a "full-time salesman" as defined per Reg.1.132-5(o). TP should have completed the schedule attached to the IDR.
   b. Ask if any non-employees have use of demos.
   c. Ask how the value for personal use of demos was determined. Identify amounts reported for W-2 purposes for each individual. Methods and amounts will vary depending on employee position.
   d. Ask for demo agreements if any. What policy does company have on use of demos? What are the restrictions, if any, placed on the use of demos? Any mileage logs kept? Does the company provide gas for demos?
   e. Ask about treatment of "drivers", "car shuttlers", or "car jockeys". Are they treated as employees or independent contractors?

## C. POTENTIAL ISSUES

a. MISCLASSIFICATION OF EMPLOYEES AS FULL-TIME SALESMEN. The most frequently misclassified employee is the F and I manager. He is not a full time salesman for demo purposes. Sales managers are sometimes questionable. Most dealers treat them as full-time salesmen. An owner will occasionally be misclassified. The effect of reclassifying these employees per the audit will increase W-2 income from zero to whatever the ALV will generate.

b. INCORRECT VALUATION METHOD. The $3 per day commuting valuation rule is frequently used for non full-time salesmen. This is incorrect. Refer to Reg.1.61-21(f) - Commuting Valuation Rule. There are five requirements for use of this method. The second requirement - "for bonafide noncompensatory business reasons" - will negate the $3 per day rule. The use of demos are a form of additional compensation. Look at the other requirements for use of this rule. The most frequent users of this method will be people such as the Parts, Service, Body Shop managers, Service director, Controller, etc. Other hybrid methods will be used. The only legitimate method available to the auto dealer is the ALV or they can resort to Reg. 1.132-5(o) regarding full-time salesmen.

0718

c. EXAMPLES OF INDIVIDUAL DEMO USERS OTHER THAN EMPLOYEES.
   1. WIVES –
   (A) Shareholders' wives.
   (B) Officers' wives.
   (C) Employees' wives.
   2. RELATIVES –
   (A) Children.
   (B) Parents.
   (C) Siblings of shareholders.
   (D) Other (aunts, uncles, in-laws, etc.).
   3. FORMER OWNERS – Will be additional income on individuals' 1040.
   4. ATHLETES – Will probably be additional income on individuals'
      1040.
   5. BARTERING – Will be income on the individuals' 1040. If no 1099
      issued consider the Back-Up withholding provisions per IRC 3406.
      Examples: (1) An individual performs voice work on radio in
      exchange for use of a demo; (2) An individual who provides legal
      service reduces his bill to his client in exchange for use of a
      demo.
   6. EXCHANGE OF DEMOS FOR ENTERTAINMENT TICKETS. Will be income to
      both parties. Similar to bartering.

d. INCLUSION OF GASOLINE – Maintenance and isurance costs are included
   in the ALV but fuel costs are not. The FMV of the fuel must be
   computed separately based on all the facts and circumstances, except
   that for convenience, the employer or employee can elect to value
   such fuel at 5.5 cents per personal miles driven.

e. OFFERING OF CASH IN LIEU OF DEMO – The working condition fringe
   exclusion is destroyed to the extent cash is offered in lieu of the
   use of a demonstration automobile. First, the cash option seems to
   be evidence that the dealer is providing the automobile as compensa-
   tion rather than "primarily to facilitate the performance of
   services" as required by section 132(j)(3)(B)(i) of the code.
   Second, under assignment of income principles, an employee who is
   permitted to choose between cash and a nontaxable benefit is treated
   as if he or she chose the cash, even if the nontaxable benefit is
   selected instead. Section 125 of the Code provides a limited
   exception to this rule for a choice between cash and certain
   nontaxable benefits. Benefits governed by section 132, however,
   are not eligible for this special treatment. See section 125(f).

f. REPORTING PERSONAL USE ON A 1099 – Personal use of a demo should be
   reported on a W-2 if the user is an employee of the dealership.
   Use of a 1099 will give the employer the benefit of not paying the
   applicable FICA due on wages.

g. INDEPENDENT CONTRACTOR – INSPECT 1099's. Be on the lookout for
   potential employer-employee relationships. One issue that is generic
   to auto dealers are payments to "drivers", "car shuttlers", or "car
   jockeys". It is the IRS position that these individuals are
   employees and not independent contractors. There are two revenue
   rulings (55-144 and 66-381) and one court case (Avis Rent A Car –
   USTC-74-"9725) addressing this issue.

The increase in W-2 wages for this issue will generate an assessment for the employer and employee share of FICA (15.3%) plus an additional 20% withholding per IRC 3402. Where an individual is over the FICA limit consider the Medicare portion of FICA. This will equal 2.9% times the wages over the limit. The independent contractor issue will be subject to IRC 3509.

The withholding rate per IRC 3402 for 1994 is 28%.

FUTA assessment on the increase in W-2 wages will be in most cases insignificant. However, a conversion of independent contractors to employees under IRC 3509 might make the FUTA assessment significant. The decision to examine the 940 should be made at the agents' level.

E. SAMPLE WORKSHEET OF ACTUAL AUDIT

Attached is a worksheet of an actual audit. Refer to the notes as to why and how the adjustment of $33,390 was determined.

F. FINAL NOTE

Each dealership you visit will have a different set of circumstances. Mileage logs maintained for demos will be virtually non-existent. Also, the valuation method will probably be questionable. It is up to you to use your ingenuity in coming up with the adjustment. Be flexible and analyze. This issue involves more than just verifying. Be creative.

BACK UP WITHHOLDING 1993 & PRIOR 28%
BACK UP WITHHOLDING 1994 & SUBSEQUENT 31%

| | Schedule No. or Exhibit |
|---|---|
| Name of Taxpayer<br>PERSONAL USE OF DEMO - ISSUE AND LAW | Year/Period<br>XXXX |

ISSUE:
The sole issue for determination is whether or not the taxpayer correctly valued the personal use of company cars (demonstrators) for W-2 purposes. If the taxpayer's valuation is incorrect, the taxpayer would owe additional employment taxes per IRC 3101, 3111 and 3402.

FACTS:
The taxpayer is in the business of selling cars.  Company cars (demonstrators) were provided to various individuals.  A listing of the individuals and their positions are found on pages          of this report.
The employer and employees who were provided demonstrators did not maintain mileage records with respect to each automobile driven.  Thus, it was not possible to determine the amount of business use based on mileage, the total use based on mileage, date of use, and the business purpose for the use of the automobile.

LAW:
When an employer provides a car to an employee for the employee's personal use, the employee is generally required to treat the value of that use as a taxable fringe benefit.  In addition, the employer must include the value of that personal use in the employee's wages for income and employment tax purposes.  Thus, the taxable fringe benefit is subject to the rate of tax required by IRC 3101 and 3111.  In addition, an employer's liability for failure to withhold the correct amount of tax is determined by the amount of tax that should have been withheld under IRC 3402.
The amount included in an employee's wages for income and employment tax purposes due to personal use of an employer-provided car is determined by the fair market value of its availability.  Generally, this value is the cost that would be paid to lease the same or comparable car from a third party on the same or comparable terms in the geographic area the car is used, but alternative methods of valuation may be used.  Those methods are the annual lease valuation method (Reg. 1.61-21(d)), the cents-per-mile method (Reg. 1.61-21(e)) and the value of the commuter use of an employer-provided car (Reg. 1.61-21(f)).  Valuation of personal use of a car under one of these "safe harbor" rules will be accepted by the IRS if the rule is applied properly.
Section 1.274-5T(e) of the regulations provides that an employee may not exclude from gross income as a working condition fringe any amount of the value of the availability of "listed property" provided by an employer to the employee, unless the the employee substantiates for the period of availability the amount of the exclusion in accordance with the requirements of section 274(d).  The term "listed property" includes any passenger automobile.  Section 280F(d)(4)(A)(i).
Section 274(d) of the Code provides that, with respect to listed property, no deduction is allowable unless the taxpayer substantiates by adequate records or sufficient evidence corroborating the taxpayer's own statement the amount, time and place, business purpose, and business relationship of the expense or other item.
Section 1.274-5T(b)(6) of the regulations provides, in pertinent part, that the elements to be proved with respect to an automobile are (1) the amount of business use based on mileage, (2) the total use based on mileage,

| Name of Taxpayer | Year/Period |
| PERSONAL USE OF DEMO - ISSUE AND LAW | XXXX |

(3) date of use, and (4) the business purpose for the use of the automobile.
Detailed rules on substantiation are provided in section 1.274-5T(c) of
the regulations. These regulations strongly encourage taxpayers to maintain
contemporaneous written records and other documentary evidence but do not
require them. The following passage is illustrative:

> A contemporaneous log is not required, but a record of the elements
> of an expenditure or of a business use of listed property made at or
> near the time of the expenditure or use, supported by sufficient
> documentary evidence, has a high degree of credibility not present
> with respect to a statement prepared subsequent thereto when
> generally there is a lack of accurate recall. Thus, the
> corroborative evidence required to support a statement not made at
> or near the time of the expenditure or use must have a high degree
> of probative value to elevate such statement and evidence to the
> level of credibility reflected by a record made at or near the time
> of the expenditure or use supported by sufficient documentary
> evidence.

CONCLUSION:

It is the Commissioner's determination that the taxpayer has valued the
personal use of provided company cars (demonstrators) improperly. The annual
lease valuation method is the only method available to the taxpayer. Various
circumstances and inadequate records prevent the use of the other methods.
Furthermore, since the substantiation requirements of IRC 274(d) and the
regulations thereunder have not been satisfied, 100% of the ALV has been
determined to be the correct valuation for those individuals who drove demos.
See pages          of this report.

W-drives    Goodrich    (N.) Winchester

JUNE 1, 1994   THRU   DEC. 31, 1994

DEMONSTRATOR USE APROX. 300 MI. PER
MO. PERSONAL USE 250 mi. PER
MO. COMPANY USE

AVERAGE VALUE IN INVENTORY - $12,000

AVERAGE 3 SALES PER MO.

JAN. 1, 1995   THRU   DEC. 31, 1995
SAME AS ABOVE.

| | | UNROUNDED | | ROUNDED | |
|---|---|---|---|---|---|
| | | THIS YEAR | LAST YEAR | THIS YEAR | LAST YEAR |
| **TLG #   205: OTHER COSTS** | | | | | |
| 01301 | A DELIVERY EXPENSE | 11,858.39 | 10,788.95 | 11,858.00 | 10,789.00 |
| 01501 | A POLICY WORK | 15,093.93 | 17,535.00 | 15,094.00 | 17,535.00 |
| 06704 | A POLICY WORK | 2,410.34 | 3,115.72 | 2,410.00 | 3,116.00 |
| LINE TOTAL | | 29,362.66 | 31,439.67 | 29,362.00 | 31,440.00 |
| **TLG #   207: INVENTORY END OF YEAR** | | | | | |
| 23000 | A INVENTORY - DEMONSTRATOR | 92,307.02 | 0.00 | 92,307.00 | 0.00 |
| 23100 | A INVENTORY-NEW CARS | 173,504.96 | 306,573.86 | 173,505.00 | 306,574.00 |
| 23110 | L ACCUM LIFO-NEW CARS | -108,990.00 | -147,035.00 | -108,990.00 | -147,035.00 |
| 23700 | A INVENTORY-NEW TRUCKS | 496,967.72 | 409,201.12 | 496,968.00 | 409,201.00 |
| 23710 | L ACCUM LIFO-NEW TRUCKS | -138,036.00 | -131,208.00 | -138,036.00 | -131,208.00 |
| 24000 | A INVENTORY-USED CARS | 207,758.86 | 188,333.49 | 207,759.00 | 188,333.00 |
| 24100 | A INVENTORY-USED TRUCKS | 340,725.84 | 278,937.26 | 340,726.00 | 278,937.00 |
| 24200 | A INVENTORY-PARTS & ACCESS | 94,616.52 | 79,154.67 | 94,617.00 | 79,155.00 |
| 24400 | A INVENTORY- G.O.G. | 2,099.19 | 4,187.23 | 2,099.00 | 4,187.00 |
| 24600 | A INVENTORY-SUBLET REPAIRS | 59.40 | 0.00 | 59.00 | 0.00 |
| 24700 | A INVENTORY-WORK IN PROCESS | 1,390.09 | 0.00 | 1,390.00 | 0.00 |
| 25800 | A INVENTORY-MISC RECD TRADE | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| LINE TOTAL | | 1,163,403.65 | 989,144.63 | 1,163,404.00 | 989,144.00 |
| **TLG #   401: CASH** | | | | | |
| 20000 | A PETTY CASH | 250.00 | 250.00 | 250.00 | 250.00 |
| 20200 | A CASH IN BANK-FSB | 66,192.69 | 1,149.17 | 66,193.00 | 1,149.00 |
| 20201 | A CASH IN BANK-BANK ONE | 2,653.60 | 5,563.00 | 2,654.00 | 5,563.00 |
| 20202 | A CASH IN BANK-OMAHA | 1,130.62 | 358.99 | 1,131.00 | 359.00 |
| 20203 | A FSB-IMMA ACCOUNT | 4,790.06 | 4,678.83 | 4,790.00 | 4,679.00 |
| LINE TOTAL | | 75,016.97 | 11,999.99 | 75,018.00 | 12,000.00 |
| **TLG #   402.1: ACCOUNTS RECEIVABLE** | | | | | |
| 22000 | A ACCOUNTS REC- P & S | 27,956.41 | 16,049.06 | 27,956.00 | 16,049.00 |
| 26100 | A FACTORY REC-HOLDBACK | 43,501.38 | 48,064.53 | 43,501.00 | 48,065.00 |
| 26101 | A FACTORY REC-NEW VEH INSPE | 901.85 | 559.13 | 902.00 | 559.00 |
| 26103 | A REBATES-GM | 21,460.81 | 13,751.00 | 21,461.00 | 13,751.00 |
| 26200 | A DUE FROM BANK OF ILLINOIS | 845.27 | 500.00 | 845.00 | 500.00 |
| 26201 | A DUE FROM FSB | 18,485.66 | 18,044.36 | 18,486.00 | 18,044.00 |
| 26202 | A DUE FROM BANK ONE | 1,000.00 | 550.52 | 1,000.00 | 551.00 |
| 26300 | A WARRANTY CLAIMS | 9,001.50 | 16,947.08 | 9,002.00 | 16,947.00 |
| LINE TOTAL | | 123,152.88 | 114,465.68 | 123,153.00 | 114,466.00 |
| **TLG #   410.1: BUILDINGS, OTHER DEPREC ASSETS** | | | | | |
| 28200 | A MACH & SHOP EQUIPMENT | 131,057.13 | 129,906.86 | 131,057.00 | 129,907.00 |
| 28300 | A PARTS & ACCESS EQUIPT | 6,922.58 | 6,697.58 | 6,923.00 | 6,698.00 |
| 28400 | A FURNITURE & FIXTURES | 65,765.05 | 58,978.21 | 65,765.00 | 58,978.00 |
| 28600 | A LEASEHOLDS | 43,880.18 | 42,500.93 | 43,880.00 | 42,501.00 |
| LINE TOTAL | | 247,624.94 | 238,083.58 | 247,625.00 | 238,084.00 |
| **TLG #   410.2: LESS ACCUMULATED DEPRECIATION** | | | | | |
| 35200 | L A/C DEPREC-MACH & SHOP | -117,445.21 | -106,298.28 | -117,445.00 | -106,298.00 |
| 35300 | L A/C DEPREC-PARTS & ACCESS | -6,162.34 | -5,558.53 | -6,162.00 | -5,559.00 |
| 35400 | L A/C DEPREC-FURN & FIXT | -59,739.87 | -54,655.40 | -59,740.00 | -54,655.00 |
| 35600 | L A/C AMORTIZ-LEASEHOLDS | -34,027.98 | -33,012.16 | -34,028.00 | -33,012.00 |
| LINE TOTAL | | -217,375.40 | -199,524.37 | -217,375.00 | -199,524.00 |

*Polmey Chevrolet Trial Balance*
*1994*
*8/26/96 Mg*

48075-01                                    Poling Chevrolet, Inc.                          Prepared by_____

03/13/95                                    Adjusted Trial Balance                          Reviewed by_____
5:39 PM                              for the period ended December 31, 1994                                Page   1

| Account # | Account Name | Prior Period (Adjusted) 12/31/93 | Unadjusted Balance Dr (Cr) | Ref # | Adjustments Dr (Cr) | Adjusted Balance Dr (Cr) | Workpaper Reference |
|---|---|---|---|---|---|---|---|
| 20000 | Petty cash | 250.00 | 250.00 | | | 250.00 | |
| 20200 | Cash in bank-FSB | 1,149.17 | 66,192.69 | | | 66,192.69 | |
| 20201 | Cash in bank-Bank One | 5,563.00 | 2,653.60 | | | 2,653.60 | |
| 20202 | Cash in bank-Omaha | 358.99 | 1,130.62 | | | 1,130.62 | |
| 20203 | FSB-IMMA account | 4,678.83 | 4,790.06 | | | 4,790.06 | |
| 20500 | Contracts in transit | | | | | | |
| 21000 | Notes rec- new vehicles | | | | | | |
| 22000 | Accounts rec- P & S | 16,049.06 | 27,956.41 | | | 27,956.41 | |
| 22001 | Customer deposits | (1,100.00) | (13,615.76) | | | (13,615.76) | |
| 23000 | Inventory - Demonstrator | | 92,307.02 | | | 92,307.02 | |
| 23100 | Inventory-new cars | 306,573.86 | 173,504.96 | | | 173,504.96 | |
| 23110 | Accum LIFO-New cars | (147,035.00) | (108,990.00) | | | (108,990.00) | |
| 23700 | Inventory-new trucks | 409,201.12 | 496,967.72 | | | 496,967.72 | |
| 23710 | Accum LIFO-New trucks | (131,208.00) | (138,036.00) | | | (138,036.00) | |
| 24000 | Inventory-used cars | 188,333.49 | 207,758.86 | | | 207,758.86 | |
| 24100 | Inventory-used trucks | 278,937.26 | 340,725.84 | | | 340,725.84 | |
| 24200 | Inventory-parts & access | 79,154.67 | 94,616.57 | | | 94,616.57 | |
| 24400 | Inventory- G.O.G. | 4,187.23 | 2,099.19 | | | 2,099.19 | |
| 24600 | Inventory-Sublet Repairs | | 59.40 | | | 59.40 | |
| 24700 | Inventory-Work in Process | | 1,390.09 | | | 1,390.09 | |
| 25800 | Inventory-Misc recd trade | 1,000.00 | 1,000.00 | | | 1,000.00 | |

025

1994

*Poling Chevrolet*
*Trial Balance 9412*
*9412   8/27/96 H*

48075-01

Poling Chevrolet, Inc.

Prepared by *MMC*
3/7/96

03/07/96
1:48 PM

Adjusted Trial Balance
for the period ended December 31, 1995

Reviewed by _____

Page    1

| Account # | Account Name | Prior Period (Adjusted) 12/31/94 | Unadjusted Balance Dr (Cr) | Ref # | Adjustments Dr (Cr) | Adjusted Balance Dr (Cr) | Workpaper Reference |
|-----------|--------------|-------------------|-------------------|-------|-------------|-------------------|-----------|
| 20000 | Petty cash | 250.00 | 250.00 | | | 250.00 | |
| 20200 | Cash in bank-FSB | 66,192.69 | 17,378.03 | | | 17,378.03 | |
| 20201 | Cash in bank-Bank One | 2,653.60 | 1,030.67 | | | 1,030.67 | |
| 20202 | Cash in bank-Omaha | 1,130.62 | 1,130.62 | | | 1,130.62 | |
| 20203 | FSB-IMMA account | 4,790.06 | 4,913.31 | | | 4,913.31 | |
| 20500 | Contracts in transit | | | | | | |
| 21000 | Notes rec- new vehicles | | | | | | |
| 22000 | Accounts rec- P & S | 27,956.41 | 16,100.74 | | | 16,100.74 | |
| 22001 | Customer deposits | (13,615.76) | (4,890.78) | | | (4,890.78) | |
| 23000 | Inventory - Demonstrator | 92,307.02 | 44,465.68 | | | 44,465.68 | |
| 23100 | Inventory-new cars | 173,504.96 | 679,400.08 | | | 679,400.08 | |
| 23110 | Accum LIFO-New cars | (108,990.00) | (116,936.00) | | | (116,936.00) | |
| 23700 | Inventory-new trucks | 496,967.72 | 666,841.64 | | | 666,841.64 | |
| 23710 | Accum LIFO-New trucks | (138,036.00) | (156,633.00) | | | (156,633.00) | |
| 24000 | Inventory-used cars | 207,758.86 | 344,541.10 | | | 344,541.10 | |
| 24100 | Inventory-used trucks | 340,725.84 | 428,644.66 | | | 428,644.66 | |
| 24200 | Inventory-parts & access | 94,616.57 | 85,772.35 | | | 85,772.35 | |
| 24400 | Inventory- G.O.G. | 2,099.19 | 1,775.43 | | | 1,775.43 | |
| 24500 | INV PAINT & B/S MATL | | 17,940.51 | | | 17,940.51 | |
| 24600 | Inventory-Sublet Repairs | 59.40 | 233.06 | | | 233.06 | |
| 24700 | Inventory-Work in Process | 1,390.09 | 6,598.30 | | | 6,598.30 | |

026
Poling Chevrolet
Trial Balance 9512
9512              9/25/96 *ff*  *H*  *W!*

| Form 2504 (Rev. Sept. 1988) | Department of the Treasury - Internal Revenue Service<br>Agreement to Assessment and Collection of Additional Tax<br>and Acceptance of Overassessment<br>(Excise or Employment Tax) | | | Date received by<br>Internal Rev.Service |

Name,SSN,or EIN, and address of taxpayer(s) (Number,street,city or town, State,ZIP Code

Poling Chevrolet          37-0867554
P.O. Box 192
Monticello, IL 61856-0192

### Additional Tax and Penalties

| Tax Period Ended | Return Form Number | Kind of Tax and Internal Revenue Code Section | Amount of Tax | Penalty |
|---|---|---|---|---|
| 1994 | 940 | FUTA: Sec. 3301 | | 259.30 |
| 03/31/94 - 12/31/94 | 941 | FICA and Income Tax Withholding: Sec. 3101 3111 | 300.44 | 48.45 |
| 1995 | 940 | FUTA: Sec. 3301 | | 458.29 |
| 03/31/95 - 12/31/95 | 941 | FICA and Income Tax Withholding: Sec. 3101 3111 | 2,704.86 | 4,797.37 |
| 03/31/96 - 12/31/96 | 941 | FICA and Income Tax Withholding: Sec. 3101 3111 | 766.26 | |
| | | Total | 3,771.56 | 5,563.41 |

### DECREASE IN TAX AND PENALTIES

| Tax Period Ended | Return Form Number | Kind of Tax and Internal | Amount of Tax | Penalty |
|---|---|---|---|---|
| | | | | Internal Revenue Service |
| | | | | JUL 2 6 1996 |
| | | | | Exam____ Champion, Il. |
| | | Total | | |

I consent to the immediate assessment and collection of any additional tax and penalties and accept any over assessment (decrease in tax and penalties shown above, plus any interest provided by law.

| Signatures | Date |
|---|---|
| > | |
| > | Date |
| >by /[signature] | Title [signature] President | Date 7-26-96 |

Note: If you consent to the assessment of the amounts shown in this agreement, your signature will expedite our adjustment to your account. Your consent will not prevent you from filing a claim for refund (after you have paid the tax) if you later believe you are entitled to a refund. It will not prevent us from later determining, if necessary, that you owe additional tax; nor extend the time provided by law for either action.

Who Must Sign
If you are making this agreement for a partnership, all partners must sign. However, one partner may sign with appropriate evidence of authorization to act for the partnership.

For a corporation, enter the name of the corporation followed by the signature and title of the officer(s) authorized to sign.

027

For an agent or attorney acting under a power of attorney, a power of attorney must be sent with this form if not previously filed.

Form 2504 (Rev. 09-88)

Certificate _____ 561249



*To all to whom these Presents Shall Come, Greetings:*

*I,* **George H. Ryan**, *Secretary of State of the State of Illinois, pursuant to the authority as granted under Illinois Compiled Statutes,* 625 ILCS 5/2-108 *as amended, do hereby certify that the following and hereto attached is a true photostatic copy of*

title history of all documents in file covering 1997 Chevrolet

vehicle identification number 1G1JF12T5V7104863.*****************

_____

_____

_____

_____

_____

_____

*the original of which is now on file and a matter of record in this office.*

**In Testimony Whereof,** *I hereto set my hand and cause to be affixed the Great Seal of the State of Illinois, Done at the City of Springfield this* _____ 30th _____ *day of* _____ October _____ *AD 19* 96



RT OPR-62.5

025

*Secretary of State*



### CERTIFICATE OF ORIGIN FOR A VEHICLE

3998

**GM**

RBLPDD19
INVOICE NO.
10D21159008

DATE
08/01/96

VEHICLE IDENTIFICATION NO.
1G1JF12T5V7104863

YEAR
1997

MAKE
CHEVROLET

SHIPPING WEIGHT
2764

BODY TYPE
2-DOOR

HP (SAE)
20.1

NO. CYLS

GVWR
3748

NO. CYLS
04

SERIES OR MODEL
1JF37

I, the undersigned authorized representative of the company, firm or corporation named below, hereby certify that the new vehicle described above is the property of the said company, firm or corporation and is transferred on the above date and under the Invoice Number indicated to the following distributor or dealer:

NAME OF DISTRIBUTOR, DEALER, ETC.
47438 023BDC
POLING CHEVROLET COMPANY
PO BOX 192
MONTICELLO          IL 61856-0192

It is further certified that this was the first transfer of such new vehicle in ordinary trade and commerce.

CHEVROLET MOTOR DIVISION
THIS VEHICLE HAS A
GENERAL MOTORS CORPORATION
FEDERAL EMISSION SYSTEM

*David E. Zinger*
(SIGNATURE OF AUTHORIZED REPRESENTATIVE)    (AGENT)

WARREN          MI 48093-2350

029

Each undersigned seller certifies to the best of his knowledge, information and belief under penalty of the law that the vehicle is free and has not been registered in his or any state at the time of delivery and that the vehicle is not subject to any lien, security interest other than those disclosed below and warrant title to the vehicle.

**DISTRIBUTOR-DEALER ASSIGNMENT NUMBER 1**

NAME OF PURCHASER(S): Michael T + Sherry F. HELFER

ADDRESS: 401 Arburs Dr     Savoy   IL   61875

I certify to the best of my knowledge that the odometer reading is _10_   No Terms

DEALER: Carol Chevrolet Co Inc.   862   BY Dawn Ellis   Gary Lucas

State of: IL
County of: PIATT

OFFICIAL SEAL
DEBRA A STEPHENS
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:12/19/98

**DISTRIBUTOR-DEALER ASSIGNMENT NUMBER 2**

NAME OF PURCHASER(S): _____
ADDRESS: _____
I certify to the best of my knowledge that the odometer reading is _____   No Terms
DEALER: _____   BY _____
State of: _____
County of: _____

**DISTRIBUTOR-DEALER ASSIGNMENT NUMBER 3**

NAME OF PURCHASER(S): _____
ADDRESS: _____
I certify to the best of my knowledge that the odometer reading is _____   No Terms
DEALER: _____   BY _____
State of: _____
County of: _____

**DISTRIBUTOR-DEALER ASSIGNMENT NUMBER 4**

NAME OF PURCHASER(S): _____
ADDRESS: _____
I certify to the best of my knowledge that the odometer reading is _____   No Terms
DEALER: _____   BY _____
State of: _____
County of: _____

**ODOMETER DISCLOSURE FOR RETAIL SALE**

Federal law requires you to state the odometer mileage in connection with the transfer of ownership. Failure to complete or provide a false statement may result in fines and/or imprisonment.
I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked. Odometer Reading _10_   NO Terms  The mileage stated is in excess of its mechanical limits.  The odometer reading is not the actual mileage.  WARNING ODOMETER DISCREPANCY

Selling Dealer: Carol Chevrolet Co Inc.
Selling Dealer: Carol Chevrolet Co Inc.   Date of Statement: 8-16-96   Date of Sale: 8-16-96
Signature of Purchaser(s): Michael J Helfer  Sherry Helfer
Printed Name of Purchaser(s): Michael F Helfer  John Helfer
Company Name (if Applicable): _____
401 Arburs Dr   Savoy IL  61874

OFFICIAL SEAL
DEBRA A STEPHENS
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:12/19/98

**LIENHOLDER**

1st lien in favor of: _____
whose address is: _____
2nd lien in favor of: _____
whose address is: _____

GM521 REV. 3-91

T6260399036

030

**Application for Vehicle Transaction(s)** — Illinois Secretary of State (VSD-190.13A)

| | | |
|---|---|---|
| ☐ TITLE & PLATES | ☐ PLATE TRANSFER | 2 CURRENT PLATE NO. MYKHEL 4 | YEAR 99 | PLATE TYPE ISSUED PASS | X EXPIRATION 02-197 |

RP:RS:09/05/96:01:1251:  
MYKHEL4    TT    25.00 CK1

**Owner Information**

| 5 OWNER'S & DRIVER'S LICENSE NO. | DATE OF BIRTH | SEX | 6 OWNER'S NAME | FIRST | MIDDLE | LAST |
|---|---|---|---|---|---|---|
| H41655844349 | 12/08/44 | ☒ M ☐ F | (1) MICHAEL T. HELFER | | | |
| CO-OWNER'S & DRIVER'S LICENSE NO. H41678646937 | 11/27/46 | ☐ M ☒ F | (2) SHERRY F. HELFER | | | |

9 COUNTY: CHAMPAIGN  
COUNTY CODE: 010  
10 RESIDENCE BUSINESS ADDRESS: 401 ARBOURS DR  
CITY: SAVOY  ZIP CODE: IL 61874

**Vehicle Information**

| 11 CURRENT ODOMETER READING | 12 VEHICLE IDENTIFICATION NUMBER |
|---|---|
| 10 | 1G1JF12T5V7104863 |

| 14 YEAR | 15 MAKE OF VEHICLE | 16 MODEL | 17 BODY STYLE |
|---|---|---|---|
| 1997 | CHEVROLET | CAVALIER | 2DR |

18 PURCHASE DATE: AUG 16 /96  
19 NO CC / MOTORCYCLE  
20 VEHICLE COLOR: GREEN GREEN

23 SURRENDER TITLE NUMBER AND STATE OF ISSUANCE: MCO  

**Transfer / Previous Vehicle Information**

| PREVIOUS VEHICLE INFORMATION | 29 VEHICLE IDENTIFICATION NUMBER | 30 YEAR | 31 MAKE OF VEHICLE |
|---|---|---|---|
| | 1G2WH54TXPF301486 | 1993 | PONTIAC |

32 GROSS WEIGHT/NO CC  
33 DISPOSITION OF PREVIOUS VEHICLE: ☒ SOLD ☐ SALVAGED ☐ STOLEN ☐ JUNKED ☐ STORED  
DATE OF DISPOSITION: 08/16/96

4 FROM WHOM DID YOU BUY?  
AME POLING CHEVROLET COMPANY  
ADDRESS 500 WEST BRIDGE ROAD  
MONTICELLO, IL 61856

35 IF PURCHASED FROM DEALER, DEALER MUST SIGN AND GIVE DEALER NUMBER: _Poling_  DEALER NUMBER 562

36 ARE YOUR PLATES NOW SUSPENDED OR REVOKED? ☐ YES ☒ NO

I/We hereby affirm the information provided is true and correct and, when applicable, will abide by the Mandatory Insurance Law requiring liability insurance throughout the registration period. If applying for title for a motor vehicle nine years old or newer, I/we also acknowledge awareness of the odometer certification made by the seller.

SIGN HERE  
X (1) Michael T. Helfer  
X (2) Sherry Helfer

DAYTIME TELEPHONE NUMBER: 351-1723

TAX PAID BY MR24  
AUG 27 1996

GEORGE H. RYAN  
SECRETARY OF STATE  
STATE OF ILLINOIS

REMITTER AGENCY/DR  
SEP 03  T6260309036

TAX IN NUMBER: 17427027-2

**Illinois Department of Revenue**

# ST-556
(R-4/94)

## Sales Tax Transaction Return
(For Vehicles, Watercraft, Aircraft, Trailers, and Mobile Homes)

96242 3160622

| | | | | |
|---|---|---|---|---|
Do not write above this line | NS | CA | DP | RC | TL |

Tax return no.: **17427027-2**
IBT no.: **0022-9229**
Taxable location no.: **074-0001-2**
Taxable location: **MONTICELLO**
Dealer's license no.: **DL 562**
REV **01**
FORM **016**

POLING CHEVROLET CO
500 W BRIDGE ST RD
PO BOX 192
MONTICELLO IL 61856-0192

(217) 762-2158

## 1. Give the buyer's name and address

Name(s) MICHAEL T. HELFER          SHERRY F. HELFER

Street 401 ARBOURS DR          City SAVOY          State IL          ZIP 61874

## 2. Describe the item sold

- [ ] A Vehicle
- [ ] B Watercraft
- [ ] C Aircraft
- [ ] D Trailer
- [ ] E Mobile Home

[X] New   [ ] Used

Identification no. 1G1JF12T5V7104863

Year 97          Make CHEVROLET

Body style & model          CAVALIER

## 3. Give the date of delivery   08 / 16 / 96
month   day   year

## 4. Describe the trade-in, if any

Item traded in

Identification no. 1G2WH54TXPF301486

Year 93          Make PONTIAC

Body style & model          GRAND PRIX

## 5. Is the sale exempt from tax?

If so, check the correct box below and fill in Section 6, lines 1 and 2.

- [ ] A Sold to/shipped to an out-of-state purchaser/dealer.
  drive-away permit no._____ or plate no._____
- [ ] B Sold to an Illinois dealer for resale.
  dealer's IBT no._____ lic. no._____
- [ ] C Sold to an exempt organization (government, school, religious, or charitable). Tax exempt no. E_____
- [ ] D Sold to an interstate carrier (attach Form RUT-7)
- [ ] E Sold for rental use.
  renter's IBT no.: _____
- [ ] F This form is void. Keep in your records for 42 months.
- [ ] G Other. describe _____

*(left margin, vertical)* ATTACH PAYMENT HERE

We have examined this return, including any schedules and statements, and believe it is correct. If the seller has taken a qualified trade-in, we also state that the buyer has properly transferred and assigned the title of the trade-in to the seller.

Signature of buyer(s) _____ Date 08/16/96

Signature of seller _____ 08/16/96
Date

This form is authorized as outlined by the Illinois tax laws and the Illinois Vehicle Code. Disclosure of this information is REQUIRED. Failure to provide information could result in penalties. This form has been approved by the Forms Management Center.          IL-492-1556

## 6. Give the price and figure the tax
(to nearest dollar)

1 Total price, including accessories, federal tax, and freight ............... **16375**
2 [X] Trade-in allowance or
  [ ] Net insurance settlement amount....... **9425**
  (Attach Form RVT-7)
3 Amount subject to tax [line 1 – line 2] .... **6950**
4 Tax [line 3 × .0625 ] (If you made this sale from a temporary sales location, see the instructions) . **434**

5 Use tax - optional (see instructions) ....... **N/A**
  a. County _____
  b. City _____
  c. Township _____

6 Total tax [line 4 + line 5] ............... **434**
7 Retailers' allowance if filed on time
  [line 6 × .0175 ] ................. **8**

8 Tax due [line 6 – line 7] ............... **426**

9 Prior ST-1 overpayment ................. **N/A**

10 Net tax due [line 8 – line 9] ........... **426**

11 Penalty (see instructions) ............... **N/A**

12 Interest (see instructions) ............... **N/A**

13 Excess tax collected .................... **N/A**

14 Tax, penalty, and interest due
   [line 10 + line 11 + line 12 + line 13] ..... **426**

15 Credit memorandum (see instructions) .... **N/A**

16 Amount due [line 14 – line 15] ..... **426**

032
Dealer's check number—_____

Do not write below this line.

Date received by State of Illinois

Copy 1 Revenue's
AUG 27 1996



1997 Edition

AMERICAN CAR

Price Guide

Dealers Cost
Corporation

## 1997 CHEVROLET CAMARO cont'd

| | Dealer Cost | Sug'ted Retail |
|---|---|---|
| Convertible Preferred Equipment Group 2 | 1059.00 | 1231.00 |
| RS Coupe Preferred Equipment Group 1 | 485.00 | 565.00 |
| RS Coupe Preferred Equipment Group 2 | 1058.00 | 1231.00 |
| RS Coupe Preferred Equipment Group 1 | 485.00 | 565.00 |
| RS Convertible Preferred Equipment Group 1 | 1059.00 | 1231.00 |
| RS Convertible Preferred Equipment Group 2 | 516.00 | 600.00 |
| Z28 Coupe Preferred Equipment Group 1 | 1089.00 | 1266.00 |
| Z28 Coupe Preferred Equipment Group 2 | 486.00 | 565.00 |
| Z28 Convertible Preferred Equipment Group 1 | 1059.00 | 1231.00 |
| Z28 Convertible Preferred Equipment Group 2 | | |
| Engines — 3.4 Liter V6 | | No Charge |
| 5.7 Liter V8 | | 815.00 |
| Transmissions — 6-Spd. Manual | | No Charge |
| 5-Spd. Manual | | No Charge |
| 4-Spd. Automatic w/Overdrive | 700.00 | 815.00 |
| Acceleration/Slip Regulation | 387.00 | 450.00 |
| Air Conditioning | | No Charge |
| Axle-Optional Performance | 258.00 | 300.00 |
| Defogger, Rear Window | 146.00 | 170.00 |
| Door Lock System, Power | 189.00 | 220.00 |
| Performance Package 1LE | 1010.00 | 1175.00 |
| Performance Handling Package Y87 | 344.00 | 400.00 |
| Roof Panels - Removable Glass | 855.00 | 995.00 |
| Seat, Power — Driver Side Only | 232.00 | 270.00 |
| Leather Buckets | 429.00 | 499.00 |
| Tires, P245/50ZR16 Performance | 193.00 | 225.00 |
| Wheels, 16" Aluminum Cast - Includes Wheel Locks | 236.00 | 275.00 |
| Chrome Aluminum 16" with Z28 | 430.00 | 500.00 |
| Chrome Aluminum 16" without Z28 | 667.00 | 775.00 |

## 1997 CHEVROLET CAVALIER

| Model | Model No. | Dealer Cost | Sug'ted Retail |
|---|---|---|---|
| **2-DOOR COUPE** | | | |
| Coupe | 1JC37 | 10376.00 | 10980.00 |
| Z24 Coupe | 1JF37 | 13235.00 | 14465.00 |
| **4-DOOR SEDAN** | | | |
| Sedan | 1JC69 | 10565.00 | 11180.00 |
| LS Sedan | 1JF69 | 12376.00 | 13380.00 |
| **2-DOOR CONVERTIBLE** | | | |
| Convertible | 1JF67 | 16432.00 | 17765.00 |

### ACCESSORIES AND EQUIPMENT

**ACCESSORIES**

| Model | Dealer Cost | Sug'ted Retail |
|---|---|---|
| Coupe Base Equipment Group | | No Charge |
| Coupe Preferred Equipment Group 1 | 213.00 | 240.00 |
| Coupe Preferred Equipment Group 2 | 619.00 | 696.00 |
| Coupe Preferred Equipment Group 3 | 1152.00 | 1295.00 |
| Sedan Preferred Equipment Group 1 | 198.00 | 223.00 |
| Sedan Preferred Equipment Group 2 | 527.00 | 593.00 |
| LS Sedan Preferred Equipment Group 1 | 387.00 | 435.00 |
| LS Sedan Preferred Equipment Group 2 | 1090.00 | 1225.00 |

ADD'L NATIONWIDE DESTINATION CHARGES $500

## 1997 CHEVROLET CAVALIER cont'd

| | Dealer Cost | Sug'ted Retail |
|---|---|---|
| Z24 Coupe Preferred Equipment Group 1 | 258.00 | 290.00 |
| Z24 Coupe Preferred Equipment Group 2 | 868.00 | 975.00 |
| Engines — 2.4 Liter | | No Charge |
| 2.4 Liter DOHC | 352.00 | 395.00 |
| Transmissions — 5-Spd. Manual | | No Charge |
| 3-Spd. Automatic | 490.00 | 550.00 |
| 4-Spd. Automatic | 708.00 | 795.00 |
| Air Conditioning | 707.00 | 795.00 |
| Appearance Package — Exterior | 227.00 | 255.00 |
| Defogger, Rear Window | 151.00 | 170.00 |
| Door Locks, Power — Coupes | 187.00 | 210.00 |
| Sedans | 222.00 | 250.00 |
| Sun Roof — Electric | 596.00 | 670.00 |
| Wheels — 15" Aluminum | 263.00 | 295.00 |

## 1996 CHEVROLET CORVETTE

| Model | Model No. | Dealer Cost | Sug'ted Retail |
|---|---|---|---|
| Coupe | 1YY07 | 31827.00 | 37225.00 |
| Convertible | 1YY67 | 38526.00 | |

## 1997 CHEVROLET CORVETTE

| | Dealer Cost | Sug'ted Retail |
|---|---|---|
| Coupe/Convertible | | |
| Performance Handl... | | |
| Special Performanc... | | |
| Axle, Performance Ra... | | 31258.00 |
| Engines - 5.7 Liter V... | | |
| Transmissions - 6-S... | | No Charge |
| | | No Charge |
| Grand Sport Group | 1333.00 | |
| Collectors Edition | 2045.00 | |
| Hard Top, Removable | | |
| | 42.00 | 50.00 |
| | 1050.00 | 1250.00 |
| | 2730.00 | 3250.00 |
| | 1675.00 | 1995.00 |

*1997 CHEVROLET CORVETTE PRICES WERE NOT RELEASED AT PRESS TIME. IF YOU ARE A SUBSCRIBER AND THIS BECOMES A PROBLEM FOR YOU, WRITE US OR PHONE (817) 757-CARS AND WE WILL MAIL YOU INSERTS WITH ALL OUR CURRENT UPDATES.*

## 1997 CHEVROLET LUMINA

| Model | Model No. | Dealer Cost | Sug'ted Retail |
|---|---|---|---|
| Sedan | 1WL69 | 15335.00 | 16945.00 |
| LS Sedan | 1WN69 | 17326.00 | 19145.00 |

### ACCESSORIES AND EQUIPMENT

**ACCESSORIES**

| Model | Dealer Cost | Sug'ted Retail |
|---|---|---|
| Sedan Preferred Equipment Group 1 | 675.00 | 758.00 |
| LS Sedan Preferred Equipment Group 1 | 525.00 | 590.00 |

ADD'L NATIONWIDE DESTINATION CHARGES $550



*Central Edition*

# N.A.D.A.®

## OFFICIAL USED CAR GUIDE-

DOMESTIC CARS—IMPORTED CARS
TRUCKS

**63** Years of Service

1996—AUGUST—1996

035

**58   PONTIAC 1994-93**

| Trd-in | BODY TYPE | Model No. | Loan | Retail |
|---|---|---|---|---|
| **1994 BONNEVILLE-6-AT-PS-AC-FWD-Continued** | | | | |
| .175 Add Cruise Control* | | | 175 | 175 |
| .260 Add Cust. Whls/Covers. | | | 260 | 260 |
| .350 Add Leather Seats | | | 350 | 350 |
| .800 Add SSEi Pkg | | | 800 | 800 |
| .250 Add Theft Deterrent | | | 250 | 250 |
| * Std. SSE | | | | |
| **1994 GRAND PRIX-6-AT-PS-AC-FWD** | | | | |
| 10225 Sedan 4D SE | W15 | 9225 | 12300 |
| 10225 Coupe 2D SE | WJ1 | 8225 | 12300 |
| .500 Add Power Sunroof | | | 500 | 500 |
| .225 Add CD Player | | | 225 | 225 |
| .150 Add Power Seat | | | 150 | 150 |
| .180 Add Cruise (Std.Coupe). | | | 180 | 180 |
| .225 Add Cust. Whls/Covers. | | | 225 | 225 |
| .550 Add 3.4LV6(Std.GT,GTP) | | | 550 | 550 |
| .825 Add GT Perf Pkg | | | 825 | 825 |
| .850 Add GTP Perf Pkg | | | 850 | 850 |
| .300 Add Leather Seats | | | 300 | 300 |
| .450 Add Anti-Lock Brakes | | | 450 | 450 |
| .250 Add Theft Deterrent | | | 250 | 250 |
| **1993 LEMANS-AT-PS-AC (Korea)** | | | | |
| **LEMANS-L-4-FWD** | | | | |
| 4000 Aerocpe 3D 4 Spd..TX2 | 3800 | 6325 |
| 5060 Aerocpe 3D SE | TK2 | 4550 | 6525 |
| 5300 Sedan 4D | TN5 | 4775 | 6800 |
| .200 Add Sunroof | | | 200 | 200 |
| .200 Add Theft Deterrent | | | 200 | 200 |
| .350 Deduct Manual Trans. | | | 350 | 350 |
| .75 Deduct Convent Steer | | | 75 | 75 |
| .450 Deduct W/out Air Cond | | | 450 | 450 |
| **1993 SUNBIRD-AT-PS-AC-FWD** | | | | |
| **SUNBIRD LE-L4** | | | | |
| 6425 Sedan 4D | JC5 | 5800 | 8000 |
| 6325 Coupe 2D | JC1 | 5700 | 7900 |
| **SUNBIRD SE-L4** | | | | |
| 7025 Sedan 4D | JB5 | 6325 | 8700 |
| 8925 Coupe 2D | JB1 | 8250 | 8550 |
| 10175 Convertible 2D | JB3 | 9175 | 12200 |
| **SUNBIRD GT-V6** | | | | |
| 8825 Coupe 2D | JD1 | 7875 | 10350 |
| .200 Add Sunroof | | | 200 | 200 |
| .150 Add CD Player | | | 150 | 150 |
| .75 Add Pwr/Wind(Std.Conv.) | | | 75 | 75 |
| .25 Add Tilt Strg. Wheel | | | 25 | 25 |
| .175 Add Cust. Whls/Covers. | | | 175 | 175 |
| .75 Add Cruise Control | | | 75 | 75 |
| .450 Add V6 Eng.(Std. GT). | | | 450 | 450 |
| .200 Add Theft Deterrent | | | 200 | 200 |
| .400 Deduct Manual Trans. | | | 400 | 400 |
| .500 Deduct W/out Air Cond | | | 500 | 500 |
| **1993 GRAND AM-AT-PS-AC-FWD** | | | | |
| **GRAND AM SE-Quad 4** | | | | |
| 7450 Sedan 4D | NE5 | 6725 | 9250 |

| Trd-in | BODY TYPE | Model No. | Loan | Retail |
|---|---|---|---|---|
| 7650 Coupe 2D | NE1 | 6900 | 9475 |
| **GRAND AM SE-V6** | | | | |
| 7650 Sedan 4D | NE5 | 6900 | 9475 |
| 7850 Coupe 2D | NE1 | 7075 | 9675 |
| **GRAND AM GT-Quad 4** | | | | |
| 9100 Sedan 4D | NW5 | 8200 | 11100 |
| 9300 Coupe 2D | NW1 | 8375 | 11300 |
| **GRAND AM GT-V6** | | | | |
| 9200 Sedan 4D | NW5 | 8300 | 11200 |
| 9400 Coupe 2D | NW1 | 8475 | 11400 |
| .200 Add CD Player | | | 200 | 200 |
| .125 Add Power Windows | | | 125 | 125 |
| .125 Add Power Seat | | | 125 | 125 |
| .50 Add Tilt Strg. Wheel | | | 50 | 50 |
| .200 Add Cust. Whls/Covers. | | | 200 | 200 |
| .125 Add Cruise Control | | | 125 | 125 |
| .200 Add Theft Deterrent | | | 200 | 200 |
| .600 Deduct Manual Trans. | | | 600 | 600 |
| .800 Deduct W/out Air Cond | | | 600 | 600 |
| **1993 FIREBIRD-AT-PS-AC** | | | | |
| **FIREBIRD-V6** | | | | |
| 9600 Coupe 2D | FS2 | 8650 | 11625 |
| **FIREBIRD-V8** | | | | |
| 12620 Coupe 2D Formula | FV2 | 11375 | 14875 |
| 13725 Coupe Trans Am | FV2 | 12375 | 16050 |
| .700 Add T-top | | | 700 | 700 |
| .200 Add CD Player | | | 200 | 200 |
| .50 Add Power Door Locks* | | | 50 | 50 |
| .125 Add Power Windows* | | | 125 | 125 |
| .125 Add Cruise Control* | | | 125 | 125 |
| .250 Add Leather Seats | | | 250 | 250 |
| .125 Add Power Seat | | | 125 | 125 |
| .200 Add Theft Deterrent | | | 200 | 200 |
| .600 Deduct Manual (V6) | | | 500 | 500 |
| .600 Deduct W/out Air Cond | | | 600 | 600 |
| * Std. Trans Am | | | | |
| **1993 BONNEVILLE-6-AT-PS-AC-FWD** | | | | |
| 10500 Sedan 4D SE | HX5 | 9450 | 12725 |
| 14250 Sedan 4D SSE | H25 | 12825 | 16700 |
| 16450 Sedan 4D SSEi | HY5 | 13825 | 17975 |
| .600 Add Power Sunroof | | | 500 | 500 |
| .225 Add CD Player | | | 225 | 225 |
| .150 Add Power Seat* | | | 150 | 150 |
| .150 Add Cruise Control* | | | 150 | 150 |
| .225 Add Cust. Whls/Covers. | | | 225 | 225 |
| .300 Add Leather (Std.SSEi). | | | 300 | 300 |
| .550 Add S'Charged V6(Std.SSEi) | | | 550 | 550 |
| .150 Add PassAirBag(Std.SSEi) | | | 150 | 150 |
| * Std. SSE, SSEi | | | | |
| **1993 GRAND PRIX-6-AT-PS-AC-FWD** | | | | |
| 8325 Sedan 4D LE | WH5 | 7500 | 10225 |
| 9175 Sedan 4D SE | W15 | 8275 | 11175 |
| 9175 Coupe 2D SE | WJ1 | 8275 | 11175 |
| 12200 Coupe 2D STE | WT51 | 11000 | 14450 |

DEDUCT FOR RECONDITIONING
1994 AUGUST 1994                          E

---

**PONTIAC 1993-92   59**

| Trd-in | BODY TYPE | Model No. | Loan | Retail |
|---|---|---|---|---|
| **1993 GRAND PRIX-6-AT-PS-AC-FWD-Continued** | | | | |
| 11100 Coupe 2D GT | WP1 | 10560 | 13850 |
| .450 Add Power Sunroof | | | 450 | 450 |
| .200 Add CD Player | | | 200 | 200 |
| .125 Add Power Windows* | | | 125 | 125 |
| .125 Add Power Seat* | | | 125 | 125 |
| .125 Add Cruise Control* | | | 125 | 125 |
| .50 Add Tilt Strg. Wheel* | | | 50 | 50 |
| .200 Add Cust. Whls/Covers. | | | 200 | 200 |
| .600 Add 3.4L V6 Engine | | | 600 | 600 |
| .600 Add Aero Perf. Pkg | | | 500 | 500 |
| .250 Add Leather Seats | | | 250 | 250 |
| .150 Add Anti-Lock Brakes* | | | 150 | 150 |
| .200 Add Theft Deterrent | | | 200 | 200 |
| * Std. GT, STE | | | | |
| **1992 LEMANS-AT-PS-AC (Korea)** | | | | |
| **LEMANS-L-4-FWD** | | | | |
| 2850 Aerocpe 3D 4 Spd..TX2 | 2675 | 4050 |
| 3800 Aerocpe 3D SE | TK2 | 2425 | 5100 |
| 4000 Sedan 4D SE | TN5 | 3500 | 5325 |
| .175 Add Sunroof | | | 175 | 175 |
| .300 Deduct Manual Trans. | | | 300 | 300 |
| .50 Deduct Convent Steer | | | 50 | 50 |
| .400 Deduct W/out Air Cond | | | 400 | 400 |
| **1992 SUNBIRD-AT-PS-AC-FWD** | | | | |
| **SUNBIRD LE-L4** | | | | |
| 5575 Sedan 4D | JC5 | 5025 | 7100 |
| 5475 Coupe 2D | JC1 | 4950 | 6975 |
| **SUNBIRD SE-L4** | | | | |
| 6125 Sedan 4D | JB5 | 5525 | 7675 |
| 6025 Coupe 2D | JB1 | 5425 | 7575 |
| 9075 Convertible 2D | JB3 | 8175 | 11000 |
| **SUNBIRD GT-V6** | | | | |
| 7575 Coupe 2D | JD1 | 6825 | 9275 |
| .175 Add Sunroof | | | 175 | 175 |
| .125 Add CD Player | | | 125 | 125 |
| .50 Add Pwr/Wind(Std.Conv.) | | | 50 | 50 |
| .25 Add Tilt Strg. Wheel | | | 25 | 25 |
| .125 Add Cust. Whls/Covers. | | | 125 | 125 |
| .50 Add Cruise Control | | | 50 | 50 |
| .400 Add V6 Eng. (Std. GT). | | | 400 | 400 |
| .350 Deduct Manual Trans. | | | 350 | 350 |
| .450 Deduct W/out Air Cond | | | 450 | 450 |
| **1992 GRAND AM-AT-PS-AC-FWD** | | | | |
| **GRAND AM SE-Quad 4** | | | | |
| 6325 Sedan 4D | NE5 | 5700 | 8050 |
| 6525 Coupe 2D | NE1 | 5875 | 8250 |
| **GRAND AM SE-V6** | | | | |
| 6525 Sedan 4D | NE5 | 5875 | 8250 |
| 6725 Coupe 2D | NE1 | 6075 | 8475 |
| **GRAND AM GT-Quad 4** | | | | |
| 7775 Sedan 4D | NW5 | 7000 | 9600 |
| 7975 Coupe 2D | NW1 | 7200 | 9825 |

| Trd-in | BODY TYPE | Model No. | Loan | Retail |
|---|---|---|---|---|
| **1992 GRAND AM GT-V6** | | | | |
| 7875 Sedan 4D | NW5 | 7100 | 9725 |
| 8075 Coupe 2D | NW1 | 7275 | 9950 |
| .175 Add CD Player | | | 175 | 175 |
| .100 Add Power Windows | | | 100 | 100 |
| .100 Add Power Seat | | | 100 | 100 |
| .25 Add Tilt Strg. Wheel | | | 25 | 25 |
| .150 Add Cust. Whls/Covers. | | | 150 | 150 |
| .100 Add Cruise Control | | | 100 | 100 |
| .450 Deduct Manual Trans. | | | 450 | 450 |
| .550 Deduct W/out Air Cond | | | 550 | 550 |
| **1992 FIREBIRD-AT-PS-AC** | | | | |
| **FIREBIRD-V6** | | | | |
| 7475 Coupe 2D | FS2 | 6750 | 9275 |
| 11350 Convertible 2D | FS3 | 10225 | 13500 |
| **FIREBIRD-V8** | | | | |
| 7975 Coupe 2D | FS2 | 7200 | 9825 |
| 11850 Convertible 2D | FS3 | 10675 | 14025 |
| 8675 Coupe 2D Formula | FS2 | 8000 | 10800 |
| 10475 Coupe Trans Am | FW2 | 9450 | 12575 |
| 14350 Conv Trans Am | FW3 | 12925 | 16700 |
| 12725 Coupe 2D GTA | FW2 | 11475 | 15000 |
| .650 Add T-top | | | 650 | 650 |
| .175 Add CD Player | | | 175 | 175 |
| .25 Add Power Door Locks* | | | 25 | 25 |
| .100 Add Power Windows* | | | 100 | 100 |
| .100 Add Cruise Control* | | | 100 | 100 |
| .225 Add Leather Seats | | | 225 | 225 |
| .775 Add 5.7L V8 Engine* | | | 775 | 775 |
| .450 Deduct Manual Trans. | | | 450 | 450 |
| .550 Deduct W/out Air Cond | | | 550 | 550 |
| * Std. GTA | | | | |
| **1992 BONNEVILLE-6-AT-PS-AC-FWD** | | | | |
| 8975 Sedan 4D SE | HX5 | 8100 | 11075 |
| 12425 Sedan 4D SSE | HZ5 | 11200 | 14775 |
| 13425 Sedan 4D SSEi | HY5 | 12100 | 15825 |
| .450 Add Power Sunroof | | | 450 | 450 |
| .175 Add CD Player | | | 175 | 175 |
| .125 Add Power Seat* | | | 125 | 125 |
| .125 Add Cruise Control* | | | 125 | 125 |
| .200 Add Cust. Whls/Covers. | | | 200 | 200 |
| .250 Add Leather Seats | | | 250 | 250 |
| .450 Add S'Charged V6(Std.SSEi) | | | 450 | 450 |
| .125 Add Anti-Lock Brakes*. | | | 125 | 125 |
| .100 Add PassAirBag(Std.SSEi) | | | 100 | 100 |
| * Std. SSE, SSEi | | | | |
| **1992 GRAND PRIX-6-AT-PS-AC-FWD** | | | | |
| 7050 Sedan 4D LE | WH5 | 6350 | 8825 |
| 7750 Sedan 4D SE | WJ5 | 6975 | 9575 |
| 7750 Coupe 2D SE | WJ1 | 6975 | 9575 |
| 10150 Sedan 4D STE | WT5 | 9150 | 12225 |
| 9850 Coupe 2D GT | WP1 | 8875 | 11875 |
| .400 Add Power Sunroof | | | 400 | 400 |
| .175 Add CD Player | | | 175 | 175 |

DEDUCT FOR HIGH MILEAGE
CENTRAL EDITION                          E

---

D
O
M
E
S
T
I
C

C
A
R
S

D
O
M
E
S
T
I
C

C
A
R
S

| Type of Activity: | Inspection Service | Date and Time |
|---|---|---|
| ☒ Personal Interview<br>☐ Telephone Interview<br>☐ Records Review<br>☐ Other | **Memorandum of Interview**<br>**or Activity** | January 7, 1997<br>1:30 PM |

| Activity or Interview of: *(Include all necessary data)* | Conducted by: SI Gary Bacon |
|---|---|
| DEE FEATHERSTONE<br>Examination Division Branch Chief<br>DDIR - Illinois District | Location Of Interview/Activity<br><br>320 West Washington<br>Springfield, Illinois |

**Subject Matter/Remarks**

FEATHERSTONE advised the following:

Research of Examination Division closed files for the past three years disclosed that no other automobile dealership audits were assigned or worked by Internal Revenue Agent (R/A) MICHAEL HELFER.

On December 17, 1996 R/A HELFER requested through his manager to take leave without pay due to a medical condition claiming that he has received a prescription for lithium from a physician. On December 19, 1996 she (FEATHERSTONE) advised HELFER through his manager that a physicians statement would be required before leave would be approved. On December 24, 1996 HELFER submitted a statement from his Psychologist recommending that HELFER not return to work for four to six weeks. However, since a psychologist cannot prescribe medication, HELFER was advised that a statement from a medical doctor is required. As of this date, HELFER has not provided the required documentation and is currently absent without leave (AWOL).

037

| Name: | Case Number: |
|---|---|
| HELFER, Michael | 6-9610-0026 |

| Form 8052 IS (Rev. 8-96) | Department of the Treasury - Internal Revenue Service |
|---|---|

# Routing Slip

 **Internal Revenue Service**

| To | Symbol | Room | Action Code | Initial/Date |
|---|---|---|---|---|
| Manager, Exam Group 1711 | | | | |
| | | | | |
| | | | | |
| | | | | |

☐ 1. Per our conversation
☐ 2. As requested
☐ 3. Approval
☐ 4. Comments
☐ 5. Information
☐ 6. Corrections

☐ 7. Signature
☐ 8. Initials
☐ 9. Note and return
☐ 10. Necessary action
☐ 11. See me
☐ 12. Call me
☐ 13. File

☐ 14. Prepare reply for signature of
_____

☐ 15. Please answer by
_____

**Remarks**

Urgent. Please expedite attached.

| From | Phone | Room No. |
|---|---|---|
| *Michael J. Wolf* | Date 12/17/96 | |

Form 1725 (Rev. 8-85)    *U.S. GPO: 1992-327-311

## Request for Advanced Annual/Sick Leave/LWOP

**Name of Employee:** _____ Michael T. Helfer _____

**Position:** _____ Revenue Agent _____

**Grade:** __GS-12__  **Years with the Service:** ___ Approx. 27 ___

**Branch** ___7___  **Group/Section** _____ 1711 _____

**Requested Leave:**                                                    240
(number of hours)  ADV ANNUAL LV     ADV SICK LV      LWOP

**Dates of Leave:  From** ___Present___  **To** __01/31/97__

**Current Leave Balances:** *    23            4
                            Annual         Sick

**Is the employee on a leave concern letter?**  **Yes**     **No**
                                                            ___

**Amount of Advanced Annual/Advanced Sick/LWOP**
**Approved to Date this Calendar Year:**
_____ LWOP - 80 Hrs. _____

**Reason for Requested Leave:** _____ See attached _____

_____

_____

_____

_____

**Requested By:** _Michael T. Helfer_            _12/16/96_
                                                 **Date**

**Branch Level**
**Concurrence:** _Albert C. Woodruff_            _12/24/96_
                                                 **Date**

**Division Level**
**Approval:** _____            _____
                                          **Date**

**Revised 5/27/93**

* include accruals for pp # 25

2:04-cr-20031-MPM-DGB    # 86    Page 60 of 76

Michael T. Helfer - Attachment to Request for Leave Without Pay (LWOP)

Reason for Requested Leave:

I am necessarily requesting up to six weeks LWOP for medical
reasons.  In this reqard, I am currently suffering from diagnosed
severe depression and am in no condition to effectively or otherwise
deal with the public.  I am under the care of a Physican, a
Psychologist, and soon a Psychiatrist since the Physican just
prescribed lithium which requires monotering by a Psychiatrist.

I am requesting up to six weeks since the new medication will take
time to both determine the proper dosage and then to level out my
mental condition.  In regard to my condition, it has been diagnosed as
temporary, but is such at the moment that I am unable to function.  I
can only focus or concentrate for several minutes at a time and fear
making any decisions.  Anything I do is an ordeal which makes
everything I do seem overwhelming.  Too, I have loss of appetite and
sleep poorly which reduces my energy level.

My leave balances are depleted since about a year ago I was
diagnosed similarly with Seasonal Adjustment Disorder and used my leave
to recover.  Medication (Prozac) and usage of a sun lamp helped at that
time, but they have not currently been effective.  I am told the
lithium will stablize my condition now and in the future, but will take
time to work.

Finally, even though I am requesting up to six weeks LWOP, it is
possible that my recovery will occur prior to that time which
would allow me to return sooner.

**ROUTING AND TRANSMITTAL SLIP**

**Date** 12-17-96

| TO: (Name, office symbol, room number, building, Agency/Post) | Initials | Date |
|---|---|---|
| 1. CHIEF, EXAMINATION BRANCH | 7 | |
| 2. STOP 4000 SPR | | |
| 3. | | |
| 4. | | |
| 5. | | |

| Action | | File | | Note and Return |
|---|---|---|---|---|
| Approval | | For Clearance | | Per Conversation |
| As Requested | | For Correction | | Prepare Reply |
| Circulate | | For Your Information | | See Me |
| Comment | | Investigate | | Signature |
| Coordination | | Justify | | |

**REMARKS**

Mike will need LWOP for this
PP if he doesn't work.

Roger Fisher —
a doctor's statement is needed.

Please see the cc mail message.

Dee
12-19-96.

**DO NOT use this form as a RECORD of approvals, concurrences, disposals, clearances, and similar actions**

| FROM: (Name, org. symbol, Agency/Post) | Room No.—Bldg. |
|---|---|
| | Phone No. |

5041-103    *U.S. GPO: 1995-404-763/20072

**OPTIONAL FORM 41 (Rev. 1-94)**
Prescribed by GSA

Author:   Deloris Featherstone at MWR-SPR
Date:     12/19/96  03:51 PM
Priority: Normal
TO: Roger Fisher
Subject: Re: Employee Absence
------------------------- Message Contents ------------------------------

    Roger, we need to get a medical statement from Mike. It needs to be
specific as to Mike's ability to be at work. The one I saw in his file
from his prior absence is not as detailed as needed for a long period
of absence. I would suggest you contact Kindi in labor relations as to
what should be included in the statement from Mike's physician in
order for us to accept it. You may also want to look at the IRM
requirement on this and that new personnel book we got a few weeks
ago.

    Dee


_____ Reply Separator
_____ Subject: Employee Absence
Author:   Roger Fisher
Date:     12/13/96 08:48 AM

    Mike Helfer has been on leave all week.  He says he has been
diagnosed as manic-depressive.  So, I don't know when he
will return to work.  He doesn't have much of a leave
balance.

042



CHRISTIE

CHRISTIE CLINIC ASSOCIATION
101 West University Avenue
Champaign, IL 61820-3970
217.366.1200

December 24, 1996

Mr. Roger Fisher
Manager, Examination Group
Internal Revenue Service
310 West Church St.
Champaign, IL   61820

Re:  Michael Helfer

Dear Mr. Fisher:

Mr. Helfer is experiencing a significant depression and is
currently taking antidepressant medication. Due to his current
illness he will not be able to work full-time for the next 4-6
weeks. He may return to work on a part-time basis at an earlier
date.

Sincerely,

James R. Smith, Ph.D.

JRS/mjz

043

| Type of Activity: | Inspection Service | Date and Time |
|---|---|---|
| ☒ Personal Interview<br>☐ Telephone Interview<br>☐ Records Review<br>☐ Other | **Memorandum of Interview or Activity** | February 4, 1997<br>9:45 AM |

| Activity or Interview of: *(Include all necessary data)* | Conducted by: SI Gary Bacon |
|---|---|
| DEE FEATHERSTONE<br>Examination Division Branch Chief<br>DDIR - Illinois District | Location Of Interview/Activity<br><br>320 West Washington Street<br>Springfield, Illinois |

**Subject Matter/Remarks**

FEATHERSTONE provided the following information:

Internal Revenue Agent (R/A) MICHAEL HELFER has not yet provided a physicians statement regarding his medical absence from work. R/A HELFER has returned to work periodically but has no annual or sick leave balances. On those ocassions when HELFER has not come into work, he is placed in Absent Without Leave (AWOL) status. For the period December 23, 1996 through January 17, 1997 HELFER has been charged with 73 hours AWOL and additional AWOL hours were charged during the last pay period.

As of this date (02/04/97) R/A HELFER has still not provided the required physicians statement to support his absence from work.

| Name:<br>HELFER, MICHAEL | Case Number:<br>6-9610-0026 |
|---|---|

Form 8052 IS  (Rev. 8-96)    Department of the Treasury - Internal Revenue Service

| Type of Activity:<br>☒ Personal Interview<br>☐ Telephone Interview<br>☐ Records Review<br>☐ Other | Inspection Service<br>**Memorandum of Interview**<br>**or Activity** | Date and Time<br>February 12, 1997<br>2:20 PM |
|---|---|---|
| Activity or Interview of: *(Include all necessary data)*<br><br>MARC POLING<br>President, Poling Chevrolet Company<br>500 West Bridge Street<br>Monticello, Illinois | Conducted by: S/I Gary Bacon<br>Insp. Rick Semmens | |
| | Location Of Interview/Activity<br><br>Poling Chevrolet Company<br>500 West Bridge Street<br>Monticello, Illinois | |

**Subject Matter/Remarks**

MARC POLING met with Inspectors and provided copies of documents relating to the sale of a 1997 Chevrolet Cavalier sold to Internal Revenue Agent (R/A) MICHAEL HELFER on August 16, 1996. POLING provided the following information:

R/A HELFER was conducting an audit of POLING CHEVROLET, during the summer of 1996. Sometime in late July or early August 1996, R/A HELFER indicated to him that he noticed and was interested in a 1997 Chevrolet Cavalier, which was displayed on the showroom floor of the dealership. HELFER passed by this vehicle every time he was at the business conducting the audit. Sometime during the second week of August, possibly on or about August 10 to August 13, 1996, R/A HELFER indicated to him that he was interested in purchasing the vehicle. R/A HELFER approached him asking if he (POLING) would "have a problem" with him purchasing a vehicle from him. POLING advised HELFER that he did not have a problem selling HELFER a vehicle if HELFER did not have a problem with it. POLING advised that the company had never been audited by the Internal Revenue Service (IRS) before and had to depend on the information that HELFER was giving him. HELFER told him that he had no problem with purchasing the vehicle. At that point, POLING asked one of his salesmen to work with HELFER in setting up the sale. He added that R/A HELFER never hinted or otherwise applied pressure to them to give him a better deal, because he was conducting the IRS audit. The vehicle was sold to HELFER on August 16, 1997.

POLING reviewed internal documents relating to this sale and advised that the suggested retail price (sticker price) for the subject vehicle was $16,375.00. POLING added, however, that the average car buyer does not pay full sticker price for the vehicle. R/A HELFER actually paid $15,950.00 for the vehicle. HELFER was issued a General Motor's credit card and use of that card earned him a credit toward a purchase of a new vehicle in the amount of $2,465.81, which was applied as a downpayment against the purchase of the vehicle. HELFER also traded in a 1993 Pontiac Grand Prix and received a trade-in credit, in the amount of $9,000.00, for that vehicle. HELFER paid the remainder of $4,484.19 by issuing personal check number 7200, in the amount of $4,943.19, which included sales tax, in the amount of $434.00 and a documentation fee of $25.00. HELFER agreed to and was "happy" with that deal.

Inspectors reviewed dealer documents supporting the above figures. POLING added that the average profit on 1997 Chevrolet Cavaliers is approximately $1,019.00. The gross profit on the sale of the new vehicle, which was purchased by R/A HELFER was $1,410.00. POLING stated that in his opinion, R/A HELFER got a worse that average deal on the purchase of the vehicle in question, but knew that HELFER really liked and wanted to buy the vehicle. To his knowledge, POLING received no special favor from HELFER regarding the audit.

POLING advised that he feels that he has done nothing improper regarding the sale of the car to HELFER, but admits that he is nervous, due to the attention the sale has produced. He stated that in hind sight, he should have asked HELFER to wait until another time to discuss the car deal.

| Name: HELFER, MICHAEL | Case Number: 6-9610-0026 |
|---|---|

Form 8052 IS (Rev. 8-96)    Department of the Treasury - Internal Revenue Service



**CHRISTIE**

CHRISTIE CLINIC ASSOCIATION
101 West University Avenue
Champaign, IL 61820.3909

February 3, 1997

CONFIDENTIAL DATA:
ALL INFORMATION IN
THIS FILE IS STRICTLY
PRIVILEGED

Roger Fisher
Manager Examination Group
Internal Revenue Service
310 W. Church
Champaign, Illinois 61820

RE:  Michael Helfer

Dear Mr. Fisher,

Your employee, Michael Helfer, has been followed by James Smith,
Ph.D., for depressive difficulties which have been particularly
prominent since December 1996.  I first saw him on a referral from
Dr. Smith in late December.  At that time he was already on an
antidepressant medication and had been started on low doses of
lithium by his family physician.  His lithium dose was increased
and a number of situations in his life reviewed.  By mid-January
his state had improved and he had returned to work.

I believe Dr. Smith had contacted you in late December by mail
stating that Mr. Helfer was experiencing a significant degree of
depression and that he might not be able to return to full-time
work for a period of four to six weeks.  I am in support of that
estimate based on the information at that time, although clearly it
appears that his return to work has come a little quicker than
initially anticipated.

Sincerely,

John A. Gergen, M.D.

JAG/mrk

047

| Type of Activity: | Inspection Service | Date and Time |
|---|---|---|
| ☒ Personal Interview<br>☐ Telephone Interview<br>☐ Records Review<br>☐ Other | **Memorandum of Interview**<br>**or Activity** | February 26, 1997<br>10:00 AM |

| Activity or Interview of: *(Include all necessary data)* | Conducted by: SI Gary Bacon<br>Insp. Rick Semmens |
|---|---|
| MICHAEL T. HELFER<br>Internal Revenue Agent (R/A)<br>DDIR - Illinois District | Location Of Interview/Activity<br><br>Internal Revenue Service Office<br>310 West Church Street<br>Champaign, Illinois |

**Subject Matter/Remarks**

Internal Revenue Agent (R/A) MICHAEL HELFER was interviewed in the presence of National Treasury Employees Union (NTEU) Representative DENNIS MATHEWS. R/A HELFER was advised that he was the subject of a conduct investigation and was further advised of the allegation. R/A HELFER was issued, read, and understood Notice 417, Privacy Act Notice. R/A HELFER also read and signed IRS Form 8111, Employee Notification Regarding Union Representation. R/A HELFER was then placed under oath and provided the following information:

In June 1996, he was assigned to conduct a corporation income tax audit of POLING CHEVROLET, INC., located in Monticello, Illinois. Shortly after beginning the audit, he discovered that POLING CHEVROLET was delinquent in employment tax returns and an employment tax audit resulted. HELFER stated that he does not normally conduct employment tax audits and only conducted this one as part of the corporate audit. R/A HELFER was shown a copy of the Motor Vehicle ISP re: demonstrator automobiles and asked if he used this document in the corporate audit. R /A HELFER responded that he was not aware of this document and stated that he did not use it in the audit. R/A HELFER was shown document D-9 of the audit and advised that it was not in his handwriting. However, he admitted that he had reviewed the document during the audit and made notations at the top of the document. He stated that he would have questioned the figures on the document and what method was used to arrive at those figures. He believes that the document was prepared by ANDY SCHMIDT, who was a trainee assigned to assist him on the audit.

R/A HELFER stated that the "demo" issue would have been addressed by him had he continued the corporate audit, but since he asked that the audit be reassigned, it was never addressed by him. He added that normally, adjustments made to the employment tax returns would flow to the individual tax returns, but in this situation, he would have completed the corporate audit, then would have gone back and corrected the employment tax figures. He again added that he examined the employment taxes first, because he discovered some delinquencies and that he needed to get them filed to stop the penalties and interest. HELFER stated that he was not an expert in employment tax audits.

048

| Name:<br>HELFER, Michael T. | Case Number:<br>6-9610-0026 |
|---|---|

Form 8052 IS  (Rev. 8-96)    Department of the Treasury -  Internal Revenue Service

HELFER concluded by stating that he acted properly in requesting reassignment of the audit and did not benefit from his IRS position in purchasing the vehicle in question.

| Type of Activity: | Inspection Service | Date and Time |
|---|---|---|
| ☒ Personal Interview<br>☐ Telephone Interview<br>☐ Records Review<br>☐ Other | **Memorandum of Interview or Activity** | March 7, 1997<br>1:15 PM |

| Activity or Interview of: *(Include all necessary data)* | Conducted by: SI Gary Bacon |
|---|---|
| ROGER FISHER<br>Examination Group Manager<br>DDIR - Springfield, Illinois | Location Of Interview/Activity<br>Internal Revenue Service<br>Inspection Office<br>320 West Washington  Rm. 610<br>Springfield, Illinois |

**Subject Matter/Remarks**

Examination Group Manager (GM) FISHER reported the following:

During the summer of 1996, Internal Revenue Agent (R/A) MICHAEL HELFER had indicated to him that he (HELFER) was thinking of selling his automobile, a 1993 Pontiac Grand Prix, and getting a new one.  HELFER mentioned that he may sell his car to his brother-in-law. FISHER mentioned that he and R/A HELFER had a good working relationship and occasionally met each other socially.

On May 16, 1996 he received an Form 1120, Corporate Income Tax Return examination file for POLING CHEVROLET, Inc. of Monticello, Illinois.  On or about June 11, 1996, prior to reviewing the file,  he had information from POLING CHEVROLET's  accountant that there may be some issues involving employment taxes filed by POLING CHEVROLET.  He assigned the examination to R/A HELFER, noting that the employment taxes could be an issue.  R/A HELFER then initiated the audit by sending an appointment letter to the taxpayer (POLING CHEVROLET), on or about June 26, 1996.

On August 13, 1996 R/A HELFER came into the office and requested that he be removed from the examination because he had decided to purchase a vehicle from the taxpayer.  It appeared that HELFER had made up his mind to purchase the vehicle.  At this point, FISHER realized that R/A HELFER had possibly violated the IRS Handbook of Employee Conduct and Ethical Behavior.  He asked HELFER if he (HELFER) was sure that he wanted to do this and even attempted to persuade HELFER that purchasing the car would not be a good idea, challenging the wisdom of purchasing a vehicle from the taxpayer.  FISHER did not directly notify HELFER that he may be in violation of the IRS Handbook of Employee Conduct and Ethical Behavior.  He did not directly forbid HELFER from purchasing the vehicle.  However, FISHER was unaware, at that time, that HELFER had made adjustments to the taxpayers employment tax returns and had obtained an signed agreement on July 26., 1996.  The examination was reassigned to R/A NANCY ALLEN.   After discussing the issue with Examination Branch Chief on August 15, 1996, FISHER decided to report the matter to Inspection. FISHER could not get in touch with Inspectors until August 19, 1996. Review of the examination file in approximately September 1996 indicated that adjustments were made to the taxpayer's employment tax returns and that an agreement had been signed.  This was brought to the attention of Branch Chief FEATHERSTONE.

| Name:<br>HELFER, MICHAEL T. | Case Number:<br>6-9610-0026 |
|---|---|

FISHER added that adjustments to employment tax returns are not normally made until completion of the corporate income tax audit due to the fact that adjustments made on the income tax audit could affect prior employment tax returns filed by the taxpayer. For this reason, the employment tax returns are examined after the income tax audit. R/A HELFER did not do this regarding the POLING CHEVROLET audit. Also, it did not appear that R/A HELFER properly analyzed the value of the demonstration autos listed in the taxpayers inventory. This caused IRS management some concerns, due to the fact that HELFER purchased a vehicle from the taxpayer, after adjustments were made and agreements were signed. FISHER noted that although adjustments were made in July 1996, to the taxpayer's 1994 and 1995 employment tax returns, no time was charged to the 1995 corporate tax return audit by HELFER, until August 12, 1996, indicating that the employment tax returns were audited, prior to the corporate tax return.

After being notified by Inspectors that R/A HELFER had been interviewed on February 26, 1997 regarding this matter, FISHER was contacted by HELFER on or about February 27, 1997. HELFER asked FISHER if the taxpayer (POLING CHEVROLET) had reported him to Inspection. FISHER responded that he did not know.

On or about March 3, 1997 FISHER received a note on his desk from HELFER wanting to know if he (FISHER) was the "whistle-blower". FISHER immediately called HELFER into his office to discuss the note. He advised HELFER that like every other IRS employee that becomes aware of misconduct, he was required to report it. HELFER then left his office stating something to the effect, "So you are the whistle-blower." Again, FISHER called HELFER back into the office and he advised HELFER that IRS employees should never enter into financial dealings with taxpayers whom they are in the process of auditing. He then admitted to HELFER that he did, in fact, contact Inspection regarding this matter.

| Name:<br>HELFER, MICHAEL T. | Case Number:<br>6-9610-0026 |
|---|---|
| Form 8052 IS (Rev. 8-96) | Department of the Treasury - Internal Revenue Service |

*[handwritten initials/signature]*

6/4/96

JERRY JOHNSON (217) 543-2398        CALL 8:30-12N
    " TAX & ACCOUNTING , ARTHUR, IL


HAS   CLIENT; IS EMPLOYEE OF COMPANY
    401(K) DEDUCTION ON W-2
    TAKE OUT 401(K) THEN FIGURE SOCIAL SECURITY


    BOOKKEEPER AT
        COMPANY IS RELYING ON
        COMPUTER PROGRAM TO FIGURE
        HAS BEEN TOLD IT'S INCORRECT; CHECKED W/ COMPUTER VENDOR; SAYS ITS OK
        SAYS SHE WON'T CHANGE IT.
    ABOUT 20 EMPLOYEES AT BUSINESS — UNKNOWN HOW MANY ARE 401K CONTRIBUTORS
        COMPANY IS:
        POLING   CHEVROLET
        MONTICELLO
        37-0867554

        *[handwritten right-side notes: Checked into this. Issued T/P improperly. Bundling 401K payment for FICA and medicare. Picked of adjusted F.941's. and corrected.]*

    CLIENT WISHES TO REMAIN ANONYMOUS
        WANTS TO CORRECT SITUATION SO HE DOESN'T OWE SOC.SEC.     *[initials]*


Note: — I called Jerry Johnson to let him know (we will come)
        got his message.

                J-053 *[signature]*
                    6/4/96
                    11:25 A.M.

# Routing Slip



**Internal Revenue Service**

| To | Symbol | Room | Action Code | Initial/Date |
|---|---|---|---|---|
| Roger Fisher | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

☐ 1. Per our conversation
☐ 2. As requested
☐ 3. Approval
☒ 4. Comments
☐ 5. Information
☐ 6. Corrections

☐ 7. Signature
☐ 8. Initials
☐ 9. Note and return
☐ 10. Necessary action
☐ 11. See me
☐ 12. Call me
☐ 13. File

☐ 14. Prepare reply for signature of
_____

☐ 15. Please answer by
_____

**Remarks**

What's your role in my drspection inquiry? Were you the whistle blower?

| From | Phone | Room No. |
|---|---|---|
| | **Date** | |
| M. Hall | 2/28/97 | |

Form 1725 (Rev. 8-85)

*U.S. GPO: 1992-327-311

054

## NEGOTIATED ALTERNATIVE DISCIPLINARY AGREEMENT
MW-CHI-I-97-20

The parties to this negotiated discipline agreement are:

Employee: **Michael T. Helfer, Internal Revenue Agent, Examination Division, Internal Revenue Service, Illinois District**

Agency:   **Michael T. Donovan, Chief, Examination Division, Illinois District, Representing the Agency**

This agreement is entered into as a result of Michael Helfer's request to use the Alternative Discipline Agreement provisions as provided for in the agreement with NTEU and IRS dated October 27, 1994.

This request is the result of a proposal to suspend the employee, Michael Helfer, for five (5) days from employment with the Internal Revenue Service. The reason for the proposed suspension was a conflict of interest in purchasing a vehicle from an automobile dealership Mr. Helfer was auditing. The Employee understands how a reasonable person could perceive the purchase of a car from the dealership under these circumstances is a conflict of interest which is a violation of the Rules of Conduct.

The following conditions are agreed to by all parties to this agreement. This includes the Agency's decision and the Employee's or the union's right to grieve or appeal the action.

1.    The Agency hereby agrees to place the employee in non-pay status (LWOP) the week of September 22, 1997 for five (5) days. The impact of this alternative action is tantamount to a five (5) day suspension, except a LWOP SF-50 is being used in lieu of a suspension SF-50.

2.    The Employee and his representative forfeit any and all rights to grieve, appeal, complain or contest the conditions of this agreement. The Employee freely and voluntarily agrees to these conditions. He has had ample time to consider the conditions, to seek legal advice from an attorney, union representatives or others, and he fully understands that he has the option to accept a formal disciplinary action, rather than elect the alternative action described herein. The Employee understands that the election of the formal disciplinary action procedures, in lieu of this alternative action, may have also resulted in a five (5) day suspension.

3.    The Employee hereby understands and agrees that he is solely responsible for expenses incurred in connection with the execution of this agreement and agrees to waive any right to seek reimbursement for such expenses with the Agency. Further, unless prohibited by law and public policy, the Employee agrees to waive

Exhibit 2

his right to all entitlement, not specifically mentioned as part of
this agreement, to which he may be entitled, pursuant to any
regulation, statute or law.

4.    The parties agree that this discipline agreement shall not be
publicized, except as is necessary for the Agency to administer the
Alternative Discipline Program and this agreement.

5.    The parties further agree this discipline agreement is for the
mutual benefit of the parties and will not establish any precedent,
nor will this agreement be used as a basis by the employee or other
persons or groups to seek or justify similar terms in a subsequent
case.  It may, however, be used as evidence in any subsequent
proceeding in which either of the parties alleges a breach of the
agreement.  In addition, the alternative discipline agreement will
have the effect of a formal disciplinary action and the gravity of
the action it replaced.  Should future misconduct occur, this
alternative discipline agreement will constitute a prior
disciplinary action that may be considered in determining
appropriate disciplinary action.

6.    This agreement constitutes the full and complete resolution of
the improper conduct stated above and the Agency's corrective
action thereof.  It does not preclude the Agency from taking
appropriate action regarding any other misconduct not covered by
this discipline agreement.

7.    The parties understand the alternative agreement will not be
placed in the Employee's Official Personnel Folder (OPF); however,
it will be maintained indefinitely by the Agency.  The employee's
immediate manager will also maintain a copy of this agreement in
the employee's drop file until the terms of this agreement are met.

8.    No other promises or agreements shall be binding unless
mutually agreed to in writing and made part of this agreement by
amendment.


_Patricia A. Leatherwood_      9/2/97
Michael T. Donovan              Date
Chief, Examination Division


_Michael T. Keller_             8/28/97
Michael T. Keller               Date
Internal Revenue Agent



NTEU Chapter 43                 Date
(Optional)

his right to all entitlement, not specifically mentioned as part of this agreement, to which he may be entitled, pursuant to any regulation, statute or law.

4.   The parties agree that this discipline agreement shall not be publicized, except as is necessary for the Agency to administer the Alternative Discipline Program and this agreement.

5.   The parties further agree this discipline agreement is for the mutual benefit of the parties and will not establish any precedent, nor will this agreement be used as a basis by the employee or other persons or groups to seek or justify similar terms in a subsequent case.  It may, however, be used as evidence in any subsequent proceeding in which either of the parties alleges a breach of the agreement.  In addition, the alternative discipline agreement will have the effect of a formal disciplinary action and the gravity of the action it replaced.  Should future misconduct occur, this alternative discipline agreement will constitute a prior disciplinary action that may be considered in determining appropriate disciplinary action.

6.   This agreement constitutes the full and complete resolution of the improper conduct stated above and the Agency's corrective action thereof.  It does not preclude the Agency from taking appropriate action regarding any other misconduct not covered by this discipline agreement.

7.   The parties understand the alternative agreement will not be placed in the Employee's Official Personnel Folder (OPF); however, it will be maintained indefinitely by the Agency.  The employee's immediate manager will also maintain a copy of this agreement in the employee's drop file until the terms of this agreement are met.

8.   No other promises or agreements shall be binding unless mutually agreed to in writing and made part of this agreement by amendment.

_Patricia A. Leatherwood_      9/2/97

Michael T. Donovan            Date
Chief, Examination Division

_Michael T. Keller_      3/28/97

Michael T. Keller            Date
Internal Revenue Agent

NTEU Chapter 43              Date
(Optional)