**E-FILED**
Friday, 17 June, 2005  10:06:42 AM
Clerk, U.S. District Court, ILCD

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF ILLINOIS

3       URBANA DIVISION

4

5

6    GRAND JURY INVESTIGATION

7

8

9  PRESENT:

10  MS. HILARY FROOMAN
      Assistant United States Attorney
11  Urbana, Illinois

12

13

14

15

16

17

18

19

20

21

22          TRANSCRIPT OF TESTIMONY

23              OF

24          LARRY PHILLIPS

25          June 4, 2003


CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS     217-525-6167
2


1          FOREPERSON:  You do solemnly swear that all

2    the testimony you are about to give in the case now

3    before the court is the truth, the whole truth, and

4    nothing but the truth, so help you God?

5          MR. PHILLIPS:  I do.

6              EXAMINATION BY

7          MS. FROOMAN:

8      Q.  Will you tell the grand jurors your name and

9    spell your last name?

10     A.  Larry Phillips, last name is spelled

11   P-h-i-l-l-i-p-s.

12     Q.  And are you employed?

13     A.  Yes, I am.

14     Q.  Who are you employed with?

15     A.  A company by the name J.K. Harris & Company.

16     Q.  What do you do for them?

17     A.   At the present time I field tax questions

18   via cell phone.

19     Q.   Okay.  What exactly does J.K. Harris do?

20     A.   They're a tax resolution company located in

21   Charleston, South Carolina.  They assist people that

22   are having problems dealing with the IRS, Internal

23   Revenue Service.  If you have a collection problem or

24   an audit problem our company will attempt to assist

25   you in dealing with those folks at the IRS.

1     Q.   What is your background and experience?

2     A.   Well, 30 years with the IRS doing a variety

3   of things.  Basically in audit all those years, I did

4   quite a bit of instructing for the IRS, about eight

5   or nine years, three years full time.

6       The audits that I were involved with for the most

7   part were corporate audits and I guess -- and I was

8   in the state of Michigan for most of my career and

9   Cincinnati, Ohio, for a short three year period

10   during teaching time.

11    Q.  You were subpoenaed to appear before the

12  grand jury and to provide to the grand jury copies of

13  any and all work papers from the audit file of Denny

14  Patridge for the period January 1, 1998, through

15  December 31, 1999, and copies of any and all work

16  papers from the audit file of another individual

17  named Gary Scherer, S-c-h-e-r-e-r, involving any

18  dealings with Denny Patridge.

19    And have you complied with that request by means

20  of turning those records over through myself and

21  through Special Agent Coleman?

22    A.  Yes, I have.

23    Q.  Okay.  That Exhibit is 146, just to keep

24  track of that for grand jury purposes.  And you met

25  with myself and Special Agent Coleman yesterday and

1  went through a lot of the records you have brought,

2  is that right?

3    A.  That's correct.

4    Q.  Did your company assign you to a particular

5  client named Denny Patridge?

6   A.  They did.

7   Q.  What if anything did you know about the

8   situation before you first met with Mr. Patridge?

9   A.  The only thing that I knew that he was

10  involved with a trust and it was a complicated trust

11  according to my boss who asked me to assist Denny

12  Patridge in going to the IRS to deal with the IRS

13  regarding that trust activity that he was involved

14  with.  That's basically all I knew.

15  Q.  Now I'm going to show you Exhibit 146A.  Is

16  this a handwritten listing of the dates that are

17  relevant to the contract through J.K. Harris &

18  Company and your meetings with Denny Patridge?

19  A.  Yes, that is my handwriting and those are

20  the accurate dates that I was with him, I met with

21  the client.

22  Q.  Okay.  So when you met with Denny Patridge,

23  and we're talking about the year 2000, and your first

24  meeting would have been is it June 30th, 2000?

25  A.  That's correct, June 30, 2000.

1    Q.   Okay.  What did you learn from him in that

2    meeting and subsequently about what his involvement

3    with these trusts were and why he was having trouble

4    with the IRS?

5    A.   It's kind of a loaded question.

6    Q.   Well, let's go back then, how about to 1996,

7    '97.  What did you learn had taken place with

8    Patridge and the IRS with respect to those years?

9    A.   From what I understand from Denny Patridge

10   when we first met on June 30 of 2000 at his home, I

11   believe it was in Strasburg.

12   Q.   Is that S-t-r-a-s-b-u-r-g?

13   A.   I believe that's it, yes.

14   Q.   Okay.

15   A.   Illinois of course.

16       (Whereupon Mr. Harris entered the

17        grand jury room.)

18       MR. HARRIS:  Excuse me just one second.

19   Questionnaires, forms and pencils I have for you.

20   I'll just put these on the desk, so please sign those

21   as you leave at the end of the day.  Thanks.  Sorry

22   about that.

23       MS. FROOMAN:  No problem.

24           (Whereupon Mr. Harris left the grand

25           jury room.)

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS    217-525-6167
6

1    A.   I asked Denny Patrick what his status was at

2    that time that I arrived at his home, and he

3    indicated that he was audited for '96, 1996, 1997,

4    and they, the IRS disallowed all of his expenses that

5    were on his tax returns, which was on a trust tax

6    return for Form 1041, which was related to his

7    business activity which was selling life insurance.

8        And I don't know of anything else but at the

9    moment -- I don't recall anything else.  I asked him

10   why they disallowed all that, all those items, those

11   expenses, and he indicated that he was not too sure,

12   but they just did that.

13       And further discussions he said well, he never

14   went to the IRS, did not produce the records that

15   they asked for, which is income items or expense

16   items, that numbers on those forms for the trust,

17   that's what they were really interested in, because

18  he had filed those trust forms, 1041 or had them

19  filed, I don't know if he filed them, I don't think

20  he did, I think he had someone else, a tax preparer

21  file them.

22     Well, anyway, I explained to him that if you

23  don't produce the records they are going to disallow

24  the expenses.  That's the old cliche, no ticky no

25  laundry.  He understood that.  Most people do.

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS     217-525-6167
7

1     Then he proceeded to say that the '96 and '97 he

2  would like to have reopened, the audit was closed and

3  it was closed because he did not respond to the IRS

4  letter saying I'd like to meet with you, you produce

5  your records and we will then verify all the

6  expenses, verify all the income tax that are on these

7  tax returns and see if they're accurate.

8     This is standard normal operating procedures

9  within the IRS.  You put a number on a tax return and

10  they want to verify that.  That's called an audit.

11     I said I'd do what I could to get the '96 and '97

12  year reopened.  There were several ways to go.  He

13   said all right.  We proceeded then with the '98 year.

14   I asked him have you done anything with '98?  No, he

15   has not.  I said well, do you have records?  Yes, he

16   does.

17       We got involved with his comments regarding the

18   trust, what I thought about the trust, and what I

19   knew about the trust that he was involved with.  I

20   told him then, I said Denny, you're not going to get

21   free from paying income tax when you have income

22   earned in the United States.  I don't really care

23   what form you want to put your activities under,

24   business activities that is, you're going to have to

25   pay income tax if you have net income earned in the

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS     217-525-6167
8

1   United States.

2       Q.  Would you say that these trusts or what he

3   was calling trusts were basically just a series of

4   bank accounts?

5       A.  They had numerous bank accounts, yes, to

6   these trusts.  There I think were about three trusts

7  that were set up.  Money came into one trust, flowed

8  to another on paper at least, and then onto another,

9  and it ended up in a foreign country.

10      Q.  But Denny Patridge always maintained the

11  control over the money?

12      A.  Yes.

13      Q.  Unlike a trust where you give up some

14  control of the money to a trustee and money flows

15  ultimately to a beneficiary?

16      A.  Yes, Denny always maintained control of all

17  of that, all of the activity of those trusts that he

18  had created or he had them created on his behalf, he

19  bought them.

20      Q.  Did he also indicate that or did you learn

21  that he had attempted to place his insurance company

22  in a trust or call it a trust?

23      A.  The insurance company, the activities from

24  the insurance company were put into -- all the assets

25  were put into a trust.  His home was put into --

1  everything that he owned was put into a trust, one

2  trust or another.

3    Q    So in other words, if you looked at him as a

4  person or as a business, it would not appear that he

5  had -- he or the business had any assets, it was only

6  trusts that had the assets?

7    A.  That's correct.

8    Q.  Okay.  Did you tell him whether you could do

9  that?

10    A.  Yes, you can create a trust and put assets

11  in a trust, there's no question about that.

12    Q.  What was wrong with what he was doing?

13    A.  When you do that if that trust because of

14  holding certain assets creates income, there are two

15  options.  One, the trust pays tax on that income or

16  two, the income is distributed to the beneficiary and

17  they pay tax on that income.

18    This didn't happen with his trust setup.  It went

19  from one trust to another trust to another trust and

20  then overseas.  No taxes were ever paid.

21    Q.  Well, obviously he had a home and he had

22  expenses.  Did you ever ask him how he was paying for

23  those if his money was in a foreign account?  I mean

24  how did he get out the money?

25    A.  I asked him that question, and he indicated

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS    217-525-6167
10

1  that he would contact the people in the foreign

2  country, and the name of the foreign country was

3  Belize, I'm not exactly sure where Belize is located,

4  I think it's south of us.  But anyway, he would

5  contact them.  I didn't ask how he did that, by phone

6  or fax or mail, probably phone, but I don't know

7  that, stating that he needed to borrow as he put it

8  some money, 20,000, 30,000, whatever the number was

9  that he might want at that time.

10    They then would wire money up to him, I assume

11  that, I don't know how else you're going to get money

12  that quick, but they probably did, that was just an

13  assumption.  But anyway, they would send him the

14  money.

15    He then would take his loan paper that he had in

16  front of him and fill it out, and I am borrowing

17  money from this account and sign his name, Denny

18  Patridge.

19    Q.  Well, it sounds to me like he was borrowing

20  money from himself.

21    A.  Yeah, I said that to him, too.  I said it's

22  like you have a savings account, you put money into

23  the savings account and then you go to the bank and

24  say I'd like to withdraw a thousand dollars or

25  $10,000, whatever might be available to you, and they

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS    217-525-6167
11

1  say fine, this is your money.  They give you the

2  money and then you go home and sign a note, I

3  borrowed $10,000 from my savings account.

4    Q.  Did you ever actually see the bank records

5  for this foreign account?

6    A.  No, ma'am, I did not.

7    Q.  Did you ever ask if this was in fact, you

8  know, a bank as the rest of us would normally think

9  of the bank building, you know, with a president and

10  everything, or you know, whether anyone could borrow

11  money from this place where the money was being held?

12    A.  Yes, I never saw the bank statements.  I did

13  ask him for them, and he said well, they don't have

14    them.  I said okay.  I said to him Denny, sitting at

15    his dining room table and his wife Judy was there,

16    you remember funny little things that happened in

17    your life, you all do I guess.

18        But I said to Denny, I said well, if you can

19    borrow money, could I go to Belize and walk into this

20    bank and ask them if I could borrow money against

21    that account, assuming that I had collateral?  Could

22    I borrow that money like you did?

23        Judy spoke up, his wife, and said well no, you

24    can't do that, that's our money.  Denny give her a

25    strange look, that's all he did, and then he went on

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS    217-525-6167
12

1    to say I don't know that they would loan you any

2    money on that account.  I said oh, okay.

3        And then I don't know if it's a -- you know, I

4    don't know what kind of an account it is other than a

5    savings account.  I mean I didn't say that, but I

6    would assume that.

7    Q.  Well, here you are, you are there to assist

8    a taxpayer who apparently wants assistance with the

9    IRS, but you in all the time you were actually

10   working for him as your client never actually saw all

11   the bank records that were involved in the argument

12   with the IRS?

13       A.   That's correct.

14       Q.   Going back to the 1998 tax year, did he

15   comply with the IRS request to provide the records to

16   the Internal Revenue Service?

17       A.   He complied very minimally, that is if -- I

18   don't remember the number of records that was asked

19   for or the number of expense accounts that needed

20   verification or documentation.  I can only think of

21   one invoice that I saw that dealt with entertainment

22   expense.  Out of probably eight or ten different

23   expense accounts, I only saw that one invoice.  He

24   didn't want to give me very many documents or

25   records, and of course I don't know why, but he

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS    217-525-6167
13

1    didn't.  That was his call.  I could only ask him and

2    say well, the IRS is going to want to see your phone

3   bills.  I never saw the phone bills.  Well, I'll try

4   to get them for you, okay.  Well, that was the

5   response and of course I never got them.

6       Q.  You had a number of meetings with him.  Was

7   his wife usually present?

8       A.  Yes.

9       Q.  And if you asked specifically well, do you

10  have X invoice for such and such a date, would they

11  ever be able to produce it?

12      A.  They never did produce it.

13      Q.  Okay.  Did they ever provide you with any

14  documents?  I mean you're sitting there trying to put

15  -- get an idea of their finances and the income and

16  expenses, and anyone ever say between either Judy or

17  Denny Patridge well, let me go get you that file?

18      A.  The only thing that I can recall in

19  reviewing the notes the other day was that he did

20  provide copies of Form 1099, which is an income form,

21  if you have interest income you'll get a 1099 from

22  the payor of that if you folks are familiar with it

23  or if you're self-employed such as Denny was

24  self-employed.  So he would have a 1099.

25      And he had copies of those 1099s, which I

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS    217-525-6167
14

1    reviewed those.  They to my knowledge were accurate,

2    that is the 1099 was accurate but that amount adding

3    those numbers up came to the tax return.

4        But asking for invoices for expenses, the only

5    one I remember was some bill that he had for a

6    restaurant where he entertained some people, he

7    bought their dinners.

8    Q.   And he got you sufficient documentation on

9    that occasion of that, I mean of that occasion?

10    A.   Well, not sufficient for the IRS.  The IRS,

11    if you entertain someone the IRS wants you to list

12    names of the people that were entertained and the

13    reason or the purpose of this expenditure.  It's nice

14    to buy somebody a dinner, that's very fine.  But why?

15    Normally there's something behind it.

16        Your wife may ask you for dinner, you take her

17    out for dinner, that's kind of common sense.  But why

18    would I take a stranger out unless I had some

19    business purpose?  So you have to have the name of

20  the person and what was discussed at that dinner in

21  order to get a tax deduction.

22     We asked him for the names or I did and so did

23  the revenue agent that was doing the audit.  Never

24  got the names.  So I don't know who was there and I

25  don't know why they met.  Well, he told me verbally,

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS     217-525-6167
15

1  but that isn't going to fly.

2     Q.  You mean he told you verbally the names?

3     A.  No, he mentioned one or two names, but, you

4  know, I said well, is that the only people there,

5  just three people or how many names he mentioned, and

6  he said well no, there were 12 or 15.  We had --

7  well, the invoice indicated there was 12 or 15, I

8  don't remember exactly.

9     Q.  But he simply said he wasn't going to give

10  you the names?

11     A.  He said I don't remember the names, I don't

12  have a list, I don't have a record of the names.

13     Q.  Okay.  So basically what was -- among other

14  things what was happening was the expenses which

15  would then if you're filling out the tax return, you

16  would be allowed if they're well documented to deduct

17  them from the income and therefore pay less taxes.

18  He was not providing the documentation to support

19  those deductions or subtractions, is that right?

20      A.  That's correct.

21      Q.  So where did he stand with the IRS, did you

22  manage -- did you meet with the IRS and get them to

23  agree to reopen his 1996, 1997 audits?

24      A.  Yes, I did.

25      Q.  You're hesitant?

1      A.  I'm hesitant because I never really found

2  out where were they going, were they -- was the IRS

3  going to reopen those '96 and '97 tax return years,

4  because I left Illinois and went back to South

5  Carolina, my corporate office.

6      But they were working on it and said yes, they

7  would reopen them, providing he would get those

8  records together.

9    And I met with Denny and I told him that Denny,

10    we need the records from '96 and '97.  You indicated

11    you had them, put them in a box, bag them up and I'll

12    take them down to the IRS, I'll get them together for

13    you.  And this was well, it's always man, I don't

14    know if, you know, I'll get them together for you.

15    Procrastinating was something he did very well.

16    I would call and say do you have those together

17    and yes, I would drive down there from roughly

18    Champaign, Illinois, down to his home, and when I got

19    there I'd say do you have them in a box?  Well, no, I

20    haven't got them all together yet, I'm still working

21    at it.  I've got a few here, a few there, and it

22    became very frustrating.  I'm not really sure why he

23    didn't put everything into a box or a bag and say

24    here they are.

25    Q.  So you're saying basically you left the area

1    before that was resolved?

2    A.  Yes, ma'am.

3    Q.  Now, did you -- are you saying you sort of

4   just threw the towel in and gave up on the case or

5   what?

6       A.   Well, I was in Illinois in that area for

7   about two months, and I really wasn't getting

8   anywhere with this gentleman.  I -- if I'm going to

9   try to help somebody, you know, you need to help

10  yourself a  little bit, too.  And if you don't give

11  me the records and I have asked several times, then I

12  really don't know what I can do.

13      And I told Denny that and I told him that I had

14  to get back to the corporate office.  I can't spend,

15  you know, six months, eight months out here in

16  Illinois.  I have a job to do in South Carolina also.

17      We sort of left it that I was leaving the area,

18  and as soon as he got them all together and put them

19  in a box, a bag, and he could then mail them to me in

20  South Carolina and we would prepare the correct tax

21  returns at that time for the years '96, '97.

22      Q.   Did you ever get them?

23      A.   Never got them.

24      Q.   Okay.  In going through the records that you

25  had in your file with J.K. Harris, did you find

1   documentation in which Denny Patridge contacted the

2   Internal Revenue Service and basically told them

3   well, you don't have the authority to request the

4   records you're requesting?  And I'm going to show you

5   146B.

6       A.   Yeah, I've seen this, ma'am.

7       Q.   Okay.  And what -- how would you

8   characterize that letter to the Internal Revenue

9   Service?

10      A.   It's a very argumentative letter written --

11  I don't know who written by, signed by Denny

12  Patridge, but I don't know who wrote it, I don't

13  think Denny wrote it, stating to the IRS that you in

14  essence, you don't have any authority to challenge my

15  tax return.

16      Well, folks, IRS does have that authority.  And

17  when you -- when I read this, I was shocked that

18  anybody would challenge the IRS with all sorts of law

19  cited, whether it would be applicable or not, that

20  you don't have the authority to ask for anything.  I

21  have prepared a correct tax return so please just go

22  away.  A little stronger terms than that in this

23  letter.

24     I told Denny that I had been involved as a

25  revenue agent, and I was one for about 30 years, and

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS    217-525-6167
19

1  if I got a letter like this, it would really tick me

2  off.  We're all human beings, and if that were to

3  happen to anybody in here I'm sure they'd probably

4  feel the same way.

5     I don't write these laws, Congress writes them,

6  and Congress does have the authority to ask for your

7  documents to support a sheet of paper that you submit

8  showing your income and your expenses.  So that's the

9  wrong thing to do.

10    Q.  Okay.  And is there some sort of a date on

11  that either as to when it was sent or when it was

12  received by the IRS?

13    A.  Dated June 16th, 1999.

14    Q.  Is that the sent date or the received date

15  by the IRS?

16    A.  That was, oh, received by the IRS.

17    Q.  No, I'm sorry, you read a date, I just

18  wasn't sure what you meant was that date.

19    A.  Date of the letter received June 18th, two

20  days later.

21    Q.  The letter was sent on what date?

22    A.  June 16th.

23    Q.  Okay.  Year 2000?

24    A.  '99.

25    Q.  '99, okay.  Did you obtain from the IRS a

1  list of what it was they were requesting from Denny

2  Patridge, I mean these are the documents we would

3  like to have, and I'm going to show you 146C?

4    A.  Yes, ma'am.

5    Q.  Okay.  Is that your handwriting?

6    A.  That's my handwriting.

7    Q.  Okay.  And so how did you obtain -- you took

8  notes in talking with the IRS agent yourself?

9    A.  Yes, I did.

10    Q.  And did you communicate that list to Denny

11    Patridge, this is what they're asking for?

12    A.  Yes, I did.

13    Q.  Pull these records together?

14    A.  Yes, I did.

15    Q.  Okay.  Did you also communicate with the IRS

16    and let Denny Patridge know, well, how far you were

17    getting with them, the progress you were making in

18    trying to reach some sort of agreeable conclusion

19    with respect to whether they would review a '96 and

20    '97?

21    A.  I kept him abreast of that as much as I

22    could, as far as things progressed I'd let him know,

23    yes.

24    Q.  All right.  Let me show you 146D.  What is

25    that?

1    A.  For the year '96 and '97, the audit was

2    closed, that is it was concluded because he did not

3    provide those records that were requested.  So what

4    IRS does in that case, they will accept your income

5   as shown with no expenses and you pay tax on your

6   gross income.  They have no choice really.

7       He wanted to have those years, '96, '97, reopened

8   so that he now could present to the IRS those

9   documents that they had originally asked for, and he

10   basically ignored their request.

11       What I had done then is gone to the IRS office in

12   Champaign, Illinois, talked to the group manager of

13   the IRS office there, asking how can we go about

14   doing this?  He provided me with the information

15   that's in the IRS manual, how do we open or get an

16   audit reopened, audit reconsideration.

17       This is a note or notes that I wrote giving them

18   to Denny stating Denny, here's what you need to do in

19   order to get this case reopened or at least for

20   consideration to be reopened.  IRS has the authority

21   to say no or they have the authority to say yes.

22       There is a procedure, you start at the local

23   office and it goes on up to the top and you have to

24   explain why you want this audit reopened, and I was

25   just telling Denny what you needed to do and how to

22

1   go about getting this accomplished.

2      Q.  What date did you tell him that?

3      A.  7-17-2000.

4      Q.  Okay.  So it's not really up solely to the

5   local agent, the local revenue agent, he would have

6   to -- it's not solely his approval that's required,

7   it would have to go up the ladder is what you're

8   saying?

9      A.  Yes, ma'am.

10     Q.  I'm going to show you 146E.  It's a letter

11   that has a date on the top of July 20th, 2000.  No

12   one signed it.  First of all do you know if that was

13   ever sent?

14     A.  I don't know that, ma'am.

15     Q.  Okay.  Can you tell us the background to

16   that letter, how you received it and also what it is

17   that is requested in that letter?

18     A.  The letter is written under I believe my

19   guidance here in these notes that I sent to Denny in

20   longhand stating what he needed to do and who he

21   should address it to.  So he addressed it to the

22  district director through the group manager which was

23  correct, stating this is a request for an audit

24  reconsideration for the years '96, '97 for he gives

25  his name and Social Security number.

1    It also states that they were not able to secure

2  adequate representation before.  I'm not sure what

3  Denny meant by that, but he probably did not have

4  anybody such as myself to help him with this audit.

5  I don't know that but I would draw the conclusion

6  from that.

7    He also states that he did not have or could not

8  find any attorneys and/or accountants with knowledge

9  or willing to work with the Service regarding these

10  trusts that he had gotten involved with.

11    Now he feels that because of J.K. Harris and

12  myself that was representing J.K. Harris or working

13  for J.K. Harris & Company, that this audit should now

14  be reopened.

15    Q.  Okay, you don't know if he ever actually

16  communicated that letter to the IRS or not?

17    A.  No, I do not know.

18    Q.  Let me show you 146F, this one's dated

19  August 30th, 2000, and ask you to explain the

20  information in that and whether you communicated it

21  to Denny Patridge?

22    A.  You want to know -- I'm sorry, ma'am?

23    Q.  Could you explain the information that's

24  contained in that memo and whether you communicated

25  that information to Denny Patridge?

1    A.  Well, number one I did communicate this to

2  Denny Patridge, yes.  I had a friend of mine, a

3  revenue agent in the state of Michigan that I

4  corresponded with periodically and I asked him if he

5  would shed a light on these trusts.  And the reason I

6  did that is that he has available within the IRS a

7  great deal of research background that I did not have

8  since I was not with the IRS via the computer.

9    And I mentioned that to Denny that I had done

10  that and he said fine.  And then I had also told

11  Denny that the trusts were being challenged

12  throughout the United States, these types of trusts

13  that is that Denny was involved with.  IRS was not

14  allowing that trust to be recognized for business

15  income and business expenses.

16    The IRS was considering the majority of them

17  shams, they had no economic merit, did not allow the

18  taxpayer to properly pay his respective share of

19  income tax based on his income.

20    I did tell Denny in this note good news for us in

21  Illinois.  I was dealing with another revenue agent

22  in the state of Ohio that same time via phone.  This

23  person was handling his own audit stating that the

24  penalties associated with this omission of proper tax

25  returns, which is 20 percent of the tax, in Ohio they

1  were abating that or in the assessing that 20 percent

2  penalty.

3    So I thought we could then be able to get the 20

4  percent penalty abated or not assessed in the state

5  of Illinois, and that did come to materialize.

6    Q.  Okay.  But it would only be abated or not

7    assessed if the taxpayer fully cooperated with the

8    IRS, is that right?

9    A.  That's right, and agreed to whatever taxes

10   might be determined to be correct.

11   Q.  Okay.  So that would have been the advantage

12   to Patridge if he had provided all the records and

13   fully cooperated is that he would have had a chance

14   of getting that penalty abated?

15   A.  Yes, ma'am.

16   Q.  Okay.  Ultimately did Denny Patridge get

17   somewhat upset with you and the company you worked

18   for?

19   A.  I think so.  The main reason is contrary to

20   what he and I talked about most of the time, Denny

21   was a firm believer that these trusts were a valid

22   tax document that he could use and not pay taxes.

23   And I was taking the opposite position.  I could find

24   nothing in the tax law that would allow anyone or any

25   business to use the guise of a trust instrument so as

1  to not pay any income tax.

2      And I used some examples like General Motors,

3  Proctor and Gamble, Dow Chemical, Kelloggs, name

4  them, all these big corporations, if they could use

5  trusts for not -- I mean for doing their income tax

6  and not pay any taxes, don't you think they would all

7  do that?  Wouldn't everybody, Denny, in the United

8  States climb on that bandwagon and say I'm going to

9  create a trust and not pay any income tax if it were

10  something that could be done, Denny?

11      Well, they just don't know about it yet, Larry,

12  they haven't gotten around to these trusts yet.  They

13  will though some day.  I said no, I don't think so,

14  Denny, but I cannot support your position.  All I can

15  do is take your numbers off of the trust forms and

16  put them on the proper 1120 corporate form or 1040

17  individual form.

18      And never once did he say Larry, I think you're

19  right, I don't think these trusts are gonna fly, he

20  never said that.

21  Q.  So you did indicate though that you could

22  actually help him rewrite tax returns for the years

23  in question?

24     A.  Yes, ma'am.

25     Q.  And actually get them filed?

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS     217-525-6167
27

1     A.  Not a problem to do the tax returns

2  correctly.

3     Q.  I'm going to show you 146H, it's a letter

4  that was faxed to you September 12th of 2000, and I

5  note that in the first paragraph in particular he

6  accuses you and the company for which you worked of I

7  suppose you might call it misrepresentation.

8     I was wondering if we could look at that

9  paragraph, you might want to read it to the grand

10  jurors and explain what your opinion of it is.

11     A.  The first paragraph or second paragraph?

12     Q.  Which do you think is the better summary of

13  the accusation?  You can take your pick or do both if

14  you like.

15     A.  Well, I'll read them.

16     Q.  Okay.

17     A.  This came from Denny Patridge to me after I

18   had left Illinois and I was now in Charleston, South

19   Carolina, back at corporate headquarters.

20       Attention Bob Micky, my boss, and Larry Phillips.

21   When we contracted with your company April 20, 2000,

22   we were convinced J.K. Harris could get us into audit

23   and take care of our 90 day letter.  When we had the

24   conference call my attorney was on the call.  Bob

25   told -- that's my boss Bob, told Mark Miller, the IRS

1    agent in Champaign, Illinois, told him he would be

2    delighted to sit down with someone for the '96-97

3    years.

4        This was only done by phone, nothing in writing.

5    When Larry went to do the audit, Mike Helfer, another

6    IRS agent in Champaign, said it was too late.

7    Evidently they lied to you on the phone.

8        When Larry called the Chicago office he was told

9    the agent in Champaign could ask that those years be

10   put back into the audit.  Even after the individual

11   in Chicago spoke to the Champaign office, the people

12   in Champaign stalled or stonewalled us.  We also

13    wrote the letter as they requested in Champaign.

14    Then we were told if they didn't cooperate we could

15    file a doubt as to liability.

16        Even with Larry's efforts to get the taxpayer

17    advocate office to help out, nothing was done from

18    the Champaign office.  I need a list of all names of

19    the people in Chicago that Larry spoke with.

20        Q.  All right.  Well, is there anything that's

21    slightly incorrect about what Denny Patridge is

22    writing there?

23        A.  My response to those two paragraphs.

24    Paragraph one.  When we contracted the IRS --

25    contacted, pardon me, the IRS in Champaign, later

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS     217-525-6167
29

1    part of April, Mark Miller, revenue agent, agreed to

2    review the data for '96 and '97.  It was not known if

3    Mark had the authority to retrieve your file from the

4    90 day section of the IRS or not.  He probably did

5    not.

6        When we arrived in Champaign, Mark was taken off

7   of your audit, which is standard procedure to rotate

8   the agents within the office.  The new agent Mike

9   Helfer was auditing the '98 return and had no control

10  over the two prior years.

11      It's sort of awkward to explain a lot of things

12  here, but I'll try.  The years '96 and '97, a man

13  named Mark, forget last names for a moment, had the

14  audit, requested information from Denny.  Denny did

15  not provide the information.  Mark had some records

16  to show that to me anyway that he had attempted

17  through letters, please send me the information.

18  Never happened.

19      So he as I said earlier today, Mark has the

20  authority to disallow all expenses and tax you on

21  your gross income, that was done.  Years are closed,

22  end of the story, here's what you owe IRS.  Obviously

23  Denny was unhappy with that.  Still didn't provide

24  any records for '96, '97 to Mark.

25      Paragraph 2A, call was made to the Chicago

1  office, the 90 day section to inquire about

2  procedures for audit reconsideration.  Explain 90 day

3  section for just a moment, what that means.  At the

4  conclusion of any IRS audit, there's a date on that

5  IRS report.  You as an individual have 30 days to

6  respond to that audit, that report.  That you if you

7  agree I sign it and mail it back.  You did not agree,

8  you've got 30 days from the date of that audit to

9  write a brief or a protest, I do not agree with the

10  findings of this audit because.  Send it back to the

11  revenue agent.

12      They, the revenue agent will then forward that on

13  to what they call appeals division.  You then go to

14  appeals, present your case.  If you don't do anything

15  within that 30 day period, then you lose your appeal

16  right to the appeals division.

17      That automatically that case goes to what they

18  call a 90 day status, a 90 day period of time that

19  you have to petition the tax court.  They give you a

20  date 30 days from the date -- well, actually it would

21  be 120 days from the date of that revenue agent's

22  report, 30 days for appeals, and you've got a 90 day

23  letter.

24      Once it gets to 90 day status, that's the tax

25   court.  They now have jurisdiction over that case.

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS     217-525-6167
31

1   Denny's case for '96 and '97 had gone to that 90 day

2   period, which he had to go to the tax court if he's

3   going to protest.

4      He didn't want to go to the tax court.  He told

5   me that.  The reason was there was one court case in

6   Illinois, I don't remember the name, but that's

7   immaterial, the guy was a -- he raised pigs for

8   slaughter, a big pig farmer.  He was involved with a

9   trust.  The court threw out the trust and sanctioned

10   him $10,000 because of a -- I don't know why but they

11   did, a frivolous tax return I suppose.

12   Q.  Well --

13   A.  Denny was aware of that.

14   Q.  He was aware, he knew about that decision?

15   A.  Oh, yes.

16   Q.  And he knew it involved the type of trust he

17   was using?

18   A.  Yes, same, the same trust set up for the big

19    farmer as the one that was -- that Denny was involved

20    in.

21        Q.   And yet he was still telling you that the

22    only reason that, well, places like Dow Chemical and

23    the other major corporations weren't using these

24    trusts is because they simply haven't learned about

25    them?

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS     217-525-6167
32

1        A.   Right.  The court didn't know what they were

2    doing when they disallowed that trust.

3        Q.   That's what he was suggesting?

4        A.   Yes.  I guess then if you don't agree with

5    the tax courts you go to the next court which is the

6    court of appeals, circuit court, eventually Supreme

7    Court.  They didn't do that.  To my knowledge

8    nobody's ever gone beyond tax court.

9        Q.   Okay, go ahead.

10        A.   And I also stated here in this second

11    paragraph where in response to his second paragraph

12    they indicated that they didn't want to cooperate

13    with him and I was getting nowhere with the taxpayer

14    advocate's office.

15        Q.  He's suggesting the IRS didn't want to

16    cooperate with him?

17        A.  Didn't want to cooperate with either him or

18    me.

19        Q.  Okay.

20        A.  Didn't want to cooperate, IRS did not want

21    to cooperate with Denny Patridge.

22        Q.  That's what he's saying?

23        A.  That's what he's saying.

24        Q.  Okay.

25        A.  And keep in mind he was in this 90 day

1    period which IRS says when you're in that status you

2    have one option here, you go to tax court.  Well, the

3    other option is to pay the tax, then you can file a

4    claim.  There's other things, but no need to get

5    involved with that.

6        But basically 90 days means you're going to tax

7    court.  We were told that the group manager would be

8    one to initiate the reconsideration for the audit.

9    That's where it starts, group management.

10    There did appear to be some confusion as to the

11    specific route to take by the manager in Champaign.

12    I state that because the manager was not aware of the

13    manual procedure, how to initiate or get started with

14    this audit reconsideration.

15    I helped him with that, he hadn't been in the

16    Service 30 years like I had at that point in time.

17    And so I told him it was in the manual, he found it.

18    After talking to the taxpayers advocate in

19    Chicago several times, we did receive instructions as

20    to auditing the '96 and '97.  We were advised the

21    taxpayer advocate got notice of levy, of the intent

22    to levy.  They concluded that this was done because

23    of the age of the case and due to the amount of money

24    assessed.

25    So I was just trying to address Denny's concerns

1    that we didn't really do that much for him and our

2    efforts were shot down.  And that's not really true.

3    It took a lot of leg work on a lot of people and from

4    a lot of people, including myself I guess, I was the

5    one who was trying to get this thing reopened.

6        IRS upper management has that jurisdiction, they

7    can say yes or they can say no.  It was mentioned

8    here a doubt as to liability.  And that's in quotes,

9    the second paragraph.  Doubt as to liability is an

10   offer, it's called an offer doubt as of liability.

11   There's also an offer doubt as to collectability.

12       Doubt as to liability means that you don't think

13   you owe this money that IRS has assessed.  I'm

14   doubting that liability.  When IRS gets that form

15   they then have no option but to put that year or

16   years that you're questioning the liability that's

17   been assessed back into the audit stream.  It's an

18   automatic.

19       To go to the other route, the other route would

20   be to ask for audit reconsideration, that has to be

21   approved by upper management within the IRS.

22       That's tough to get, particularly in Denny's

23   case, because he was afforded all the time, all the

24   opportunity to present the records for '96, '97 and

25   he did not.  Plus he wrote this really smart aleck

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS     217-525-6167
35

1  letter.  He didn't write it I don't think, but it was

2  written on his behalf, he signed it.  That was really

3  telling the IRS you don't have the authority is

4  really absurd to me.  Again I'm a former revenue

5  agent and I pay taxes, you know, for I don't know how

6  many years, since I was 15 I guess.

7      Q.  So basically you're saying that Denny

8  Patridge pretty well put himself in the position he

9  ended up in?

10     A.  Oh, yes, ma'am, that's my opinion.

11     Q.  Okay.  Now, so you then got out of it in the

12  fall of 2000 and you went back to work for J.K.

13  Harris, they probably assigned you all kinds of other

14  duties, and you didn't deal with him again until

15  approximately 2003, is that right?

16     A.  That's correct.

17     Q.  And I don't know if you still have your copy

18  of it, but somehow while we were back in my office

19  and I gave you a transcript of the telephone call, do

20  you have your copy that I gave you?

21    A.  I think I left it on your desk, ma'am, I'm

22  sorry.

23    Q.  Okay.  I may have to sit next to you.

24  Instead of reading the whole thing then I'll just ask

25  you some questions about it.  Tuesday, February --

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS     217-525-6167
36

1  Tuesday, January 28th of 2003, did you get a  phone

2  call from someone who identified himself as Brent

3  Winters, an attorney for Denny Patridge?

4    A.  Yes, I did.

5    Q.  So this would have been about well, it was

6  over two years since you'd dealt with this matter, is

7  that right?

8    A.  That's correct.

9    Q.  You helped your office pull together the

10  records that were requested by the grand jury

11  subpoena previously to that, is that right?

12    A.  I'm not sure which came first.  I was asked

13  some questions by Denny's attorney on that phone

14  call, and I was not comfortable in answering a lot of

15  them because I didn't have the file with me.

16    Q.  Okay.

17    A.  The file was in the archives of our company.

18    Q.  Okay, but even if you had provided us the

19  documents, you hadn't read through all of them prior

20  to that?

21    A.  That's correct.

22    Q.  So it had been a long time since you had

23  looked at the details is what we can agree on easily,

24  is that correct?

25    A.  Yes.

1    Q.  And in this telephone conversation he was

2  telling you the position Denny was in at that point

3  and asking for your assistance, is that right?

4    A.  That's correct.

5    Q.  And I've got a transcript of it, 146I.  Now

6  you had a chance to listen to the tape back in my

7  office prior to the grand jury meeting, is that

8  right?

9    A.  That's correct.

10    Q.  And it was a pretty bad tape, is that right?

11    A.  That's right, it was hard to understand

12  but --

13    Q.  Did you know you were being taped during

14  that conversation?

15    A.  No, ma'am.

16    Q.  So the tape was made without your knowledge,

17  is that right?

18    A.  That's correct.

19    Q.  The conversation is, well, typed double

20  spaced it comes out to be about two and a half pages

21  long.  Just looking at it who does most of the

22  talking, you or the attorney?

23    A.  The attorney.

24    Q.  Okay.  Well, you know that's an attorney,

25  right?  There's a suggestion in there just as you

1  happened to use the words in your answer, the way

2  Brent Winters asked the question, he says that now,

3  Denny shipped those documents back because you at

4  that time said well, the best thing to do is to

5  collapse all this, get rid of it and just do what

6  they want to do, which was good advice I agree and

7  you apparently -- he followed your advice, closed

8  everything, shipped all the documents back to Belize

9  and now they're coming back over two years later

10  saying we want them.

11     Of course he has no idea and he's having trouble

12  getting them.  We're working hard to try and do that.

13  But he of course, uh, telephone calls and they seem

14  to be friendly people there but they don't -- their

15  laws may not permit them to do what we want them to

16  do.

17     At any rate I've even talked to their attorney

18  about this but, uh, would you be willing to help us

19  in this matter if and, uh, substantiate that.  Uh,

20  you indeed told Debbie that this wouldn't work being

21  that the IRS wasn't going to go for it and that he

22  should collapse it, cut all the ties to all these

23  people, give them all their material back and quit.

24  Would you be willing to help us substantiate that?

25  And your answer was -- why don't you read that

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS     217-525-6167
39

1   paragraph for the grand jurors?

2     A.   I don't have any problem with that, but my

3   situation is this.  I currently am living down in

4   Florida.  That's not a major crisis either.  I'm

5   outside of Tampa about 30 miles.  But I don't know

6   right offhand, I don't know what -- what work papers

7   I have that would -- would be construed as

8   predictable court documents and that is something

9   that the IRS may want now.  And if I did have I have

10   to find out where those folders are at the moment.  I

11   don't think I have any of them here in my office in

12   Florida.  I think they should be at the main office

13   in Charleston.

14     But I'll make a phone call and retrieve those

15   files.  I say I can, it's very rare that I haven't

16   been successful in, you know, collecting that data.

17     Q.   Just the way the questions are, possibly

18   it's the order in which they appear, the attorney's

19   statement then your answer, were you attempting to

20   state yes, you agree, that you had told Denny

21   Patridge to send the documents back to Belize?

22   A.  No, I never told Denny that.

23   Q.  Would you ever tell that to a client?

24   A.  No.

25   Q.  Why not?

1    A.  You can't do an audit if you don't have the

2   records.  I would never go into an office and tell

3   people do you have records, and they might say yes, I

4   have a lot of records, and I would say or would I say

5   well, send them all away, I don't want to see them?

6   That, you know, is like da, I'm sorry, but, you know,

7   no one in here was born yesterday.

8      You need records, all the records that you use to

9   prepare these tax returns, anything that you have

10   available so that I may review them as a revenue

11   agent or if I'm going to assist you in this audit, I

12   need all those documents.  It would be absurd to

13   think that I would tell anybody, well no, you send

14   those back, we don't need those, that's crazy.  I

15   never got them anyway.  He couldn't find them.

16    Q.  Okay, I believe that that's Exhibit 146I, is

17  that right?

18    A.  Yes.

19    Q.  Let me show you 146J.  Subsequent to that

20  Brent Winters, the attorney, did provide you with an

21  affidavit and asked you to sign it, is that correct?

22    A.  That's correct.

23    Q.  Okay.  And this fax to you is dated by hand

24  January 29th, 2003, and let me just read what they

25  wanted you to sign.  Basically it is -- no, I don't

1  have it.  Why don't you go ahead and read what the

2  affidavit they wanted you to sign and explain why you

3  refused to sign it.

4    A.  In its entirety?

5    Q.  Do you want to read -- how about you choose

6  what you believe the relevant portion is as to Denny

7  Patridge and his situation.  Because it has also who

8  you are, what your background is, who you work for

9  and all that stuff.

10    A.  Yes, yes.  You already know who I am and

11    where I work and 30 years of my life.  I've been -- I

12    retired in '88 and I'm still working, so -- and I've

13    been working in the tax field ever since and/or

14    accounting field ever since.  Someone said are you

15    retired?  No, retarded is a better term.

16       But he states, he writes that I'm going to sign

17    this, I, Larry, am writing this, this attorney Brent

18    Winters whom I've never met.  I am now retired, I

19    added from the IRS, and I'm currently working for

20    J.K. Harris, a tax resolution firm.  I represented

21    Denny Patridge as an enrolled agent under the power

22    of attorney before the IRS agent Mike Helfer during

23    the -- during -- well, he's got July and August and I

24    corrected it June and July, 2000 for the tax audit of

25    Denny Patridge for the year 1998.

1     After exercising due diligence and investigating

2     Mr. Patrick's trust structure established by Aegis

3     Company I concluded --

4     Q.  Aegis, that's A-e-g-i-s?

5    A.   A-e-g-i-s, yes, ma'am.

6    Q.   Is that who he apparently purchased the

7   trust from?

8    A.   To my knowledge, yes.

9    Q.   Okay.  Go ahead.

10    A.   I concluded to advise Mr. Patridge to

11   collapse all trusts, excuse me, all entities, I added

12   the word trust, with which he had been involved and

13   allow any income tax liability to be computed on his

14   personal account, I put on Form 1040.

15    The document states I did not believe that the

16   arrangement of his affairs would be accepted by the

17   auditor.  I scratched that out.  I advised Mr.

18   Patridge further in the interest of showing good

19   faith to cease seeking advice from this Aegis Company

20   and to cut all ties and relationships with foreign

21   trust corporations.

22    In order to effect this cutting of ties I also

23   advised him to return all documents to appropriate

24   foreign parties.  And I drew a line through that

25   because I never did ask him to send documents back to

43

1    Belize.  As I explained earlier, that would be

2    absurd, I would never do that.  You don't have

3    records, how can you do an audit?  There are ways by

4    the way.

5       In these matters Mr. Patridge complied willingly

6    and promptly.  Willingly and promptly, no.  I drew a

7    line through that.  With my advice and I proceeded to

8    the tax audit with instructions for Mr. Patridge to

9    work with Agent Helfer in order to determine his

10    personal tax liability without consideration of any

11    other entities.

12       I tried that, but you can't do an audit without

13    records to substantiate income and expenses.  But I

14    tried that just verbally.  Mr. Patridge provided all

15    documents.  I scratched the word all.  Requested that

16    is, willingly and without hesitation.  I scratched

17    willingly and without hesitation.  Believing in good

18    faith that Agent Helfer intended to complete the

19    audit and get back to me with final figures.  Without

20    warning or apparent cause, Agent Helfer refused to

21    accept documents offered, would not recognize routine

22  deductions, and ceased communications in regard to

23  the audit.  I scratched that entire sentence.

24      I added various documents received from Denny

25  Patridge were given to Agent Helfer which were

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS    217-525-6167
44

1  allowed in part.  As I recall, one entertainment

2  document was challenged by Helfer.  It was my

3  thoughts that Denny Patridge had additional records

4  that were not provided to me at the time.

5      I had to leave the state of Illinois in late

6  July, I don't know the exact date, 27th or 8th,

7  returning to my office in Charleston, South Carolina.

8  I did recall advising Denny Patridge to gather all

9  documents and forward them to me in South Carolina so

10  that I could prepare a substantially correct return.

11      To my knowledge those records were never sent.

12  Now I added that, and when I put together as

13  requested by this attorney Brent Winters who I talked

14  to on the phone, he asked me to put together -- if I

15  can't live with this affidavit then please put one

16  together that I can live with, and I did that.

17    Q.  Were you ever asked to then sign it

18    formally?

19    A.  I never signed it.

20    Q.  Okay.

21    A.  But I did put it together.  It was not

22    beneficial to Denny Patridge, but I'm sorry, I just

23    -- I don't show any -- I try not to show any

24    partiality in these audits or these helping people.

25    I'll help you if I possibly can, but I need to see

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS    217-525-6167
45

1    those documents and those records, but don't tell me

2    that I told you to send records back to Belize.  That

3    never happened, so that really upset me.

4    And then he was giving me willingly and very

5    rapidly all these records that were asked for by the

6    IRS and myself, we never got them.

7    Q.  Okay.

8    MS. FROOMAN:  Do you have any questions for

9    Mr. Phillips?

10    GRAND JUROR:  On the transactions amongst

11   the trusts, was there a paper trail then from the

12   time that it left where he had the income coming in

13   and sending it to different trusts?  Was that ever

14   given to you as something that you could look at and

15   say that I've gained X amount of money and

16   transferred it to this trust, that trust to get it

17   overseas?

18       A.   I never saw a paper trail per se.  It was

19   done through if you wish journal entries, notes

20   written on a book, transferred, you know, 35,000

21   dollars to Trust A or from Trust A to Trust B, that

22   sort of thing.

23       He did have the trusts' name on the 1044s.  That

24   would indicate that whomever he is working for

25   selling their insurance, he told that company don't

1   send it to me, Denny Patridge, but send it to me

2   Denny Patridge trust.

3       That was done, so the money then on the 1099 was

4   made payable or the check, I didn't see the checks,

5   but the 1099 indicated it was sent to the trust which

6    was of course Denny Patridge.

7        MS. FROOMAN:  So you're saying you never saw

8    all the bank documents --

9      A.  No.

10        MS. FROOMAN:  -- for the trusts for Denny

11    Patridge for the insurance company, you didn't have

12    access to those?

13      A.  No, I never saw those.

14        GRAND JUROR:  Thank you.

15      A.  Yes, sir.

16        MS. FROOMAN:  Any other questions?

17          (No response.)

18        MS. FROOMAN:  May this witness be excused?

19        FOREPERSON:  Yes, he may.

20        MS. FROOMAN:  Okay.  Thank you.

21

22

23

24

25

1  STATE OF ILLINOIS  )
                       ) SS
2  COUNTY OF SANGAMON )

3

4            CERTIFICATE

5      I,  Susan Freeman, affiliated with Capitol

6  Reporting Service, Inc., do hereby certify that I

7  reported in shorthand the foregoing proceedings

8  before the Federal Grand Jury sitting in Springfield,

9  Illinois, and the foregoing is a true and correct

10  transcript of my shorthand notes so taken as

11  aforesaid.

12

13

14

15  _____
                       Certified Shorthand Reporter
16                      License No. 084-001342
                       Registered Professional Reporter
17                       Notary Public

18

19  Dated this 10th day of

20  June, A.D., 2003, at

21  Springfield, Illinois.

22

23

24

25