IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
DANVILLE/URBANA DIVISION

UNITED STATES OF AMERICA,

v.                                              Case No.   CR 04-20031

DENNY R. PATRIDGE

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR STAYING
OF SENTENCE AND JUDGMENT AND RELEASE PENDING APPEAL

Defendant files this memorandum in support of his Motion for Stay of Sentence

and Judgment entered by this Court pending the outcome of any appeal.

**DUTY OF THE COURT**

Rule 9(a) of the Federal Rules of Appellate Procedure unambiguously requires that

the district court "must" provide a statement of "reasons" for a decision regarding release,

either in writing or orally on the record. Although the standards for what suffices as a

statement of reasons are not subject to rigid definition, we believe that a statement of

reasons encompasses **more than** a mere recitation of the statutory language followed by

nothing more than a conclusory statement that the applicable factors have (or have not)

been met. See *United States v. Fields*, 466 F.2d 119, 121 (2d Cir. 1972) (reasons must "be

stated with particularity"); *United States v. Thompson*, 452 F.2d 1333, 1336 n.7 (D.C. Cir.

1971) ("A mere parroting of the provisions of the applicable statute is not an adequate

substitute for a full statement of reasons"), cert. denied, 405 U.S. 998 (1972). In other

words, "a district court's reasons for its decision must be adequately explained; conclusory

1

statements are insufficient." *United States v. Wheeler,* 795 F.2d 839, 841 (9th Cir. 1986).

The district court's refusal to provide the mandatory statement of reasons would have several negative consequences. First, in the absence of a remand, it forces the Seventh Circuit to undertake a task specifically designated to be completed by the district court. See *United States v. Eaken*, 995 F.2d 740, 741 (7th Cir. 1993)(Circuit Court conducts de novo review of orders granting or denying release pending appeal).

Nevertheless it is vital to the court of appeals to be apprised of the district court's rationale. See *United States v. Stanley*, 469 F.2d 576, 581-84 (D.C. Cir. 1972). Where the reasons for denial of a stay request are not provided with an adequate statement of reasons, the Circuit Courts would be forced to speculate as to the reasons for the district court's decision. This would be unfair to the bail applicant because it hampers his efforts to obtain bail in the court of appeals and because it injects unnecessary delay in the processing of the bail motion. See *United States v. Affleck*, 765 F.2d 944, 954 (10th Cir. 1985) (the writing requirement aids the appellate function); *Stanley*, 469 F.2d at 583-84 ("`[t]he District Judge's reasoning must be delineated both out of fairness to the Defendant and as an aid to this court'") (citation omitted).

Finally, requiring the District Court to state its reasons for denying a stay request keeps the goal of judicial economy alive and prevents the case from bouncing back and forth between the two courts. Judicial economy is particularly important in motions for release, as these motions must be handled expeditiously due to the liberty interest at stake.

See Fed. R. App. P. 9(a) and (b).

Where a district court fails to comply with Rule 9(a), it is appropriate to remand

the case to the district court. See *Hooks*, 811 F.2d 391; see also *Cordero*, 993 F.2d at 986

n.1; *Wheeler*, 795 F.2d at 841; *United States v. Wong-Alvarez*, 779 F.2d 583, 585 (11th

Cir. 1985) (per curiam).

## LEGAL REQUIREMENTS FOR STAY

First, a district court must find that the convicted person will not flee or pose a

danger to the community if the court grants bail. Second, the district court must find that

"the appeal is not for purpose of delay and raises a substantial question of law or fact

likely to result in reversal or an order for a new trial." *U.S. v. Pollard*, 778 F.2d 1177 (6th

Cir. 1985); see also *U.S. v. Chilingirian* (6th Cir. 2002)

After considering the legislative history of the Bail Reform Act of 1984, the Sixth

Circuit adopted the Eighth Circuits decision in *United States v. Powell*, 761 F.2d 1227

(8th Cir. 1985) (en banc)). In Powell, the Eighth Circuit concluded that an appeal raises a

substantial question when the appeal presents a "close question or one that could go either

way" and that the question "is so integral to the merits of the conviction that it is more

probable than not that reversal or a new trial will occur if the question is decided in the

defendant's favor." "Since the district court is familiar with the case, the district court is in

an excellent position to determine in the *first* instance whether the defendant raises a

substantial question on appeal." *Pollard* **supra**

3

There are 4 issues for release pending appeal, pursuant to 18 U.S.C. § 3143, namely:

1) A showing, by clear and convincing evidence, that the person is not likely to flee, and;

2) A showing, by clear and convincing evidence, that the person is not likely to pose a danger to the safety of any other person or the community, and;

3) A showing that the appeal is not for purpose of delay, and;

4) A showing that the appeal raises a substantial question of law or fact likely to

result in (i)  reversal,

(ii) an order for a new trial,

(iii) a sentence that does not include a term of imprisonment, or

(iv) a reduced sentence to a term of imprisonment less than the total of the

time already served plus the expected duration of the appeal process

1.    Defendant is not likely to flee pending appeal.

The Defendant was indicted on June 2, 2004, and has attended each and every hearing, including trial, and all post trial events, while remaining free on bond. Defendant is not likely to flee and there is no evidence to the contrary.

2.    Defendant does not pose a danger to safety of any person or the community.

Defendant has remained free on bond since the return of the indictment almost three years ago and has not posed any danger to any individual or to the community as a

4

whole.   Prior to the indictment in this case and the issues derived herein, Defendant had an exemplary record regarding compliance with the thousands of laws he interacted with, both personally and professionally.   Defendant does not pose a danger to any person nor to the community in which he would live pending appeal.

3.      Defendant is not appealing for purpose of delay.

        Defendant is not appealing the numerous errors he claims occurred in the bringing and maintaining the indictment and trial in this case for the purpose of delay.  As this Court is aware, there are several issues that if decided in Defendant's favor, would completely reverse the conviction of all counts in which he stands convicted.

 4.      Defendant clearly can show that his appeal raises substantial questions of fact and law likely to result (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process

        Defendant raises Seven Questions with the First having two sub parts which would clearly result in reversal, a new trial or complete dismissal of the indictment.  The Questions are:

> DISMISSAL OF COUNTS 2,3,4,5,6,7
>
> **1a    Whether an indictment for Tax Evasion of the Payment of Taxes under 26 U.S.C. § 7201 can be maintained in the District Court and sustained on Appeal to the 7th Circuit when one of the elements is a "tax deficiency" and that deficiency is under review under section 6330?                    PAGE 7**

DISMISSAL OF COUNTS 2,4,5,6,7

**1b    Can requesting a due process hearing be an attempt to evade the payment of taxes owed when the very hearing requested brings into question the validity of that liability?                                    PAGE 7**

DISMISSAL OF COUNT 3

**2    Whether an indictment of Tax Evasion of the "assessment of taxes" can be maintained and sustained when one of the elements is a "tax deficiency" and that deficiency could not have taken place until after each of the affirmative acts alleged had transpired?                                    PAGE 18**

DISMISSAL OF COUNTS 2,3,4,5,6,7

**3.    Whether Jury was required to find Defendant was specifically aware of the specific provision of the tax code the Indictment which charged him with violating Counts One, Two and Three?                                    PAGE 23**

DISMISSAL OF COUNTS 2,3,4,5,6,7

**4.    Whether the Paperwork Reduction Act of 1995 prohibited the Government from subjecting Defendant to penalties under section 7206 and 7201 due to the IRS's refusal and failure to bring Form 1040 for 1996, 1997, 1998 and 1999 into strict compliance with this Act?                                    PAGE 32**

DISMISSAL OF COUNTS 2,3,4,5,6,7

**5.    Whether the District Court should have granted Defendant's Motion to Dismiss on grounds of Prosecutorial Misconduct on the part of Hilary Frooman?.                                    PAGE 43**

REVERSAL AND NEW TRIAL  OF COUNTS 2,3,4,5,6,7

**6.    Whether the District Court should have recused itself either on its own or by the granting of Defendant's Motion to Recuse?                                    PAGE 61**

REVERSAL AND NEW TRIAL  OF COUNTS 2,3,4,5,6,7

**7.    Whether the sealing of numerous documents between the Government and Court, along with the unsealing of those documents after the sentencing in this case happened, save the Special Agent Report,  rendered the entire trial, not public, not fair, and in violation of the Fifth and Sixth Amendment?                                    PAGE 68**

# FIRST QUESTIONS PRESENTED[1]

**.1    Whether an indictment for Tax Evasion of the Payment of Taxes under 26 U.S.C. § 7201 can be maintained in the District Court and sustained on Appeal to the 7th Circuit when one of the elements is a "tax deficiency" and that deficiency is under review under section 6330?**

**.2    Can requesting a due process hearing be an attempt to evade the payment of taxes owed when the very hearing requested brings into question the validity of that liability?**

## ARGUMENT AND AUTHORITY

### 1.    Count Two of the indictment and superceding indictment failed to allege an offense under 26 U.S.C. § 7201's tax Payment prong.

Defendant filed Federal Income Tax Returns for 1996 and 1997, Patridge Asset Management Trust filed Trust Tax Returns.  All taxes therein claimed owed were paid timely.   The IRS decided to challenge the returns.

Count Two alleged that Defendant willfully failed to pay income taxes stemming from an issuance of a Notice of Deficiency dated January 27, 2000 for calender years 1996 and 1997 to Patridge Asset Management Trust.  On the same day the IRS issued what has been referred to as a "whipsaw" Notice of Deficiency to Defendant.  In reality, it is a totally different claim made by the IRS in violation of section 7214.

The evidence at trial established that Defendant, on April 14, 2000 and again on April 20, 2000 hired J.K. Harris and Company to represent him in Tax Court regarding

---

[1] Defendant has captioned each section with the questions being presented in that section for which the Stay is sought.

7

the two 90 day notices of deficiencies illegally issued by V. Boyd on January 27, 2000.

Although the evidence does show J.K. Harris and Company agreed to the terms and treated Defendant's Notice of Deficiencies as "emergencies", the evidence shows J.K. Harris and Company had IRS problems of its own with its Power of Attorneys and did not dispute the Notice of Deficiencies in a timely manner on or before May 11, 2000. The double problems of the POA's and the failure to file a petition to tax court were unknown to Defendant.  Thereafter, Defendant requested a Collection Due Process Hearing on November 28, 2000, after being given that opportunity by the IRS on November 23, 2000.

The elements of a section 7201 offense are "willfulness; the existence of a tax deficiency; and an affirmative act constituting evasion or attempted evasion of the tax." *Court Order November 10, 2004 @ 3.*   The Court further held that an indictment is "generally sufficient when it sets forth the offense in the words of the statute itself, as long as those words expressly set forth all the elements necessary to constitute the offense intended to be punished." *Court Order November 10, 2004 @ 4-5*

The Court held that the "superceding indictment identifies the law Defendant violated as being the payment of personal income taxes due and owing for the 1996 and 1997 calendar years." *Id.*   The Court then stated that "Defendant has not cited any case law in support of his argument that criminal charges cannot be brought when a due process hearing has been requested." *Id.*

8

The Court then determined that "in a tax evasion case, it is the date of the latest act of evasion, not the due date of the taxes, that triggers the statute of limitations." *Court Order November 10, 2004 @ 6.*  The Court relied upon *United States v. Trownsell*, 367 F.2d 815 (7th Cir. 1966) for its explanation of when the crime of tax evasion was complete.  In *Trownsell*, the 7th Circuit reported that "the Tax Court of the United States entered a decision, **based on written stipulations**, that defendant and the two corporations were each deficient in income taxes and additions to tax for the years 1946-1953."  Id. @ 816.

First, section 7201 never mentions the phrase "affirmative acts", so the idea that the indictment was sufficient by following the language of the statute is clear error on the part of the District Court.

The Court allowed the indictment to be saved by allowing the Government to advance a theory of evasion of payment of taxes for 1996 and 1997, which were still under dispute by the Defendant, while allowing the claims to be maintained due to the alleged last act of evasion, which included the affirmative act of asking for a collection due process hearing challenging the alleged liability.  This process by the Court renders section 7201 vague and ambiguous.

As this Court is fully aware, even after the Jury received the mountain of instructions involving the law in Count Two, the jury was still left with wondering what the difference was between the meaning of the term "evade" and "avoid."  The answer by

9

the Court only confused the jury.

Congress passed in 1998 section 6330 that provided a taxpayer with more prepayment relief regarding any Notice of Levy commonly referred to as a Collection Due Process Hearing.  Furthermore, Congress suspended the statute of limitations for any criminal investigation and charges so long as a collection due process hearing was being sought by the taxpayer and was pending.  See 26 U.S.C. § 6330(e)(1998).

Concerning these issues the Court, in denying Defendant's Motion to Dismiss Count Two, "declines to adopt Defendant's hyper-technical arguments regarding the insufficiency of the charges."  *Court Order November 10, 2004 @ 8*

Section 7201 is "the capstone of a system of sanctions which singly or in combination were calculated to induce prompt and forthright fulfillment of every duty under the income tax law and to provide a penalty suitable to every degree of delinquency." *Sansone v. U.S.*, 380 U.S. 343, 350 (1965);  *Spies v. United States*, 317 U.S. 492, 497.

At the same time, due to the "complexity of the Internal Revenue Code", *Cheek v. U.S.*, 498 U.S. 192, 205 (1991), the 7th Circuit has described  the complexity of the tax code in terms that there are "many innocent explanations" and that a "failure to report income correctly may be due to mistake, inadvertence, reliance on professional advice, honest difference of opinion, negligence or carelessness, none of which constitutes deliberate intent to defraud."  *U.S. v. Peters*, 153 F.3d 445, 455 (7th Cir. 1998)

"The proliferation of statutes and regulations has sometimes made it difficult for the average citizen to know and comprehend the extent of the duties and obligations imposed by the tax laws.  Congress has accordingly softened the impact of the common law presumption by making specific intent to violate the law an element of certain federal criminal tax offenses."  *Cheek*, 498 U.S. 199-200 (1991)

Based on the notion that the law is definite and knowable, the common law presumed that every person knew the law.  This common law rule has been applied by the Court in numerous cases construing criminal statutes. *Cheek* at 199; See, e.g., *United States v. International Minerals & Chemical Corp*., 402 U.S. 558 (1971); *Hamling v. United States,* 418 U.S. 87, 119-124 (1974); *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337 (1952).

There is nothing definite about the word "attempt".   There is nothing definite about the word "evade" and now because of section 6330 there is nothing definite about the words "the payment thereof".

Section 7201 makes it a crime to "willfully attempt in any manner to evade or defeat any tax imposed by this title or the payment thereof".  *Cheek*, infra      The word "thereof" must be construed to be referencing the tax imposed by this title.   This then means that in order for the Government to allege a crime under section 7201, specifically addressing the "deficiency", which is defined at 26 U.S.C. § 6211, the indictment must be required to allege that the tax has been "imposed by this title".  That title being Title 26.

11

How does a "tax" become imposed by Title 26?  Under the circumstances of the case against the Defendant, the Government chose not to accept the voluntary submissions made by Defendant and decided to issue a Notice of Deficiency.

Under Section 6211, deficiency is defined as "the amount by which the tax imposed by subtitle A or B, or chapter 41,42,43 or 44 exceed the excess the sum of the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax.

Section 6212 defines what a "notice of deficiency" means and section 6213 defines the restrictions applicable to deficiencies which prohibits the IRS for issuing a Notice of Levy unless "the expiration of such 90 day...period" as the case may be, "nor if a Petition has been filed with the tax court, until the decision of the tax court has become final."

Section 6330 provides that no levy may be made on any property or rights to property of a taxpayer unless the Secretary has notified such person in writing of their right to a hearing under this section before such levy is made.  See *Living Care v. U.S*, 411 F.3d 621 (6th Circuit)(2005)(taxpayer may challenge underlying tax liability in CDP hearing)(referencing liability as "unpaid" taxes); See also *Robinette v. Commissioner*, 04-3600, (8th Circuit)(2006)(taxpayer may raise any relevant issue to the "unpaid" tax).

In this question, whether an amount is owed and whether the amount is due hinges upon whether the "tax imposed by this title" is "imposed" yet.  The evidence at trial showed that a Collection Due Process Hearing had been offered to Defendant, timely

requested by Defendant, but that it not occurred as of the date of the charges in the indictment because "the IRS's policy that a criminal action in a case takes precedence over its civil aspects and that any civil enforcement action involving the same tax and periods as an active criminal investigation is suspended or deferred until the criminal aspects of the case are closed." *Court Order November 10, 2004, at 5*

The District Court stated that its position was supported by the 7th Circuit's decision in *U.S. v. Peters*, 153 F.3d 445, 454, n13 (7th Cir. 1998). Dr. Peters' case involved 1987 and 1988 tax returns. The Restructuring and Reform Act of 1998 did not become enacted until July 22, 1998 and would never have applied to Dr. Peters' false filings. Furthermore, Defendant was acquitted of filing any false return under Count One.

Also, Section 6330(e) of the 1998 restructure suspends the limitation time under section 6531 during any pending request by the Taxpayer under section 6330. Yet the District Court simply ignores all of this to conclude that the crime of evasion is not when the money is owed but the last affirmative act alleged.

The Government alleged the taxes for 1996 and 1997 were "due and owing" yet in Count Two, the Government also alleged that requesting a CDP Hearing, which the IRS offered to Defendant as "required by this title", was an affirmative act of tax evasion of the payment of taxes therein at issue.

.     A basic principle of our criminal law is that the Government only prosecutes

13

people for crimes under statutes passed by Congress which fairly and clearly define the conduct made criminal and the punishment which can be administered. See, e.g., *International Harvester Co. v. Kentucky*, 234 U.S. 216; *Connally v. General Construction Co.*, 269 U.S. 385, 391-392. This basic principle is flouted if either of these statutes can be selected as the controlling law at the whim of the prosecuting attorney or the Attorney General. "For, the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself." *Yick Wo v. Hopkins*, 118 U.S. 356, 370. *Berra v. U.S.*, 351 U.S. 131, 139-140 (1956)

"In our system, avoidance of a tax by remaining outside the ambit of the law that imposes it is every person's right. 'Over and over again, courts have said that there is nothing sinister in so arranging one's affairs as to keep taxes as low as possible. Everybody does so, rich or poor; and all do right, for nobody owes any public duty to pay more than the law demands: taxes are enforced exactions, not voluntary contributions. To demand more in the name of morals is mere cant.'" U.S. v. Thompson Center/Arms Co., 504 U.S. 505, 518 fn4 (1992); quoting *Commissioner v. Newman*, 159 F.2d 848, 850-851 (CA2) (L. Hand, J., dissenting), cert. denied, 331 U.S. 859 (1947)

How then can "this title" (title 26) provide for a due process remedy (6330) regarding whether Defendant owed the illegal whipsaw of the taxes claimed against

14

Patridge Asset Management Trust and Defendant personally, while at the same time the

U.S. Government claim the use of that exercise in due process is an affirmative act to a

tax evasion felony, instead of an innocent exercise of a given right?

In *Flora v. U.S.*, 362 U.S. 145 (1960) the Supreme Court explained that they

believed that the legislative history surrounding both the creation of the Board (Tax

Court) and the subsequent revisions of the basic statute suppored the Government's

position that to maintain a refund action the taxpayer had to pay the entire tax.  In

reaching this conclusion, the Supreme Court explained why Congress created the Tax

Court.   The House Committee Report, H. R. Rep. No. 179, 68th Cong., 1st Sess. 7. The

Senate Committee on Finance filed a similar report. S. Rep. No. 398, 68th Cong., 1st

Sess. 8. for example, explained the purpose of creating the Tax Court  as follows:

> "The committee recommends the establishment of  a Board of Tax Appeals
> to which a taxpayer may appeal **prior to the payment of an additional
> assessment of income, excess-profits, war-profits, or estate taxes**.
> Although a taxpayer may, after payment of  his tax, bring suit for the
> recovery thereof and thus secure a judicial determination on the questions
> involved, he can not, in view of section 3224 of the  Revised Statutes,
> which prohibits suits to enjoin the collection of taxes, secure such a
> determination prior to the payment of the tax. **The right of appeal after
> payment of the tax is an incomplete remedy, and does  little to remove
> the hardship occasioned by an incorrect assessment**. The payment of a
> large additional  tax on income received several years previous and which
> may have, since its receipt, been either wiped out by subsequent losses,
> invested in nonliquid assets, or spent, sometimes forces taxpayers into
> bankruptcy, and often causes great financial hardship and sacrifice.   These
> results are not remedied by permitting the taxpayer to sue for the recovery
> of the tax after  this payment. **He is entitled to an appeal and to a
> determination of his liability for the tax prior to its  payment**."

15

(Emphasis added.)

*Flora*, at 158-159

"Moreover, throughout the congressional debates are to be found frequent expressions of the principle that payment of the full tax was a precondition to suit: "pay his tax . . . then . . . file a claim for refund"; "pay the tax and then sue"; "a review in the courts after payment of the tax"; "he may still seek court review, but he must first pay the tax assessed"; "in order to go to court he must pay his assessment"; "he must pay it [his assessment] before he can have a trial in court"; "pay the taxes adjudicated against him, and then commence a suit in a court"; "pay the tax . . . [t]hen . . . sue to get it back"; "paying his tax and bringing his suit"; "first pay his tax and then sue to get it back"; "take his case to the district court - conditioned, of course, upon his paying the assessment." Id. at 160

Since it is obvious that the Restructuring and Reform Act of 1998 did not exist in 1960 when Flora was announced by the Supreme Court, and taken together with the fact Congress authorized an appeal of any administrative decision stemming from a Notice of Determination issued by the IRS regarding a Notice of Levy, and since the IRS cannot seize property until 90 days after a final decision on that notice has occurred, see 6330(d) and (e), the United States was forbidden from relying upon any amount still under administrative review to make out a tax evasion of payment claim against Defendant for the years 1996 and 1997.

16

The Government and Court choose to say that on the one hand, the statute of limitations is measured by the last affirmative act and not when the tax became due or owing while on the other hand, they choose to justify asking for a collection due process hearing as an "affirmative act" to the tax evasion alleged in Count Two, on grounds that somehow Defendant owed money allegedly claimed by the IRS in two illegal whipsaw Notice of Deficiencies dated January 27, 2000.  From all the testimony, is there any doubt that the two Notices of Deficiency were in fact illegal?

If the evasion of payment derived from the tax returns filed in 1997 and 1998, then no claim could be made against Defendant because the amounts owed by those tax returns was paid at the time those returns were filed.   Since the evasion of payment stems from the issuance of a Notice of Deficiency and since that administrative process was still pending on those amounts therein, the indictment simply did not allege an offense of evasion of payment in Count Two as the amount at issue was **"entitled to an appeal and to a  determination of his liability for the tax prior to its  payment**." *The House Committee Report, H. R. Rep. No. 179, 68th Cong., 1st Sess. 7. The Senate Committee on Finance filed a similar report. S. Rep. No. 398, 68th Cong., 1st Sess. 8.*

Section 6330 authorizes appeals of any decision regarding Collection Due Process Hearings, and since that appeal had not been concluded, stemming from the Notice of Deficiencies dated January 27, 2000 for Patridge Asset Management Trust and for Denny Patridge individually, regarding calendar years 1996 and 1997,  final payment was not yet

due and owing.

Accordingly, this Court should have dismissed Count Two as it failed to allege an offense under section 7201 against Defendant Denny R. Patridge, and thus the District Court is likely to be reversed on whether Count Two alleged an offense allowable under section 7201.

## SECOND QUESTION PRESENTED

**Whether an indictment of Tax Evasion of the "assessment of taxes" can be maintained and sustained when one of the elements is a "tax deficiency" and that deficiency could not have taken place until after each of the affirmative acts alleged had transpired?**

## ARGUMENT AND AUTHORITY

2.     Count Three of the indictment and superceding indictment did not allege an offense under 26 U.S.C. § 7201's tax imposed prong.

The claim in Count Three is time stamped from "Early 1999" "to approximately October 15, 2000.

Count Three alleged Defendant "willfully evade and defeat, and attempted evasion and defeat of a large part of his personal income tax due and owing to the United States of America for the 1999 Calendar Year, specifically, approximately $19,523 due and owing on Approximately $76,796; he did so by, among other things, transferring money he earned as income to a foreign account, concealing that money from the IRS, using the money to pay personal expenses, and failing to file an individual income tax return, as required by law."

18

The indictment claims that the "affirmative act" claims in the indictment began "during 1999, Defendant caused a portion of his income to be transferred to various bank accounts which bore his name, his business name, Patridge Insurances Services, Inc. And the name of the Trusts he had established.[2]   At least one account was an offshore account. Another affirmative act is alleged that on March 17, 2000, the Defendant "caused a U.S. Corporate Income Tax Return, Form 1120" to be prepared and filed with the IRS.

Another affirmative act alleged was that between January of 1999 through November of 1999, the "Defendant evaded taxes when he caused the transfer of approximately $29,500" from the Patridge Asset Management Trust Account to another account in Antigua.

Another alleged affirmative act is that between February 1999 through September 1999, the Defendant transferred money from one account in Antigua to another account in the same bank in Antigua.

Another alleged affirmative act is that Defendant did not pay tax on the money he transferred to Antigua between January 1999 through December 1999, while paying "credit card charges" for "personal expenses" in 1999.

The last affirmative act alleged against the Defendant for the evading the assessment charges in Count Three is that around July 2000 Defendant transferred "all documents associated with Exempt Services company, LTD" to "Belize" "placing the

---

[2]  Patridge Asset Management Trust.

19

documents outside the reach of the IRS and making the documents unavailable for review."

It is clear by the reading of Count Three that the tax evasion of the tax imposed by this title must be for a tax imposed on the earning of income for calendar year 1999.

The Court instructed the Jury that the Government must prove that "First on April 15, or date of a legal extension of the year following tax year 1999, federal income tax was due and owing by the Defendant; Second, the Defendant intended to evade or defeat the ascertainment, assessment, computation or payment of the tax; Third, the Defendant willfully did some act in furtherance of the intent to evade tax or payment of the tax." *See Court's Instruction # 21*

The actual allegation in the superceding indictment involved the claim the Defendant was required to file an income tax return and willfully did not file the return. The Jury was forbidden from finding whether Defendant was required to file any specific form for calendar year 1999 over Defendant's objections to the contrary.

This Court instructed the jury that:

> "If the Defendant incurred a tax liability, it exists from the date the return is due.  A taxpayer's tax liability exists independent of any administrative assessment.  It is not necessary that a taxpayer receive a tax assessment before he is charged with a criminal violation of willful attempt to evade or defeat income tax."

*Court's Instruction # 26*

The Supreme Court said in *Sansone v. U.S.*, 380 U.S. 343 (1965) stated that  the

elements of § 7201 are willfulness; the existence of a tax deficiency, *Lawn v. United States*, 355 U.S. 339, 361; *Spies v. United States*, 317 U.S. 492, 496; and an affirmative act constituting an evasion or attempted evasion of the tax, *Spies v. United States*, supra.

In comparison, §7203 makes it a misdemeanor willfully to fail to perform a number of specified acts at the time required by law - the one here relevant being the failure to file a tax return form 1040 when due.  This misdemeanor requires only willfulness and the omission of the required act - here the failure to file the return when due. As recognized by the Supreme Court in *Spies v. United States*, supra, at 499, the difference between a mere willful failure to file a return (or perform other enumerated actions) when due under §7203 and a willful attempt to evade or defeat taxes under §7201, is that the latter felony involves "some willful commission in addition to the willful omissions that make up the list of misdemeanors." *Sansone* at 351

In *U.S. v. McGill*, 964 F.2d 222 (3rd Cir. 1992) it was held that the Government must prove attempted evasion for each count beginning at the dates cited in the indictment. No prior acts were to be considered under this element of the offense.  Prior acts were held to be "relevant in determining whether a current act is evasive."  Id.  Further, prior acts are always relevant in the assessment of willfulness. *United States v. Dixon*, 698 F.2d 445, 447 (11th Cir. 1983). The issue here, however, is whether they may also substitute for the proof of a current act.

The Supreme Court says that willful omission plus willful commission of an

affirmative act of "attempt" creates a felony.  The test of the attempt is on the dates alleged in the indictment.  If the tax return was not due until October 15, 2000, for calendar year 1999, then simply looking at each of the acts alleged in Count Three of the Indictment would answer the question as to whether the jury was required to find forward looking acts to satisfy the affirmative act element of the section 7201 charge or whether the jury was asked to look backwards.

In Count three, there are no alleged acts under the "affirmative act" section that if true, qualify as acts accomplished or attempted to be accomplished after October 15, 2000.

Although the indictment alleges the time period of Count Three to be from January 1999 though October 15, 2000, there is no affirmative act alleged after the October 15, 2000 date as alleged in the indictment, which, if true, would allow a Jury to find was an attempt to evade the assessment of any tax imposed by Title 26.  Therefore, it was error for this Court to allow Count Three to be presented to a jury when no affirmative acts were either alleged or proven to have occurred after both the Court's and Government's claim of when the tax return was due to be filed for calendar year 1999.

In Count Two there were no "affirmative acts" alleged to have taken place prior to the date the Defendant filed his returns for calendar year 1996 and 1997.   There were no affirmative acts alleged after those dated but before May 11, 2000, which is the date the Government's theory of the Notice of Deficiency became due and owing.

Yet, in Count Three all the affirmative acts are alleged to have happened before the

22

requirement to file a return or otherwise any assessment was due to be made.[3] [4]

Since there are no alleged affirmative acts after October 15, 2000, and since all affirmative acts to tax evasion must be forward looking and not backwards, this Court should have dismissed Count Three as it failed to allege an offense under section 7201. As a result, the District Court is likely to be reversed on whether Count Three alleged an offense allowable under section 7201.

### THIRD QUESTION PRESENTED

**Whether Jury was required to find Defendant was specifically aware of the specific provision of the tax code the Indictment which charged him with violating Counts One, Two and Three?**

### ARGUMENT AND AUTHORITY

3       The Supreme Court in defining "willful" created an exception to the traditional rule that ignorance of the law is not an excuse to a violation of the law, by making it a mandatory requirement the jury find the Defendant was specifically aware of the specific provision of the tax code the Defendant was accused of violating.

A.   Willful as specifically shown to know the facts that violated the law

"The presumption of innocence, although not articulated in the Constitution, is a

---

[3]   There is 1 act alleged on July 22, 2000 that is phrased in words "transferred all documents associated with Exempt Services" which clearly was false and misleading.   Even though only the creation documents were sent back at the direction of former IRS Agent Larry Phillips, this claimed attempt remains premature to the October 15, 2000 alleged date.  It is also simply not true.

[4]   This issue also brings in Brent Winters of which will be addressed below on the issue of recusal and the taped conversation the Government fought so adamantly to keep the jury from hearing because it shows the misconduct the Government utilized to obtain the Grand Jury consent in the first place.

basic component of a fair trial under our system of criminal justice." *Estelle v. Williams*, 425 U.S. 501, 503 (1976); see also *Cool v. United States*, 409 U.S. 100, 104 (1972)("constitutionally rooted presumption of innocence"). The presumption serves as a reminder to the jury [and the court] that the United States has the burden of proving every element of the offense beyond a reasonable doubt. See *Delo v. Lashley*, 507 U.S. 272, 278 (1993).

The traditional rule provides that "ignorance of the law" is no defense to a criminal prosecution. *Cheek v. United States*, 498 U.S. 192, 199 (1991); see also *Bryan v. United States*, 524 U.S. 184, 195 (1998). "Ignorance of the law" as a rule was based on the notion that the law is definite and knowable; the common law presumed that every person knew the law. This common law rule has been applied by the Court in numerous cases construing criminal statutes. See, e.g., *United States v. International Minerals & Chemical Corp.*, 402 U.S. 558 (1971); *Hamling v. United States*, 418 U.S. 87, 119-124 (1974); *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337 (1952). Thus, a specific intent crime "normally does not necessitate proof that the defendant was specifically aware of the law penalizing his conduct." *United States v. Scanio*, 900 F.2d 485, 489 (2d Cir. 1990); accord *United States v. Shirk*, 981 F.2d 1382, 1390 (3d Cir. 1992), cert. denied, ___ U.S. ___, 114 S.Ct. 873 (1994). See *also U.S. v. Blair*, 54 F.3d 639 (10th Cir. 1995)

 B.  Willful means specifically shown to know the law the facts violated

Thus, Congress enacted an exception to this "general rule" involving "Tax Crimes"

and "Bank Secrecy" Crimes.  See *Cheek*, 498 U.S. at 199. This was because the

"proliferation of statutes and regulations has sometimes made it difficult for the average

citizen to know and comprehend the extent of the duties and obligations imposed by the

tax laws. Congress has accordingly softened the impact of the common law presumption

**by making specific intent to violate the law an element of certain federal criminal tax**

**offenses**." Id. at 200.  (Emphasis added).

Because only willful conduct is criminal under section 7201 and because

willfulness requires a voluntary intentional violation of a known duty, "the duty involved

must [first] be knowable."  *U.S. v. Pirro*, 212 F.3d 86, 90 (2d Cir. 2000)(emphasis added).

"In criminal cases, actual **knowledge of illegality** is required for a willful violation of a

criminal statute." *Reynolds v. Hartford*, 435 F.3d 1081, 1098 (9th Cir.2006). The Seventh

Circuit has held that an indictment must be dismissed where a defendant is provided "no

fair warning that her conduct was criminal," and because "new points of tax law may not

be the basis of criminal convictions." *United States v. Harris*, 942 F.2d 1125, 1131 (7th

Cir.1991). The court referred to a civil case discussing the distinction between income and

gifts, and stated, "[C]riminal prosecutions are a different story. These must rest on a

violation of a clear rule of law. . . .  If 'defendants in a tax case could not have ascertained

the legal standards applicable to their conduct, criminal proceedings may not be used to

define and punish an alleged  failure to conform to those standards.'" *Id., citing United

States v. Mallas*, 762 F.2d 361, 361 (4th Cir. 1985).

25

The Supreme Court has repeatedly discussed what willfulness requires in the criminal context;

> The word "willfully" is sometimes said to be "a word of many meanings" whose construction is often dependent on the context in which it appears. See, e.g., *Spies v. United States*, 317 U.S. 492, 497 (1943). Most obviously it differentiates between deliberate and unwitting conduct, but in the criminal law it also typically refers to a culpable state of mind. As explained in *United States v. Murdock*, 290 U.S. 389 (1933), a variety of phrases have been used to describe that concept.  As a general matter, when used in the criminal context, a "willful" act is one undertaken with a "bad purpose."  In other words, in order to establish a "willful" violation of a statute, "the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994).

*Bryan*, 524 U.S. at 191-192.

In *Cheek*, the Court defined willfulness—"Willfulness, as construed by our prior decisions in criminal tax cases, requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek*, 498 U.S. at 201.  The Court explained this rule more fully, "in certain cases involving **willful violations of the tax laws**, we have concluded that the jury must find that the **defendant was aware of the specific provision of the tax code** that [s]he was charged with violating." *Bryan*, 524 U.S. at 194, *citing Cheek*, 498 U.S. at 201, (emphasis added). The Court continued, "Both the tax cases and [banking cases] involved highly technical statutes that presented the danger of ensnaring individuals engaged in apparently innocent conduct.  As a result, we **held** that these statutes 'carve out an exception to the traditional rule' that ignorance of the law is no

excuse and require that the **defendant have knowledge of the law**." *Id.* at 194-195 (emphasis added).

Thus, the rule of law as set forth by the Supreme Court is that in tax cases, the government must prove that "THE DEFENDANT WAS AWARE OF THE SPECIFIC PROVISION OF THE TAX CODE THAT SHE WAS CHARGED WITH VIOLATING." *Id.* The Ninth Circuit, in citing *Bryan* at 194-195, acknowledged "the cases to which *Bryan* refers are cases in which the Supreme Court read the element of 'actual knowledge of the law' into complex statutes that punished 'willful' failures to perform statutory duties." *United States v. Hancock*, 231 F.3d 557, 562 (9th Cir.2000), *citing Ratzlaf*, 510 U.S. at 149, and *Cheek*, 498 U.S. at 201.

There is no doubt the tax laws are a complicated mess. The proliferation of statutes and regulations has sometimes made it difficult for the average citizen to know and comprehend the extent of the duties and obligations imposed by the tax laws. Congress has accordingly softened the impact of the common law presumption by making specific intent to violate the law an element of certain federal criminal tax offenses. *Cheek v. United States*, 498 U.S. @ 199-200 (1991)

Willfulness, as construed by our prior decisions in criminal tax cases, requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty. *Cheek v. United States*, 498 U.S. @ 201 (1991)

27

It is not enough for the Government simply to allege the Defendant acted "willfully" with respect to Counts II through VII. This is because there are two types of willfulness. The term "knowingly" does not necessarily have any reference to a culpable state of mind or to knowledge of the law. As Justice Jackson correctly observed, "the knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law." Thus, in *United States v. Bailey*, 444 U.S. 394 (1980), the Supreme Court held that the prosecution fulfills its burden of proving a knowing violation of the escape statute "if it demonstrates that an escapee knew his actions would result in his leaving physical confinement without permission." Id., at 408. And in *Staples v. United States*, 511 U.S. 600 (1994), the Supreme Court held that a charge that the defendant's possession of an unregistered machine gun was unlawful required proof "that he knew the weapon he possessed had the characteristics that brought it within the statutory definition of a machine gun." Id., at 602. It was not, however, necessary to prove that the defendant knew that his possession was unlawful. See *Rogers v. United States*, 522 U.S. 252, 254-255 (1998) (plurality opinion). Thus, **unless the text of the statute dictates a different result, the term "knowingly" merely requires proof of knowledge of the facts that constitute the offense.**

 Similarly, in order to satisfy a willful violation in *Ratzlaf*, the Supreme Court concluded that the jury had to find that the **defendant knew that his structuring of cash transactions to avoid a reporting requirement was unlawful**. (Emphasis added). See

28

510 U.S., at 138, 149. "Both the tax cases and *Ratzlaf* involved highly technical statutes that presented the danger of ensnaring individuals engaged in apparently innocent conduct." *Bryan v. U.S.*, 524 U.S. 184, 194 (1998)  As a result, we held that these statutes "carv[e] out an exception to the traditional rule" that ignorance of the law is no excuse and require that the defendant have knowledge of the law.  *Bryan* at 195

Though the indictment alleged the Defendant acted willfully, it did not allege the Defendant had knowledge of the specific law nor did it list out what if any other laws were involved in the theory the Government advanced through the Grand Jury in its superceding indictment.

At no time did the Government allege or prove that the Defendant was aware of 26 U.S.C. §7201.   Nor did the Government prove the Defendant was aware of the judicial interpretations establishing the elements to a section 7201 violation.  Not one single shred of evidence was tendered in which the Jury could determine the Defendant knew or was aware of section 7201 or its judicial interpretations.

To decide whether a resulting trust arose, we apply the law of the State of Illinois. See *Estate of Young v. Commissioner*, 110 T.C. 297, 300 (1998) (citing *Fernandez v. Wiener*, 326 U.S. 340, 355-57 (1945)) ("[W]hat constitutes an interest in property held by a person within a State is a matter of State law.").  *Scott v. CIR*, 226 F.3d 871, 874 (7th Cir. 2000)

29

In its pretrial Opposition to Defendant's Motion to Dismiss, the Government

responded to Defendant's deficient claims of the indictment as follows:

> "The Government agrees with the premises, but does not agree with the
> defendant's application of the law to the factual circumstances set forth in
> Count Two."

Just what was the Government agreeing with in its pretrial opposition to

Defendant's Motion to Dismiss?   In its opposition dated October 13, 2004, the

Government was addressing the assertion by Defendant that "he cannot have violated an

evasion of payment statute because he must have acted willfully and to act willfully, he

must have been 'aware of the specific provision of the tax code that he was charged with

violating.'"   *Paragraph 26, page 11, Gov't Opp. Motion to Dismiss dated 10-13-2004*

Next, the Government qualifies its opposition in response to the holding by the

Supreme Court twice, once in *Cheek v. U.S.* , 498 U.S. 192, 201 (1991) and once again in

1998 in *Bryan v. U.S.* 524 U.S. 184, 191 (1998).[5]   So, twice in the last 15 years, the

Supreme Court informed the entire Country, including the U.S. Department of Justice,

what  the Government must prove to a Jury beyond a reasonable doubt in this case,  and at

no time did the Government, in this case, ever enter any evidence from which a jury could

---

[5]  In its opposition to Defendant's Pretrial Motion to Dismiss the Government says that
the Bryan decision was announced by the Supreme Court in 1988 (page 11, paragraph 26) but
that is simply false.   The Supreme Court announced its Bryan decision in ***1998***.  However, if the
government's position was correct, that would have meant additional time that the government
knew what it was required to prove in order to establish the willful requirements in *Bryan*.

have found the defendant was specifically aware of 26 U.S.C. §7201 or for that matter any of the provisions alleged in the superceding indictment.

The Government may try to overcome this brick wall by arguing "circumstantial evidence", but the Supreme Court said the jury must find the defendant was aware of the "specific" provision of the tax code he is charged with violating and there is no way the Government can overcome the willfulness burden by converting willfulness to circumstantial evidence to attempt to establish a particular state of mind.    In order for the Government to prove the Defendant was aware of 26 U.S.C. §7201, they must be required to show direct evidence that Defendant actually read section 7201 and understood what the words in section 7201 intended to reach or cover, and that what he did violated those words and that was what he intended.

The Government never entered any evidence Defendant read or was directed to read section 7201.   The Government never directed Defendant to section 7201 in their illegal notices of deficiencies.  The Government never entered any testimony that Defendant was made aware of section 7201 prior to the original indictment being handed down.  Not one single document was entered in the trial that presented code section 7201 upon its inscription.  No explanation, nothing.  Without such factual evidence proving that Defendant was aware of Section 7201, the conviction cannot stand.  Therefore, the District Court is likely to be overturned on this issue as its decision surrounding its instruction to the Jury along with the Government's evidence at trial did not establish the jury considered

31

whether Defendant was aware of the specific provision, section 7201, that he was alleged

to have violated, let alone whether the jury could have found this specific awareness.

_____ **FOURTH QUESTION PRESENTED**

> **Whether the Paperwork Reduction Act of 1995 prohibited the Government from subjecting Defendant to penalties under section 7206 and 7201 due to the IRS's refusal and failure to bring Form 1040 for 1996, 1997, 1998 and 1999 into strict compliance with this Act?**

_____

4.      Form 1040 for Calendar Years 1996, 1997, 1998 and 1999 do not comply with the Paperwork Reduction Act of 1995 and therefore, simply bringing the charges against the Defendant was a direct violation of 44 U.S.C. § 3512 (1995) which subjected Defendant to the penalty under section 7206 and 7201.  Likewise, it was these forms that subjected Defendant to Counts Four through Seven.

[6]Notwithstanding the error that no evidence was submitted establishing the

Defendant had knowledge of section 7201 or that what he was doing violated section 7201

or  7206,[7] Counts Two and Three involve the requirement of the Defendant to make an

individual income tax return for calendar years 1996, 1997 and 1999 that complies with

the Internal Revenue Service Form 1040, identified by OMB # 1545-0074.  44 U.S.C.

§3512 mandates that  **no person shall  be subject to any penalty** for failing **to comply**

**with a collection**  of information that is subject to the Paperwork Reduction Act of 1995

("PRA")("1980" or "1995") if it fails to (1) display a valid control number assigned by the

_____

[6]  The exhibits attached originally to the Defendant's Motion to Dismiss on the PRA are not reproduced in this Stay request, though the argument is.  This Court chose not to address these issues post-trial and therefore the actual issue is reproduced notwithstanding the exhibits.

[7]  Of which Defendant was acquitted.

Director in accordance with the PRA of 1995; or (2) fails to inform the person who is to respond to the collection of information that such person is not required to respond to the collection of information unless it displays a valid control number.  (Emphasis added).

Furthermore, the PRA of 1995, for clarification, added subparagraph (b) which provides "The protection provided by this section may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable  thereto."

The Form 1040 for the years 1996, 1997 and 1999 ("tax forms") fails to comply with the PRA of 1995 in at least four different specific violations.

First, the tax forms contain a purported approval number that has been displayed upon the Form 1040 since 1981, in violation of  44 U.S.C. § 3507(g)

Second, for tax forms 1996 and 1997, the IRS never even filed an 83-I (application) for 1995 in compliance to the then recently enacted 1995 Paperwork Reduction Act. Without any 83-I for 1995, there would be no application to amend for 1996 and 1997, and nothing that using the 83-C form would or could accomplish.  This makes the OMB number 1545-0074 for 1996 and 1997 outlaw and bootleg.  As the Supreme Court has stated, when an agency uses these "outlaw forms," an individual may "refus[e] to answer these information collection requests." *Dole v. Steelworkers*, 494 U.S. 26, 40 fn6 (1990).

33

Third, the tax form for 1999 contains changes made to the request for information that was neither presented to OMB for approval on form 83-I for 1998, or was presented after approval for re-approval in violation of 44 U.S.C. § 3507(h)(3). .

Fourth  the tax forms fail to inform the person who is to respond to the collection of information that such person is not required to respond to the collection of information unless it displays a valid control number in violation of 44 U.S.C. § 3512(a)(ii).


PAPERWORK REDUCTION OF ACT OF 1980 AND 1995

In 1980, Congress enacted the Paperwork Reduction Act of 1980, P.L 96-511 which purpose, in part, was to both "Minimize the public burden of Federal paperwork", Maximize usefulness" and to  "Ensure that the collection ....of information is consistent with applicable laws relating to privacy, security, and confidentiality." *House Report, P.L. 104-13 [page 8][ page 171].*  44 U.S.C. § 3512 (1980) required all information collection request forms to display a current OMB control number or STATE ON THE FORM THAT THE REQUEST WAS NOT SUBJECT TO THE 1980 PRA.  (Emphasis added). Since the IRS chose to seek and display a number, this Court must conclude that the IRS believed their request Form 1040 was subject to the PRA of 1980.

One law governing this request for information is the Privacy Act of 1974 of which the IRS states to the public in its "instruction" booklets and **not on any Forms at issue in this case**, that when the IRS asks you for information we must first tell you our legal right

34

to ask for the information, why we are asking for it and how it will be used.   We must also

tell you what could happen if we do not receive it and whether your response is voluntary,

required to obtain a benefit, or mandatory under the law."

Since 1996, the IRS has purposefully referred to the PRA of 1980, in stead of the

PRA of 1995, in all its publications and statements.  On this same page, the IRS states

"Our legal right to ask for the information is section 6001, 6011, and 6012(a) AND

THEIR REGULATIONS.".  *(Emphasis added).*

If the 1040 Form does not display a valid OMB number, displays a number that is

expired, appearing for over 3 years, or contains changes that were not submitted to OMB

for approval, the form is bootleg and "no person shall be subject to any penalty." See 44

U.S.C. § 3512(a).

The Legislative History of the 1995 PRA was enacted to clarify that the 1980 PRA

was originally enacted to among other things, "eliminate exemptions" for the "Internal

Revenue Service".  *House Report, 104-13, [page 8] at 171 (1995*)    This Report also

directed that the difference between the language of the old section 3512 and the new

section 3512 was to maintain the same purpose.   The only reason it was modified to add

certain terms was to maintain consistency and clarity and to "unequivocally cover all

collections of information"  *House R. [page 54] at 217*

In the House Conference Report involving the 1995 PRA, No. 104-99 [page 36] at

248, the House and Senate agreed that:

35

"the Senate bill contains a provision which changes the Act's current "public protection" provision by requiring a collection of information subject to the Act display a notice that a person is not required to respond to the collection of information unless it displays a control number  which is valid."

44 U.S.C. § 3512 (1995)  provides:

(a) Notwithstanding any other provision of law, **no person shall  be subject to any penalty** for failing **to comply with a collection**  of information that is subject to this subchapter if -

(1) the collection of information does not display a valid control number assigned by the Director in accordance with this  subchapter; or

(2) the agency fails to inform the person who is to respond to the collection of information that such person is not required to respond to the collection of information unless it displays a valid control number.

(b) The protection provided by this section may be raised in the  form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable  thereto.

The 10th Circuit described the 1980  "public protection provision" as:

Notwithstanding any other provision of law, no  person shall be subject to any penalty for failing to maintain or provide information to any agency if the information collection request involved was made after December 31, 1981, and does not display a current control number assigned by the Director [of OMB], or fails to state that such request is not subject to this chapter.

*See U.S. v. Dawes*, 951 F.2d 1189 (10th Cir. 1991)

36

It is clear the changes between the 1980 Act and the 1995 Act were to remove any theory by which any Federal Agency could claim their request to the public was not subject to the Paperwork Reduction Act.  (See removal of "or fails to state such request is not subject to this chapter)(and replaced with "fails to inform the person who is to respond to the collection of information that such person is not required to  respond to the collection of information unless it displays a valid control number")

The PRA of 1995 is to assist in the government's collection of information. One of the specific purposes of the PRA is to "ensure that the creation, collection, maintenance, use, dissemination, and disposition of information by and for the Federal Government is consistent with applicable laws." 44 U.S.C. § 3501(8). In order to assure compliance with the PRA, a federal agency has various responsibilities, including, "The head of each agency shall be responsible for--(A) carrying out the agency's information resources management activities to improve agency productivity, efficiency, and effectiveness; and (B) complying with the requirements of this subchapter and related policies established by the Director." 44 U.S.C. § 3506(a)(1).

Beginning in 1990, the Supreme Court took up the issue of whether third party information collection requests were subject to the Paperwork Reduction Act of 1980 ("1980 PRA") in *Dole v. United Steelworkers*, 494 U.S. 26 (1990) wherein the Supreme Court reached the conclusion that the requests at issue in *Dole* were not subject to the 1980

PRA.  In the Supreme Court's decision they concluded that "tax forms" were "typical information collection requests" subject to the 1980 PRA.  Id. @ 33.

In 1992, the 7th Circuit in *Salberg v. U.S.*, 969 F.2d 379 (7th Cir. 1992), while acknowledging the Supreme Court's decision in *Dole,* tax forms were typical information collection requests subject to the PRA of 1980, rejected a defense regarding regulations and instruction booklets not having OMB numbers displayed

The 7th Circuit stated in *Salberg* that "Information requests include 'tax forms, medicare forms, financial loan applications, job applications, questionnaires, compliance reports, and tax or business records.' *Dole v. United Steelworkers*, 494 U.S. 26, 33, 110 S.Ct. 929, 933, 108 L.Ed.2d 23 (1990)." "An agency may not attempt to collect information unless it has obtained the Director's approval along with a control number to display on the information request. 44 U.S.C. § 3507.  If an agency's information request does not display an OMB number, 'no person shall be subject to any penalty for failing to maintain or provide information' to the agency pursuant to the request. 44 U.S.C. §3512." Id.

*Salberg* contended that although "the form 1040 displays an OMB control number, it does not display an expiration date and thus does not comply with the Act."  Id.  The 7th Circuit agreed with the 10th Circuit in *United States v. Collins*, 920 F.2d 619, 631 (10th Cir. 1990) that the "failure to display an expiration date on the form does not violate the

Act. Even if the PRA requires an expiration date, the form was expressly designated a "1981" tax return which is sufficient to satisfy such a requirement."

In *U.S. v. Collins*, 920 F.2d 619, the 10th Circuit Court of Appeals announced that, at footnote number 12, in explaining their decision in <u>United States v. Tedder</u>, 787 F.2d 540, at page 542, a decision rendered by the 10th Circuit in 1986, that previously held that "tax forms ***were not*** information collection requests subject to the Paperwork Reduction Act because the filing of income tax returns was **obligatory,** held that the *Tedder* decision was "superseded by the Supreme Court's analysis in <u>Dole v. United Steelworkers</u>, 494 U.S. 26, 110 S.Ct. 929, 933, 108 L.Ed.2d 23 (1990), which **included federal income tax forms** within the category of information collection requests under the Act." Id.  (Emphasis added).

In 1991, the 10th Circuit Court of Appeals determined that "As long as the 1040 form complies with the Act, nothing more is required." <u>United States v. Dawes</u>, 951 F.2d 1189, 1193 (10th Cir. 1991).

In 1992, the 8th Circuit held in <u>U.S. v. Holden</u>, 963 F.2d 1114 (8th Cir. 1992) that:

> "Although tax forms fall within the PRA's definition of information collection requests, <u>Dole v. United Steelworkers</u>, 494 U.S. 26, 33, 110 S.Ct. 929, 933, 108 L.Ed.2d 23 (1990), tax instruction booklets do not. <u>United States v. Dawes</u>, 951 F.2d 1189, 1192 (10th Cir. 1991). Because tax instruction booklets simply assist a taxpayer in completing tax forms and ensure compliance with the information collection requests, booklets are not required to display an OMB number. Id. "As long as the 1040 form complies with the [PRA], nothing more is required." <u>Dawes</u> at 1193."

39

Next, *Salberg* argued that the relevant IRS regulations and the 1040 instruction books do not display OMB control numbers as required by the PRA. *Salberg* argued that since the regulations and instruction book, not the 1040 itself, require that the form be made and they fail to comport with requirements of the PRA, he cannot be penalized for failing to file a tax return. *Salberg* relied on *United States v. Smith*, 866 F.2d 1092 (9th Cir. 1989),[8] in which the Ninth Circuit held that agency regulations were subject to the requirements of the PRA. Id. at 1098-99. The *Smith* court reversed a criminal conviction based on the defendant's failure to file an information request required by an agency regulation because the regulation, not bearing a current control number, failed to comply with the PRA. Id. at 1099.

To distinguish *Smith* from *Salberg*, the 7th Circuit stated that the defendants in *Smith* were convicted of violating a regulation; *Salberg* was convicted of violating a statute. It was a federal statute - 26 U.S.C. § 7203 - not a regulation or an instruction booklet that required Salberg to file an income tax return.

It is hard to swallow the 7th Circuit's dicta in *Salberg* that section 7203 mandated *Salberg* file an income tax return. Section 7203 provides a threat of punishment as does section 7201.[9]  The 7th Circuit went on to say "Statutes are not subject to the PRA and, as

---

[8] And this was before the Dole decision by the Supreme Court of the United States.

[9] Of which the Government failed to establish any evidence Defendant was aware of the specific language and provision, 26 U.S.C.  Section 7201.

40

the government points out in its brief, every court that has considered the argument that the regulations and the instruction books promulgated by the IRS are within the scope of the PRA has rejected it. See *United States v. Kerwin*, 945 F.2d 92, 92 (5th Cir. 1991) (per curiam); *United States v. Wunder*, 919 F.2d 34, 38 (6th Cir. 1990); *Brewer v. United States*, 764 F. Supp. 309, 316 (S.D.N.Y. 1991); *United States v. Karlin*, 762 F. Supp. 911, 912-13 (D.Kan. 1991); *United States v. Crocker*, 753 F. Supp. 1209, 1214-16 (D.Del. 1991).

It is clear by the holding in *Salberg* that the 7th Circuit accepts the *Dole* decision. The 7th Circuit accepts the *Collins* decision by the 10th Circuit.  It is equally clear the 7th Circuit does not accept argument that instructions and regulations need OMB approval.

The "statutory origin theory" for deriving the duty to make a Form 1040 was rejected by the 10th Circuit in 1991 when it was held  "As long as the 1040 form complies with the Act, nothing more is required."  <u>United States v. Dawes</u>, 951 F.2d 1189, 1193 (10th Cir. 1991).

For years 1996, 1997, 1998  and 1999, the Commissioner of the Internal Revenue writes "Our legal right to ask for the information is section 6001, 6011, and 6012(a) AND THEIR REGULATIONS." .

The Commissioner of the Internal Revenue completely rejects the  "statutory origin theory" otherwise utilized to circumvent the public protection provision, 44 U.S.C.§ 3512(1995).   The Supreme Court has also rejected any statutory origin theory.   In the

most learned words of the Supreme Court in 1960 "The result is that neither the statute nor the regulations are complete without the other, and only together do they have any force." *U.S. v. Mersky*, 361, U.S. 431 438 (1960)

There can be no argument from the Government the tax forms complied with the PRA of 1995. They simply did not comply. There can be no argument they were not required to comply. The Legislative History says it all. There can be no argument that Defendant is not subject to the protection provided by 44 U.S.C. §3512 (1995), and only subject to the penalty announced in section 7201, notwithstanding the Defendant had no knowledge of this section or the facts that would trigger application of this section to him.

Since the protection applies to the Defendant under 44 U.S.C. Sec. 3512 (995), the Government would have had to demonstrate, which it could not, that the 1040 Form complied with the PRA. Since the Government did not, and could not establish that the 1040 Form complied with the PRA, it was not entitled to prosecute, and cannot obtain a conviction against the Defendant. The indictment should have been dismissed, and the convictions set aside as to Counts II and III. Further, since the proof for Counts IV through VII come from Count II, those Counts also must fail as a matter of law, the indictment dismissed, and the convictions set aside on those counts as well.

The District Court is likely to be reversed on whether Count One Two and Three alleged an offense prohibited by 44 U.S.C. § 3512(1995).

42

## FIFTH QUESTION PRESENTED

**Whether the District Court should have granted Defendant's Motion to Dismiss on grounds of Prosecutorial Misconduct on the part of Hilary Frooman?**.

## ARGUMENT AND AUTHORITY

5       The District Court should have granted Defendant's Motion to Dismiss on Prosecutorial Misconduct Grounds.

      **A.     Agent Coleman intentionally lied to the Grand Jury regarding the reason why the IRS issued the Notice of Deficiencies to both the defendant and Patridge Asset Management Trust.**

The elements of tax evasion are "willfulness, a substantial tax deficiency, and one affirmative act constituting evasion."

On June 2, 2004, Hilary Frooman, Assistant U.S. Attorney for the Central District of Illinois conducted an interrogation of Criminal Investigator Bernie Coleman regarding the tax liabilities and other matters involving the defendant and Patridge Asset Management Trust for tax years 1996 and 1997 before the Grand Jury.

Agent Coleman falsely testified about when the IRS became aware of the defendant's usage of the Aegis Financial Plan.

First, Agent Coleman ("IRS") in answering a question from Assistant U.S. Attorney Hilary Frooman ("government") about "at some point the IRS catches on or else he catches the attention of the IRS.  I don't know which is the better way to explain it...."  and the he answers "yes."   The IRS knew full well what caught the attention of the IRS and it

43

had nothing to do with any "audit" on 1996 and 1997.  *Page 15,   line 26, Page 16 through line 4, June 2, 04 Trans*

_____It was the investigation of Aegis which was eventually detailed by the Affidavit for Search Warrant by Bernie Coleman in March of 2000.

Agent Coleman falsely testified to the Grand Jury about why Agent Boyd issued the Notice of Deficiency because Agent Coleman never spoke to Agent Boyd.

Agent Coleman testified to the Grand Jury saying "So the revenue agent disallows the expenses and picks up the income and writes a report for the assessment of the taxes because he would not cooperate and provide any documentation during the audit." *Page 16, line 19, June 2,04 Trans*

Agent Coleman never spoke to Agent Boyd and Agent Coleman and Hilary Frooman knew this at the time these false statements were injected into the minds of the Grand Jury.

Agent Coleman told the Grand Jury that Larry Phillips told the defendant "these trusts did not work" which was a statement Larry Phillips never made to Agent Coleman and former IRS Agent Larry Phillips never said these words.

Agent Coleman testified in answering a question about Larry Phillips opinion regarding what he told the defendant about the type of trusts the defendant was using and the Agent said before the Grand Jury that Larry Phillips told the defendant that "these trusts did not work." *Page 18, line 3-4, June 2,04 Trnas.*

44

Agent Coleman falsely testified to the Grand Jury when he told them Larry Phillips said the documents which were to redetermine the tax liability for 1996 and 1997 did "not come freely."

When asked did Larry Phillips have "difficulty obtaining all the documents he really needed to see to understand the Patridge's finances" Agent Coleman answered "Yes he did, he told us that the documents did not come freely..."  *Page 18, lin 12-18, June 2,04 Trans*

Agent Coleman falsely testified to the Grand Jury when he knew that the list of accounts that were closed as listed in Counts Two and Four were held in the name of Patridge Asset Management Trust and not the defendant personally.

Agent Coleman testified to the Grand Jury that Mr. Patridge "liquidates a stock account he has with Raymond James...*"  Page 21, line 5 -16, June 2, 04 Trans*

Agent Coleman falsely testified to the Grand Jury and told them that around July 31, 2000, was when the defendant was given his final notice of intent to levy and right to collection due process hearing when it was actually dated November 23, 2000.

The Government asks the IRS "And this is just about the time he is receiving the final – the notices from the Internal Revenue Service very late July and First week in August" to which Agent Coleman answered "Yes, it is."

Hilary Frooman knew that the Defendant was a target in an on going criminal investigation prior to January 27, 2000.   She also knew those "notices" were not "final."

45

Agent Coleman ,who testified against the Defendant on June 2, 2004, the day of the indictment, as a summary witness, also was the CID agent who swore out an affidavit for the search warrant of the affiliated Aegis Company targets back in 2000.  Hilary Frooman knew the Notice of Deficiencies dated January 27, 2000 were defective in many ways and could not be relied upon to establish the tax liability of the Defendant.

She knew they did not explain the reason for the issuance of the Statutory Notices under 26 U.S.C. § 6213(a).

She knew they contained no explanation for the 20% penalty.

She knew they did not contain the "last day for filing" as the amendments to section 6213 mandate.

She knew the Defendant hired JK Harris, and Larry Phillips to address the January 27, 2000 deficient Notice of Deficiencies.

She knew that Larry Phillips was still working on years 1996 and 1997 well into October of 2000.

She knew the Defendant did not owe $200,000 plus which was the amount and relevance of the wires at issue in Counts Two, Four, Five, Six and Seven,

She knew the Notice of Deficiencies were over inflated by some $200,000.

She knew the Defendant had enough cash reserves to pay any amount of money he actually could have owed, setting aside the previous strategies the Defendant acquired

through the Aegis Company, and treating the Defendant as if he and not the corporation or trust earned any income.

She knew the notice sent to the Defendant on October 16, 2000, referred to as a CP-504 is not a "final notice" as she states before the Grand Jury on June 4, 2003 and again on June 2, 2004, and to which is reiterated in the indictment at Count Two, paragraph 9.

She knew the Defendant had a right to a "final notice" and right to notification of right to collection due process hearing.

She knew that notice was not given to the Defendant until November 23, 2000.

She knew by the time of the "final notice" the IRS had decided not to allow "audit reconsideration" to the Defendant for years 1996 and 1997.

She knew that this November 23, 2000 "final notice" still afforded the Defendant to challenge the underlying claim of liability, when all else fails,  prior to the Defendant having to "pay" or "owe" the January 27, 2000 amounts which she now admits the Defendant did not owe.

She knew the Defendant was making every effort to have his representative from JK Harris figure out whatever the IRS wanted.[10]

She knew on June 2, 2003 when she issued the subpoena to Larry Phillips that she did not wish for Mr. Phillips to turn over those subpoenaed records until after she had a chance to look at them.

_____

[10] What the Defendant did not know is why the IRS raided J.K. Harris and that it had to do with Defendant's Power of Attorney he tendered to J.K. Harris.

She knew that having a fact witness turn over records to her was improper since she was the Government attorney prosecuting the case yet her June 2, 2003 subpoena to Larry Phillips offers this option.

She knew by September 1, 2004, the Grand Jury to whom issued a superceding indictment against the Defendant, was not aware of the "more than $30,000.00" they added in the "special finding" section in the back of the superceding indictment.

She knew no testimony was presented to support these numbers.

She knew that no person testified that the reason for the Defendant exercising his right to a CDP hearing was so that he could "delay and prevent enforced collection action, to gain time to spend the money....and to delay and prevent the IRS from discovery that the mortgage filed on October 4, 2000,...., was in fact controlled by him...."

Hilary Frooman even had Agent Coleman falsely claim that the Paris Bank Defendant used was further away from his home than the a Bank in Clay City, using significantly further away to describe motive, while knowing full well that the Paris Bank was a few miles closer to the Defendant than the Bank in Clay City.

Each of these false and misleading acts directly affect the rights of the Defendant regarding his right to have any possible Grand Jury indictment contain a finding of probable cause as to each element of the alleged crime.   There is no question that the Tax Evasion charge in Count Two clearly relies heavily on the Defendant's willful acts, that he

owed a substantial tax deficiency, and that he committed at least one affirmative act

constituting evasion.

**B.     Agent Coleman participated in Hilary Frooman's Prosecutorial Misconduct.**

How else could the numerous factual errors have been presented?   They simply

could not have been done without the assistance of Agent Coleman.

**C.     Larry Phillips committed perjury before the grand jury at the direction of Hilary Frooman**

Larry Phillips was the professional JK Harris appointed to the Defendant's case

when Defendant hired the JK Harris Company to handle and satisfy the IRS involving the

matters of the Defendant.

Larry Phillips was well aware that long after July 20, 2000, he remained the

representative Power of Attorney for the Defendant and that long after July 30, 2000, the

IRS was still considering the tax liability of the Defendant.

Larry Phillips continued to write letters to the Defendant informing him of current

state of his "audit" well into September, 2000.

Larry Phillips knew that he had participated in a taped conversation with the

Defendant and Defendant's then attorney Brent Winters.

He was made aware of the transcript prior to his testifying before the Federal Grand

Jury.

During the time Phillips testified before the Grand Jury he was asked to read certain parts and comment on what the transcript said regarding what he had told or directed the Defendant to do with certain documents which purported to establish the existence of certain entities.  At no time is it alleged that any records of transactions the entity participated in were ever sent or directed to be sent to any place whatsoever.

What Mr. Phillips read and what he omitted clearly was an attempt by him and Hilary Frooman to mislead the Grand Jury into believing "records" of transactions and not "documents" establishing the existence of the entities was what was "shipped" to a foreign country.

Hilary Frooman and Larry Phillips intentionally misled and lied to the Grand Jury about this fact in effort to make the Grand Jury believe that the Defendant sent "records" of transactions out of this country regarding the entity in effort to keep the IRS from discovering those records.  This is what Count Two and Three allege.

First, the Government alleges that the amount the Defendant owed was conclusive as of May 11, 2000, when the Defendant did not exercise his option of going to Tax Court. Shipping records, though this never happened, in conjunction with any tax liability for years 1996 and 1997 and those amounts already claimed "owed,"  would not be any issue whatsoever.

50

Second, the list of entities in paragraph 23 of Count Two are not any listed entity regarding Count Two other than paragraph 23 itself.   Though the title of this section is "Transfer of Records" the body only mentions "documents associated with ..."

Third, the Government's position is that policy of the IRS is to disregard the form and turn to "substance" to calculate any liability.   Though the Government has no federal law that grants them this license and operating policy, if the forms are disregarded then what relevance to what happened to those forms would there be to a tax evasion charge as to Count Two.

The only relevance is alleging the transfer of the entity creation documents was an "affirmative act" to the tax evasion theory alleged in Count Two.   Specifically lying to the Grand Jury in effort to confuse them and distort what actually happened and furthering this objective by having Larry Phillips read only part of the transcript of the conversation he had with the Defendant and his attorney in 2003, when the remaining part clearly says the opposite of what Larry Phillips said to the Grand Jury, is prosecutorial misconduct and this Court should have found such.

Larry Phillips was allowed to lie to the Grand Jury several times regarding the Defendant giving him "records" so he could calculate what the IRS sought which was tax returns according to the way the IRS wished them to appear.  Again, disregarding form and looking at substance only.  He made references to the Defendant's cooperation at one point as only giving one copy of an entertainment expense, then he stated he gave few expenses,

then he said there was no paper trail per se, then he said the Defendant did not supply

additional records to him, then he spoke about the "various" documents, all in an effort to

confuse the Grand Jury and mislead them on what the Defendant had actually done.   At

trial he testified the Patridges tendered him an entire box of documents that he chose to

make copies of.

If the Defendant had chosen not to give any evidence of any "expenses" that Larry

Phillips asked for under no uncertain terms, could this have prevented Larry Phillips from

doing his job.   At best, this type of conduct would only make what was owed more to the

Government.   Though this is not the case, the Grand Jury was misled into believing this

former IRS Agent who the Defendant hired was telling the truth.

Next, at the direction of Hilary Frooman, Mr. Phillips told the Grand Jury that all the

1099's showing the income of the Defendant were reported to the IRS in the name of

Trusts.   This was not true.  In fact, almost all the 1099's at issue reported to the IRS in the

name of Denny Patridge and Patridge Insurance Services, Inc.   Certainly, any 1099 issued

to an entity Trust  was the exception and not the rule.  Yet , Mr. Phillips led the Grand Jury

into believing that all the income was reported to the IRS as being received by entities.

This was an intentional false statement before the Grand Jury made in effort to mislead the

Grand Jury into thinking the IRS could not find the "income" Denny Patridge earned.

In fact, it appears the Government wishes the Defendant ignore that he filed

information forms with the IRS through professional services.  But that can hardly be the

2:04-cr-20031-MPM-DGB     # 221     Page 53 of 72

case.   The Defendant attached all 1099's to each document.   Larry Phillips had them.   The

IRS had them.   Hilary Frooman had them.   The Grand Jury records keeper had them.   Yet,

Mr. Phillips and Mrs. Frooman attempted, with success, to mislead the Grand Jury into

indicting the Defendant by claiming crafty or tricky moves by the Defendant to somehow

keep the IRS from learning of the Defendant's income.

        In this case, the facts demonstrate that all income was reported to the IRS through

1099s, 1040s, 1120s and 1041's, yet the Government claimed the complete opposite that the

Defendant had some reason why he would not give all his 1099s to Mr. Phillips and that

reason was because they were all made out to Trusts to which the Defendant sought to hide.

That is complete and utter nonsense.

        The Government claims through Larry Phillips that the Defendant would not

cooperate with  his own representative, Larry Phillips, for instance, regarding bank

statements for 1996 and 1997.   Then how did Larry Phillips hand writing get on the bank

statements?   Why did he meet with the Defendant at a truck stop if they were not

cooperating?   How does he say in a letter in September that he had all the numbers figured

and ready for audit reconsideration if he did not have any bank accounts, expenses copies,

income statements, nor any cooperation from the Defendant?   He is simply lying.

        Furthermore, the Government sought and obtained these records by Grand Jury

Subpoena which was later "discharged" and "terminated" because the Government had

received all the "records" they sought through the Grand Jury Subpoenas.

Hilary Frooman knew there was more to the document she had Larry Phillips read regarding the transcript of the phone conversation between Larry Phillips and the Defendant and that what she directed Mr. Phillips to read and then comment on clearly contradicts the remaining paragraphs of the transcript she omitted from having Larry Phillips read to the Grand Jury.   Why would she need Larry Phillips to read from a transcript that Larry Phillips was unaware of?   What about that transcript was she attempting to argue against?   It is clear she was attempting to give testimony in opposition to the transcript while at the same time not allowing consideration as to why she was giving the opposition in the first place.    Not one time did Mr. Phillips testify as to whether the transcript of the conversation was in fact what he said.  How could he when the tape recording speaks for itself?

Hilary Frooman knew that she had Mr. Phillips give false testimony about what he had told the Defendant in the taped telephone conversation and she knew why she had to present the false testimony.   Otherwise, there would have been no merit to any "affirmative act" regarding whether "documents" were sent out of the Country in July of 2000  regarding entities not at issue with the 1996 and 1997 tax liability.  Clearly, Mr. Phillips told the Defendant to send back to where they came from those creation entity documents because the IRS was disregarding form and considering substance only for the purpose of any future years outside of 1996 and 1997.   The transcript of the conversation said Mr. Phillips directed the Defendant return the originating documents to the originator

54

and Hilary Frooman misled the Grand Jury into believing that Mr. Phillips never directed

the Defendant to send "records" of transactions for 1996 and 1997 out of the Country.

She knew that any records for 1996 and 1997 were of no issue yet she continued to

advance her erroneous theory.   The only logical theory that this Court could construe for

the need in July of 2000 for originating documents of entities not at issue for tax years 1996

and 1997 is because there was an ongoing "criminal investigation" going on without the

IRS ever informing the Defendant.


   **D.     Larry Phillips paticipated in the Prosecutorial Misconduct of Hilary
           Frooman**.

Once an IRS Agent it appears always an IRS Agent.  Former Agent Phillips

carefully and craftily navigated around the evidence which opposed what he wanted the

Grand Jury to hear.    There is no other way to construe the multiple errors other than Larry

Phillips knew what Hilary Frooman wished for and that he participated with her in that

delivery.


   **E.     Agent Coleman was aware Defendant had requested a collection due
           process hearing offered him by the IRS and authorized by section**.

Count Two contains a startling "affirmative act" allegation because the Defendant

exercised "his option" to ask for a Collection Due Process Hearing.   We know what

section 6330 says.   We know that the "statute of limitations" is suspended while any case

is pending in the appeals procedure outlined in section 6330.    We know a person can

55

challenge the liability therein prior to "owing" what the government claims they are

intending to levy.   We also know that the Government carefully omitted from the Grand

Jury the time period of when Mr. Phillips was helping the Defendant get into "audit

reconsideration."   We know the Government claims the "final" notice of intent to levy was

sometime in September/October by the testimony of Agent Coleman  and there is no

mention to the Grand Jury of the November 23, 2000 actual "Final Notice of Intent to Levy

and Right to Collection Due Process Hearing" Notice.  We know that Agent Coleman

claims it is a mystery when the actual criminal investigation began.   We know that Hilary

Frooman was fully aware of the CDP process between the IRS and the Defendant when she

issued the Grand Jury Subpoena which rendered anything the Defendant was doing before

the CDP Officer suspicious.   All you have to do is read the "notes" of the CDP Officer.

Hilary Frooman utilized Agent Coleman to thwart any forthcoming decision on the

challenge to the liability the Defendant was raising before the CDP.  She says in her

"response" to the Defendant's Motions to Dismiss that it was the Defendant who stalled the

CDP hearing knowing that was not true.   She says the same notes from the CDP Officer

claims that everything the CDP Officer looked at so far was frivolous.    At the same time

she admits the liability was over "inflated" by $200,000.00.

Section 6330 says that the Defendant was to be given an unbiased Appeals Officer.

Why then could the CDP Officer, Agent Coleman, Agent Boyd, Hilary Frooman and all

others involved in the tax endeavors of the Defendant, say for so long that the Defendant

owed $236,000.00, when we now know and no one disputes that the Notice of Deficiencies

taxed dollars twice, and the "assessments" contained slightly different numbers with no

explanation as to how they changed and decreased based upon the January 27, 2000 Notices

of Deficiency?   The Levy amounts the IRS gave the Defendant notice of were over

$200,000.00.    Audit reconsideration was denied.  The right to CDP request is carefully

overlooked by the Government and the moment the Government finally has to admit the

numbers they were trying to collect do not measure up even in the most liberal

interpretation of the tax code, the Government claims asking for these numbers to be

reviewed by CDP was nothing more than another act in a series of "affirmative" acts

affirming a tax evasion motive.

How much of the $236,000.00 was the Defendant allegedly attempting to "evade"

by asking for the place of last resort to verify what the IRS has done?   $30,000.00.   This

means that over $200,000.00 was not being attempted to be evaded by the asking for the

CDP hearing.  Also, how much was the amount of money sent out of the Country?

$200,000.00!    Then, the Government admits that the Defendant had enough money to pay

$30,000.00 if that was determined to be owed.   Yet, nothing in the law forces the IRS to

"collect" money here in the United States.  Instead, the Government argues they had a right

for the $30,000.00 to come from the $200,000.00 which left the Country.   The Defendant

had a right to ask for the Collection Due Process Hearing and telling the Grand Jury that

was an act to affirm tax evasion of some $236,000 is simply outrageous conduct which only

sanctions can displace.

Hilary Frooman advanced a theory before the Grand Jury that mislead, concealed,

distorted and outright lied to the Grand Jury.  For this, the Court should find Prosecutorial

Misconduct and dismiss this action.

**F.    Agent Coleman led the Grand Jury to believe the Notice of Deficiencies issued on January 27, 2000 were more than accurate**.

The answer to this question is absolutely not.

**G.    Hilary Frooman committed prosecutorial misconduct.**

It is abundantly clear that Assistant United States Attorney Hilary Frooman

coordinated the testimony between Agent Phillips and Agent Coleman to  mislead, conceal,

distort and outright allow perjury before the Grand Jury.

**H.    The indictment should have been dismissed**.

There is no other option because there is no way of saying that the Grand Jury would

have ever indicted the Defendant if they were given the entire truth without fabrication.

There can be no doubt that "the knowing use of perjured testimony involves

prosecutorial misconduct " *U.S. v. Bagley*  473 U.S. 667, 680 (1985).   Whenever a Grand

Jury returns an indictment, the defendant can move to dismiss based on prosecutorial

misconduct before the Grand Jury.  Many courts have dismissed indictments procured

through deliberate presentation of perjured testimony, intentional failure to present

exculpatory evidence, and a variety of other types of prosecutorial misconduct. *Gray v. Bell*, 712 F.2d 490 (D.C. Cir. 1983)

First, a court may dismiss an indictment if it perceives constitutional error that interferes with the grand jury's independence and the integrity of the grand jury proceeding. "Constitutional error is found where the `structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice' to the defendant." *United States v. Larrazolo*, 869 F.2d 1354, 1357-58 (9th Cir. 1989). Constitutional error may also be found "if [the] defendant can show a history of prosecutorial misconduct that is so systematic and pervasive that it affects the fundamental fairness of the proceeding or if the independence of the grand jury is substantially infringed." Id. at 1358. See U.S. v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992)

This general rule encompasses claims of prosecutorial misconduct during the grand jury proceedings. See *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254-255,263 (1988). Prejudice occurs if a "violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence" of the violation. Id. @ 256 (quotation and citation omitted). The prejudicial inquiry must focus on whether any violations had an effect on the grand jury's decision to indict. If violations did substantially influence this decision, or if there is grave doubt that the decision to indict was free from such substantial influence, the violations cannot be deemed harmless. Id. @ 263

Few restraints protect targets appearing before grand juries. "One protection to which a target remains entitled is the conscientious and dutiful conduct by the prosecutor, who 'is an administrator of justice, an advocate, and an officer of the court.'" Id. (quoting *American Bar Ass'n Standards Relating to the Admin. of Crim. J.*). We emphasize that "[t]he duty of the prosecutor is to seek justice, not merely to convict." Id. (quoting same). *U.S. v. Gillespie*, 974 F.2d 796 (7th Cir. 1992)

And, as did the First Circuit in *Pacheco-Ortiz*, the Seventh Circuit gave notice that alternative avenues to secure enforcement of the Department's internal practice may be pursued in the future. Therefore, in appropriate circumstances, the Court is to consider referring internal policy violations to the Department's Office of Professional Responsibility for a report concerning the steps the Department proposes to take to police its internal policy guidelines and to discipline those of its employees who choose not to follow them. "This comports with Nova Scotia, which directs that the focus be placed upon the responsible individual - i.e., the prosecutor who failed to adhere to internal policy-and that the responsibility be placed upon the accountable agency - i.e., the Department of Justice. See 487 U.S. at 263, 108 S.Ct. at 2378. The prospect of such enforcement, we trust, will prove an adequate deterrent to violations of policies designed to ensure a fair judicial process." *Gillespie,* supra

There is no question Prosecutorial Misconduct occurred in instituting the indictment and accordingly this Court should have dismissed the entire indictment against the Defendant.

The District Court is likely to be reversed on whether the indictment should have been dismissed on grounds it was obtained through prosecutorial misconduct prejudicial to Defendant.

### SIXTH ISSUE PRESENTED

**Whether the District Court should have recused itself either on its own or by the granting of Defendant's Motion to Recuse**?

6.    The Honorable Judge Michael P. McCuskey should have recused pursuant to 28 U.S.C. § 144.  See also 28 U.S.C. § 455(b)(1), (2) and (3).

The facts are as follows.  Subsequent to July 13, 2000, the Honorable Chief Judge Michael P. McCuskey, provided background information regarding Defense witness and Attorney Brent A. Winters, along with recommending "an investigation of Winters' possible criminal conduct." *See Informational Notice in Case CR06-20023*

On or about July 9, 2002, following the sentencing of Dwight D. Larson, the alleged "co-conspirator" and a witness for the Government against Defendant in this case, the Honorable Chief Judge Michael P. McCuskey, "inquired of AUSA Hilary W. Frooman regarding the progress of any investigation of Brent Winters."

On September 1, 2004, the Grand Jury tendered the Government a superceding indictment alleging 7 Counts including the filing of a false tax return in Count 1, Tax Evasion of the Payment of Taxes in Count 2, Tax Evasion of the assessment of taxes in

Count 3, Wire Fraud in Counts 4 and 5 and Money Laundering in Counts 6 and 7 against Defendant.

During the pendency of this action, several communications have occurred between the Government and the Court under the word "sealed". Defendant was unaware of the contents therein until after the Court announced sentencing in this case.

During the trial and a key part of the defense was that Defendant relied upon the advice from several different attorneys, including Brent A. Winters, involving the allegations against the Defendant in the indictment. This Court excused them all from having to give testimony as to what they directed the defendant to do, protecting their privilege under the Fifth Amendment over the Sixth Amendment rights the Defendant had to their testimony. At one point during the trial the Government reminded the Court that Mr. Winters was under investigation.

Trial was held and at 1:15 pm, June 30, 2005, the Court received and announced in open Court the Jury's Verdict of Not Guilty on Count 1 and Guilty on Counts 2,3,4,5,6 and 7. On August 17, 2006, in case No. CR06-20023, the prosecutor in the action herein filed in the action therein an Informational Notice revealing several issues not known to the Defendant or his Counsel.

<u>ARGUMENT AND AUTHORITY</u>

1.    <u>Recusal was warranted</u>.

62

The Honorable Chief Judge Michael P. McCuskey in 2000 expressed an opinion against Attorney Brent Winters that he was not a truth-worthy person and was given updates as to the Judge's request Mr. Winters be investigated by the U.S. Attorney's Office. 28 U.S.C. §455(a) requires a judge to recuse himself when his presiding over a case would create an appearance of bias. *United States v. Troxell*, 887 F.2d 830, 833 (7th Cir. 1989) *Tezak v. U.S.*, 256 F.3d 702, 706 (7th Cir. 2001)

28 U.S.C. §144 allows a party to file "a motion to disqualify a judge ....if a party files a timely and sufficient affidavit that the judge has a personal bias or prejudice against a party. *United States v. Balistrieri*, 779 F.2d 1191, 1199 (7th Cir. 1985).    The factual statements of the affidavit must support an assertion of actual bias. Id.

Credit is to be given to only those facts which are "sufficiently definite and particular to convince a reasonable person that bias exists; simple conclusions, opinions, or rumors are insufficient." *United States v. Boyd*, 208 F.3d 638, 647 (7th Cir. 2000),  The factual averments must be stated with particularity and must be definite as to times, places, persons, and circumstances. *Balistrieri,* 779 F.2d at 1199. The court must assume the truth of the factual assertions.   Id.

Recusal is appropriate when the "judge was involved in the investigation of activities at issue in the trial", see *U.S. v. Boyd*, 208 F.3d 638, 646 (7th Cir. 2000), and where direct evidence "shows that he had personal, extrajudicial knowledge of those activities." Id.   In *Boyd*, the 7th Circuit stated that had "Judge Zagel learned of this

63

connection from the 1986 investigation of SMS, Robinson would be entitled to a new trial before a different judge." Id.

In the instant matter, the record clearly indicates that Chief Judge Michael P. McCuskey not only was involved in the investigation of attorney/witness Brent A Winters as far back as 2002, but he was the reason the investigation began in the first place sometime after July 2000.

The Court, in denying Defendant's Motion for Recusal determined that it was filed too late. The time period between when the transcript was made available with the reasons the Government filed the  August 17, 2006, informal notice in case #  CR06-20023, and when the Defendant herein made his request to this Court, this Court ruled found as untimely. This decision was erroneous.    The time period between the first week of September and the third week of September is simply not sufficient to warrant raising the untimely claim the Court determined.

In order to justify recusal, an affidavit must come forth certifying facts in support for a Motion to Recuse.   The only facts in such an affidavit that must be credited, are those that are "sufficiently definite and particular to convince a reasonable person that bias exists; simple conclusions, opinions, or rumors are insufficient." *United States v. Sykes*, 7 F.3d 1331, 1339 (7th Cir. 1993); see also *United States v. Balistrieri*, supra, 779 F.2d at 1199; *Jones v. Pittsburgh Nat'l Corp.*, 899 F.2d 1350, 1356 (3d Cir. 1990); *13A Charles Alan*

64

*Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure* § 3551, pp. 634-37 (2d ed. 1984).

The affidavit of Denny Patridge set forth facts that are definite and particular regarding the Honorable Chief Judge Michael P. McCuskey's personal bias against Brent A. Winters and as well the Defendant's defense in this case.    The affidavit sets forth that Judge McCuskey issued a personal complaint with the former U.S. Attorney, Jan Paul Miller, directing a criminal investigation should begin because the Judge thought Mr. Winters did not testify truthfully during a hearing Judge McCuskey presided over.

Judge McCuskey should have recused himself under 28 U.S.C. § 455(a).   455(b) provides that Judge McCuskey shall disqualify himself where (1) he has a bias or personal knowledge of disputed evidentiary facts concerning the proceeding; (2) if the judge is a material witness; and (3) expressed an opinion concering the merits of the particular case in controversy.

28 U.S.C. § 455(b)(3) is applicable if as Judge, Judge McCuskey "express[ed] an opinion about it" [the case].  Id. (Emphasis added).  "There is a pregnant difference in wording between the participation and expression-of-opinion clauses of 455(b)(3). The former refers to participation in "the proceeding," the latter to expressing an opinion on the merits of "the particular case in controversy," and we have held that the use of the word "particular" narrows the clause to the situation in which the judge expressed his opinion in "the present case, not a related former case." *Russell v. Lane*, 890 F.2d 947, 948 (7th Cir.

1989); cf. *Rice v. McKenzie*, 581 F.2d 1114, 1116 (4th Cir. 1978). Because in *Boyd*, Judge

Zagel said nothing at the press conference that could reasonably be construed as an

expression of opinion on the merits of the case that he presided over, the 7th Circuit chose

"not [to] pursue this novel and interesting interpretive question."  Id.

     In this case, not only had Judge McCuskey expressed his opinion in writing in an

order involving case No. 00-U-13,14 and 15, regarding Brent Winters appearance of not

testifying truthfully, he went beyond that and expressed an opinion as to what needed to be

done by the U.S. Attorney regarding Mr. Winters.  Defendant needed Mr. Winters to testify

in aid of his Defense and there was nothing presented on the record by either the

Government, Court or Mr. Winters, that demonstrated why Defendant should not have been

allowed to present that direct evidence to the jury for its consideration of what Mr. Winters

directed Defendant to do.

     Mr. Winters was eventually indicted which gave rise to the revelation at issue in

Defendant's request for a New Trial, but none of the charges contained in the original

indictment at any time connect in any way to the Defendant in this action to his charges.

     The cases interpreting the participation clause do not require a formal identity

between the proceeding in which the government employee, who is now a judge,

participated or expressed an opinion; it is enough if they overlap significantly. See, e.g.,

*United States v. Outler*, 659 F.2d 1306, 1312-13 (5th Cir. 1981); *Jenkins v. Bordenkircher*,

611 F.2d 162, 166 (6th Cir. 1979); *Mixon v. United States*, 608 F.2d 588, 591-92 (5th Cir.

66

1979).   There was an overlap here, in the part of the Winters' investigation that linked

Winters to Judge McCuskey.  The requisite "participation" is that it must be personal. E.g.,

*Mangum v. Hargett*, 67 F.3d 80, 83 (5th Cir. 1995); *Kendrick v. Carlson*, 995 F.2d 1440,

1444 (8th Cir. 1993); *United States v. Di Pasquale*, 864 F.2d 271, 279 (3d Cir. 1988).

Referring briefly to section 455(a), the 7th Circuit wished to emphasize their belief

that compliance with it is essential to the perceived legitimacy of the judicial process,

especially when the defendants are facing long sentences and the prosecution has been

marred by irregularities.  *Boyd @ 648.*

There were many issues stemming from the indictment that involved Mr. Winters.  It

was Mr. Winters that advised Defendant to do many of the actions he took  which the

Government addressed as criminal acts.   The Court had expressed an opinion unknown to

the Defendant or his Counsel that a key witness in the Defense was not truthful and

appeared to deserve to be criminally investigated.  The Court apparently believed that such

an opinion and participation was sufficient to force the Court, Judge McCusky, to recuse

himself from the Winters' prosecution, but only after those facts were revealed to the

public.  Defendant herein is entitled to the same result, recusal of this Honorable Court.

For this reason, the Court clearly had a bias and prejudice against the essential key

witness for the Defense and the Defendant and that this bias was articulated by Chief Judge

Michael P. McCuskey on more than one occasion, therefore pursuant to 28 U.S.C. § 144

Judge Michael P. McCuskey should not have proceeded no further and another Judge

should have been assigned.  That was not done.

This error alone warrants this Court to enter a stay of its decision and judgment of

sentencing Defendant to five years in prison.    The Court referenced the Defendant as a

"tax terrorist" at the sentencing hearing, a "bill of attainder" strictly forbidden by Article I,

Section 9, of the U.S. Constitution.

For the reasons herein,  this Court should have recused itself as it had an embedded

bias against Defendant, his witnesses, his defense, and his status in society as a "tax

terrorist", along with the fact the Government held this secret bias over the Court's head

until it became something the Government needed to expose to obtain the liberty of another

American Citizen, that of Brent Winters, an act unconscionable in the eyes of justice.

This alone warrants an order for Stay of the sentence and judgment pending the

outcome of any appeal.

## SEVENTH ISSUE

**Whether the sealing of numerous documents between the Government and
Court, along with the unsealing of those documents after the sentencing in this
case happened, save the Special Agent Report,  rendered the entire trial, not
public, not fair, and in violation of the Fifth and Sixth Amendment.**

## ARGUMENT AND AUTHORITY

7.    Trial by jury is not to be a secret affair between the Court and Prosecutor, including
IRS witnesses, in which neither Defendant nor his Attorney are made aware of the
actual issues being considered by the Court based upon those secret communications
evolving from the Prosecution.

The Seventh Circuit reported in *U.S. v. Hawkins*, 340 F.3d 459, (7th 2003), that it has repeatedly recognized the paramount importance of providing public access to court proceedings, especially in criminal matters. See, e.g., *In re Associated Press v. Ladd*, 162 F.3d 503, 509-10 (7th Cir. 1998); *Grove Fresh Distribs., Inc. v. Ever fresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994). At the very least, once the identity of the unindicted coconspirator became known, the indictment should have been unsealed, and it is, as of this date (whether or not the document was sealed in the district court) in the public record unless a judge of this court orders it to be sealed.  Documents sealed in the district court will be maintained under seal in this court for 14 days, to afford time to request the approval required by . . . this procedure."

Why would the public be provided with this access yet the Defendant is not?    The Special Agent Report remains sealed.   At sentencing the Government directed this Court that Defendant simply refused to accept the verdict in this case.    Why would he?    He was denied an unbiased judge.  He was denied a right to call any witness for his defense regarding reliance and good faith because this court extended a blanket fifth amendment privilege to each of them.  The only other person Defendant relied upon was Phillips and he lied to the grand jury and petit jury apparently at the direction of Ms. Frooman.  The Defendant was illegally whipsawed.   The IRS told this Court and the Tax Court they would not make any attempt to collect any money from Patridge Asset Management Trust yet that is exactly what they are currently doing outside the view of this Court.   The Tax

Evasion statute, section 7201, has no legal meaning to the very word "evade" driving its intended meaning.   The Court refused to recognize the Paperwork Reduction Act of 1995. The Court refused to recognize the meaning of section 6330 CDP hearings and how that hearing affects the word "payment."   This Court refused to recognize the Supreme Court's decision in Dole and Bryan where, in Dole, the tax forms were information collection request forms subject to the PRA and Bryan held that the jury must find the Defendant was aware of the specific provision of the tax code he was accused of violating.   This Court had 6 years to realize its role in the actions taken against Brent Winters and yet decided that from the moment Defendant could have become aware of the Court's decision to recuse in the Winters case until the time Defendant moved for the Court to recuse in this case was too long when the time was measured in a few weeks at most.

And finally, this Court referred to Defendant at sentencing as a "tax terrorist."   If sealing documents, denying the right to have witnesses testify in aid of his defense, refusing to recognize Supreme Court precedent, refusing to recuse, and allowing the Government to continue its illegal misconduct within this Court's view does not show the inherent bias this Court had for Defendant due to his association with Brent Winters, then referencing the Defendant as a tax terrorist should finish the connection.

## CONCLUSION

Defendant respectfully request this Court grant his Motion for Stay of this Court's final sentence and judgement entered in the case herein for the reasons herein.

Respectfully Submitted


/s/ Jerold Barringer

Jerold Barringer
Attorney at Law
P.O. Box 213
Nokomis Illinois 62075
217-563-2646
IL Bar # 06185092
Jwbarringer@dtnspeed.net

CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT a true and correct copy of this Memorandum in

Support of Motion for Stay of final sentence and judgment, has been electronically

delivered through the Court's ECF system on November 13, 2006 to:


Hilary W. Frooman
U.S. Assistant Attorney
201 South Vine
Urbana, Illinois 61801
217-373-5875

<u>/s/ Jerold Barringer</u>
Jerold Barringer
Attorney at Law
P.O. Box 213
Nokomis Illinois 62075
217-563-2646
IL Bar # 06185092
Jwbarringer@dtnspeed.net