UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

           Plaintiff,

    vs.

DENNY R. PATRIDGE,

         Defendant.

Docket No. 04-20031

Urbana, Illinois
June 28 & 29, 2005

FILED
MAR 2 7 2008
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

**EXCERPT FROM JURY TRIAL**
(Testimony of Nicoli Ferrell)

BEFORE THE HONORABLE MICHAEL P. McCUSKEY
UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S :**

For the Plaintiff:    HILARY W. FROOMAN, ESQUIRE
                      Assistant United States Attorney
                      201 South Vine Street
                      Urbana, Illinois  61802
                      (217) 373-5875

                      LEA A. CARLISLE, ESQUIRE
                      U.S. Department of Justice Tax Division
                      P.O. Box 972
                      Washington, D.C.  20044
                      (202) 514-5762

For the Defendant:    JEROLD W. BARRINGER, ESQUIRE
                      Attorney at Law
                      P.O. Box 213
                      Nokomis, Illinois  62075
                      (217) 563-2646

Court Reporter:       LISA KNIGHT COSIMINI, RMR-CRR
                      Official Court Reporter
                      201 South Vine Street, Suite 344
                      Urbana, Illinois  61802
                      (217) 384-2290

Proceedings recorded by mechanical stenography; transcript
produced by computer.

1              NICOLI FERRELL, sworn, 3:50 p.m.,

2              DIRECT EXAMINATION BY MS. CARLISLE:

3      Q      Good afternoon, Ms. Ferrell.

4      A      Good afternoon.

5      Q      Could you please introduce yourself and spell your

6      last name for the jury -- pardon me -- for the court reporter?

7      A      My name is Nicoli Ferrell.  First name is

8      N-i-c-o-l-i.  Last name is Ferrell, F-e-r-r-e-l-l.

9      Q      And where are you from?

10     A      Originally from Montana, but I live in Boise,

11     Idaho.

12     Q      What kind of education do you have?

13     A      I have two degrees.  I have a degree in accounting

14     and a degree in finance.

15     Q      Are those bachelor degrees?

16     A      Yes, they are, bachelor of science.

17     Q      And are you currently employed?

18     A      Yes, I am.

19     Q      How are you currently employed?

20     A      I'm a revenue agent for the Internal Revenue

21     Service.

22     Q      Was that a job you took straight out of college?

23     A      No, it wasn't.

24     Q      What did you -- where did you work before you

25     became employed with the IRS?

USA v. DENNY R. PATRIDGE, No. 04-20031

1          A     I went to work for the Bar Association, and I

2     audited attorneys, trust funds, and was taught the beginning

3     of my forensic auditing.

4          Q     Now, how long have you been with the IRS?

5          A     18 years.

6          Q     Have you served continually in the last 18 years as

7     a revenue agent?

8          A     Yes, I have.

9          Q     Have you held any other positions at all?

10         A     Yeah.  Well, I've held coordinator positions.  I've

11    done quite a bit of training.  Currently, I'm a special

12    enforcement agent, and I work out of Portland, Oregon.

13         Q     What does "special enforcement agent" mean?

14         A     Special enforcement primarily prepares cases to go

15    to trial.  We also bring cases forward for, that are suspected

16    of criminal activity.  I have a specific job right now where I

17    testify as to what a sham trust is and what abusive tax

18    systems are.

19         Q     While you're a special enforcement agent, are you

20    also still a revenue agent?

21         A     Yes, I am.

22         Q     Are you assigned to any particular area in the

23    revenue agent capacity?

24         A     Basically, I work Oregon and Idaho.

25         Q     What are your duties as far as the revenue agent

1    portion of your job goes?

2         A    I was -- I was like the other agents that have

3    testified.  I began with auditing, just sole proprietorships,

4    regular 1040 work, went on to corporate work, partnerships,

5    LLCs, trust work.  I specialized in attorney audits.  I also

6    specialized in employment taxes and have testified as an

7    expert witness in cases of employment taxes.

8         Q    In your experience with that regard, do you have

9    experience with trusts?

10        A    Yes, I do.

11        Q    And what kind of experience with trusts do you

12   have?

13        A    I began auditing trusts in 1995, and I have audited

14   over 250 years of trusts.

15        Q    What exactly does that mean?

16        A    That means each year that you audit a trust, the --

17   when you do an audit, you may do three years' worth of

18   returns.  If you add up all of the audits I've done per year,

19   it's over 250, which I can't even begin to tell you how many

20   different taxpayers that was that it represents.

21        Q    Ms. Ferrell, as far as your auditing of trusts

22   goes, are you familiar with what's been called abusive trusts

23   or as also known as abusive tax arrangements?

24        A    Yes.  Of the 250 that I've audited, only two cases,

25   two taxpayers, were just general trust audits that didn't --

1    that weren't in the realm of an abusive trust or abusive tax

2    arrangement.

3        Q    Why is it called an abusive tax arrangement?

4        A    An abusive tax arrangement is an arrangement

5    whereas the taxpayer sets up his entities to evade the payment

6    of tax and to evade the taxes themselves.

7            MR. BARRINGER:  Your Honor, I'm going to object

8    now.  I, I don't want to take up issues that may be for the

9    Court's purview only, but it would strike me that this

10   testimony is not within this framework of what was originally

11   structured for this case and may, in fact, be opening up all

12   new areas that various motions had previously addressed.

13           THE COURT:  Well, I'm going to wait and see if the

14   foundation is laid.  They haven't tendered -- the purpose of

15   this witness was to tender her as an expert witness?

16           MS. CARLISLE:  Yes, Your Honor, to tender her as an

17   expert in trusts.

18           THE COURT:  Okay.  So you may --

19           MR. BARRINGER:  Your Honor, --

20           THE COURT:  -- continue on that foundation.  I have

21   not yet found the foundation having been laid.  So your

22   objection is premature.

23           MR. BARRINGER:  It was also my understanding that

24   she was originally as some sort of a summary witness as well,

25   and that obviously --

1          THE COURT:  Well, they haven't laid the foundation

2  for that either.  So you may renew the objection later.  Let

3  the foundation continue to be laid.

4          MS. CARLISLE:  Thank you, Your Honor.

5  BY MS. CARLISLE:

6      Q    Ms. Ferrell, I believe you were explaining abusive

7  tax arrangements to us?

8      A    Yes.

9      Q    Had you finished your explanation?

10     A    Basically, yes.

11     Q    Okay.  And are you familiar with offshore entities

12 that also are known as abusive trust arrangements?

13     A    Yes, abusive tax arrangements.

14     Q    Sorry.

15     A    They don't need to be a trust to be an abusive

16 arrangement.  They can be corporations; they can be

17 partnerships, personal service corporations.  It's the abusive

18 nature of how the entities are put together.

19     Q    Do you have any specialized Internal Revenue

20 Service training with regard to trusts?

21     A    Yes, and abusive arrangements.  I have done

22 offshore training.  I have done abusive tax promotions as

23 training.  I have done fiduciary school.  I teach CPEs on

24 numerous subjects from abusive systems through Section 7701

25 which identifies the taxation of entities.

1    Q    And are you -- does that training include the
2    training in identifying abusive tax arrangements?

3    A    Yes, it does.

4    Q    What other areas does it include?

5    A    How they're treated when we audit them, what our
6    procedures are, how we utilize the internal procedures, and
7    what we allow to be done once one of these has been
8    identified.

9    Q    When you say how they're treated, does that mean if
10   an entity is found to be an abusive tax arrangement how the
11   IRS would then determine that it should be taxed?

12   A    That's correct.

13   Q    Okay.  And you stated earlier that you had some
14   teaching experience.  Could you just explain that a little bit
15   more, please?

16   A    I've been part of a cadre for years that teaches in
17   the Northwest on abusive trusts.  I sit on panels.  I teach
18   individually.  I teach a lot of new students the basic
19   concepts of how abusive systems work.  I have even taught in
20   other areas of the IRS.

21   Q    Who generally makes up your students?

22   A    Well, it depends on who I'm teaching.  I've taught
23   collection, how abusive systems work, which is another side of
24   the IRS -- but, basically, people who have not audited abusive
25   systems prior.

USA v. DENNY R. PATRIDGE, No. 04-20031

8

1           I also do some work with CPAs and state groups so

2   that they can recognize the entities that we are auditing.

3       Q       So do some of the students include other IRS

4   revenue agents or special agents or other areas like that?

5       A       That's the majority of my students.

6       Q       Now, based on your experience and your education,

7   are you knowledgeable about characteristics of different types

8   of trusts?

9       A       Yes, I am.

10      Q       And can you identify the elements of trusts?

11      A       Yes, I can.

12      Q       Can you also identify when an entity that is called

13  a trust is not actually a trust?

14      A       Yes, I can.

15      Q       And you stated earlier that you're familiar with

16  the tax treatment of trusts?

17      A       Yes, I am.

18      Q       As well as entities that have been deemed as

19  abusive trusts or abusive tax arrangements?

20      A       Yes.

21      Q       And how do you know all this?

22      A       This is what I do for a living.  I am -- I audit

23  them.  I testify to them.  And I help other agents, whether in

24  Criminal Investigation or in other places in the IRS, identify

25  them and sometimes set them up for trial.

1      Q      Are you familiar with the entities that the

2   defendant used in this case?

3      A      Yes, I am.

4      Q      And how do you have that familiarity?

5      A      Well, I wasn't here the first two days.  I came

6   from another trial; but I sat through this, and I have

7   reviewed all of the records that have been provided, and I

8   have gone through many of the records that, that the

9   prosecution has.

10     Q      Do you mean the first two days of the government's

11  case?

12     A      Yes.

13     Q      Were you here throughout the defendant's case?

14     A      Yes, I was.

15         MS. CARLISLE:  Your Honor, at this time, the

16  government would tender Ms. Ferrell as an expert in trusts and

17  abusive tax arrangements.

18         THE COURT:  Well, I'm going to ask some questions

19  because I don't think they've been asked.

20         You said that you've been an expert witness in

21  cases with employment taxes; is that correct?

22         THE WITNESS:  That's true, Your Honor.

23         THE COURT:  And those -- were those cases in United

24  States District Courts?

25         THE WITNESS:  Yes, they were.

1          THE COURT:  Were you then qualified as an expert

2    witness in those cases relative to employment taxes?

3          THE WITNESS:  Yes, in Idaho.

4          THE COURT:  Now, relative to trusts and the tax

5    treatment of trusts and the analysis of whether trusts or

6    other corporate or partnership may be abusive, have you ever

7    been qualified as an expert witness in the United States

8    District Court on those issues?

9          THE WITNESS:  Yes, sir.  May I list the districts?

10          THE COURT:  Please.  Because that has not been

11   asked.

12          THE WITNESS:  Wyoming, Idaho, Oregon, Washington,

13   Alaska, Hawaii, and Arizona.

14          THE COURT:  Okay.  Mr. Barringer, I'll allow you to

15   cross-examine at this time on her status as an expert witness

16   before the Court rules on the government's motion.

17          MR. BARRINGER:  Thank you, Your Honor.

18          CROSS-EXAMINATION BY MR. BARRINGER:

19   Q      And this is a little different; so -- with respect

20   to your testimony concerning trusts and what you said people

21   call trusts, what are you referring to?

22   A      What they call trusts?

23   Q      Yes.

24   A      Well, they refer to grantor trusts, complex trusts,

25   civil trusts, estates.  When we get into abusive systems, we

1    move past that and go into Massachusetts business trusts and

2    other arrangements which can be corporations with trusts as

3    the shareholders, LLCs with the trusts being partners.

4                It just depends on the individual system how

5    they're set up.

6        Q    Have you been -- strike that.

7                What sort of training have you had with respect to,

8    as you said, Massachusetts business trusts?

9        A    I've been working with them for the past -- since

10   1995.

11       Q    And when you mean -- when you say working with

12   them, what does that mean?

13       A    It's how to determine whether they are abusive or

14   if they follow the actual definition and rules relating to

15   Massachusetts business trusts, including state regulations on

16   them.

17       Q    Is it your opinion that such entities can exist?

18       A    Oh, yes.  They can, sir.  In fact, Illinois

19   recognizes them.

20               MR. BARRINGER:  One moment, Your Honor.

21                   (Brief pause in proceedings.)

22               MR. BARRINGER:  And I apologize.  I'm not sure if

23   this is voir dire or cross, but --

24               THE COURT:  Well, it's, in effect -- I mean, it's

25   your cross-examination of her qualifications as an expert

1    witness based on the tender the government's made and the

2    Court's foundational questions.

3                MR. BARRINGER:    What --

4                THE COURT:    And then after you do that, I'll rule.

5                MR. BARRINGER:    Thank you, Your Honor.

6    BY MR. BARRINGER:

7        Q      What knowledge or training have you had with

8    respect to the tax law as it applies to trusts?

9        A      Complete.    I've been to fiduciary school.    I've

10   been an IRS agent for 18 years.    I audit them.    Basically, the

11   taxation of trusts doesn't -- doesn't really affect the type

12   of work I do because once I get into a situation and make a

13   determination that the trusts are abusive, we're not falling

14   back on trust law.    We are really moving forward with general

15   tax law.

16       Q      And what is your training or education concerning

17   Massachusetts business trusts and tax law?

18       A      We follow state law generally as to what, how the

19   entity is determined to be; and all my foundation in

20   Massachusetts business trusts has been through training in

21   abusive systems.    So we know how to recognize one that is

22   with-- inside the statutes of the state and the rules

23   regarding how a Massachusetts business trust is to be run.

24               MR. BARRINGER:    I know that anything else I'm going

25   to ask, Your Honor, would be direct cross-examination.    I

1    think that's all I have.

2              THE COURT:  I do have another couple questions; and

3    if that causes anything further on your behalf, you may do it.

4              Now, the Massachusetts business trust situation

5    you're talking about, is it anything like the Aegis system

6    that's been testified to here?

7              THE WITNESS:  Actually, I think that the business

8    trust that Aegis was using is a Massachusetts business trust.

9    It's of the common law trust, which is trust by contract.

10             THE COURT:  So before you came here, had you ever

11   heard of the Aegis system from Palos Hills, Illinois?

12             THE WITNESS:  Yes, I have.

13             THE COURT:  Okay.  And so the testimony that you've

14   heard relative to that system is familiar to you in your

15   background and the auditing of trusts since 1995 and the

16   education that you've had?

17             THE WITNESS:  Yes, it is, sir.

18             THE COURT:  Okay.  Anything in follow-up to that,

19   Mr. Barringer?

20             MR. BARRINGER:  No, Your Honor.  But I would

21   still --

22             THE COURT:  You still wish to preserve your

23   objection?

24             MR. BARRINGER:  I still would object.  I don't

25   believe that we've brought anything in this case that would

14

1    require an expert to testify on this particular subject.

2            THE COURT:  Okay.  Your objection previously noted

3    and noted today remains for the record.

4            The Court will find the witness to be an expert

5    witness and appropriate to give testimony in this case for the

6    jury, and the motion is allowed to certify her as an expert

7    witness over the defendant's objection.

8            You may proceed, Ms. Carlisle.

9            MS. CARLISLE:  Thank you, Your Honor.

10   BY MS. CARLISLE:

11       Q    Ms. Ferrell, --

12       A    Yes.

13       Q    -- can you explain to us what exactly a trust is?

14       A    Well, a trust is a statement of intent and desire

15   that an individual gives that he wishes to have his assets

16   directed.

17       Q    And what is a grantor to a trust?

18       A    A grantor is the person who is giving the assets

19   over as his desires -- the way he wishes to have it directed.

20   That's who the grantor is.  It's the person giving up the

21   asset.

22       Q    What about a trustee?

23       A    A trustee is a person who is going to take legal

24   possession of these assets and to preserve them and see that

25   the intent of the grantor is followed.

1    Q    Does the trustee have any other duties besides

2    that?

3    A    Just to preserve the assets and see that they're

4    taken care of.

5    Q    What about the beneficiary?

6    A    Beneficiary is the person who will receive the

7    income from the assets if there's any income generated.

8    Q    Are there any other people that might be involved

9    in trusts?

10    A    There's one other, and that's a remainderman; and

11    that is the person that after the trust reaches its maturity

12    and is no longer going to exist, then the assets that are

13    inside the trust go to someone, and that's the remainderman.

14         I have a diagram that I would like to use, maybe to

15    show the jury how this works.

16         THE COURT:  Okay.  We'll have to wait until the

17    government asks to use demonstrative evidence.

18         MS. CARLISLE:  Your Honor, as the witness stated,

19    we do have a demonstrative exhibit.  Unfortunately, I did not

20    have the opportunity to show it to defense counsel before we

21    started, and I apologize to the Court for that.

22         THE COURT:  Well, --

23         MS. CARLISLE:  It's right here in the courtroom.

24         THE COURT:  Do you want to do that now?

25         MS. CARLISLE:  Yes, Your Honor.

USA v. DENNY R. PATRIDGE, No. 04-20031

1                 (Brief pause in proceedings.)

2          THE COURT:  I don't know how com-- I know you

3     haven't seen it.  If it's something complex you want to look

4     at after 4:30 and you can fill the time before then, we can

5     take it up in the morning.

6          MR. BARRINGER:  I would prefer that, Your Honor.

7          THE COURT:  And that's -- that will be the Court's

8     ruling so that -- because this is not something that's a

9     surprise witness to the defense.  So we shouldn't have a

10    surprise demonstrative exhibit.  It could have been shown any

11    time for days.  So that may not be shown until defense has a

12    chance to review it.

13         MS. CARLISLE:  Yes, Your Honor.

14         THE COURT:  Okay.

15         MR. BARRINGER:  Thank you, Your Honor.

16    BY MS. CARLISLE:

17    Q    Okay.  Ms. Ferrell, let's go back to the trusts.

18    What are the elements of a trust document?

19    A    Basically, the trust document will tell you who the

20    grantor is, what assets he's contributing to the trust.  It

21    will also tell the purpose of the trust.  The purpose is

22    probably one of the most important things of the trust because

23    it becomes the recipe for the trustee to follow.

24         An example would be if someone had a portfolio of

25    income and they wanted to help a child go through college.

1    The purpose would state very specifically that this was money

2    you were putting into this trust, that it was to grow until

3    the child reached the age of 18, and at that time the income

4    from that trust would be used to put the child through

5    college.

6            It may also contain other portions to it, like how

7    much money the child can have, if it can only be used for

8    tuition and books, can't be used for partying, can't buy a

9    car.  This is what, the important part of a trust document.

10   They're written very specifically for an individual.  It's not

11   something you can just boiler-plate out because each

12   individual person has different needs for different

13   situations.

14           Q    And how do assets get into the trust?

15           A    Assets are gifted into the trust.  If -- say, if

16   Dad were -- we're back to Dad who's gonna put his kid through

17   college.  He may have a portfolio of $100,000.  He is allowed

18   to put that into the trust, but he gifts it; and by gifting

19   it, he files a gift tax return.

20           Q    Does that mean he pays tax on the gift before it

21   goes into the trust?

22           A    No, he doesn't.  The gift taxes are like a credit

23   against his estate in the end.  It's, it's a joint system that

24   works with your estate taxes.  So people kind of gamble on

25   contributing a lot to their trusts, knowing that in the future

1    there's a good chance that the amount that you're allowed for

2    your estate will continue to increase at the rate it's been

3    increasing.

4         Q    Now, Ms. Ferrell, can a trust be a business entity?

5         A    No, it can't.

6         Q    Why not?

7         A    A business entity is a corporation or a

8    partnership.  You can have different forms of the corporation:

9    L-- limited liability -- not limited liability -- 1120S, which

10   is a small business corporation.  You can have standard

11   corporations.  In partnerships, you can have limited liability

12   partnerships.

13        You can also have limited liability companies where

14   you have the opportunity to determine if you want to be a

15   corporation or a partnership.  There's a new law on the books

16   on regulations at 7701 which states that if you don't make a

17   choice of what your entity is going to be, it will default.

18   If there's two people and you haven't made a decision, then it

19   defaults to a corporation -- or to a partnership.  If there's

20   only one person in the business entity, then it defaults to a

21   Schedule C, which is a sole proprietorship that is filed on

22   the individual's 1040 tax return.

23        Q    What does the term "revocable" mean as it applies

24   to trusts?

25        A    If your, if your trust is revocable, that means

1  that you have the chance to change it.  You can go back in and

2  change the trust structure.

3      Go back to our example of Dad setting up his trust

4  for the child to go to college.  If he sets up a revocable

5  trust and at 16 the kid decides he would rather smoke dope and

6  race around town, Dad has the right to go in and revoke that

7  trust, collapse it down, take his assets back, and not have to

8  worry about that money sitting there for a kid who's not

9  interested in going to college.

10    Q    And what does "irrevocable" mean as it applies to

11  trusts?

12    A    If it's irrevocable, once he places those assets in

13  the trust, he no longer has a say about changing anything

14  that's going on inside.  He can't move the assets out.  He

15  can't use the assets, and he can't change the determination of

16  who the beneficiary will be.

17    Q    What are the filing requirements for a trust?

18    A    If you have a trust and your gross receipts coming

19  into the trust are $600 or more or if there is a tax due, then

20  you have to file a trust return.

21    Q    Is that a 1041?

22    A    That's a Form 1041.

23    Q    What exactly is a grantor trust?

24    A    I would really rather save that so I can show it.

25  It's much easier to explain with the diagram.

1    Q    Okay.  Let's move on down.  What are the tax

2    advantages of trusts?

3    A    Essentially, there are no tax advantages of trusts.

4    If you have an irrevocable trust and you put your house in it,

5    your house is no longer a residence.  It is no longer entitled

6    to the breaks that you get from the Internal Revenue Service,

7    which means that if you sell it, you don't, as a single

8    person, you don't get the $250,000 exemption.  If you're a

9    married couple you don't get the $500,000 exemption on the

10   capital gains.

11        If you live in certain counties where they allow a

12   residential credit on your property taxes, once it's placed in

13   trust, you are no longer allowed that credit on your, for your

14   property tax.

15        The tax rate on trusts raises extremely fast.

16   Within the first $9,000 of income earned inside a trust,

17   you're taxed at the highest rate that the Internal Revenue

18   Service has; and that's to discourage people from using

19   trusts.

20   Q    Ms. Ferrell, you testified earlier that you had, in

21   fact, examined some of the entities that the defendant used in

22   this case?

23   A    Yes.

24   Q    And are you, therefore, familiar with the trust

25   document of the Patridge Asset Management Company?

USA v. DENNY R. PATRIDGE, No. 04-20031

1       A    Yes, I am.

2            MS. CARLISLE:  Your Honor, I believe this was

3       admitted earlier as Exhibit 132.

4            THE COURT:  Government 132, --

5            DEPUTY CLERK:  Yes.

6            THE COURT:  -- 132 was admitted Monday, yesterday.

7       So you may proceed with that document.

8            MS. CARLISLE:  Thank you.

9            If we could look at the first page of Exhibit 132.

10           I'm sorry.  This must be the wrong exhibit.  Just

11      one moment, please, Your Honor.

12                 (Brief pause in proceedings.)

13           THE COURT:  Bates stamp 7427 through 7529.

14           MS. CARLISLE:  I'm sorry, Your Honor.  It is, in

15      fact, Exhibit 132.  It just simply wasn't scanned.

16           THE COURT:  Okay.  You can use the ELMO.  That will

17      also allow you to zoom and make it easier for everybody to

18      see.

19           MS. CARLISLE:  Thank you, Your Honor.

20           Your Honor, I provided the defense earlier with a

21      copy of the trust document which we had numbered the

22      paragraphs on.  I wonder if I might be allowed to use that.

23           THE COURT:  Sure.

24           MS. CARLISLE:  It also has a couple of underlines.

25           THE COURT:  Well, that, that may -- we'll see where

1    we're underlined.

2              MS. CARLISLE:  Okay.

3              DEPUTY CLERK:  But turning into paragraphs, I don't

4    have a problem with that.

5    BY MS. CARLISLE:

6        Q    Ms. Ferrell, is this your copy of -- is this a copy

7    of your copy of the trust document where you made specific

8    notations?

9        A    Yes, it is.

10       Q    Okay.  On the first line, you appear to have

11   underlined "irrevocable"?

12       A    That's true.

13       Q    And what did that signify to you?

14       A    That anything that was written inside this document

15   cannot be changed.  It is as it is, and that becomes the

16   controlling document of the entity.

17       Q    Also, right above here we see a title.  What is

18   that title?

19       A    Common law business organization, which is also

20   known as a Massachusetts business trust, common law trust.

21       Q    Is that a trust as we were discussing them a few

22   moments ago?

23       A    No.  That is not a statutory trust.

24       Q    Can you explain to us what a common law business

25   organization or a Massachusetts business trust is?

1      A      A Massachusetts business trust is a contractual

2      agreement by two or more people to carry on a business by

3      contributing assets.  They -- when they draw up the contracts,

4      they make a determination at that date, if it's outside the

5      statutes of the state, how they will file their tax returns,

6      whether they will be a corporation or a partnership.  They

7      exchange their assets into the entity and receive units of

8      beneficial interest, which makes it very much like a

9      corporation in receiving stock.

10     Q      Now, you started off saying that it was between two

11     or more people?

12     A      Yes.

13     Q      Can it be between one person?

14     A      No.  It is a contract.  It is an agreement between

15     two people to form a business.

16     Q      Okay.  What else on the front of this document can

17     you tell us about?

18     A      This -- another thing that shows that this is a

19     Massachusetts business trust is the fact that it's an

20     agreement.

21            When you have a statutory trust, you don't have an

22     agreement.  What you have is a statement of intent.  There

23     will not be a meeting of the minds because the only one that

24     determines what a statutory trust is is the grantor, and he

25     doesn't have to have anybody agree with him to set his trust

1    in order.

2        Q    Now, can you tell from the front of this document

3    who is purported to be involved in this contract?

4        A    Could you move this up just a little?

5        Q    Sure.

6            MS. CARLISLE:  Your Honor, may I approach the

7    witness and give her a hard copy of --

8            THE COURT:  You may.

9        A    This shows that Denny R. Patridge is the investor.

10       Q    What does that mean where Edward Bartoli's name is?

11       A    I don't know.  He's not listed as an investor.

12       Q    It says "by and between Edward Bartoli"?

13       A    Excuse me.  It does say underneath it that they are

14   the acceptors as the board of directors.  When you have a

15   Massachusetts business trust, the assets are turned over to a

16   trustee, much like a statutory trust; and this is indicating

17   that Mr. Bartoli and Judy Patridge are going to be the board

18   of directors.  They're going to be the trustees.  They will

19   oversee the running of the business.

20       Q    Okay.  If we could look back up a little bit where

21   it, right underneath where it says, "This agreement,

22   conveyance, and acceptance" --

23       A    Yes.

24       Q    And then that paragraph continues on and it says,

25   "By and between Edward Bartoli, who drafted the common law

1   business organization documents as the creator hereof and the

2   offerer herein, and Denny R. Patridge as the investor and

3   offeree herein."

4       A   Yes.

5       Q   Does that not mean that this is a contract between

6   Edward Bartoli and Denny Patridge?

7       A   No.  Mr. Bartoli may have created it, but he is not

8   an investor.  There's only one investor, and that's Mr.

9   Patridge.  No one else has placed assets into the business

10  trust.

11      Q   So for it to be a contract between two people, both

12  of those people must be investors?

13      A   Yeah.  The agreement is between the investors.

14  It's a joint venture.  It is -- it's a joint venture.  They

15  both -- two people -- two or more people will come together to

16  form this.

17      Q   Ms. Ferrell, since you now have your copy, can you

18  tell us what paragraphs stand out to you as being particularly

19  pertinent?

20      A   In the first paragraph, one of the things I thought

21  was interesting is that, "The creator hereby constitutes and

22  appoints the above directors to be, in fact, directors of the

23  company hereby created and established.  The investors for and

24  in consideration of the objects and purposes herein set forth

25  the cash sum of $10 in hand and other considerations of value,

1    the receipt of which hereby acknowledges does agree -- does

2    hereby agree to sell, assign, convey and deliver unto the

3    directors."

4        Q    It is -- what does that mean to you?

5        A    Well, they're saying that they're selling and

6    assigning it.  Essentially, what it is, when you form a

7    Massachusetts business trust, you're not selling anything.

8    You are -- this is your contribution of capital to form a

9    business, and it's no different than a partnership or a

10   corporation.

11        If you were buying stock in a corporation, your

12   contribution would be the money that you're putting in.  If

13   you're forming a partnership, a lot of times it's assets, such

14   as office equipment, a machine that makes widgets -- that's

15   your contribution, and a value is put on it; and for that, you

16   will receive either a percentage of the partnership or you

17   receive stock in the entity.

18        In this case, it's units of beneficial interest

19   that you receive.

20        Q    What exactly is beneficial interest?

21        A    Beneficial interest, you have equitable interest in

22   things, which means that you have ownership.  Beneficial

23   interest means that you have the rights of the proceeds from

24   those assets.

25        So if you, you -- we'll go back to the dad again

1    who's got his money in this trust, and the beneficial interest

2    from this trust will be the income that's being earned that

3    eventually can be passed on to the good kid that's going to go

4    to college.

5        Q    Ms. Ferrell, I'm going to step back a moment.  When

6    you are looking at trusts to determine if they are a sham, are

7    there any specific factors or lists of factors that you go

8    down?

9        A    Yes.  There are four factors that we test to see if

10   we're going to sham -- if this is a sham entity.  We apply

11   these tests to all of our entities that we're working with.

12   One of the most important factors when we do this is that it's

13   the substance of what's going on, not the form.

14            So even though you may have, say, a corporate

15   charter that is accepted and registered by the State, if that

16   is being used for a purpose that has no economic benefit, then

17   that would be considered a sham with other characteristics,

18   but that would be one of them.

19            So we look to, really, the substance of

20   transactions, not just the legal form that they're set up

21   with.

22       Q    Do you ever look to see if a trust document follows

23   statutory trust law?

24       A    We look at the document to see if it follows law,

25   not just trust law.  If it's a corporation, we want to see if

1    it's going to follow the corporate rules.  We're going to see

2    if that document -- if the people who have signed it and put

3    it together and created it, purchased it, are actually

4    following what they have signed up and agreed to do.

5         Q    And what is the importance of the grantor's, or

6    whoever is involved in the trust, control of the assets?

7         A    In a Massachusetts business trust and in a trust

8    other than a grantor trust, the purpose is the person who's

9    putting their assets in gives up control and legal title; and

10   the beneficial interest goes to the beneficiaries.

11        In the case of a Massachusetts business trust, it

12   would be the investor holding his units of beneficial interest

13   just like stock.

14        Q    What is an independent trustee?

15        A    An independent -- a trustee is, is independent.

16   They are required to be independent.  Their duty is not to the

17   grantor.  Their duty is to the beneficiaries and to see that

18   the document is followed specifically and exactly as the

19   grantor wanted it to be done.

20        So if the trustee -- go back to our dad who's got

21   his money in the trust for the son to go to college.  If a

22   cousin wanted to go to college and there was money in there,

23   the trustee would not be able to turn around and give some,

24   the money to someone else because he would be restricted by

25   the trust document and by the desires of the grantor and by

1    the beneficiaries who have that beneficial interest.

2        Q    Is it a sign to the IRS about whether or not an, a

3    trust is, in fact, a sham if there is no trustee?

4        A    That is one of the badges that shows us that this

5    is not being properly run.  We would not necessarily sham it

6    because of that if we looked internally and it was not causing

7    a problem and it could be rectified.

8        Q    And is another badge whether or not there is, in

9    fact, economic reality with regard to the trust?

10       A    That is -- that's -- economic reality is one of our

11   most important things that we're looking at because if there's

12   no economic reality for why these entities were set up, other

13   than to evade tax -- not avoid, but to actually evade tax --

14   then we would look at them as being a sham transaction.

15       THE COURT:  This is a good point to stop, and it is

16   also 4:30.  We'll be resuming at 8:30 tomorrow morning.

17

18           * * * * * * * * * * * * * *

19

20       (In open court, June 29, 2005;

21       jury present, 8:35 a.m.)

22       We are ready to resume, and Ms. Ferrell is on the

23   stand from yesterday.  You're still under oath.

24       THE WITNESS:  Yes, sir.

25       THE COURT:  And Ms. Carlisle, you may resume your

1    direct examination.

2              MS. CARLISLE:  Thank you, Your Honor.

3    BY MS. CARLISLE:

4         Q    Good morning, Ms. Ferrell.

5         A    Good morning.

6         Q    Let's backtrack and go back to where we had the

7    cutoff yesterday and explain trusts.  Would a demonstrative

8    aid help you in that?

9         A    Yes, it would.

10             MS. CARLISLE:  Your Honor, with the Court's

11   permission, Ms. Ferrell will step down and --

12             THE COURT:  That's fine, and I'll let the two of

13   you work out the appropriate microphone situation and the

14   location of the demonstrative exhibits.

15             And, Mr. Barringer, you may adjust yourself

16   accordingly so you'll be able to see, and I'll do the same.

17                  (Brief pause in proceedings.)

18   BY MS. CARLISLE:

19        Q    Ms. Ferrell, what is a grantor trust?

20        A    The first that I'll be showing you is a grantor

21   trust.  The grantor is the person who places the assets, owns

22   the assets -- he places the assets into the trust.  These

23   assets -- be it a portfolio of investments, whatever it is --

24   eventually earn income.  In the grantor trusts, the income

25   returns to the grantor, and the grantor is taxed on the income

1    that's generated.  The assets remain in the trust, and they

2    actually eventually belong to another beneficiary.

3        Q    Ms. Ferrell, how are the -- how is the income from

4    a grantor trust reported to the IRS?

5        A    A grantor trust income is reported on the grantor's

6    1040 tax return the same as any other income that he is

7    earning.

8        Q    And could you please explain to us a simple trust?

9        A    A simple trust is an irrevocable trust where the

10   grantor places the pre-taxed assets into the trust.  The

11   assets earn income; and in the simple trust, all of the

12   income, all of it that can be distributed is distributed to

13   the beneficiary.  That beneficiary is then taxed on the full

14   amount of income he receives, and there's no taxing to the

15   trust because the trust is no longer holding income, just the

16   assets.

17       Q    How is the income from a simple trust reported to

18   the IRS?

19       A    The simple trust, the income is reported -- the

20   trust files a tax return, a Form 1041, and reports the amount

21   of income that was earned by the trust.  They are allowed to

22   take what is called a distribution deduction for the amount of

23   income that flows to the beneficiary.

24            This Form 1041 that reports the income also has an

25   information document attached to it which is called a K-1.

USA v. DENNY R. PATRIDGE, No. 04-20031

1    It's much like a 1099.  It reports the flow of income and who

2    it goes to.  That K-1 is attached to the tax return, and it's

3    also provided to the beneficiary to tell him how much income

4    he has earned from this trust, what kind of income it is, and

5    it is reported on his tax return the exact same way that it

6    flows through.  So if he earns so much interest, he will

7    report that as interest on his return.  If it's capital gain,

8    he'll report it as capital gain on his return.

9         Q     And you specified that it was pre-taxed income.

10   What is the importance of that?

11        A     All of the assets that the grantor contributes is

12   income that he has paid the tax on.  These are his assets,

13   meaning it's already been taxed.  These are just assets that

14   he owns.

15        Q     Could you please explain a complex trust?

16        A     A complex trust is where grantor places the assets

17   in the trust.  The trust earns income; and at this time, the

18   trustee decides how much of the income will be distributed

19   according to the trust document.

20             So if we go back to our scenario again about the

21   father who places the money in the trust so his son can have

22   an education, in a complex trust, he can hold that money back,

23   the income back, and the trust itself will pay the tax on it.

24   No K-1 goes to the beneficiary, and only the trust is taxed.

25             Later on, when the child reaches the age where he

1    can have, have the income flow, then the amount of income the

2    trust allows him to have flows to the beneficiary, and the

3    beneficiary is taxed on that amount.

4            But there may be more income earned that year.

5    That income that's beyond what the beneficiary is allowed to

6    have remains inside the trust, and then the trust is taxed on

7    the amount of income that it retains.

8        Q    And how is income from a complex trust reported to

9    the IRS?

10       A    It's reported the same way as a simple trust.  The

11   trust will file a Form 1041 on it.  It will report all of the

12   income that it earned.  It will be allowed to take a

13   distribution deduction for the amount that passes over to a

14   beneficiary.

15           At that point, the beneficiary will receive the

16   K-1, which is like the 1099.  It tells them how much he earned

17   and what he is required to report on his Form 1040 where he

18   will be taxed.

19       Q    Ms. Ferrell, based on your examination of the

20   Patridge Asset Management Trust, does that entity fit any of

21   these three types of trusts?

22       A    No.  It is not a statutory trust.

23       Q    In your opinion, what is the Patridge Asset

24   Management Trust?

25       A    In my opinion, the -- it is most -- let's see, the

1    characteristics of it is most like a Massachusetts business

2    trust or common law trust.

3        Q    And at this point, examining the Patridge Asset

4    Management Trust, what's the next step in your analysis?

5        A    We would go to the trust documents, the documents,

6    the contracts, whatever created the Patridge Asset Management.

7        Q    Okay.  Let's do that then.  In the meantime while

8    we're taking this down, can you explain a little bit about

9    what exactly income is?

10            THE COURT:  Are we done with the demonstrative

11    exhibit?

12            THE WITNESS:  Yes.

13            MS. CARLISLE:  This one, Your Honor.

14            THE COURT:  Okay.  We have other one?

15            MS. CARLISLE:  Yes, Your Honor.

16                (Brief pause in proceedings.)

17            THE COURT:  I'm not sure that the jury's going to

18    be able to read that in that position.  I mean, the print to

19    me is too small.  You're going to have to move it more towards

20    the center of the courtroom.

21            MS. CARLISLE:  Your Honor, we apparently have this

22    poster scanned in as well.

23            THE COURT:  Okay.  Well, that's fine.  Then you can

24    put it where the, the witness can see it; and the jury will

25    see it up on the scan.  That's fine then.  Then Mr. Barringer

1    can see it off of his screen.

2    BY MS. CARLISLE:

3        Q    Is that an okay place, Ms. Ferrell?

4        A    That's fine.

5        Q    Ms. Ferrell, you have that copy of the Patridge

6    Asset Management Trust that we were discussing yesterday?

7        A    Yes, I do.

8        Q    While we're waiting for the --

9             THE COURT:  There it is.

10       Q    Could you please explain to us what exactly the

11   sham test is?

12       A    When we are auditing abusive arrangements, we test

13   these business entities to determine if we are going to sham

14   them, if we are going to collapse them, and disallow the

15   entities as being an entity with economic reality.

16            These are the four tests that have been determined

17   to be used because of previous court cases.  This is what we

18   look to as a test to see if these entities are valid entities

19   for the purposes of taxation.

20       Q    Ms. Ferrell, what exactly is a sham?

21       A    Actually, the IRS uses "sham" more as a verb,

22   meaning that we will disallow them; but it has been used more

23   now to show something that is really like a facade.  It has a

24   phony front.  It's not what it appears to be.

25       Q    Okay.  And what is this first test, and how would

36

1    you apply that?

2        A    When -- the first thing we do when we look at these

3    entities, we go to the document that created them, whatever is

4    in writing that tells us how they are to be run and what the

5    restrictions are that the people who purchased these entities

6    agreed to.

7        Q    And does the Patridge Asset Management Trust, how

8    does this test apply to that entity?

9        A    Well, we have gone in and looked at it, and they

10   have called themselves a common law business trust, which is

11   also a Massachusetts business trust.  These business trusts

12   are permitted by statute in many states.  Very few states do

13   not allow them to exist.

14            We go in and look at what they are claiming

15   themselves to be and see if they fit the actual definition for

16   business practice of what they claim to be.

17       Q    And how did the Patridge Asset Management Trust do

18   under this test?

19       A    It did not do well.  A Massachusetts business trust

20   is a contractual agreement between two or more people.  They

21   come together, form a contract, and agree on how to run a

22   business.  At that point, they contribute assets into the

23   business; and in exchange for their assets, they receive

24   shares of beneficial interest. These shares, as I stated

25   previously, are very much like stock in a corporation.

1    At the time of formation, the investors agree to

2    allow a trustee or a management person to run the business for

3    them.  They do not participate in the decisions or the control

4    over the business.

5    A Massachusetts business trust is not formed to

6    hold assets.  That's what a trust would do.  A Massachusetts

7    business trust is formed to carry on a business pursuit.

8    Q    And, again, based on this first test, does the

9    Patridge Asset Management Trust follow the rules of a

10    Massachusetts business corporation?

11    A    No.  Actually, from what we could determine, there

12    was no business going on inside the trust.  Mr. Patridge had

13    merely transferred his assets in there, including his home;

14    and the money that was flowing into it, which was coming from

15    his personal service corporation, was merely a sham because

16    there were no employees in this business trust.  They couldn't

17    have earned commissions from selling insurance.

18    Q    So what exactly -- how -- well, excuse me.

19    What is a personal service corporation?

20    A    A personal service corporation is when a

21    professional person -- like a doctor or a lawyer, an

22    accountant, an insurance salesman -- earns his income not from

23    a product or by manufacturing something.  It's from his

24    personal services, like a doctor would be seeing patients; and

25    it's his background and education that is actually earning his

1    money.  It is not a piece of equipment.

2              With an accountant, he does books and records.

3    It's based on his ability to provide services to the public.

4    When you're selling insurance, it is the same way.  It is your

5    ability.  Your product that you're selling is your knowledge

6    and your skills.

7              So in a personal service corporation, there are

8    very tight restrictions on how it is run.  Your income must

9    flow directly to the person providing the personal services.

10   In this case, it would be Mr. Patridge; and Mr. Patridge by

11   selling his insurance was earning commissions.  Those

12   commissions under the Code are only taxable to him.  They are

13   not taxable to a third party, and they cannot be assigned to

14   another party.  He earned them.  No one else did.

15   Q     So in this case, when the defendant transferred

16   assets into the Patridge Asset Management Trust, whose income

17   was it?

18   A     When he transferred the commission money from his

19   corporation into the Patridge Asset Management, the money was

20   taxable to Mr. Patridge in his corporation.  If he didn't

21   distribute it, if he kept the money in the corporation as a

22   personal service corporation, he is taxed at the highest tax

23   rate for corporations on any amount that he retains inside his

24   corporation.

25   Q     You just stated corporation.  Mr. -- we've had

1    testimony that the defendant did not incorporate until 1997.

2    Does that still apply even before he had incorporated the

3    Patridge Insurance Services?

4        A    Yes.  As a sole proprietor, any income that he

5    earned could not be assigned to anyone else.  It is only

6    taxable to him, and that's under the Internal Revenue Code,

7    Section 61 and the regulations thereunder.  Income is not

8    assignable to other people.  It is only taxable to the person

9    who earns it.

10        Q    Let's look at the second test on your sham test.

11    How did that apply to the Patridge Asset Management Trust?

12        A    When Mr. Patridge placed his assets and the money

13    into the common law business organization, he took over as the

14    director of the corporation.  He had full control over any

15    money and any assets inside of the Patridge Asset Management

16    Company and distributed the funds and the assets as he chose.

17    It was never in the hands of an independent trustee.

18            The document that Mr. Patridge signed specifically

19    says in it that the investor will not control the company.  It

20    will only be controlled by a director; and, yet, within days

21    after it was formed, Denny Patridge had full control over this

22    company.

23        Q    So did the taxpayer's relationship to the property

24    differ materially after the trust formation?

25        A    It remained exactly the same.  He had full control

1    over his assets and full legal rights to them.

2        Q    And under test three, was there, in fact, an

3    independent trustee?

4        A    No, there wasn't.  Denny Patridge took over the

5    control of the business immediately after he signed the papers

6    and created the entity.

7        Q    Under test four, was there an economic interest or

8    legally enforceable right passed to the beneficiaries?

9        A    Denny Patridge had all of the rights to the money

10   at all times.  He could write checks.  He could direct it.  He

11   could use the money for his own purposes.

12       Q    Based on your answers to the four tests here, was

13   the Patridge Asset Management Trust, in fact, a Massachusetts

14   business trust?

15       A    No, it wasn't.  It was only one person.  It was not

16   put together for a business purpose, and the contract was

17   never enforceable.  It never followed what it agreed it would

18   be.  It would be deemed by the Internal Revenue Service as

19   being a sham.

20       Q    Now, let's look at how the funds moved in the

21   Patridge Asset Management Trust to the other entities.  Based

22   on what you've just stated that it was not a Massachusetts

23   business trust, how should the income have been taxed that was

24   placed into the Patridge Asset Management Trust?

25       A    At all times, it would have been taxed before it

1    got there.  It would be taxed -- the tax would be -- Denny

2    Patridge would be liable for all of the taxes on any income

3    earned.  He earned it personally.  It was his income.

4        Q    How should he have reported it to the IRS?

5        A    It should have been -- prior to his forming the

6    corporation, it should have been reported on his 1040,

7    Schedule C, as his sole proprietor income.

8            After he formed the corporation, it would have been

9    removed from the corporation probably, first as salary.  If he

10   retained anything, it would be taxed to the corporation; and

11   then when he received it, he would be taxed again as dividends

12   from his personal service corporation.

13       Q    Does the movement between, of the income between

14   the Patridge Asset Management Trust to Ebba International

15   Trust change your analysis?

16       A    No, it doesn't.  He has every right to move the

17   money offshore if he wishes to after it's been taxed -- it was

18   his income -- as long as he's not moving it for purposes of

19   evading the payment of his income tax.

20       Q    Based on your examination of the movement of the

21   money, in your opinion, what is the Ebba International Trust?

22       A    It appears to be a foreign business trust.  Any

23   money that was put in there and any income that was generated

24   from that would be taxable to Mr. Patridge under Internal

25   Revenue Code 1 and the regulation which says U.S. citizens are

1    taxed on their worldwide income.

2              So it doesn't matter where you place your income.

3    If you -- or your assets.  If you are earning income from

4    those assets anywhere in the world, it is taxable to you as a

5    U.S. citizen in the United States.

6        Q    Does the control of the money have any effect on

7    your reasoning?

8        A    It does only in the verification that these are

9    shams.  Nothing changed.  Mr. Patridge retained full control

10   over his assets at all times.  They were his assets.

11       Q    Even when they were in the Ebba International

12   Trust?

13       A    It doesn't matter where he places them.  He had

14   control over them.  They are still his assets.

15       Q    What about when they moved to the Conventus Global

16   Trust?

17       A    If -- it still is a foreign trust.  If you have a

18   U.S. beneficiary, you're required to file a tax return.  Mr.

19   Patridge always -- the money came back to him.  It was always

20   his money.  He made it flow.  He's the one that brought it

21   back.  He's the one that controlled it.  He always was the

22   beneficiary of these trusts.

23              It doesn't matter how many people, how many

24   entities you flow the money through.  Each step along the

25   way -- it's called the Step Transaction Doctrine -- each step

1    along the way, if you move the money with a specific purpose

2    and in the end it's still your money, it is always taxable to

3    you, and you remain the beneficiary.  It is merely a sham

4    transaction to evade income tax or the payment thereof.

5        Q    Now, Ms. Ferrell, we also heard testimony that

6    there was a second system used at the point where Mr. Patridge

7    claimed to have collapsed these trusts.  Did you examine the

8    second system?

9        A    Yes, we did.

10        Q    And what was your opinion of Sultan Services?

11            MR. BARRINGER:  Your Honor, I'm going to object if

12    this is beyond the scope as far as being a trust and her

13    knowledge on that is concerned.

14            THE COURT:  Objection's overruled.

15            MS. CARLISLE:  Ms. Ferrell, what was your opinion

16    of Sultan Services?

17            THE COURT:  Well, lay a foundation though first --

18    or I will sustain the objection -- as to what she examined

19    with Sultan Services as far as any documents or what, what she

20    reviewed before she gives her opinion about Sultan Services.

21            MS. CARLISLE:  Yes, Your Honor.

22    BY MS. CARLISLE:

23        Q    Ms. Ferrell, were you present in court during

24    testimony about Sultan Services?

25        A    Yes, I was.

1        Q       And have you examined the transactions that Sultan

2   Services was involved in?

3        A       Yes, I have.

4        Q       Have you looked at any other materials related to

5   Sultan Services?

6        A       Mostly the flow and how it was used, the movement

7   of the money from Sultan to the corporation that Mr. Patridge

8   created, Minetta Services, the flow of the money back to Mr.

9   Patridge's home where the mortgage was placed, and the money

10  flowing back into Sultan Services.

11       Q       Did you consider the characteristics of the entity

12  called Sultan Services?

13       A       Yes, I did.

14       Q       What about Minetta, Inc.?  Did you have the chance

15  to examine the flow through which Minetta was involved?

16       A       Yes, I did.

17       Q       And did you also consider the characteristics of

18  Minetta, Inc.?

19       A       Yes, I did.

20       Q       Were you able to examine any documents related to

21  Minetta, Inc.?

22       A       Yes, I did.

23       Q       Could you please at this time give us your opinion

24  as to what exactly Sultan Services was?

25               MR. BARRINGER:  Your Honor, I'm going to object

1   again.  She was qualified as an expert on trusts, and there's

2   still been no testimony or any foundation that such documents

3   are, in fact, trusts; and it would appear to me that she's

4   beyond the scope of her expertise at this point.

5           THE COURT:  Well, her expertise is also income

6   taxes.  Objection overruled.

7   BY MS. CARLISLE:

8       Q    Ms. Ferrell, if you could please tell us your

9   opinion on Sultan Services?

10      A    Sultan Services is just another step in an abusive

11  tax arrangement and it -- on the step transaction theory, it

12  is set up merely to hold the money offshore.  It lent money to

13  a newly-created entity whose purpose was solely to lend money

14  to Denny Patridge in the form of mortgages and loans on

15  automobiles.  There was no other business going on.  They had

16  no other customers.  It was merely a facade set up to move

17  money from offshore to onshore, remove the ownership of Mr.

18  Patridge's assets back again offshore in the form of mortgages

19  held by offshore entities.

20      Q    Does it have characteristics fitting any of the

21  definitions of trusts?

22      A    No.  It is just merely another form of an abusive

23  system.

24      Q    And was it a Massachusetts business trust

25  either?  Or business corporation, I'm sorry.

USA v. DENNY R. PATRIDGE, No. 04-20031

1    A    Yes.  It was a business corporation; but I, I don't

2    know if it met the terms of a Massachusetts business

3    corporation.

4         It doesn't matter what its form is.  What we're

5    talking about is the substance.  We look at the substance of

6    what is going on inside the transaction.  Every one of these

7    entities may be a legal entity.  We are not disputing whether

8    these are legal entities.  What we dispute is the taxation of

9    the flow of income within these entities, whether they are

10   shams, and the money should be taxed to the individual rather

11   than to the entities.

12   Q    Is it the treatment or the use of the entity which

13   is important?

14   A    Yes, the control.

15   Q    We heard testimony from the defendant about private

16   annuities.  What is a private annuity?

17   A    If a private annuity was used in the United States,

18   it would be considered to be a portfolio.  We talked about the

19   father who put money in trust and he had a portfolio; and it

20   may have included things that had dividend earnings, interest

21   earnings.  It could have rental income.

22        And the reason why it's called a private annuity is

23   because it's unregulated.  In a private annuity, if it is

24   offshore, all this income is earning -- or all of these

25   different investments are earning income, such as the mortgage

1    income from Minetta.  They borrowed the money from Sultan

2    Services.  They were paying them interest.  That interest

3    income is still taxable on a yearly basis to Mr. Patridge

4    because of Internal Revenue Code, Section 1, and the

5    regulations thereunder which says that a U.S. citizen is taxed

6    on his worldwide income.  So it would have been taxable to him

7    on a yearly basis, no matter if it was offshore or not.

8        Q    What about when the money was transferred to

9    Minetta, Inc., under the guise of a loan?

10       A    We would --

11            MR. BARRINGER:  Objection to the comment, "guise of

12   a loan," Your Honor.

13            THE COURT:  Sustained as to the word "guise."

14   Rephrase the question.

15            MS. CARLISLE:  Yes, Your Honor.

16   BY MS. CARLISLE:

17       Q    What about when the money was transferred to

18   Minetta as a loan?

19       A    We would look at this strictly as circulation of a

20   person's money.  It was just Mr. Patridge's money.

21       Q    Did it remain taxable to Mr. Patridge?

22       A    It was taxable -- any money that Mr. Patridge

23   earned was taxable to him at the time he earned it.  How he

24   flows it later on doesn't matter as far as the taxability of

25   it.  It was taxable to him at the time he earned it in his

1    insurance business.

2         Q      And then when the money went from Minetta back to

3    Mr. Patridge, what was the taxability at that point?

4         A      That tax still remains at the point he earned it.

5         Q      What about when he transferred it back to Sultan

6    Services?

7         A      It does not cause a taxable event.  The taxable

8    event occurred when he earned the income from selling his

9    insurance.

10         Q      Ms. Ferrell, based on your examination of both of

11    these systems, what is your conclusion about the first system

12    involving Patridge Asset Management Trust, Ebba International

13    Trust, and Conventus Global Trust?

14         A      This was an abusive tax arrangement that was

15    instituted to evade income tax and to move money offshore out

16    of the reach of the Internal Revenue Service.

17         Q      And based on your examination of the second system

18    involving Sultan Services and Minetta, Inc., what is your

19    conclusion about that system?

20         A      It was merely a guise to get money offshore.

21              MS. CARLISLE:  Your Honor, may I have one moment?

22              THE COURT:  You may.

23                   (Brief pause in proceedings.)

24              MS. CARLISLE:  We have no other questions at this

25    time.

1          THE COURT:  Mr. Barringer, you may cross-examine.

2          MR. BARRINGER:  Thank you, Your Honor.

3               CROSS-EXAMINATION BY MR. BARRINGER:

4     Q     Good morning, Ms. Ferrell.

5     A     Good morning.

6     Q     Going back to your testimony yesterday, you

7  indicated that you have been studying this material how long?

8     A     What material are you referring to?

9     Q     Trusts, how trusts work.

10    A     I started right out of -- well, actually, I have a

11 degree in accounting.  So when I got my degree, part of my

12 class training was on trusts.  I went to work for the Bar

13 Association and was trained in trusts and forensic auditing on

14 trusts with the Bar Association.  I took specialized training

15 in -- that the Internal Revenue Service provided on auditing

16 trusts of attorneys.  I went from there to fiduciary school to

17 abusive trust school to abusive tax arrangements to foreign

18 abusive arrangements training.  So it's been quite extensive.

19    Q     Lots and lots of time, lots and lots of years of

20 studying and trying to learn how to do these and how to

21 understand these?

22    A     Right, and how to audit them, yes.

23    Q     It's a complex process that you have to go through

24 to understand how to determine whether something's a sham by

25 looking at documents, by looking at the codes and regulations;

1   isn't that right?

2       A     Not really.  It's -- I guess it's not as difficult

3   as many areas of the Internal Revenue Code.

4       Q     We've heard testimony from all the other revenue

5   agents about they don't know very much about trusts.  Did you

6   hear that testimony?

7       A     I -- no.  I'm sorry.  I wasn't here.

8       Q     Okay.

9       A     Remember, I missed the first couple days.

10      Q     You came in the third day or something.  So you

11  didn't hear the other agents testifying about their lack of

12  knowledge on trusts?

13      A     No, I didn't.

14      Q     What particular provisions do you -- strike that.

15            You are the person who generated the 97-24 memo; is

16  that correct?

17      A     No.  I did not.

18      Q     You didn't work on helping putting that together?

19      A     No, I didn't.

20      Q     At what point in time were you involved in

21  developing the abusive trust program with respect to the IRS?

22      A     Well, I've been teaching it for years.  In 19--

23  what, ninety -- I'm trying to think when it was, '97, I think,

24  '98, right in there, I helped develop some training materials

25  for the Internal Revenue Service.  Trusts in the Wild West,

USA v. DENNY R. PATRIDGE, No. 04-20031

1    out where I'm from, trusts really took off again.  And so when

2    we got into this relatively early as far as auditing and

3    taking our cases to court, we needed a new guide, training

4    guide; and at that time, I helped develop one.

5        Q    What you're saying is that some people were

6    marketing trusts again to, types of trusts, business common

7    law trusts, different types of arrangements to people again,

8    right?

9        A    Yes.  This is very cyclical, as I told you

10   yesterday.  It seems like about every 25 years, people think

11   this is a grand idea and start selling them again.

12       Q    Okay.  And with respect to that, you said you were

13   testifying, I believe, in Phoenix the beginning of this trial?

14       A    Yes.

15       Q    And in that, it was the same sort of -- dealing

16   with, again, with what people were calling common law trusts;

17   is that not true?

18       A    That's true.

19       Q    In that one, however, if I understand, nobody was

20   filing tax returns at all; isn't that true?

21       A    Yes.

22       Q    And that was part of how you determined what was a

23   sham with respect to that particular program; is that not

24   true?

25       A    Not the nonfiling of the returns.  It goes down to

1    what we're actually seeing.  There are many theories to

2    different shams, and different promoters have different

3    theories about the product they sell.  Some sell actual

4    trusts, statutory trusts and, upstream and downstream with

5    them.  So there'll be a whole series of trusts where the money

6    moves, and each trust has a different purpose.

7           Some of them sell the common law business trusts.

8    Some of them advocate filing.  Some of them advocate that

9    there's no need to file because it is a right to contract.  It

10   just depends on who, who the promoter is selling their

11   product, what their product is.

12          THE COURT:  Well, in this case, you're familiar

13   with the testimony that we're talking about, Aegis and

14   Goldstein?

15          THE WITNESS:  Exactly.

16          THE COURT:  You're familiar with both of them?

17          THE WITNESS:  Yes, I am.

18          THE COURT:  Well, what is the Aegis system, and

19   what's the Goldstein system?

20          THE WITNESS:  The Aegis system is the selling of

21   this entity, which is a common law trust, which they use the

22   units of beneficial interest as a mechanism to give it, to

23   assign those units of beneficial interest to an offshore

24   entity so that the money can be then sent as like a dividend.

25   The income flows, the income streams are then sent offshore.

1    They, at that time, are passed through another entity where

2    supposedly the Internal Revenue Service cannot follow the

3    money anymore; and it literally removes it from the purview of

4    the Internal Revenue Service.

5         THE COURT:  That's Aegis, right?

6         THE WITNESS:  That's Aegis.

7         THE COURT:  Well, what's Goldstein?

8         THE WITNESS:  Goldstein had more than one program

9    that he sold.  What he was selling was the idea of the private

10   annuity, moving your money offshore, investing it in anything

11   that you wished to invest it with; but it was not a controlled

12   or a registered product like an annuity being sold in the

13   United States would have to be controlled as far as

14   regulations go.  It would be totally at the discretion of the

15   person that controls the annuity as to how it is invested and

16   what could be done with it.

17        THE COURT:  We talked about everything, but I

18   thought we ought to focus finally on Aegis and Goldstein.

19   BY MR. BARRINGER:

20   Q    These, as you talked about, these abusive trust

21   programs as you're defining, in some instances, lots of people

22   buy them; isn't that right?

23   A    Yes.

24   Q    In Phoenix, more than 3,000 have purchased that

25   system?

1         MS. CARLISLE:  Objection, relevance.

2         THE COURT:  Overruled.

3    A    Oh, the Internal Revenue Service is busy day and

4   night tracing these down.  It, it's a huge population that has

5   gotten into this.

6    Q    And that includes people like attorneys and doctors

7   and accountants -- professionals have bought that system?

8    A    Yes.

9    Q    And as we talked about, that one actually said

10  nobody has to file a tax return, based upon how the promoters

11  said the system worked?

12    A    That's correct.

13    Q    Here we saw the video of Mike Vallone on the

14  screen, 20 minutes roughly of him talking.  He and Bartoli and

15  Hopper were the guys that created Aegis; isn't that right?

16    A    I believe that's true.

17    Q    And those guys are the ones marketing it out to

18  everybody, "Look, if you do it this way and work through our

19  system as we teach you, you can move the money offshore

20  ultimately," as you said, "so that it's not taxed by the time

21  it gets to the second trust"?

22    A    That's very true.

23    Q    That's the system they promoted.  That's the system

24  they sold.  You heard Mr. Probst talk two days ago that he

25  bought that system?

1      A     That's true.

2      Q     He was a large farmer.  He had a farming operation

3  that went into his business trust; is that right?

4      A     That's true.

5      Q     His business trust was then running a business

6  called a farm; was it not?

7      A     I really and truly -- I didn't get enough out of

8  the testimony to be able to -- I'm sure that's true, but I --

9      Q     Nevertheless, that was treated as a sham, even

10  though it had an operating business within the business trust,

11  because of the process of how the money ultimately then moved?

12      A     That's true.

13      Q     So we have a situation that, whether it's a

14  business that's involved or not a business, it's what you look

15  at as far as how the money is moving that is the real issue

16  here?

17      A     It's the taxability of the income.  That's true.

18      Q     "How the money is moving, and who is it going to be

19  taxed to" is what your issue is?

20      A     That's our issue.

21      Q     We saw Mr. Vallone on the video talking about how

22  by doing this it was perfectly legal and not taxed back to the

23  individual; did we not?

24      A     Yes.

25      Q     And he's promoted it that way to everybody,

1    including Mr. Patridge; isn't that true?

2        A    That's true.

3        Q    That one chart that you put up talking about

4    trusts, revocable trusts, simple trusts; and I think you took

5    in the direction of being irrevocable; is that right?

6        A    Right.

7        Q    Complex trusts which was the, the trustee decides

8    how much he's going to be distributing out to the beneficiary,

9    and the example was a student in college and whether he should

10   go out partying or whether he should be limited now?

11       A    Yep.

12       Q    That's what you're talking about.  Those are

13   several different types of trusts.  We also have things called

14   testamentary trusts; do we not?

15       A    Yes, we do.

16       Q    That comes from a will and goes in and sets up a

17   trust after the fact which may, in fact, even have a business

18   built into it for a short period of time; isn't that right?

19       A    That's very true.  It holds assets until they go

20   through probate.

21       Q    And so we have all these different kinds of trusts

22   that are statutory trusts --

23       A    That's correct.

24       Q    -- that are set up by each individual state?

25       A    That's true.

57

1       Q       The state sets up the various statutes.  So we have

2   50 different statutes out there -- they may be all very

3   similar -- but 50 different statutes dealing with how trusts

4   work?

5       A       That's true.

6       Q       And then we have these things called common law

7   trusts which have existed for a long, long time; is that not

8   true?

9       A       I've heard clear back to the Roman days.

10      Q       And what you're saying is, is that people have been

11  talking about these common law trusts for, forever, in fact,

12  about how they will as a contract allow you to do things that

13  other trusts cannot do?

14      A       Because they're not a trust.

15      Q       Because they're not a trust?

16      A       That's right.

17      Q       A common law trust isn't really a trust; so --

18      A       It's a business entity.

19      Q       -- when the government talks about Mr. Patridge's,

20  in parentheses, trusts, what they're really saying is he had a

21  common law trust, or what was at least supposed to be a common

22  law trust?

23      A       Right.

24      Q       You said it didn't meet the definition of a common

25  law trust, but that was how the document was created; was it

58

1    not?

2         A    Yeah.   It was, it was created to be a common law

3    trust.  It wasn't written up to be a common law trust.

4         Q    Mr. Bartoli is the one who's shown on the front

5    page of that as the person who created the document; is that

6    not true?

7              THE COURT:   And that was Exhibit?

8              MS. CARLISLE:   I believe it's 132, Your Honor.

9              THE COURT:   Okay.

10             MR. BARRINGER:   Thank you.

11        A    He created the --

12        Q    He wrote -- he boiler-plated -- he wrote the

13   boilerplate language for the trust?

14        A    Now that I can't, I can't say he's the one that

15   wrote it.  All I can say, he is crediting himself as the

16   creator of this Patridge Management -- Asset Management; but

17   it doesn't mean that he necessarily wrote this.

18        Q    Now, you're looking again at the document which we

19   have as -- thanking Ms. Carlisle -- and it's Government's

20   Exhibit 132?

21        A    Yes.

22        Q    Is that right?

23        A    Yes.

24        Q    Have you -- how many other of these Aegis-type

25   trusts have you looked at?

1    A    Oh, probably not more than five.

2    Q    Did they look the same?

3    A    Yes.

4    Q    So, by saying that, we know that the Aegis people

5  have set up the boilerplate language of how this document is

6  supposed to be written.  Would you come to that conclusion?

7    A    Yes, I would.

8    Q    And those people are the ones who said, "Do it this

9  way, and everything will be okay as we tell you."  Did they

10  not say that?

11    A    I -- yes, they did.

12    Q    And in the process of telling the individuals, "Do

13  it this way and you don't have to pay taxes," they were the

14  ones telling the individuals this is how it works; were they

15  not?

16    A    Yes, they were.

17    Q    And in the process of that, they were giving what

18  you believed to be foolish or silly advice?

19    A    [No response.]

20    Q    Let me strike that.

21        THE COURT:  Let her finish.  She was about ready --

22  you may finish.

23        MR. BARRINGER:  I'll withdraw the question, Your

24  Honor, and I'll take --

25        THE COURT:  No.  She may answer it.  You asked it.

1    She started to answer it.  You can't cut her off.

2        A    Certainly not correct advice.

3        Q    Thank you.

4             Not correct advice according to the Tax Code?

5        A    That's correct.

6        Q    Because all you're really saying is, is that as far

7    as taxes are concerned, you think this was done wrong?

8        A    Absolutely.

9        Q    Everything else you said was that if it works this

10   way, it can be a legal entity; it can pass the money through.

11   That's perfectly fine, right?

12       A    Yes.

13       Q    It can keep passing it through, and that's

14   perfectly fine, right?

15       A    I --

16       Q    To offshore, it can do that and it's still

17   perfectly fine?

18       A    After it's been taxed.

19       Q    The question is:  How do you tax it, not whether or

20   not the money can move?  It can move and still the tax has to

21   be reflected back according to what you're saying?

22       A    Yes.  That's --

23       Q    And it moves offshore the second time; and, again,

24   it's still a process that it is perfectly legal to move the

25   money offshore, as Mr. Vallone said.  It's just:  How is it

USA v. DENNY R. PATRIDGE, No. 04-20031

1   supposed to be taxed?

2       A    It's perfectly legal to move it offshore, depending

3   on your purpose.  If you're moving money offshore to escape

4   the payment of income tax, that is not legal.

5       Q    But what you're saying is, really:  What were the

6   promoters telling the individuals about how this would work?

7   Because he was saying you can avoid the tax.

8           MS. CARLISLE:  Objection, compound question.

9           THE COURT:  Overruled.

10  BY MR. BARRINGER:

11      Q    He was saying:  You can avoid the tax by doing it;

12  it's perfectly legal.  You heard him say it, right?

13      A    Yes.

14      Q    He's saying "avoid."  You're saying "evade."  It's

15  a matter of how the statutes -- the Internal Revenue Code is

16  read and interpreted; is that not right?

17      A    No.  There's a huge difference between evading tax

18  and avoiding tax.

19      Q    That's right.  There is a huge difference.  But

20  he's saying you can do this to avoid taxes, which is legal.

21  You can avoid taxes legally; can you not?

22      A    Yes, you can.

23      Q    He's -- and that is what Mr. Vallone on that screen

24  was saying to everybody, "You can avoid these taxes by doing

25  this process," did he not?

1      A    Yes.

2      Q    You're saying he was, in fact, telling people

3  you're evading taxes, but he didn't do it; and he didn't say

4  it the correct way.  Isn't that right?

5      A    That's --

6           MS. CARLISLE:  Objection, confusing question.

7           THE COURT:  Not to an expert.  Overruled.  You may

8  answer.

9           THE WITNESS:  Now I can't remember what he --

10          THE COURT:  Okay.  Let me just ask a question.

11  Based on what Vallone was saying in that video, if every

12  individual, every partnership, and every corporation set up

13  the business transactions as he said and did what he said,

14  nobody in the United States would pay taxes, right?

15          THE WITNESS:  That's correct.

16          THE COURT:  Okay.  You may continue.

17          MR. BARRINGER:  I'm -- I don't even know what to do

18  with that question.

19          THE COURT:  Well, I just -- I mean, I listen.

20          MR. BARRINGER:  I was rocking and rolling, and now

21  I can't.

22  BY MR. BARRINGER:

23      Q    Back to where we were, what it really comes down to

24  is how the promoter promoted the, the structure and what he

25  was telling the individuals versus what's, what you believe

1    the statutory language says; isn't that what we're talking

2    about?

3         A     Not necessarily.  What I'm saying is people pay

4    their taxes.  They read the instruction books.  They

5    understand taxes are due and payable, and just because they go

6    to someone that has a new deal does not necessarily mean that

7    they're buying into it because of what the promoters say.

8    They're buying into it for reasons of their own.

9         Q     I'm sorry.  Did you talk with Mr. Patridge at any

10   point to ask him his reasons of his own?

11        A     No.  I did not.

12        Q     Did you ever contact or have anybody from the IRS

13   contact him to ask him his reasons of his own?

14        A     I was not part of this audit, sir.

15        Q     Did you hear anybody from the IRS contact Mr.

16   Patridge in 1996 when they first pulled the 1995 tax return up

17   and say, "Mr. Patridge, what are the reasons for this?"

18        A     They tried to, sir, and Mr. Patridge did not

19   cooperate.  He sent letters stating -- I think one of them was

20   he was no longer a U.S. citizen.

21        Q     I think you forgot what Mr. Pogue said, that he had

22   the 1995 tax return for two years on his desk and did nothing

23   with it.  Do you remember that testimony?

24        A     It was in his inventory.  Yes.

25        Q     In his inventory, which means he had possession of

1    a document that he could have asked that question way back

2    when, "What is your reason for this, Mr. Patridge?" could he

3    not?

4         A    No, he couldn't have because he did not open that

5    case.  That case, as I recall, was surveyed.  We do not have

6    contact with taxpayers unless we have opened.  We do not have

7    the right to ask them a question unless they are under audit.

8    He could not -- he could not -- make contact with him and ask

9    him about that tax return unless he opened the audit.

10        We have lots of cases in inventory.  I mean, we

11   pick and choose what we're gonna audit as to our schedule and

12   the number of hours we think it's going to take to do a

13   return.  Everything we're assigned is not audited.  We don't

14   have time to do all them.  We pick and choose inside our

15   inventory what we're going to do.  Just because there's a good

16   case there, you still may not have time to work it.

17        Q    What you're really saying is that the IRS didn't do

18   something with this file until 1999; is that right? That's

19   when Mr. Miller contacted Mr. Patridge?

20             MS. CARLISLE:  Objection.  That misstated the

21   witness's testimony.

22             THE COURT:  No.  She can explain what her testimony

23   is.

24             THE WITNESS:  I think this was a surveyed return;

25   was it not?

1          THE COURT:  But are you saying you, the question is

2     confusing to you?

3          THE WITNESS:  Well, I --

4          MR. BARRINGER:  That's what --

5          THE WITNESS:  I can't remember which years were

6     surveyed.  We saw the returns up on the screen that were

7     surveyed.  I don't remember which years he surveyed the audits

8     and did not audit.

9     BY MR. BARRINGER:

10         Q     With respect -- you commented that Mr. Patridge did

11    not "cooperate"?

12         A     He did not provide books and records.  He did not

13    come in for an interview.

14         Q     He wrote one letter?

15         A     Yes.

16         Q     By that time, it was already -- Mr. Miller, you

17    weren't here when his testimony was here, were you?

18         A     No, I wasn't.

19         Q     So you didn't know that he was already preparing

20    his audit examination closure before the second meeting, did

21    you?

22         A     I, I've heard that from other testimony.  Yes.

23         Q     Okay.  So one letter caused this, that the -- that

24    Mr. Miller was saying abusive trust, end of story?

25         A     No.  Mr. Miller said that he gave him two

1    opportunities, as I recall, to meet for an appointment.   At

2    that point, the taxpayer did not come in; and it is IRS policy

3    that if you're given two chances and you are not interested in

4    providing documentation as to the expenses that you've taken

5    on your tax return, that those expenses that were requested to

6    be verified are disallowed as being unverified, and a report

7    is written.

8            If you do not cooperate in a situation where there

9    is an abusive system, it's also IRS policy that there is no

10   30-day letter because that form of appeals -- there is nothing

11   to appeal because you've never provided anything.   You have

12   nothing to appeal.   There's nothing there to -- you can't go

13   tell an appeals officer, "I provided him with all these

14   documents and I didn't get it," or, "I did it under this

15   Code," because it still has to be verified.   That's why he did

16   not receive a 30-day letter.   If you don't provide something,

17   there's nothing to appeal.

18   Q      That's a policy of the IRS?

19   A      Yes, it is.

20   Q      What's the law say?

21   A      A 30-day letter is not under the law.   A 30-day

22   letter is a courtesy to the taxpayer.   It's only for people

23   who have been audited.   Mr. Patridge did not provide the books

24   and records.   There was no 30-day appeal because there was

25   nothing to appeal.   He provided nothing.

1    Q    You heard Ms. Frooman read extensively about that

2    30-day letter yesterday; did you not?

3    A    Yes, I did.

4    Q    Was she under the impression he was supposed to

5    receive that?

6    A    I don't know what her impression was.

7    Q    With respect to the processes that you've talked

8    about, common law trusts are -- as you said, some states

9    recog-- have statutes that deal with them, and some don't?

10    A    That's correct.

11    Q    It is how the case law in each state determines how

12    that common law trust is supposed to operate that sets the

13    groundwork for how the trust should be structured; is it not?

14    A    It's -- I'm not sure what you're saying.  A common

15    law business trust is an entity with certain characteristics,

16    just like a corporation is, just like a partnership is; and

17    that's pretty much universal.  There, there -- they don't

18    differ from state to state.  That's why if you form a common

19    law business trust in the State of Washington, most other

20    states that allow it will allow it to come in as a foreign

21    entity and work within their state.

22    Q    Some states don't allow it?

23    A    They don't allow them as the term "common law

24    business trust."  They allow them to exist, but they file

25    either as a partnership or a corporation.

USA v. DENNY R. PATRIDGE, No. 04-20031

1    Q    So then different states differ on how they'll

2    treat common law trusts?

3    A    Right.

4    Q    With respect to the process, common law trusts,

5    which is what you said Government's Exhibit 132 is supposed to

6    look like, --

7    A    What it's claiming to be, yes.

8    Q    What it's claiming to be?

9    A    Uh-huh.

10    Q    -- that one actually is supposed to file what tax

11    returns?

12    A    Under the State of Illinois where these are allowed

13    here, it doesn't speak to how they're to file; but under 7701,

14    which talks about business, Massachusetts business trusts and

15    business trusts, it says that they take their

16    characteristics -- they file as to the characteristics.  If

17    they're more like a corporation, then they'd be required to

18    file a corporate return.  If they're more like a partnership,

19    they would file a partnership return.  If it's one person and

20    they didn't file as a corporation, it would be a sole

21    proprietorship because they become a disregarded entity and

22    file as a sole proprietorship.

23    Q    You said under 7701.  Where are you talking about

24    7701?

25    A    In the regulations, 301 -- 7 --301.7701 and I think

1    it's (b)(4), but -- it's under 7701.

2        Q    What does the statute say?  7701 is the statute,

3    not the regulations.  What's the statute say?

4        A    The statute talks about different entities.  It's

5    the regulations you have to go into that talks about the

6    taxability of things other than a statutory trust.

7        Q    And when we talk about the regulations, we're

8    talking about lots and lots of pages dealing with all kinds of

9    different issues?

10       A    That's why most people go to accountants and

11   attorneys.

12       Q    They hire somebody else to tell them how to do the

13   stuff?

14       A    A lot, yes.

15       Q    Do you know of any instances where common law

16   trusts file 1041s because the accountant files the wrong form?

17            MS. CARLISLE:  Objection, relevance.

18            THE COURT:  Sustained.

19            MR. BARRINGER:  Your Honor, I believe we have 1041s

20   in this case.

21            THE COURT:  Right.  But you're asking a

22   hypothetical question that I think is outside the issues here.

23            MR. BARRINGER:  Thank you.

24   BY MR. BARRINGER:

25       Q    Have you ever seen 1041s filed with respect to

1    common law trusts?

2              MS. CARLISLE:   Objection relevance.

3              THE COURT:   No.   That's what we've talked about

4    now.

5         A    By promoters and the promoters' accountants, but I

6    haven't seen them filed by people that aren't associated with

7    a promoter.

8         Q    And how many of these -- well, when you talk about

9    promoters, the promoters are generally big operations; is that

10   right?

11        A    Not necessarily.

12        Q    Okay.

13        A    They can be very large.   Yes.

14        Q    Aegis, we heard, was over 600 clients?

15        A    That's correct.

16        Q    Do you know how many clients are in Aegis?

17        A    No.

18        Q    It's -- but it's a large operation?

19        A    Yes.

20        Q    Do you know whether or not any accountants have

21   specifically purchased Aegis packages?

22        A    No, I don't.

23        Q    Do you know whether or not doctors or lawyers

24   purchased Aegis packages?

25        A    No, I don't.   I don't know who the clients are.

1    Q    You saw Mr. Patridge talked about the individuals

2    that were on that video; and he pointed -- he commented about

3    one who was an attorney and an ex-judge.  Do you remember that

4    testimony?

5    A    Yes.

6    Q    Do you know what, if anything, he studied or how he

7    looked at how this process worked?

8    A    I have no idea.

9    Q    Did you ever go and talk with Vallone, Hopper, or

10   Bartoli with respect to how, why they structured it the way

11   they structured it?

12   A    No.

13   Q    You commented about this phrase, "sham," "sham it,"

14   that sort of thing?

15   A    Uh-huh.

16   Q    Now, that's a process that the IRS has developed to

17   deal with these programs; is that right?

18   A    Well, the collapsing, that means that we do not

19   accept them as a viable entity for tax reasons, and so we

20   collapse the entity and tax the person who earns the income.

21   Q    But that's what you described.  Sham, however, is

22   not something that's set up in the Code; it's policy that's

23   been created by the IRS?

24   A    It's a process.

25   Q    And, once again, the concept of economic substance

1    is something that is the process, the policy, the development

2    of by the IRS in dealing with the, what you call the abusive

3    trust programs?

4        A    I don't know what you just said.  I'm sorry.

5        Q    Economic substance, the phrase "economic substance"

6    that we've heard so much in this case, --

7        A    The substance.

8        Q    -- the substance, you know, how the income is

9    treated, that isn't something that's in the Code; it's

10    something that is policy, procedure that the IRS has

11    developed?

12        A    No.  That's not true.  It's, it's based on court

13    cases and what is really going on within a system.  We don't

14    look at -- we don't look at just one transaction.  We're

15    looking at the broad scope and what it is achieving, and

16    that's where we say that it's the substance of the

17    transaction, not the form.

18        Anybody can set up a corporation and it can be a

19    total sham and not be used for taxation purposes, which are

20    illegal; but the corporation itself may be a legal product of

21    that state.  But for federal income tax purposes, this is a

22    sham.  It, it goes beyond what the intent of the statute is.

23        Q    You had commented about a couple of different

24    statutes.  You've referred to Section 61.  I think you

25    referred to Section 1.  Section 1, you talked about it being

1  worldwide income?

2      A     It's, it's the taxation statute.

3      Q     Section 1 doesn't use the phrase "worldwide

4  income."  It doesn't even talk in terms of that.  It talks

5  about the process of who, you know, how -- how you're supposed

6  to treat income; does it not?

7      A     It talks about the -- it specifically in the

8  regulations talks about the taxability of worldwide income on,

9  for U.S. citizens.

10     Q     So, once again, we're in the regulations, not the

11  Code.  The regulations have, are longer than the Code; is that

12  not true?

13     A     Yes.  It's an explanation of how the Code applies.

14     Q     And so, once again, it's something, as you said,

15  that that's why we go to accountants and attorneys to figure

16  this kind of stuff out because there's so much stuff you have

17  to try to read and figure out to understand the concept even

18  of the phrase "worldwide income"?

19     A     I think it kind of explains it in the instruction

20  booklets when you file your returns.

21     Q     The instruction booklets aren't the law?

22     A     No, they're not.  But they are a good explanation

23  of the law.

24     Q     The instruction booklets don't give all the answers

25  to questions?

USA v. DENNY R. PATRIDGE, No. 04-20031

```
1         A     Absolutely not.

2         Q     Did any of the agents that were dealing with Mr.

3    Patridge -- Mr. Miller, Mr. Helfer, Mr. Bergschneider, Mr.

4    Schermann -- ever contact you with respect to how to deal with

5    this program?

6         A     No.  They didn't even know who I was.

7         Q     You had also talked about Mr. Goldstein and that he

8    has -- he's a promoter of a variety of different programs, I

9    think you said?

10        A     Products, yes.

11        Q     Products.

12              Sells them for a price; is that right?

13        A     I assume so.

14        Q     He's advising people to do this; is he not?

15        A     Uh-huh [nodding head up and down].

16        Q     People pay him money for his advice?

17        A     Yes.

18        Q     And then they follow his program?

19        A     Yes.

20        Q     Now, you have said that you view what was going on

21   with the Goldstein program, the $200,000 in the private

22   annuity, you viewed that as a sham?

23        A     Yes, I did.

24        Q     But there wasn't any -- it wasn't a program where

25   the $200,000 was earning income that has been talked about in
```

1    this case.  It's just the $200,000 in the program that we've

2    talked about; is that not true?

3         A     I'm not sure what you're saying.  I'm sorry.

4         Q     Okay.  $200,000 went to a bank account to set up a

5    private annuity?

6         A     Okay.

7         Q     Do you know that to be true or not?

8         A     Only from testimony.

9         Q     So do you know whether that's true or not?

10             MS. CARLISLE:  Objection.  She already answered the

11   question.

12             THE COURT:  Sustained.

13   BY MR. BARRINGER:

14        Q     You have no independent -- you've done no

15   independent research aside from what you've listened to with

16   respect to Goldstein?

17        A     No, I haven't.

18        Q     Okay.  And from -- what you've heard in this

19   courtroom then is your sole knowledge of Goldstein with

20   respect to this, with Mr. Patridge?

21        A     With -- yes, with respect to Mr. Patridge.

22        Q     Okay.  Mr. Goldstein's been writing these, writing

23   these programs, writing the -- selling these products for a

24   long, long time, hasn't he?

25        A     I'm, I'm not aware of his complete history.

1      Q      More than ten years?

2      A      I'm not aware of his history.

3      Q      And you heard Mr. Patridge talking about the

4   private annuity?

5      A      Yes.

6      Q      It's designed to, in effect, increase his assets, a

7   nest egg, for lack of a better word?

8      A      That's true.

9      Q      Put $200,000 in in a private annuity -- do you know

10  what private annuity it went into?

11     A      Only from his description.

12     Q      Do you know what investments it then went into

13  after that?

14     A      Only from what he, what he told me.

15     Q      And then you saw where he described how he could

16  increase the value of the private annuity by the mortgage?

17     A      Yes.

18     Q      And that was a process he described as coming from

19  Mr. Goldstein.  Do you know whether Mr. Goldstein is, in fact,

20  provides that?

21     A      No, I don't.

22     Q      So you're relying upon -- you believe, then, that

23  what Mr. Patridge was saying is how this process works?

24     A      Yes.

25     Q      And the money went into that private annuity and

1    was allowed to grow; is that not true?

2        A    I don't know.

3        Q    Okay.  And you heard Mr. Patridge say that by

4    taking the mortgage out, he could actually make the annuity be

5    $300,000 versus the $200,000 because of the mortgage?

6        A    Yes.  But he --

7        Q    That --

8        A    Okay.

9        Q    -- was a yes.

10            And you saw that there was a note and mortgage in

11    place?

12        A    Yes.

13        Q    And that note and mortgage were filed at the

14    recorder's office?

15        A    I understand that.  Yes.

16        Q    He paid interest on that note and mortgage; is that

17    right?

18        A    I understand that.  Yes.

19        Q    And Minetta paid interest to Sultan Services on

20    that note and mortgage?

21        A    That's true.

22        Q    Now, you have said that that is all Mr. Patridge's

23    money?

24        A    That's true.

25        Q    But that isn't really the issue here with respect

1    to how the annuity was working.  The annuity was to make his

2    asset base grow; is that not true?

3         A    And it didn't work.

4         Q    $200,000 went in, $100,000 mortgage.  How do you

5    know that's not how the private annuity's structured?

6         A    He also ended up without a home with any equity in

7    it by $100,000.  All he did was move his equity offshore.  He

8    didn't gain anything.

9         Q    How do you know that's not how the private annuity

10   works?

11        A    It doesn't matter if that's how it works.  He

12   didn't gain anything.  He still had the same amount in assets.

13   All it did was move the mortgage offshore.  It was for nothing

14   else.

15        Q    Now, let me ask you this question.  As he begins to

16   pay off that mortgage and the money goes into the private

17   annuity, what happens then?  Does it grow, or does it get

18   smaller?  It grows, doesn't it?

19        A    It does, but the mortgage itself becomes less as it

20   is paid off.

21        Q    And his asset base then gets bigger twice over

22   because the mortgage got smaller, and the money went in the

23   annuity?

24        A    No.  Nothing changes.  He collects his own

25   interest.

1      Q      With respect to the Goldstein program, have you

2   investigated Mr. Goldstein with respect to how he is promoting

3   his programs?

4      A      Have I personally?

5      Q      Yes.

6      A      No.

7      Q      Have you talked with anybody who has?

8      A      No, I haven't.

9            MR. BARRINGER:  That's all I have, Your Honor.

10            THE COURT:  We'll have redirect?

11            MS. CARLISLE:  Yes, Your Honor.

12            THE COURT:  Okay.  This will be a good time for us

13   to take a break before we do the redirect.  It's 9:40.  We'll

14   take a 20-minute break.  We'll come back at 10:00 and resume

15   then.  Do not discuss the case with each other.

16                      (Jury absent, 9:40 a.m.)

17            THE COURT:  Okay.  I'll be back at 10:00.

18                      (Recess, 9:40 a.m. to 9:57 a.m.)

19            THE COURT:  We're back on the record.  It's almost

20   10:00.  Any reason that we can't tell the jury we're going to

21   bring them in?  Ms. Frooman?  Ms. Carlisle?

22            MS. FROOMAN:  No.

23            THE COURT:  Mr. Barringer?

24            MR. BARRINGER:  No, Your Honor.

25            THE COURT:  Okay.  Go see if the jury's ready and

1    bring them in if they are.

2              Do you still anticipate calling another witness?

3              MS. FROOMAN:  Yes, Your Honor, and she's in the

4    courtroom.  We don't expect anything directly.  We think we're

5    done.

6              THE COURT:  You're going to rest on the record?

7              MS. FROOMAN:  [Nodding head up and down.]

8              THE COURT:  Okay.  Very good.  And we'll be

9    probably sending the jury early to lunch so we can get started

10   then.

11             (Jury present, 10:00 a.m.)

12             THE COURT:  You may be seated.

13             Ms. Carlisle, you may redirect if you wish.

14             MS. CARLISLE:  Thank you, Your Honor.  The

15   government's decided not to redirect.

16             THE COURT:  Okay.  Ms. Ferrell, you're free to go.

17             (Witness Ferrell excused, 10:00 a.m.)

18   _____

### REPORTER'S CERTIFICATE

19

20        I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify
     that the foregoing is a correct transcript from the record of
     proceedings in the above-entitled matter.

21

22        Dated this 13th day of March, 2008.

23

24        s/Lisa Knight Cosimini
          Lisa Knight Cosimini, RMR-CRR
25        Illinois License # 084-002998